Exhibit A

1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ANTHONY KURI (A.K.A. RAMSEY QURASH),

PLAINTIFF


VS.


THE CITY OF CHICAGO, ET AL. GOTTSCHALL,

DEFENDANTS


DEPONENT:  ANTHONY KURI (A.K.A. RAMSEY QURASH)

DATE:      MAY 5, 2015

REPORTER:  JAMIE ROLL

Anthony Kuri    May 5, 2015

---

10

1  from things that have happened recently or were they
2  old doctor reports, or both?
3      A  Well, not recently.
4      Q  Okay.
5      A  I --
6          MR. FELDMAN:  I can tell you which ones if
7  you want.  It was just some of the documents that
8  were recently tendered by you guys?
9          MS. BENJAMIN:  Okay.  So the more -- the
10 Norwegian materials?
11         MR. FELDMAN:  Correct.
12         MS. BENJAMIN:  Okay.
13 BY MS. BENJAMIN:
14     Q  Did you look at any videos?
15     A  No videos.
16     Q  Okay.  Have you ever seen the videos from you
17 while you were at the police station in relation to the
18 Patel homicide?
19     A  No.
20     Q  Okay.  Do you know that you were videotaped
21 when you were at the police station?
22     A  Yes.
23     Q  Okay.  And have you ever looked at the video
24 from when you did the polygraph?
25     A  No.

---

11

1      Q  Okay.  Do you know that you were videotaped
2  when you did the polygraph?
3      A  No.  I didn't.
4      Q  Okay.  Have you ever looked at any other
5  videos of other people like Zay Russell or David Gomez?
6      A  Can you repeat yourself?
7      Q  Sure.  Have you seen videos of any interviews
8  or any interactions with David Gomez or Zay Russell?
9      A  As far as the interviews and stuff?
10     Q  Yes.
11     A  No.
12     Q  Okay.  And besides looking at some medical
13 reports and the police reports from the Patel homicide
14 and from an aggravated assault arrest that you had
15 after that, any other documents that you looked at to
16 prepare for today?
17     A  That's basically it.
18     Q  Okay.  All right.  You know what, I don't
19 think we actually spelled your full name officially.  So
20 why don't we go ahead and do that?  Can you state your
21 full name?
22     A  Ramsey Qurash.
23     Q  Can you spell it?
24     A  First name R-A-M-S-E-Y, last name Q-U-R-A-S-
25 H.

---

12

1      Q  Okay.  Do you have a middle name?
2      A  No, ma'am.
3      Q  Okay.  And that's the name on your birth
4  certificate, right?
5      A  Yes, ma'am.
6      Q  Okay.  And do you also go by the name Anthony
7  Kuri?
8      A  Yes, ma'am.
9      Q  When did you start using the name Anthony
10 Kuri?
11     A  When I first ever got arrested.
12     Q  Okay.  So do you remember when that was?
13     A  Like '05.
14     Q  And why did you use the name Anthony Kuri
15 when you got arrested in 2005?
16     A  Because my foster mom her name was Kuri and
17 my brother got adopted and he changed his name to
18 Jeremy Kuri, so I was like I'm just going to make my
19 name Anthony Kuri.
20     Q  Okay.  Did you ever -- did anyone ever call
21 you Anthony before that or have you always been called
22 Ramsey Qurash before?
23     A  Well, they didn't even call me Anthony.  They
24 would call me Ramsey.
25     Q  Okay.  All right.  So what do your friends

---

13

1  call you?
2      A  Rowdy.
3      Q  Rowdy.  Okay.  What does your brother call
4  you?
5      A  Rowdy.
6      Q  When you introduce yourself to somebody how
7  do you introduce yourself?
8      A  Hi my name is Ramsey, nice to meet you.
9      Q  Okay.  All right.  So have you ever --
10 besides giving the name Anthony Kuri to the police have
11 you ever gone by that name?  Like would anybody know
12 you as that who wasn't involved in the police arrest of
13 you or something like that?
14     A  No.
15     Q  Okay.  That was a poor question, but I'm just
16 trying to find out do you use the name Anthony Kuri in
17 any setting other than giving it the police?
18     A  No.
19     Q  Okay.  So as we sit here today, what would
20 you like me to call you?
21     A  Call me Ramsey.
22     Q  Okay.  And your brother's name -- his -- when
23 he was born what was his name?
24     A  Ram.
25     Q  Ram, Qurash also?

---

4  (Pages 10 to 13)

Anthony Kuri    May 5, 2015

14

1    A   Yeah.
2    Q   And he's -- what's your date of birth?
3    A   XX-XX-XXXX.
4    Q   And your brother is about a year and a half
5  older than you?
6    A   Yes.
7    Q   Okay.  And do you have any other siblings?
8  Brother, sisters?
9    A   I got two little brothers.
10   Q   Okay.  And are those your father's children?
11   A   Yeah.
12   Q   Okay.  And what's your father's name?
13   A   Ali.
14   Q   Same last name, Qurash?
15   A   Yeah.
16   Q   Okay.  And is it A-L-I?
17   A   Yeah.
18   Q   Okay.  And where does your father live?
19   A   Macomb, Illinois.
20   Q   Okay.  So besides the name Ramsey Qurash and
21 Anthony Kuri have you ever gone by any other names?
22   A   I think I used Jeremy Kuri before.
23   Q   And under what circumstances did you use the
24 name Jeremy Kuri?
25   A   I had a warrant.

15

1    Q   And you didn't want the police to find out
2  that you had a warrant.  Is that it?
3    A   Yeah.  Because I didn't want to go to jail.
4    Q   Okay.  And what name are you currently in
5  custody under here at Lawrence Correctional Center?
6    A   Ramsey Qurash.
7    Q   Okay.  Have you ever had a middle initial
8    A.  or middle name that began with A?
9    A   I don't recall.
10   Q   Okay.  What's your birth mother's name?
11   A   Debra Maglacheatte (phonetic).
12   Q   Can you spell that last name?
13   A   I'm not really sure --
14   Q   Okay.
15   A   -- how to spell it.
16   Q   Can you say it again slowly?
17   A   I'm not really sure how to spell that but
18 M-A-G --
19   Q   Okay.  Just say the name slowly just so we
20 can do our best to spell it.  Mag -- what?
21   A   M-A-G --
22   Q   Uh-huh.
23   A   -- L-A-C-H-E-A-T-T-E.
24   Q   Okay.  Did she also go by the name Barghout
25 B-A-R-G-H-O-U-T?

16

1    A   Not that I recall.
2    Q   How far did you go in school?
3    A   The ninth grade.
4    Q   Where did you attend ninth grade at?
5    A   Ulic.
6    Q   Can you -- Ulic?
7    A   Yeah.  Grand and Albany.
8    Q   On the streets Crane and Albany?  Is that
9  what you said?
10   A   Grand and Albany.
11   Q   Grand and Albany?
12   A   Uh-huh.
13   Q   And is -- was that a therapeutic school?
14   A   Alternative.
15   Q   Okay.  And were you living at one of the
16 Maryville facilities at the time you went to Ulic
17 school?
18   A   Yes.  Wait, no.  I was at like the Paulina
19 House.
20   Q   Say it one more time?
21   A   The Paulina House.
22   Q   Plaina House?
23   A   Paulina.
24      MR. GRILL:  Paulina.
25   Q   Paulina, the street like Paulina?

17

1    A   Yeah.
2    Q   Okay.
3    A   I guess that was.  I'm guessing.
4    Q   I'm just asking you, I don't know for
5  certain.  But it was -- it was a place where you were
6  living at the time and that's sort of a group home,
7  right?
8    A   Yeah.
9    Q   And did you finish the ninth grade?  No?
10   A   No.
11   Q   Okay.  Why didn't you finish?
12   A   I wasn't -- I wasn't focused.
13   Q   Okay.  Were you expelled or did you drop out?
14   A   Dropout.
15   Q   Have you ever gone back and gotten your high
16 school equivalency?
17   A   No.
18   Q   Have you ever tried?
19   A   Yes.
20   Q   When did you try?
21   A   When I was in Macomb.
22   Q   Was that when you were living with your
23 father?
24   A   Well, not with him but by him.
25   Q   We'll get to that in a little bit.  And what

5 (Pages 14 to 17)

Anthony Kuri    May 5, 2015

50

1    Q    Okay.  But your brother wasn't at school with
2  you?
3    A    No.
4    Q    Right?  That was something else on your own?
5    A    Yeah.
6    Q    Okay.  And how did that -- like what were you
7  -- let me withdraw that question.  When you decided to
8  become a Spanish Cobra what did that involve?
9    A    What you had to do like to get in to the
10  gang?
11    Q    Yes.  Was there any kind of an initiation?
12    A    Get a viola -- violation.
13    Q    What was that?  What's a violation?
14    A    From the wall, you got to get beat up.
15    Q    So Spanish Cobras would beat you up that
16  you could be part of their gang?
17    A    Yeah.
18    Q    Okay.  And how were you beaten badly?  Did
19  you have broken bones or describe how bad --
20    A    Just bruises.
21    Q    Okay.  How many people beat you up?
22    A    One.
23    Q    How long?
24    A    Two minutes.
25    Q    Pardon?

51

1    A    Two minutes.
2    MR. GRILL:  I didn't hear that.
3    MR. FELDMAN:  Two minutes.
4    MR. GRILL:  Two minutes.
5  BY MS. BENJAMIN:
6    Q    Was it just fists or were there things used
7  on you?
8    A    Just fists.
9    Q    Okay.  And then after that you were a Spanish
10  Cobra?
11    A    Yes.
12    Q    And what did it mean to you to be a member of
13  the Spanish Cobras?
14    A    You part of a gang, a street gang.
15    Q    Okay.  And this is when you were about 15-
16  years-old?
17    A    Yes.
18    Q    Okay.  Were there -- what other gangs were at
19  the Paulina House with you or what other gang members
20  were residing in the Paulina House when you were there
21  if you know?
22    A    Stones, G's.
23    Q    So there were multiple different gang members
24  residing in that Maryville facility while you were
25  there, right?

52

1    A    Yes.
2    Q    Were there any other Spanish Cobras?
3    A    No.
4    Q    You were the only one?
5    A    Yes.
6    Q    Okay.  So the only other Spanish Cobras were
7  at this therapeutic school that you were attending?
8    A    Yes.
9    Q    Okay.  But they didn't live with you at
10  Paulina House?
11    A    No.
12    Q    All right.  I think we had left off with - -
13  well, let me ask you more questions about that.  Do you
14  have any gang tattoos?
15    A    Yes.
16    Q    How many and what do you have?  Can you
17  describe them or show them to me?
18    A    I have one right here.
19    Q    Okay.  Can you describe it to me.
20    A    Yeah.  It's ISCN, it means Insane Spanish
21  Cobra Nation.
22    Q    Hold on.  ISCN is what?
23    A    Insane Spanish Cobra Nation.
24    Q    Insane Spanish Cobra Nation.  Okay.  And is
25  that like the official name of the Spanish Cobras?

53

1    A    Yes.
2    Q    Okay.  And that -- what's beneath it?
3    A    The diamond and --
4    Q    And what does the diamond mean?
5    A    That's the gang symbol.
6    Q    Okay.  And what is the little dot next to it?
7  The dots around it, does that have any significance?
8    A    No.
9    Q    Or is it just the whole symbol?
10    A    It's just the whole symbol.
11    Q    Okay.  And then your nickname Rowdy?
12    A    Yeah.
13    Q    Okay.  And what's the symbol to the bottom?
14    A    That's the C, Rowdy C.
15    Q    What does Rowdy C stand for -- or what does
16  the C stand for?
17    A    Cobra.
18    Q    When did you get that tattoo?  Was it all at
19  one time or...?
20    A    Um --
21    Q    Well, let's talk about that one first.  The
22  one you just showed me, when did you get that one?
23    A    When I was like 16.
24    Q    Okay.  And did you get it all at once?
25    A    All this once?  Yeah.

14  (Pages 50 to 53)

Anthony Kuri     May 5, 2015

114

1    Q   Did they have weapons out?
2    A   Yes.
3    Q   And then what happened after you were taken
4  over to the car?
5    A   That had just put me in the car and said
6  homicide wanted to talk to you, and that was it.
7    Q   Where were you taken?
8    A   Area five.
9    Q   Did those officers tell you anything else
10  about why homicide wanted to talk to you?
11   A   No.
12   Q   Did you ask any questions about why they were
13  arresting you?
14   A   They didn't want to tell me.
15   Q   Did you have handcuffs on you?
16   A   Yes.
17   Q   So it was your belief that you were under
18  arrest, right?
19   A   Yeah.
20   Q   How many times did you ask them what it was
21  all about, or did you just sit quietly in the back?
22   A   I asked them what it was about a lot because
23  I never been interrogated in a murder.
24   Q   So you knew it was about a murder though,
25  right?

115

1    A   Well, they said homicide so common sense
2  would say it was a murder.
3    Q   Okay.  So that to you at least gave you the
4  idea that there was a murder and they wanted to talk to
5  you about it, right?
6    A   Yes.
7    Q   And you had absolutely no idea what that
8  could be about?
9    A   No.
10   Q   Anything else happen on the drive over to
11  area five?
12   A   No.
13   Q   Okay.  What happened when you arrived at area
14  five?
15   A   They gave me over to the detectives,
16  homicide.
17   Q   Okay.  Did you ever see the two individuals
18  that picked you up again?
19   A   No.
20   Q   Okay.  And then when you went to the
21  detectives at area five do you remember who you met
22  with?  What their names were?
23   A   Flano (phonetic) something, I'm not sure what
24  their names.
25   Q   Do you remember Detective McDermott?

116

1    A   I don't know who these guys are.
2    Q   Okay.
3    A   I've never seen them before.
4    Q   Can you describe them?
5    A   One is tall, looked like Barney.  He had a
6  big forehead, heavyset guy.
7    Q   Like -- I assume you're not meaning Barney
8  the purple --
9        MR. FELDMAN:  Dinosaur?
10   Q   -- dinosaur, right?
11   A   No.  No.
12   Q   Okay.  Barney -- I don't know what Barney
13  you're talking about.
14       MR. FELDMAN:  Barney Fife from the Andy
15  Griffith show?
16   Q   Barney who?
17   A   No.  Like -- he just -- I don't know how to
18  explain it, but he just --
19   Q   Okay.  You said he was tall, anything else
20  you can --
21   A   Chubby, white.
22   Q   Okay.
23   A   He looked --
24   Q   How old would you say he was about?
25   A   Old.

117

1    Q   Old?
2    A   Like he been doing it for some time.
3    Q   Okay.  Gray hair or dark hair?
4    A   I don't remember if he was bald head or maybe
5  he had gray hair.
6    Q   Okay.  And was it just two detectives you met
7  with, or were there more?
8    A   Two.
9    Q   Okay.  And what was the other one?
10   A   Some young guy.  He was white.
11   Q   Can you describe him --
12   A   One was old, one was young.
13   Q   Okay.  And the young one besides being white
14  any other hair color, size?
15   A   Um --
16   Q   Nothing sticks out in your memory?
17   A   One -- one is slimmer one is chubbier.
18   Q   Okay.  Okay.  And they would have introduced
19  themselves to you, you just don't remember their names,
20  right?
21   A   Yeah.
22   Q   Okay.  And what did you first talk about when
23  you met with them?  What did they tell you while you
24  were there?
25   A   Well, they asked me if I knew anything about

30  (Pages 114 to 117)

Anthony Kuri     May 5, 2015

118

1   the murder.  I told them, "No."  Well, they read me my
2   rights, and they were like, "Got anything to say that
3   you wish to have, so what do you want to do?"  I said,
4   "Well, I plead -- I told them I plead the Fifth."
5   That's when -- that's when they were like, "Well, only
6   guilty people plead the Fifth."  So I'm like, "Okay.
7   What you want to talk about then?  We can talk."  And
8   then that's when we started talking.
9        Q   Okay.  And what did you talk about?
10       A   We talked about Little C, they showed me a
11  picture and asked me did I know him.
12       Q   And what did you say?
13       A   I told them, "No.  I don't know him."
14       Q   Okay.  But that wasn't completely accurate,
15  right?  Because you kind of knew of him through your
16  brother?
17       A   Well, yeah.  But that's not -- I don't know
18  him like, you know, I haven't talked to him or anything
19  like that.
20       Q   Okay.  But it wasn't when you looked at the
21  picture it was somebody you had never seen before and
22  you had no idea --
23       A   Right.  Yeah.
24       Q   -- who it was?  Okay.  What else besides
25  Little C did you talk about with the detectives?

119

1        A   Well, my alibi.  "Where were you at the night
2   of the murder?"
3        Q   And what did you tell them?
4        A   What did I tell them?
5        Q   Yes.
6        A   At the time?  I told them I was at -- at the
7   house.
8        Q   What house?
9        A   Tony Christian.
10       Q   Okay.  And who are -- what are Tony and
11  Christian's last names?
12       A   I don't know.
13       Q   Okay.
14       A   I just know Chris and Tony.
15       Q   Okay.  And whose apartment is it?
16       A   His.
17       Q   Okay.  Is it Tony Christian?  That's his full
18  name?
19       A   No.  That's just -- Tony Christian, I mean
20  --
21       Q   That's his girlfriend?  Christian?
22       A   No.
23       Q   Or no?
24       A   His girlfriend is Nikki.
25       Q   Oh, that's right.

120

1        A   But -- but sometimes they call Tony
2   Christian.  I don't know, he --
3            MR. FELDMAN:  Is Tony and Christian one
4   person?
5            THE WITNESS:  Yeah.
6            MR. FELDMAN:  Okay.
7   BY MS. BENJAMIN:
8        Q   During July and August of 2009 were you
9   staying at Tony's apartment?
10       A   When I had came back from overseas.  Yes.  I
11  was.
12       Q   Okay.  So from when you returned from
13  Palestine you stayed with Tony?
14       A   Yes.
15       Q   And what was Tony's address?
16       A   I'm not sure his address.  I know his mom
17  address, 1935 North Tripp.
18       Q   But that's not where you stayed, right?
19       A   Well, that's not where I stayed.  I stayed on
20  Kostner and Cortland, but sometimes when Tony was
21  spending the night at his mom's house I would go there
22  and spend the night with him.
23       Q   Okay.  So Kostner and what was the other
24  street?
25       A   Cortland.

121

1        Q   Cortland.  And was this somewhere you were
2   staying every night after you returned from Palestine
3   or was it occasional?
4        A   Occasional.
5        Q   And where else did you stay when you returned
6   from Palestine?
7        A   Different people, friends.
8        Q   Who else did you stay with?
9        A   I stayed -- like names?
10       Q   Uh-huh.  Yes.
11       A   George Loriano (phonetic), Jasmine, Jennifer
12  Loriano (phonetic), they're sisters -- they're --
13  that's his dad George Loriano.
14       Q   Where did they live?
15       A   With their mom.
16       Q   Where?
17       A   With Navara -- Navara Santiago (phonetic) --
18  Santiago.
19       Q   Okay.  Where did the Lavar -- the Lorianos
20  live?
21       A   On Bloomingdale and Wrightwood -- what was
22  it, wait.  Kilbourn is east and west, right?  Kilbourn
23  is north and south, right?  Wrightwood is east -- yeah.
24  Wrightwood and Bloomingdale --
25           MR. ADAMS:  Yeah.  Kilbourn is east and west.

31 (Pages 118 to 121)

Anthony Kuri    May 5, 2015

126

1  had given -- you talked to the detectives about an
2  alibi and where you were the night of the murder.
3      A   Yes.
4      Q   And you told them that you were where again?
5      A   At Tony's house.
6      Q   And how was it that you knew that you were at
7  Tony's house that night?  What made you remember that?
8      A   I don't know where I was at like that night
9  because, you know, I wasn't out there doing anything
10  wrong at the time so I don't need to have -- I don't
11  need to know time, date, or specific, you know, but I
12  was bouncing when I came back house to house because I
13  had different places that I could go to.
14     Q   Okay.  Did you only give the detectives
15  Tony's name?
16     A   Yes.
17     Q   So why didn't you give him the other
18  houses that you were staying at since you weren't
19  completely sure where you were that night?
20     A   Because at the time I was scared and I didn't
21  really know what really to say because I never been
22  questioned for no murder.  And I didn't know, I was
23  just scared.
24     Q   Okay.  What else besides your alibi did you
25  talk about with the detectives?

127

1      MR. FELDMAN:  Apart from what he's already
2  testified to?
3      MS. BENJAMIN:  Yes.
4  BY MS. BENJAMIN:
5      Q   What else did you talk about with the
6  detectives?
7      A   They said they had witnesses pointing me out,
8  putting me there to the scene.  They said an old man
9  and an old lady.  They were like, "Well, how come this
10  old man and old lady said they seen you outside the
11  window?  What would they say?"  "I don't even know
12  them, I wasn't there.  I have no idea about what you
13  talking about."  Then they said, "Do you know anything
14  about a bike?"  "I don't know nothing about a bike."
15  "What about a van?"  "I don't know nothing about a
16  van."  They were like, "Well, what do you know?"  "I
17  don't know anything about your murder scene."  I know I
18  was setup and I told them that.  And they were like,
19  "Well, who are you this big guy out here that think
20  we framed you?  Keep telling yourself you weren't there
21  and you'll be there."  And I said, "Okay.  I wasn't
22  there."  And that's when, "So if you're not lying you
23  wouldn't mind taking a polygraph test, right?"  I said,
24  "No."  And we went over there to the polygraph test
25  like that.

128

1      Q   Okay.  So how long would you say you were
2  talking to the detectives after you were brought in and
3  before you went to the polygraph?
4      A   Hours.
5      Q   And what else did they tell you about the old
6  man and the lady who saw you?
7      A   They said -- well, they said an old man and
8  old lady, and Tony, Zay, and that was it.  And they
9  were like, "And we got Little C.  He's testified
10  against you.  He's saying that you were there, that you
11  were over there on the bike on the back of the pegs,
12  and that he hopped off and started shooting, and you
13  guys -- and you left the bike there at the scene, took
14  off running."
15     Q   So all of that was talked about before you
16  went to the polygraph?
17     A   Yeah.
18     Q   Okay.  And so I just want to make sure I'm
19  understanding you correctly, you knew before you even
20  went to the polygraph that it was Tony and Zay Russell
21  that were identifying you as being involved in the
22  shooting?  Yes?
23     A   Yes.
24     Q   Okay.  Yeah.  I just want to make sure
25  because we have different notes now it looks like.

129

1  Okay.  Let me ask you this.  Did the detectives also
2  tell you that they had Little C, meaning Mr. Gomez,
3  testifying against you?
4      A   Yes.
5      Q   Yes?  That was your understanding?  That in
6  addition to Tony and Zay and this old man and lady
7  Little C was also saying you drove him over there and
8  you were on the bike?
9      A   Yes.
10     Q   Okay.
11     A   I'm like, "No.  That can't be because, you
12  know, that's false."
13     Q   Okay.  And that's why you agreed to do the
14  polygraph?
15     A   Yes.
16     Q   And then what happened when you went and did
17  the polygraph?
18     A   They asked me a couple questions, I answered
19  them, they came back out, I asked the detectives how I
20  did, they said, "Oh, you failed horribly."  No.  You
21  said, "You fucked up.  Now you're really going down for
22  murder."  And they took me back into the car and -- and
23  they were talking.  And we were just -- they were still
24  trying to get me to confess something I didn't do in
25  the car.  And they were like, "Well, you know, Mr.

Anthony Kuri    May 5, 2015

182

1    A    Yeah.
2    Q    Okay.  And what else did you and David Gomez
3  talk about with regard to they're saying you put David
4  Gomez there and David Gomez is saying he put you there.
5  I'm confused.
6    A    What the detectives said that he put me there
7  and they put -- you know what I'm saying?
8    Q    Okay.  Did David Gomez --
9    A    Because they're like -- they're like -- stack
10 like this big?  He said what were you saying in there?
11 So he thought, you know what I'm saying, I told on him,
12 but I wasn't even there.  I don't know anything about
13 it.
14   Q    Did David Gomez ever tell you he never even
15 talked to the police?
16   A    Yeah.  He said he didn't talk to the police.
17   Q    Did David Gomez ever tell you that he did the
18 shooting?
19   A    Yeah.
20   Q    When did he do that?
21   A    At the -- after we beat the murder.
22   Q    When was that?  That same day?
23   A    The same day when?
24   Q    The same day you were found not guilty?
25   A    Yeah.

183

1    Q    Were you still in custody at Cook County Jail
2  or had you been released yet?
3    A    Cook County.
4    Q    Okay.  And where was it that he told you
5  this?
6    A    In the bullpen.
7    Q    So when you were being taken back to the jail
8  to be released that's when he told you that he did the
9  shooting?  What specifically did he say?  Oh, you need
10 to answer out loud.  You were just shaking your head.
11 So, yes?
12   A    Yes.
13   Q    Okay.  And what specifically did he say to
14 you?
15   A    He said he was there and he shot.
16   Q    He was there and he saw it?
17   A    And he shot.
18   Q    Oh, he was there and he shot?  Do you know
19 why he told you that?  Did he tell you like what
20 prompted that conversation to happen?
21   A    I guess he was just bragging about it that he
22 beat it, they didn't get him.
23   Q    Did he ever tell you that -- you never knew
24 that until after you guys had beat the murder, right?
25   A    No.

184

1    Q    So all those times you were going down to
2  court with him you had no idea --
3    A    No.  I didn't.
4    Q    So was it your belief that both of you were
5  being framed?
6    A    No.  Just me.  They had the right shooter and
7  the wrong accomplice.
8    Q    And what do you mean by wrong accomplice?  So
9  there's some accomplice out there who has not been
10 brought to justice?
11   A    Yes.
12   Q    So did David Gomez tell you that somebody
13 rode him over on a bike to that address on Central
14 Park?
15   A    Yes.
16   Q    Okay.  Did he tell you who that was?
17   A    He told me -- I think his name is Korean - -
18 Korean -- Korean.
19   Q    Korean?
20   A    Yeah.  Korean.
21   Q    Like could you spell what you're trying to
22 pronounce?
23   A    I don't know how to spell it.
24   Q    Is this somebody that you knew?
25   A    What do you mean somebody that I knew?

185

1    Q    When he said that he was taken over just
2  before the shooting on a bike by someone name Korean
3  did you know who he was talking about?
4    A    No.  I didn't know who -- I didn't know who
5  the guy was, but that's what he said, Korean.
6    Q    Was that a Spanish Cobra that you knew?
7    A    No.  I don't.
8    Q    Did you believe that person was a Spanish
9  Cobra?
10   A    Well, yeah.  If he did crimes with them.
11   Q    Did you ever tell anyone like the police or
12 your lawyers about -- well, no.  Let me withdraw that.
13 Did you ever tell anyone like the police that the
14 person who did the shooting was David Gomez and some
15 guy name Korean?
16   A    Well, I didn't know this until after the
17 trial was over, and we was already going home.
18   Q    Okay.  But even after the trial was over you
19 never went and told anybody that?
20   A    Because I didn't know that information.
21   Q    Okay.  But there's somebody who is dead, and
22 there is nobody paying the price for it, right?  Did you
23 think it was important that the police should know that
24 someone named Korean was involved in that shooting?
25   A    Yeah.  But, you know, I'm not -- I'm not

47  (Pages 182 to 185)

Anthony Kuri    May 5, 2015

186

1  involved with this in no way, you know what I'm saying?
2  So it's -- this ain't my business, this ain't my case,
3  this ain't -- I'm not even supposed to be having this
4  discussion, you know, so I feel like I shouldn't have
5  to say anything.
6      **Q   Okay.  Well, you just heard from somebody**
7  **that they murdered someone and got away with it, and**
8  **you didn't think it was important to go and tell the**
9  **police that?**
10     A   Well, what they going to do after the murder
11 is already over with, we beat the case.  So you can't -
12 - it's double jeopardy.  You can't be like, "Okay.
13 Well, we got the real guy now.  Take him back."
14     **Q   Okay.**
15     A   The case is over with.
16     **Q   Okay.  You didn't think they could use that**
17 **to somehow charge that person Korean with the crime?**
18     A   No.  Because they already got their two
19 suspects that they said these were the suspects.
20     **Q   What else did David Gomez tell you about the**
21 **shooting?**
22     A   That I wasn't there and that some -- that he
23 don't even know how I got -- he don't even know how I
24 had got on the case.
25     **Q   And why did he tell you you weren't there?**

187

1  **What prompted him to say that, if you know?**
2      A   He must have been there because that's what
3  common sense would say.
4      **Q   And what else -- did he tell you why he did**
5  **the shooting?**
6      A   No.
7      **Q   Did he tell you it was a retaliation for Baby**
8  **C?**
9      A   No.
10     **Q   Did you believe it was a retaliation for Baby**
11 **C?**
12     A   I don't know what it was.
13     **Q   Well, you were now at war with the CVLs,**
14 **right?  The Spanish Cobras and the CVLs were at war?**
15 **And this was a shooting by a Spanish Cobra of at least**
16 **one CVL, right?  Yes?**
17     A   Yes.
18     **Q   And you didn't -- it didn't occur to you that**
19 **that might be part of that gang war that was going on?**
20     A   Well, you can stipulate.  I don't know, but -
21 -
22     **Q   Oh --**
23     A   -- nobody knows the real facts.
24     **Q   Did David Gomez tell you anything else?**
25     A   No.

188

1      **Q   Did you ever have any other conversations**
2  **with him about the shooting after that?**
3      A   No.
4      **Q   Have you seen him since then?**
5      A   No.
6      **Q   Okay.**
7         MS. BENJAMIN:  I want to ask you a few things
8  but, let's take a break and we'll change topics.
9         VIDEOGRAPHER:  The time is 12:59, and we're
10 now off record.
11        (OFF THE RECORD)
12        VIDEOGRAPHER:  The time is 1:11, and we're
13 back on record.
14 BY MS. BENJAMIN:
15     **Q   Okay.  When you were at Cook County Jail**
16 **awaiting trial for the Patel homicide did you see Zay**
17 **Russell ever?**
18     A   No.
19     **Q   Was the first time you saw Zay Russell since**
20 **your arrest the day he testified in court?**
21     A   Yeah.
22     **Q   How about Tony Fernandez?  Did you ever see**
23 **him while you were at Cook County Jail?**
24     A   No.
25     **Q   Did you know he was in custody at Cook County**

189

1  **Jail for some period of time while you were there?**
2      A   Well, yeah.  I know they told me that they
3  didn't want to come to court so they -- they here now
4  in IDOC.
5      **Q   So they were arrested for not following the**
6  **subpoenas to come to trial?**
7      A   Yeah.
8      **Q   Yes?**
9      A   Yeah.
10     **Q   That was your understanding?**
11     A   Yeah.
12     **Q   Okay.  Do you know if any Spanish Cobra**
13 **talked to Zay Russell on your behalf?**
14     A   Not that I'm aware of.
15     **Q   Do you know if any Spanish Cobra talked to**
16 **Tony Fernandez on your behalf?**
17     A   Not that I'm aware of.
18     **Q   Have you ever known any Spanish Cobra to try**
19 **and convince a witness not to testify in a criminal**
20 **matter?**
21     A   Not that I'm aware of.
22     **Q   When was the last time you talked to Zay**
23 **Russell?**
24     A   In '07, '08.
25     **Q   So since you're being found guilty you still**

48  (Pages 186 to 189)

Anthony Kuri    May 5, 2015

250

1    Q   Has he ever mentioned the name David
2  Velasquez to you?
3    A   No.
4    Q   Okay.  You would consider, I believe, your
5  testimony much earlier that you considered Zay Russell
6  a friend prior to -- of sorts at least prior to going
7  to jail in 2009, right?
8    A   Yeah.
9    Q   Okay.  Would you consider Tony Fernandez to
10 be a friend as well prior to 2009, just say?
11   A   Yeah.
12   Q   Okay.  So David Gomez, it's your testimony
13 that after the trial and as you say it's double
14 jeopardy now, David Gomez tells you that he actually
15 was the shooter, right?
16   A   Yeah.
17   Q   Okay.  And David Gomez basically is telling
18 you that he set up a car with your friend Zay Russell
19 in it, right?  I mean, in effect that's the truth,
20 right?
21   A   Yes.
22   Q   Okay.  So how did that make you feel when
23 David Gomez is telling you here that, "I actually did
24 shoot the car up with your buddy Zay in it."
25   A   Offended.

251

1    Q   Hmm?
2    A   Offended.
3    Q   I can't understand you, I'm sorry.
4    A   Offended.
5    Q   Offended.  Okay.  Like how offended?  Can you
6  make me understand that a little bit better?  I mean,
7  that's just a word.  Tell me -- try to describe to me
8  like how did it make you feel?
9    A   Because if he would have got shot then I
10 would have been -- I would have been like that's --
11 that's bogus, you know.
12   Q   What's bogus?
13   A   That they shot him.
14   Q   Okay.  Were you angry that Zay Russell was in
15 the car that got shot up by David?  Were you angry at
16 David?
17   A   I mean, he didn't get shot so -- but he could
18 have got shot.
19   Q   Okay.  Right.  It's kind -- you would agree
20 it's kind of like an accident or luck I should say that
21 Zay didn't get shot?  Would you agree with that?
22   A   Yeah.
23   Q   Okay.  So -- and it's your testimony that
24 David told you that some guy nicknamed Korean or Kareem
25 (phonetic) or something like that was the person on the

252

1  bike driving that bike that David was on the back of,
2  right?
3    A   Yes.
4    Q   Okay.  And you said that this Korean person
5  was a Spanish Cobra, correct?
6    A   Yes.
7    Q   Do you know what faction that Korean person -
8  - with the nickname Korean -- Kareem was from?  Did
9  David tell you that?
10   A   (No verbal response.)
11   Q   You're pointing, but I don't know what that
12 means.
13   A   Over there.
14   Q   Over there, where?
15   A   Lawrence, Lawndale.
16   Q   Lawrence and Lawndale?  Okay.  And you knew
17 other Spanish Cobras from that faction, correct?
18 Lawrence and Lawndale, you testified to some people
19 today that you knew from that area, correct?
20   A   Yeah.
21   Q   And that was an area that prior to 2009 that
22 you visited?
23   A   Yeah.
24   Q   And your brother is from that faction,
25 correct?

253

1    A   Yeah.
2    Q   Okay.  How hard do you think it would have
3  been for you, in your own words, to figure out who
4  Korean was in 2009?
5    MR. FELDMAN:  Object to the form.
6    Q   Strike that -- it wasn't in 2009?  It was --
7  I forget the year right now, but after the criminal
8  trial how hard do you think it would have been for you
9  to figure out who Korean was given all your contacts in
10 the Lawrence and Lawndale faction, not the least of
11 which being your brother?
12   A   Probably not.
13   Q   Not that hard?
14   A   No.
15   Q   You never looked into it, did you?  Okay.
16 Right?
17   A   Right.
18   Q   Okay.  After you were jumped into the gang in
19 2003, what did they ask of you after you became a
20 member?  What was expected of you?
21   A   They beat me --
22   Q   What's that?  No.  I'm not talking about when
23 they beat you up.  I'm talking about after that.  What
24 did they expect of you?
25   A   Just to hang out.

64 (Pages 250 to 253)

Anthony Kuri    May 5, 2015

266

1  possibly death if that person testified against a
2  Spanish Cobra in court?
3      MR. FELDMAN:  Object to form.  Foundation and
4   incomplete hypothetical.
5      A  I don't know.
6      Q   Okay.  So would the Spanish Cobras only beat
7  and/or kill other Spanish Cobras that would testify
8  against Spanish Cobras?  That same I should say penalty
9  would not extend to members of rival gangs?
10     A  Yeah.
11     Q   It would extend to members of rival gangs?
12  Yes?
13     A  For like the -- you a Cobra and squeak on
14  another Cobra?
15     Q   Yeah.  Let's say you're a Spanish Cobra --
16     A  Uh-huh.
17     Q   -- and I am a member of like the Maniac Latin
18  Disciples.  Okay?  And I see you do something, and I'm
19  going to testify against you in court.  And you know
20  who I am, or your fellow Spanish Cobras know who I am.
21  Okay?  Because, for example, they see me testify in
22  court.  Would I be at risk of retaliation, like a
23  beating and/or death from fellow Spanish Cobras for
24  doing that?  That being testifying against you in
25  court?

267

1      A  Well, common sense -- yeah.  I mean, because
2  you told on him.
3      Q   Okay.
4      A  So now you going to --
5      MR. ADAMS:  Yes or no.
6      A  Yes.
7      Q   Okay.  Did the Spanish Cobras have gang
8  meetings?  Did they gather?  Let's start with the Tripp
9  and Wabansia faction, did you guys have like a meeting
10  place back before you got arrested for this murder?
11     A  I don't do no meetings.
12     Q   Okay.  Well, did you know if there was a
13  meeting place?
14     A  No.
15     Q   Okay.  Did the gang itself have like a
16  meeting place that was maybe where the gang at large
17  would gather, like the multiple factions would come
18  together for certain things?
19     A  I don't know.
20     Q   You don't know?  Okay.
21     MR. GRILL:  Okay.  I actually have no other
22  questions.
23     MS. BENJAMIN:  I just have one follow up to
24  yours.
25  REDIRECT EXAMINATION

268

1  BY MS. BENJAMIN:
2      Q   How long did you stay with David Gomez's
3  brother after you were released from jail?
4      A  Until I found somewhere else to stay.
5      Q   Are we talking days, weeks, months?
6      A  Weeks.
7      Q   And how is it that you came to stay at his
8  house?  Were you invited, did you go by yourself,
9  something else?
10     A  No.  I got picked up.
11     Q   By who?
12     A  By his brother.
13     Q   Did he pick up both of you?
14     A  Yeah.
15     Q   Thank you.  Do you know how he knew to come
16  pick you up?
17     A  Well, he was there at the trial.
18     Q   He watched the entire trial?
19     A  Yeah.
20     Q   And Ulysses is a Spanish Cobra, correct?
21     A  Yeah.
22     Q   Do you know if he holds any rank in the
23  Spanish Cobras?
24     A  No.
25     Q   How many days did the trial take?  A couple,

269

1  right?  Yes?
2      A  Yes.
3      Q   Okay.  And was Ulysses there for every day of
4  trial?
5      A  I seen him.
6      Q   And were there any other Spanish Cobras
7  watching the trial?
8      A  I seen a bunch of people out there.
9      Q   Did you recognize them to be other Spanish
10  Cobras?
11     A  I don't know what they were, but I seen
12  Ulysses out there.
13     Q   Okay.  And Zay Russell needed to be arrested
14  in order to come in to testify at your trial, didn't
15  he?
16     MR. FELDMAN:  Objection --
17     Q   If you know.
18     MR. FELDMAN:  -- calls for speculation.
19  Foundation.
20     Q   You can answer.  Zay Russell needed to be
21  arrested in order to testify at your trial?
22     A  Yes.
23     Q   Okay.  There were some hearings about that
24  because he wasn't responding to the subpoenas, right?
25     A  Yeah.

68 (Pages 266 to 269)

Anthony Kuri     May 5, 2015

270

1      Q   Do you think that Zay Russell feared
2   testifying in front of Spanish Cobras against you?
3          MR. FELDMAN: Objection. Calls for
4      speculation.
5      A   I don't know. You would have to ask him
6   that.
7      Q   If you were in his shoes would you have
8   feared it?
9      A   I can't put myself in his shoes because I
10  ain't been to that -- I never been to that so I can't
11  speak upon that.
12     Q   Okay. But put yourself into the mindset of
13  you let's say two Conservative Vice Lords were on trial
14  and you as a Spanish Cobra was going to testify about
15  being shot at by them. Would you be fearful of that?
16     A   Well, I know I would have to watch my back
17  because, you know, I just told on his guy so now you
18  got to watch your back.
19     Q   And you would be particularly fearful if
20  there were other Conservative Vice Lords there in the
21  audience watching you testify, right?
22     A   It's different strokes for different folks.
23  Some people don't care, some people care.
24     Q   So besides Ulysses you don't know any of the
25  other people who were there watching the trial?

271

1      A   No.
2      Q   Did you have any family members?
3      A   My dad.
4      Q   Your dad came and watched the whole trial?
5      A   No. He just came for like ten minutes.
6      Q   Anyone else that you know watching the trial?
7      A   No.
8      Q   Did any of the Lorianos come and watch the
9   trial?
10     A   No.
11     Q   Did David Gomez seem to know any of the other
12  people besides his brother in the audience at court?
13     A   I wasn't paying attention to what he was
14  looking at. Couldn't speak for that.
15     Q   When Ulysses picked you up after you were
16  released from jail with David Gomez where did you go?
17     A   Out to eat.
18     Q   What -- favorite restaurant?
19     A   Tacos.
20     Q   And was that when it was decided that you
21  were going to come back and stay at his house or was it
22  already predetermined?
23     A   Well, I just went to his house because we
24  were in the same car again.
25     Q   Okay. Was there some kind of celebration

272

1   back at his house that you guys were released?
2      A   I had a couple beers.
3      Q   Did other Spanish Cobras come over and
4   celebrate yours and David's release from jail?
5      A   No.
6      Q   Okay. And was there any kind of party ever
7   that you guys were --
8      A   No. No party.
9      Q   Okay. When you were staying at Ulysses house
10  -- was that a house or an apartment?
11     A   Apartment.
12     Q   Okay. And where was it located?
13     A   I don't know because I wasn't there that long
14  and so I didn't really pay attention to where he was
15  located or anything.
16     Q   Was it near Lawrence and Lawndale?
17     A   No.
18     Q   Was it near Tripp and Wabansia?
19     A   No. I don't know where it was but it wasn't
20  nowhere around there.
21         MS. BENJAMIN: Okay. That's all I have.
22         MR. FELDMAN: Let us take a couple minutes.
23         MS. BENJAMIN: Okay. We're really almost
24  done.
25         VIDEOGRAPHER: The time is 3:13 and we're now

273

1   off record.
2          (OFF THE RECORD)
3          VIDEOGRAPHER: The time is 3:18 and we're
4   back on record.
5          MR. FELDMAN: I have no more further
6   questions, and we reserve signature.
7          MS. BENJAMIN: All right.
8          MR. FELDMAN: And could we get a card from
9   you guys?
10         VIDEOGRAPHER: The time is 3:18 and this
11  concludes the deposition.
12         (DEPOSITION CONCLUDED AT 3:18 P.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25

69 (Pages 270 to 273)

Anthony Kuri     May 5, 2015

274

```
 1          CERTIFICATE OF REPORTER
 2        COMMONWEALTH OF INDIANA AT LARGE
 3
 4      I do hereby certify that the witness in the
 5  foregoing transcript was taken on the date, and at the
 6  time and place set out on the Title page here of by me
 7  after first being duly sworn to testify the truth, the
 8  whole truth, and nothing but the truth; and that the
 9  said matter was recorded stenographically and
10  mechanically by me and then reduced to type written
11  form under my direction, and constitutes a true record
12  of the transcript as taken, all to the best of my skill
13  and ability. I certify that I am not a relative or
14  employee of either counsel, and that I am in no way
15  interested financially, directly or indirectly, in this
16  action.
17
18  JAMIE ROLL, COURT REPORTER/ NOTARY
19  MY COMMISSION EXPIRES ON: 02/22/2023
20  SUBMITTED ON: 05/18/2015
21
22
23
24
25
```

Merrill Corporation - Chicago

(312) 386-2000                                    www.merrillcorp.com/law

# Exhibit B

                IN THE UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF ILLINOIS

                        EASTERN DIVISION


    ANTHONY KURI, (a.k.a. RAMSEY        )
    QURASH),                            )
                        Plaintiff,      )
                                        )
            vs.                         )  No. 1:13-1653
                                        )
    THE CITY OF CHICAGO,                )
    DETECTIVES SZWEDO, VALKNER,         )
    FOLINO, McDERMOTT, KOLMAN,          )
    CORDARO, FIGUEROA-MITCHELL,         )
    OFFICERS LOPEZ, SANCHEZ, And        )
    As-Yet UNKNOWN CHICAGO              )
    POLICE DEPARTMENT MEMBERS,          )
                                        )
                        Defendants.     )


           The deposition of

    ROBERT CORDARO, taken under oath at

    312 North May Street, Suite 100, Chicago,

    Illinois, 11:14 A.M., on Wednesday,

    December 10, 2014, pursuant to the Rules of the

    United States District Court, Northern District

    of Illinois, before Carol M. Siebert-LaMonica,

    CSR No. 084.001355 in and for the County of

    Cook and State of Illinois, pursuant to notice.

## Page 3

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 5

1    we provide security for them.
2        Q.   And that's for the Supreme Court?
3        A.   The Illinois Supreme Court, yes,
4    ma'am.
5        Q.   How long have you had that position?
6        A.   A year.
7        Q.   Prior to holding that position where
8    did you work?
9        A.   Chicago Police Department, City of
10   Chicago.
11       Q.   And was there a gap in time between
12   your employment with the CPD and the Illinois
13   Courts?
14       A.   Yes.
15       Q.   And how long of a gap was there?
16       A.   Approximately three -- approximately
17   three years and a month.
18       Q.   During those approximate three years
19   and a month did you make application to work
20   anywhere else, aside from the Illinois Courts?
21       A.   I don't recall, no.
22       Q.   Just enjoyed retirement.
23       A.   Yes, I was.  I will say that again.
24       Q.   All right. So how long did you work

## Page 4

1            ROBERT CORDARO,
2    having been first duly sworn, was examined and
3    testified as follows:
4            EXAMINATION
5    BY MS. GOODWIN:
6        Q.   Sir, could you please state and spell
7    your name for the record?
8        A.   Robert Cordaro, C O R D A R O.
9        Q.   And are you currently employed?
10       A.   Yes.
11       Q.   And where are you employed?
12       A.   The administrative office of Illinois
13   Courts.  I'm a judicial marshal.
14       Q.   And do you work in a specific
15   courtroom or where is that?
16       A.   No, I'm assigned to protective
17   services, so we move around.
18       Q.   What are your responsibilities there?
19       A.   Protective services for an Illinois
20   State Supreme Court Justice.
21       Q.   Are you assigned then to their
22   courtroom in terms of protective services?
23       A.   To them individually, wherever they
24   need to go, whatever event they need to go at

## Page 6

1    with the Chicago Police Department before
2    retiring?
3        A.   30 years and 11 months.
4        Q.   Now at some point you were a detective
5    within Area 5?
6        A.   That's correct.
7        Q.   How long were you a detective within
8    Area 5?
9        A.   Approximately ten years.
10       Q.   And is that the position that you had
11   just prior to retiring?
12       A.   Yes, ma'am.
13       Q.   I'm sorry.  What year did you retire
14   from the Chicago Police Department?
15       A.   November, 2010.
16       Q.   What other positions did you have
17   within the Chicago Police Department?
18       A.   I was assigned to the Cook County
19   State's Attorney Narcotic Task Force. I was
20   assigned to the Chicago Police Department
21   Narcotic Unit.
22            I worked one year in Internal
23   Affairs investigations in Confidential
24   Investigations.

Page 123

1      Q.   Now, after David Gomez was charged,
2  did you continue to work on the investigation?
3      A.   After David Gomez -- can you repeat
4  the question, please?
5      Q.   After David Gomez was charged, so
6  after you contacted Felony Review and he was
7  actually charged with a crime, did you continue
8  to work on the Patel homicide investigation?
9      A.   I don't recall at this time. I'm not
10  sure if I did.
11      Q.   Did you testify at trial, the criminal
12  trial?
13      A.   I did not.
14      Q.   Were you subpoenaed to testify?
15      A.   I was not.
16      Q.   And did you testify at the Grand Jury?
17      A.   I did not, that I recall.
18      Q.   Were you subpoenaed to testify at the
19  Grand Jury?
20      A.   I don't recall at this time.
21      Q.   Okay. Let's mark this as the next
22  exhibit.
23          (Deposition Exhibit No. 5 was
24           marked for identification.)

Page 124

1      Q.   Okay. Take your time and look over
2  this document and let me know when you are
3  ready to talk about it.
4      A.   Okay.
5      Q.   All right. Can you -- for the record
6  Exhibit 5 is Bates 394 -- RFC 394 and 395.
7  These are two different reports, correct, two
8  different GPRs?
9      A.   That's correct.
10      Q.   Can you tell me what the first page of
11  this -- or what Bates 394 reflects?
12      A.   It is a GPR reflecting Zay Russell's
13  video witness statement, the date and time and
14  the room number that it was in, as well as the
15  V number, which would indicate the electronic
16  recording interrogation identification.
17      Q.   Okay. Now, this was taken or I'm
18  sorry, this GPR reflects the video witness
19  statement when the State's Attorney was in the
20  room?
21      A.   Yes.
22      Q.   So after the State's Attorney had
23  already been contacted and came to the station?
24      A.   That's correct, ma'am.

Page 125

1      Q.   And is it accurate that you had spoken
2  -- Well, strike that.
3          Is it accurate that you had
4  already interviewed Zay Russell prior to this
5  video witness statement?
6      A.   Yes.
7      Q.   And does anything on this GPR reflect
8  any portion of your conversation with Zay
9  Russell or your interview with Zay Russell
10  prior to his video statement?
11      A.   No, not in this, no.
12      Q.   Did Zay Russell make any changes in
13  his statement from the time that you spoke with
14  him during the initial interview to the time
15  that he made a video witness statement with the
16  ASA present?
17      A.   Not that I recall.
18      Q.   What do you do with the GPR once you
19  write it?
20      A.   It goes in a file. No. I'm sorry. I
21  take that back. It goes into a bin in the
22  sergeant's office and it is approved and
23  reviewed by a sergeant.
24      Q.   And does it eventually make its way to

Page 126

1  the file?
2      A.   That's correct, ma'am.
3      Q.   Who puts it in the file?
4      A.   A sergeant.
5      Q.   And was it your practice to put every
6  GPR that you wrote into the bin in the
7  sergeant's office?
8      A.   Tried to, yes.
9      Q.   What do you mean you tried to?
10      A.   Yes, you do.
11      Q.   That was what you were suppose to do,
12  right?
13      A.   And that's what I do.
14      Q.   Okay. So if there is no GPR of the
15  Zay Russell interview that you took within the
16  case file, then fair to say you never took one?
17      A.   No, because there is sometimes where
18  things get lost and it could get misplaced.
19      Q.   Are you aware of any other case files
20  where things have been lost or misplaced?
21      A.   I don't recall at this time.
22      Q.   Did it happen often?
23          MS. BENJAMIN: Object to form,
24  foundation.

Page 147

1  do you mean by responsibilities change?
2      Q.  Were you promoted in any way within
3  that rank or did you --
4      A.  I retired as a detective.
5      Q.  So you started as a detective and you
6  investigated homicide cases until you retired?
7      A.  That's correct.
8      Q.  Within Area 5?
9      A.  Yes.
10     MS. GOODWIN:  Okay.  I don't have any
11  other questions.
12     MS. BENJAMIN: Okay.  Reserve.
13             -0-o-0-
14
15
16
17
18
19
20
21
22
23
24

Page 149

1      The undersigned is not interested in
2  the within case, nor of kin or counsel to any
3  of the parties.
4      Witness my official signature in and
5  for Cook County Illinois on January 29
6
7
8      Carol M. Siebert-LaMonica
9      C.S.R. No. 084.001355
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 148

1      STATE OF ILLINOIS  )
2                         )  SS:
3      COUNTY OF COOK  )
4      The within and foregoing deposition
5  of the aforementioned witness was taken before
6  Carol M. Siebert-LaMonica, C.S.R, at the place,
7  date and time aforementioned.
8      There were present during the taking
9  of the deposition the previously named counsel.
10     The said witness was first duly sworn
11  and was then examined upon oral interrogatories;
12  the questions and answers were reported in
13  shorthand by the undersigned and transcribed
14  via computer-aided transcription.
15     The within and foregoing is a true,
16  accurate and complete record of all of the
17  questions asked of and answers made by the
18  forementioned witness at the time and place
19  hereinabove referred to.
20     The signature of the witness was
21  not waived and the deposition was submitted
22  pursuant to Rules 207 and 211 (d) of the Rules
23  of the Supreme Court of Illinois to the
24  deponent per copy of the attached letter.

Page 150

CORRECTION PAGE
    I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON: _____
____ ____ _____
        REASON:

(Signed)_____

# Exhibit C

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION


ANTHONY KURI, (a.k.a. RAMSEY          )
QURASH),                              )
                      Plaintiff,      )
                                      )
          vs.                         )   No. 1:13-1653
                                      )
THE CITY OF CHICAGO,                  )
DETECTIVES SZWEDO, VALKNER,           )
FOLINO, McDERMOTT, KOLMAN,            )
CORDARO, FIGUEROA-MITCHELL,           )
OFFICERS LOPEZ, SANCHEZ, And          )
As-Yet UNKNOWN CHICAGO                )
POLICE DEPARTMENT MEMBERS,            )
                                      )
                      Defendants.     )


          The deposition of

DETECTIVE TINA FIGUEROA-MITCHELL, taken under

oath at 312 North May Street, Chicago,

Illinois, 10:04 a.m., on October 21, 2014,

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Janice H. Heinemann, CSR, CRR, RDR, CSR

No. 084-001391 in and for the County of Du Page

and State of Illinois, pursuant to notice.

## Page 3

1    DETECTIVE TINA FIGUEROA-MITCHELL,
2  having been first duly sworn, was examined and
3  testified as follows:
4          EXAMINATION
5  BY MR. FELDMAN:
6    Q.  Good morning.
7    A.  Good morning.
8    Q.  My name is Joel Feldman.  I represent
9  Anthony Kuri in a lawsuit that he has brought
10 against various Chicago police officers.
11       Can you please state and spell your
12 name for the record.
13   A.  Tina Figueroa-Mitchell.  Tina,
14 T-i-n-a.  F -- as in Frank -- i-g-u-e-r-o-a --
15 hyphenated with Mitchell -- M-i-t-c-h-e-l-l.
16   Q.  Should I call you Tina, should I call
17 you Mrs. Mitchell, in full?
18   A.  You can call me Tina.
19   Q.  Tina, have you ever been deposed
20 before?
21   A.  Yes.
22   Q.  Approximately how many times?
23   A.  I want to say one, probably one or
24 two.

## Page 4

1    Q.  In a setting similar to this?
2    A.  Yes.
3    Q.  And when did those take place, you
4  know, approximately?
5    A.  2007 for sure.  Might have been two of
6  them in 2007, two or one in 2007.
7    Q.  And was that in connection with a
8  civil lawsuit?
9    A.  Yes.
10   Q.  Was it the same lawsuit or two
11 different lawsuits?
12   A.  I believe it might have been two
13 separate lawsuits.
14   Q.  And were you a defendant in either of
15 those lawsuits?
16   A.  In one, yes.
17   Q.  And what was that case about?
18   A.  It was a child abuse case, and I was
19 the polygraph examiner.
20   Q.  Can you remember the name of that
21 case?
22   A.  Duran versus the City of Chicago.
23   Q.  Durant?
24   A.  Yes.  D-u-r-a-n.

## Page 5

1    Q.  Oh, Duran, okay.  Do you know what
2  happened in that case?
3          MS. BENJAMIN:  Object to form.
4  BY MR. FELDMAN:
5    Q.  You can still answer.
6    A.  It went to trial.  We actually went to
7  trial.
8    Q.  And what was the result?
9    A.  They ended up, I guess, telling me at
10 the end, and my partner, that we were going to
11 be not a part of the final, whatever, something
12 happened.  And then they came back with the
13 jury and the jury awarded 4.2 million but not
14 with the detectives involved.
15   Q.  Well, you have been deposed a couple
16 times; but I will briefly just tell you sort of
17 the ground rules here.  We have a court
18 reporter here who is taking everything down.
19 In order to make her job easier, it's best if
20 you would let me finish asking my question
21 before you answer the question and vice versa.
22 Is that okay?
23   A.  Yes.
24   Q.  And then it's also important, unlike

## Page 6

1  normal conversation where you can nod your head
2  or say uh-huh or uh-uh, just keep your answers
3  audible because that will make her job easier.
4  All right?
5    A.  Yes.
6    Q.  And I do my best to ask questions
7  which are understandable, but I fail sometimes.
8  I will take no offense if you don't understand
9  a question.  Just let me know, and I will try
10 to rephrase it.  And if you go ahead and answer
11 the question, I will assume that you understood
12 what I asked.  Is that fair?
13   A.  Yes.
14   Q.  If you need to take a break at any
15 time, you know, just let us know and we can do
16 that.  The only thing I ask is that you don't
17 ask to take a break when we are in the middle
18 of the question.  All right?
19   A.  Yes.
20   Q.  Just first thing, I just want to go
21 through some background stuff.  How long have
22 you been a police officer?
23   A.  24 years.
24   Q.  And is that all with the City of

Page 7

1    Chicago?
2        A.  Yes.
3        Q.  So that would be probably in 1990,
4    1991?
5        A.  1990, yes.
6        Q.  1990.  And prior to 1990 what did you
7    do?
8        A.  I was in security.
9        Q.  Security.  And for approximately how
10   long?
11       A.  Since college.  Probably 7 years.
12       Q.  And did you graduate from college?
13       A.  Yes.
14       Q.  What type of degree did you get?
15       A.  I have a master's in social work.
16       Q.  And when did you obtain your master's?
17       A.  2007.
18       Q.  And how about when did you graduate
19   from college?
20       A.  I'm not really sure.  From, I got my
21   criminal justice degree I want to say 2000.
22   I'm guessing.
23       Q.  And when did you graduate from high
24   school?

Page 8

1        A.  1980.
2        Q.  So sometime after 1980 you got
3    involved in security?
4        A.  Yes.
5        Q.  What type of security work did you do?
6        A.  Different types, mall security, things
7    like that.
8        Q.  And when you were hired as a Chicago
9    police officer, what -- if you want to just
10   briefly run through your various jobs over the
11   years at the Chicago Police Department.
12       A.  1990 started as a probationary police
13   officer.  1991, police officer, 13th District.
14   I would say 1991 to 1992, went to the 23rd
15   District as a police officer.  A little after
16   that became a tactical officer for about five
17   years.
18           After that, '97 maybe, started working
19   with students at the Westinghouse High School
20   as the officer in the school, did that for
21   about two years, made detective in 2000.
22       Q.  And how about since 2000?
23       A.  2000 was the detective.  That's what I
24   am, a detective.

Page 9

1        Q.  Today?
2        A.  Yes.
3        Q.  You said for a few years you were a
4    tactical officer.  What is a tactical officer?
5        A.  That is a plainclothes officer that
6    works on aggressive patrol with crimes in the
7    area, to everything.  You know, it's on scene,
8    things like that, on-view crimes.
9        Q.  And in the detective bureau for the
10   last 14 years, what have been your duties?
11       A.  I started out with domestic violence,
12   and I went to forensic and became a polygraph
13   examiner in 2003.
14       Q.  And that's your current position?
15       A.  Yes.
16       Q.  And during your years on the force,
17   have you investigated any homicides?
18       A.  Personally?
19       Q.  Yes.
20       A.  No.
21       Q.  Prior to your current position in
22   forensics, I think you said you were mostly
23   responsible for domestic violence cases?
24       A.  Yes.

Page 10

1        Q.  So that would be the types of cases
2    you would investigate?
3        A.  Yes.
4        Q.  And your, I guess, transfer into the
5    forensics unit in 2003, was that something that
6    you had requested?
7        A.  That was something that was offered
8    and I applied and was accepted.
9        Q.  And was that specifically to go into
10   the polygraph section, or are there other
11   sections in the forensics unit?
12       A.  Directly to polygraph.
13       Q.  And I guess back in 2003, what sort of
14   polygraph training did you receive?
15       A.  I went to Skyhawk Polygraph Institute.
16       Q.  I'm sorry.  What was that?
17       A.  Skyhawk Polygraph Institute.
18       Q.  Skyhawk.  And what type of program or
19   classes are those?
20       A.  Oh, a two-month course, Monday through
21   Friday.  And I received a certificate from that
22   program.
23       Q.  Is that a school or training center in
24   Chicago?

Page 47

1  think I know the answer to these questions; but
2  I still have to ask them.
3      A.  Okay.
4      Q.  Do you recall what you told the
5  detectives following Mr. Kuri's exam?
6      A.  "Deception Indicated," No. 5.
7      Q.  And you recall that from reading your
8  reports in this case?
9      A.  Correct.  Correct.
10     Q.  Do you have an independent
11 recollection of that conversation?
12     A.  Not at all.
13     Q.  Do you recall what they asked you, if
14 anything?
15     A.  Did he give it up probably.  That's
16 normal.
17     Q.  So you are guessing?
18     A.  That's all they want to know is did he
19 give me any information, you know, things like
20 that.
21     Q.  Now, did you testify in court about
22 the results of Mr. Kuri's polygraph?
23     A.  No.
24     Q.  I should know this, but I don't.  Are

Page 48

1  you permitted to testify in the criminal court
2  in Illinois regarding polygraph results?
3      A.  I doubt it.  I doubt that.  I think we
4  are there mostly just for the procedure and the
5  consent.
6      Q.  I mean have you testified in a
7  criminal case regarding a polygraph exam that
8  you have administered?
9      A.  I have testified many times but they
10 stay specific to the polygraph consent form or
11 the well-being of the subject like if he's
12 healthy, things like that.  I don't think they
13 go into anything about results.
14     Q.  Do you recall testifying in front of
15 the grand jury in this case?
16     A.  No, I do not.
17     Q.  Did you meet with any state's
18 attorneys about Mr. Kuri's polygraph exam?
19     A.  They might have called for the
20 paperwork.  They might have requested paperwork
21 on that case.  That's about, that's about it.
22 That's probably my extent to that case, that's
23 all I could -- If anything, because I know we
24 did receive a subpoena for the paperwork.  I'm

Page 49

1  not sure if I hand delivered it or if I mailed
2  it in.
3      Q.  Now, in connection with administering
4  a polygraph exam, do you ask the question
5  multiple times?
6      A.  Yes.
7      Q.  And is there a minimum, a maximum
8  number of times that you are supposed to ask
9  the same questions?
10     A.  The minimum questions asked during the
11 test is two, but I believe in this case we
12 asked three times.
13     Q.  And are they always administered in
14 the same order or different order?
15     A.  Different order.
16     Q.  So in this case, and that's based on
17 your review of the video, that you believe it
18 was three separate times?
19     A.  I saw my chart and paperwork, yes.
20     Q.  We are going to go through that, yes.
21 And then is that three times plus going over
22 the questions with them ahead of time?
23     A.  Yes.
24     Q.  So really they have heard the same

Page 50

1  question or, at least in Mr. Kuri's case, he
2  heard the same questions four separate times?
3      A.  Yes.
4      Q.  And I believe again you said the first
5  time is before any of the machinery is hooked
6  up to him?
7      A.  Yes.
8         MR. FELDMAN:  Let's see, we will mark
9  this as Exhibit 2.
10            (Deposition Exhibit No. 2 was
11            marked for identification.)
12 BY MR. FELDMAN:
13     Q.  Tina, you have just been handed what
14 has been marked as Exhibit 2.  Is this the form
15 that I believe you just mentioned that you
16 received the request for a polygraph?
17     A.  This is the form, yes.
18     Q.  Is this I mean a form that you receive
19 fairly regularly in your department?
20     A.  Yes.
21     Q.  So it's just a, the first page, just
22 for the record, looks like it's a fax cover
23 sheet from the State's Attorney's Office.  It's
24 addressed to "Polygraph Unit"?

Page 51

1    A. Yes.
2    Q. And I see at the top it says, "Tina."
3  Do you see that?
4    A. Yes.
5    Q. So would some, like is there places
6  where the faxes come in and someone -- How
7  would they know to get it to your attention?
8    A. The fax looks like it came in to our
9  office, and it looks like someone looked up the
10  case and said, This is Tina's case. And they
11  wrote my name at the top because that's not my
12  handwriting, but it is my case.
13    Q. And as we sit here today, do you
14  recall any conversations that you may have had
15  with the person who sent this? And it looks
16  like her name is L-i-s-e-t-t-a or -e-t-t-e,
17  excuse me. I can't make out what the last
18  name. Mojica maybe. Do you recall any
19  conversations with that person?
20    A. I don't really recall.
21    Q. And turning to the next page, it's
22  entitled, Chicago Police Department Forensic
23  Services Division. What is this form?
24    A. This is the form that I actually type

Page 52

1  out in the CHRIS system. And this is what goes
2  to the detectives in their computer. They get
3  this through the CHRIS system. This is the
4  actual form.
5    Q. Okay.
6    A. This is like the narrative of my, of
7  my part of everything.
8    Q. And this is, is this the supp report
9  you were referring to earlier or that was
10  separate?
11    A. This actually attaches to the supp.
12  See, there is a master supp. And this is my
13  part of the supp. So when I log in to that RD
14  number we were talking about earlier, this is,
15  I go to the polygraph part, and I type this.
16  This is what I actually type. This is my part.
17    And then it uplifts and uploads to the
18  whole file for the CHRIS. And so if someone
19  wanted to just see my section, they would get
20  that heading sheet that we saw earlier with
21  this, because this is my section.
22    Q. So your supp report, basically earlier
23  you said when you pull it up in your system, it
24  prepopulated the information that appeared at

Page 53

1  the top of Exhibit 1?
2    A. Yes.
3    Q. And then for purposes of your supp
4  report, would the next thing that people would
5  see be this, what we are looking at here,
6  Exhibit 2?
7    A. For me, yes, this is all I did, right.
8    Q. And going back to Exhibit 1 just for a
9  second, I just want to make sure I understand
10  it completely. Does your report, you know,
11  look like the narrative which appears in this
12  report? Or are you just saying that your supp
13  report just pulls in wholesale Exhibit 2 that
14  we are looking at?
15    A. Right.
16    MS. BENJAMIN: Objection, form. And
17  you are pointing to one page of Exhibit 2. So
18  if you just want to put a Bates stamp number.
19  BY MR. FELDMAN:
20    Q. RFC 001110. Looking at that page, the
21  "Chicago Police Department Forensics Services
22  Division page," it says that the -- It says,
23  "Requested By: Det. McDermott." Do you see
24  that?

Page 54

1    A. Yes.
2    Q. As we sit here today, do you recall
3  speaking to Detective McDermott about
4  Mr. Kuri's case?
5    A. I'd seen it on the video where he
6  reescorted Mr. Kuri into the room, and then the
7  detective goes back to my office. But as far
8  as what was said that day, no.
9    Q. Well, was it Detective McDermott that
10  you spoke to as far as getting background
11  information about the case?
12    A. I believe so, yes.
13    Q. And now, under the "Examination
14  Result:," it says, "Deception Indicated." And
15  then there is a bracket, and it says, "r5."
16    Well, first what is, when you say
17  "deception indicated," what does that mean?
18    A. "Deception indicated" means that he is
19  involved, he's not being truthful, and that the
20  relevant question No. 5 is the one that he had
21  a problem with.
22    Q. Oh, so that "r5" is a question
23  designation?
24    A. Yes.

Page 55

1      Q.  And was that the only place that
2  deception was indicated?
3      A.  Yes.
4      Q.  I mean if deception was indicated in
5  response to multiple questions, would you have
6  indicated that here?
7      A.  Yes.
8      Q.  Like r5, r7, r10?
9      A.  Yes.
10     Q.  Now, turning to the next page, this is
11 a Polygraph Case Review, Bates No. RFC 001111.
12 What is this form?
13     A.  A Polygraph Case Review form is a form
14 where we keep like information like tracking,
15 like the time that the detectives came in, the
16 date, that information is at the top, the end
17 date, the end time, and then the out time.
18        Then it has like the information
19 about the case, like what kind of case is it.
20 This one here says, "Offense."  So you have the
21 "homicide" next to it so it's a homicide case.
22 And then next to that you have the "RD" number,
23 that is the tracking number for the Chicago
24 Police Department to keep up with the case.

Page 56

1  It's like a letter and numbers, H as in Henry,
2  R as in Robert, 445323, so that's how we can
3  research this actual case.
4      Q.  And is this your handwriting on this
5  piece of paper?
6      A.  Yes.
7      Q.  Now, the end time of "2040," what's
8  that indicative of?
9      A.  That's the time that they arrived at
10 my office.
11     Q.  They being the one more or detectives
12 and Mr. Kuri?
13     A.  Yes.
14     Q.  And then the "out" time, what is that
15 indicative of?
16     A.  The time they exit.
17     Q.  Is that the time the test was over, or
18 is that the time that the detectives and
19 Mr. Kuri, I guess, left the station; or what is
20 that indicative of?
21     A.  Exit.  When they exit, when they
22 leave.
23     Q.  I guess I want to define exit, exit
24 what?

Page 57

1      A.  Exit my office.
2      Q.  So start to finish, it looks like that
3  would be an hour and 40 minutes?
4      A.  Yes.
5      Q.  And does that include -- So you would
6  have met -- Let's strike that whole thing.
7        So you would have met with the
8  detectives to go over the case sometime after
9  20:40?
10     A.  Yes.
11     Q.  What is that, 8:40?
12     A.  Yes.  8:40 p.m.
13     Q.  Gotcha.  Gotcha.
14        What shift did you work at that
15 time?
16     A.  I would say 3:00 to 11:00, I'm sure
17 3:00 to 11:00.  I don't think I was working 10
18 hours at that time.  Because sometimes I was
19 1:00, I don't know, 1 o'clock starts.  But I
20 think that particular day, 3 o'clock to 11 p.m.
21 I'm just guessing on that because sometimes
22 they bring us in early, sometimes late.
23        But this looks like I was here just
24 in the evening hours.  Sometimes I start at

Page 58

1  1:00 and we go, you know, 10 hours.  And then
2  sometimes we go in 3:00 to 11:00 so it depends
3  on our schedule.
4      Q.  And now I see there is two things
5  indicated in the "Remarks" section.  Do you see
6  that?  One it says, "Picked out of photo by
7  living victim."  Do you see that?
8      A.  Yes.
9      Q.  That's your handwriting?
10     A.  Yes.
11     Q.  Then underneath it, it says, does it
12 say, "Denies involvement"?
13     A.  Yes.
14     Q.  Do you recall who told you those
15 items?
16     A.  The detectives.
17     Q.  And you just, again, I don't mean to
18 beat a dead horse here; but do you remember
19 that as we sit here today, or do you remember
20 that just based on this report?
21     A.  Just based on this report in front of
22 me.
23     Q.  And under this "Remarks" section, the
24 place where you write down the -- I guess sort

**Page 75**

1    And he answered that question yes?
2    A.   Yes.
3    Q.   And then the next question, No. 5,
4  "Did you ride a bike to that van that the
5  Indian kid was sitting in?"  Do you see that?
6    A.   Yes.
7    Q.   And his answer to that question was?
8    A.   "No."
9    Q.   And the information contained in
10  question 5, is that information you attained
11  from the detectives?
12   A.   Yes.
13   Q.   And again, you don't specifically
14  remember that, but would there have been any,
15  any source of that information other than the
16  detectives?
17   A.   Sometimes when a subject doesn't know
18  a name of a victim, you have to use what they
19  use.  So I'm not sure.  He could have said,
20  well, it was the Indian kid, or the detective
21  could have said it was the Indian kid.
22      But just to make sure that we're
23  clear, to clarify, that was agreed upon across
24  the board that the Indian kid was important for

**Page 76**

1  this particular question.
2    Q.   Now, you have used that phrase a
3  couple of times "agreed upon across the board."
4  Is that agreed upon by the detectives?
5    A.   And the subject.  Because the subject,
6  he might say, Well, I don't call this person
7  Patel.  The victim's name was Patel.  He might
8  say, The Indian kid.  So it could be the
9  detectives have, the detectives are told
10  upfront does the person know the victim.  And
11  if they say, No, he doesn't know his name, or
12  he doesn't know it's Patel or things like that,
13  then how will the subject know this victim.
14  So it's agreed upon, whatever the subject
15  feels comfortable with, that's what we will use
16  to make sure we are talking about the right
17  person to clarify.
18   Q.   I mean so that how did you determine
19  or how generally did you determine whether the
20  subject is comfortable with a particular --
21   A.   Just by the way we are talking about
22  it, what they say in the pretest, what we are
23  talking about, to make sure we are all talking
24  about the right person.

**Page 77**

1    Q.   Now, during the pretest, is that a
2  meeting that all of you have, being you, the
3  subject, and the detectives?
4    A.   No.  Just me and the subject.
5    Q.   And so in this case, did you question
6  Mr. Kuri about whether he knew Mr. Patel?
7    A.   Uh-huh.
8    Q.   And what did he say?
9    A.   It came down to I believe what we have
10  right in front of us, The Indian kid.  I don't
11  think he -- I don't recall directly but for
12  some reason the Indian kid came out more than
13  Patel.
14   Q.   And did, based on your observations
15  and your conversation with Mr. Kuri, was he
16  referring to Mr. Patel when he was referring to
17  the Indian kid?
18   A.   Yes.
19   Q.   But did he say he didn't know who
20  Patel was?
21   A.   I don't recall.  I know that this is
22  what he felt comfortable enough for me to say
23  this is the victim.
24   Q.   Now, did Mr. Kuri indicate to you that

**Page 78**

1  he saw an Indian kid sitting in a van?
2    A.   I don't recall.  I don't recall.
3    Q.   Like it said here, he answered the
4  question, it says, Did you ride your bike to
5  that van that the Indian kid was sitting in.
6    A.   He said, No.
7    Q.   But as we sit here today, it's your
8  understanding that Mr. Kuri wanted to refer to
9  the Indian or wanted to refer to Mr. Patel as
10  the Indian kid?
11      MS. BENJAMIN:  Objection to form.
12      THE WITNESS:  Yes.
13  BY MR. FELDMAN:
14   Q.   Now, question No. 6, it says, "While
15  being a Spanish Cobra, have you ever seriously
16  harmed anyone."  Do you see that?
17   A.   Yes.
18   Q.   And his answer was no?
19   A.   Yes.
20   Q.   Now, is that your handwriting, the
21  first part of it, "while being a Spanish
22  Cobra"?
23   A.   Yes.
24   Q.   Why would you ask him that question?

## Page 103

1  sitting in," is that in your mind a pretty
2  vague question?
3      A.  It's a direct question, "did you
4  ride."
5      Q.  Did you ask him what time of day it
6  was?
7      A.  No.
8      Q.  Did you ask him if, do you know if
9  he -- And in your mind, according to your test
10 results as you interpret them, he did not
11 answer truthfully to that question; correct?
12     A.  Correct.
13     Q.  Did your questions ask him anything
14 about the time of day he may have been around
15 that van?
16     A.  No.
17     Q.  Did you ask him whether the Indian kid
18 was sitting in the van when he rode past the
19 van?
20     A.  No.
21     Q.  And would you agree that there is a
22 lot of missing pieces to the question that you
23 asked?
24     MS. BENJAMIN:  Object to form.

## Page 104

1      THE WITNESS:  What I think about it?
2  My thought is, if he wasn't nowhere involved
3  with this case, he should not have had these
4  high reactions.  He should have been able to
5  have a low reaction and not a comparison
6  question.  He should never have went over the
7  comparison question.  For him to go over the
8  comparison question, as far as my training, is
9  there is something going on with that one
10 particular question, and that makes it
11 deception.
12 BY MR. FELDMAN:
13     Q.  I mean would you agree that if
14 Mr. Kuri was present or involved in the murder
15 of Mr. Patel that the money question was, Did
16 you see who shot him, who shot Mr. Patel?
17     MS. BENJAMIN:  Object to form.
18     THE WITNESS:  I'm not sure why he
19 focused in on that question.  I wasn't a part
20 of that investigation to know why that was the
21 question that did everything, as far as his
22 involvement.
23     I'm not sure if that was something
24 that he -- I wouldn't know if that was why he

## Page 105

1  targeted that one particular question.
2  BY MR. FELDMAN:
3      Q.  And by that question, being question
4  No. 5?
5      A.  Right.
6      Q.  Which is the one that he indicated
7  deception?
8      A.  Right.
9      Q.  And based on your experience in
10 administering these tests, can you offer an
11 explanation with respect to question R5, under
12 chart 4 for the pneumos No. 1, that was his
13 most reactive was question R5.  But then in
14 exam 1, chart 5, that was his least reactive.
15     A.  Yes.
16     Q.  Is that a consistent result?
17     MS. BENJAMIN:  Object to form.
18     THE WITNESS:  I'm not sure why he
19 relieved himself on that question.  But it did
20 not give him a high response.  So I have to
21 give the score that the response came in at.
22 And for that particular question right there,
23 he gave a zero and I gave a zero.
24

## Page 106

1  BY MR. FELDMAN:
2      Q.  And is that unusual in your mind --
3  not in your mind, but based on your experience,
4  is it unusual that for a particular question on
5  one of the tests, one of the physical -- one of
6  the physiological measurements for that
7  question would be the most reactive and then on
8  the following tests would be the least
9  reactive?
10     MS. BENJAMIN:  Object to form.
11     THE WITNESS:  I have seen it lots of
12 times.
13 BY MR. FELDMAN:
14     Q.  Does the fact that the measurements
15 can be all over the board raise any red flags
16 for you?
17     MS. BENJAMIN:  Object to form.
18     THE WITNESS:  The control question
19 shouldn't have been as low if he wasn't
20 involved.  Since there is some kind of
21 involvement on 5, that tells me that the other
22 questions might not be as threatening to him as
23 No. 5.  No. 5 is the one that he actually
24 targeted, focused on.  And that would, that's

Page 127

1 before he's actually attached to the computer,
2 we go over every question with him. The final
3 questions, then we attach the computer.
4 BY MR. FELDMAN:
5 Q. So is it then fair to say that you
6 would have had all the questions written out as
7 they appear on the piece of paper we were
8 looking at before prior to going over them with
9 Mr. Kuri?
10 MS. BENJAMIN: Objection,
11 mischaracterizes her testimony. It's also --
12 Object to form.
13 THE WITNESS: No. No.
14 BY MR. FELDMAN:
15 Q. Well, was there a point in time before
16 the actual test began where you read each one
17 of the 10 questions to Mr. Kuri?
18 A. Yes.
19 Q. Okay. That was my question.
20 A. Oh, okay. I'm sorry. I'm sorry.
21 Q. Apart from determining that Mr. Kuri
22 had the greatest physiological reaction to
23 question R5, are there any other conclusions
24 that you drew from your testing?

Page 128

1 A. No. No.
2 MR. FELDMAN: I think that's all I
3 have.
4 MS. BENJAMIN: We will reserve
5 signature.
6 * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 129

1 STATE OF ILLINOIS. )
2 ) SS:
3 COUNTY OF DU PAGE )
4 The within and foregoing deposition
5 of the aforementioned witness was taken before
6 Janice H. Heinemann, CSR, CRR, RDR, at the
7 place, date, and time aforementioned.
8 There were present during the taking
9 of the deposition the previously named counsel.
10 The said witness was first duly sworn
11 and was then examined upon oral interrogatories;
12 the questions and answers were reported in
13 shorthand by the undersigned and transcribed
14 via computer-aided transcription.
15 The within and foregoing is a true,
16 accurate, and complete record of all of the
17 questions asked of and answers made by the
18 aforementioned witness at the time and place
19 hereinabove referred to.
20 The signature of the witness was
21 not waived and the deposition was submitted
22 pursuant to Rules 207 and 211 (d) of the Rules
23 of the Supreme Court of Illinois to the
24 deponent per copy of the attached letter.

Page 130

1 The undersigned is not interested in the
2 within case, nor of kin or counsel to any of
3 the parties.
4 Witness my official signature in and
5 for Du Page County, Illinois, on this 26th day
6 of January, 2016.
7
8
9 Janice H. Heinemann, CSR, CRR, RDR
10 IL CSR No. 084-001391
11
12
13
14
15
16
17
18
19
20
21
22
23
24

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ANTHONY KURI,                        )
(a/k/a Ramsey Qurash),               )
                                     )
          Plaintiff,                 )
                                     )
  vs.                                ) Case No. 1:13-1654
                                     )
THE CITY OF CHICAGO, DETECTIVES      )
SZWEDO, VALKNER, FOLINO,             )
McDERMOTT, KOLMAN, CORDARO,          )
FIGUEROA-MITCHELL, OFFICERS LOPEZ,   )
SANCHEZ, and AS-YET UNKNOWN          )
CHICAGO POLICE DEPARTMENT MEMBERS,   )
                                     )
          Defendants.                )


        The deposition of DETECTIVE JOHN FOLINO, JR.,

taken before BETH SKLAR, Certified Shorthand Reporter

and Registered Professional Reporter, pursuant to the

provisions of the Illinois Code of Civil Procedure and

the Rules of the Supreme Court thereof pertaining to the

taking of depositions for the purpose of discovery at

Loevy & Loevy, 311 North Aberdeen Street, Chicago,

Illinois 60607, commencing at 10:03 a.m. on the 16th day

of March, 2015.

**Page 7**

1  get out a few words, and, you know, your natural
2  instinct would be to begin answering. It's best if you
3  let me finish asking my question before you begin
4  answering, and then, by the same token, I'll let you
5  finish your answer before I begin the next question.
6  All right?
7      A. It sounds fair to me.
8      Q. And we can take a break whenever you wish.
9  The only thing I ask is that we don't take a break while
10  there is a question hanging out there. All right?
11      A. Sounds fair.
12      Q. Are you taking any medication or under any --
13  suffering from any physical ailments today which will
14  affect your ability to answer my questions?
15      A. No, sir.
16      Q. Okay. The last thing, I always forget this
17  one: I will do my best to ask questions which you'll
18  understand. Despite trying to do that, I often fail. I
19  will take no offense if you don't understand something
20  that I'm asking and just ask me to rephrase it and I
21  will. If you do answer my questions, I will assume that
22  you understood what I was asking. All right?
23      A. Understandable.
24      Q. And, sir, are you currently employed as a

**Page 8**

1  Chicago police officer?
2      A. Yes, sir, I am.
3      Q. And what is your current rank?
4      A. Sergeant.
5      Q. Sergeant? And how long have you been with the
6  Chicago Police Department?
7      A. Sixteen years and a couple weeks.
8      Q. Sixteen years and a couple of weeks, so 1999?
9      A. Exactly. Correct.
10      Q. End of March?
11      A. The first week of March is my appointment
12  date. 8 March '99.
13      Q. Did you grow up in the Chicago area?
14      A. I did.
15      Q. Where about?
16      A. Grand Avenue and Harlem Avenue. That's the
17  closest major intersection of where I grew up.
18      Q. And did you attend high school around there?
19      A. I did.
20      Q. Which high school?
21      A. I went to Elmwood Park High School.
22      Q. And did you graduate from Elmwood Park?
23      A. I did.
24      Q. What year?

**Page 9**

1      A. 1993.
2      Q. Any college after graduation?
3      A. Yes, sir.
4      Q. Where did you go to college?
5      A. Triton College, University of Illinois at
6  Chicago, along with Saint Xavier University.
7      Q. Is that in Chicago?
8      A. What?
9      Q. Saint Xavier.
10      A. It is. It's the South Side of the city.
11      Q. Did you obtain degrees from one or more of
12  those institutions?
13      A. Yes, sir.
14      Q. Which ones and what degree?
15      A. Triton College associate degree. UIC, worked
16  towards a B.A., but I had to leave for the police
17  department. Saint Xavier undergrad, Saint Xavier MBA,
18  Saint Xavier half of a Master's of Science degree.
19      Q. So you got your B.A. from Saint Xavier?
20      A. That is correct.
21      Q. And what was that in?
22      A. Liberal studies.
23      Q. And then did you complete your MBA?
24      A. I did.

**Page 10**

1      Q. And then you said a master in science?
2      A. Yeah. It was not completed.
3      Q. Okay. Any particular science?
4      A. I was focusing on disaster preparedness and
5  emergency management.
6      Q. Are you still taking classes towards that?
7      A. I am not.
8      Q. When did you get your BA from Saint Xavier?
9      A. 2004.
10      Q. And then how about -- when did you complete
11  the MBA?
12      A. 2006.
13      Q. Were you doing that at night?
14      A. Afternoon to evening.
15      Q. You were employed as a police officer at the
16  time?
17      A. I was.
18      Q. Any law enforcement experience apart from
19  working for the Chicago Police Department?
20      A. No, sir.
21      Q. Did you apply to any police departments apart
22  from the Chicago Police Department?
23      A. I did.
24      Q. Which ones?

## Page 27

1 the other bosses out, asked me to come along and I --
2 the next thing you know I was on the list assisting
3 them.
4      Q.   And I'm sorry.  You may have said this, but I
5 didn't get it.  So they pulled sergeants from all
6 different districts all over the city to sort of head
7 this Operation Impact?
8      A.   That's a good way to describe it, sure.
9      Q.   And then you would go out on the street with
10 the probationary officers?
11      A.   Correct.  And also had administrative
12 responsibilities, so I would also work inside the
13 building as well.
14      Q.   And where was that based out of?
15      A.   The -- 95 percent of the time I was at 5555
16 West Grand Avenue, then I spent a little time in the
17 15th District and a little bit of time in the 11th
18 District.
19      Q.   And how long were you involved or are you
20 still involved in Operation Impact?
21      A.   Approximately four to five months.
22      Q.   And where did you go after that?
23      A.   I then went to the Bureau of Organized Crime,
24 specifically the Intelligence Section.

## Page 28

1      Q.   And where is that based out of?
2      A.   3340 West Fillmore Avenue.
3      Q.   And is that where you are at today?
4      A.   That -- well, where I'm at today is in your
5 office, but where I'm assigned to today is the
6 Intelligence Section.
7      Q.   And was that something you had requested?
8      A.   Yes, sir.
9      Q.   And what are your duties in the Intelligence
10 Section of the Bureau of Organized Crime?
11      A.   I'm a sergeant/supervisor for a field
12 investigative team.
13      Q.   And what sort of things does the team
14 investigate?
15      A.   Our main focus is terrorism.
16      Q.   And are you, just for lack of a better phrase,
17 out on the street working or are you primarily
18 supervising from the office?  If you understand the
19 question.
20      A.   I would say it's a balance of both.
21      Q.   And how many people are on your team?
22      A.   I've got 11 people on my team.
23      Q.   And are those patrol officers, detectives or a
24 mix?

## Page 29

1      A.   Both.  A mix.
2      Q.   And did you stop working with Detective
3 McDermott when you were promoted to sergeant in August
4 of 2012?
5      A.   Yes, sir.
6      Q.   Have you worked with him at all since you were
7 promoted to sergeant?
8      A.   I have not.
9      Q.   Do you know:  Is he still a detective or has
10 he been promoted?
11      A.   He is not a detective.
12      Q.   What is his job now?
13      A.   Administrative leave.
14      Q.   And did that administrative leave go into
15 effect while you were working with him at Area Central
16 Detective Division?
17      A.   It did not.
18      Q.   So that occurred after you stopped working
19 with him?
20      A.   That is correct.
21      Q.   What do you remember from your investigation
22 of the Patel homicide?
23          MS. BENJAMIN:  Object to the form of the
24 question.  Awfully vague.

## Page 30

1          THE WITNESS:  If you could be a little bit
2 more specific, I could probably answer it better.
3 Unless you're looking -- if you insert -- ask it a
4 little bit more specifically, that would help.
5 BY MR. FELDMAN:
6      Q.   Do you remember the Patel murder
7 investigation?
8      A.   I do.
9      Q.   Do you know when you were assigned to work on
10 the Patel murder investigation?
11      A.   The day or the day after the date of
12 occurrence.
13      Q.   And who assigned you?
14      A.   I believe it was Sergeant Sam Cirone,
15 C-i-r-o-n-e, I know at one point had an initial role in
16 the investigation.
17      Q.   And were you assigned to work on it together
18 with your partner, who was Officer -- or Detective
19 McDermott I believe?
20      A.   That is correct, sir.
21      Q.   And how -- I just -- I'm not familiar enough
22 with the process.  Were you -- Are certain detectives
23 designated as sort of the lead detectives on a file and
24 others assist?  How does that work?

## Page 31

1    A.  It's different throughout the city.  There's
2  no, you know, exact rhyme or reason on why.  Sometimes
3  you're the first one in the office and you need to
4  handle the case.  There's other times where it's your
5  last day before vacation, we're not giving you a new
6  homicide, so there's no rhyme or reason, so it all just
7  depends on, I hate to say, the mood of the sergeant,
8  just whatever he or she felt was, you know, appropriate
9  for that moment to investigate that thing, so it would
10  just vary.
11    Q.  And do you recall what happened in this
12  instance?  Were you the primary detective assigned?
13    A.  I was -- I was one of the assigned detectives.
14    Q.  And then what -- would people on different
15  shifts work on the same homicide investigation?  And
16  what I mean by that is, if, let's say, you worked 9 to
17  5, and did the people that come in at 5 pick up where
18  you left off or how did that work?
19    MS. BENJAMIN:  Object to the form.
20    THE WITNESS:  If I needed something
21  specifically done and it was not during the hours
22  of my investigation or my duty hours, someone else,
23  being another detective, would pick up that role
24  and assist.

## Page 32

1  BY MR. FELDMAN:
2    Q.  And how would you let the next shift know that
3  such work needed to be done?
4    A.  Usually through the sergeant, unless maybe
5  it's a closer friend and it could be face-to-face, or
6  they're coming in as you're leaving, you kind of do a
7  face-to-face heads-up, you know, "I need this taken care
8  of," so it varied.  There's no specific, you know,
9  procedure on how it was done, just get it done.
10    Q.  And specifically with respect to the Patel
11  murder investigation, once you were assigned, were you
12  given any information about the case?
13    A.  I was given paperwork, the file.
14    Q.  And do you recall what paperwork existed at
15  that time?
16    A.  Not exactly, but I do recall a case report,
17  some general progress notes.  That's about the extent of
18  it.
19    Q.  And when you were assigned to the case, do you
20  recall if there were any suspects at that time?
21    A.  Initially there was not.
22    Q.  Did you review any documents in preparation
23  for today's deposition?
24    A.  I did.

## Page 33

1    Q.  And what documents were those?
2    A.  I reviewed a case report.  I reviewed some
3  general progress reports.  I reviewed I believe there
4  was a crime scene processing report.  I reviewed I
5  believe a couple of supplementary reports.  Off the top
6  of my head, that's about the extent of what I recall,
7  specific documents that I reviewed.
8    Q.  How about any testimony?  Did you review any
9  testimony?
10    A.  I don't recall reviewing any testimony.
11    Q.  I guess I can be specific.  Did you review
12  your testimony before the Grand Jury?
13    A.  I don't believe I did.
14    Q.  Did you review your testimony from Mr. Kuri's
15  criminal trial?
16    A.  I do not believe I did.
17    Q.  Did you review any of the transcripts from --
18  I'll be specific.  Did you review the transcript of an
19  interview which took place with Zay Rusell?
20    A.  I don't believe so.
21    Q.  How about a transcript of an interview which
22  took place with Mr. Kuri?
23    A.  I don't believe so.
24    Q.  Now, once you were assigned to the case, what

## Page 34

1  do you recall from your investigation?
2    MS. BENJAMIN:  Object to the form.
3    THE WITNESS:  I mean, is there anything
4  specific that you're --
5  BY MR. FELDMAN:
6    Q.  Well, just:  What do you remember about the
7  investigation?
8    A.  I mean, the last thing in my mind is getting
9  served with this lawsuit.  I don't know how specific
10  you're looking to be.
11    Q.  I mean -- well, do you remember all of the
12  details from your investigation?
13    A.  Of course not.
14    Q.  Okay.  That's what I just want to --
15    A.  Yeah.
16    Q.  -- sort of wondered:  What do you remember
17  about your investigation?
18    A.  Okay.  I remember working with my partner,
19  Detective McDermott.  I remember we were not the scene
20  detectives.  I recall interviewing a victim in the
21  hospital.  I recall going down to the Grand Jury.  I
22  recall giving testimony.  I recall meeting with the
23  State's Attorney.  I recall driving down to Rochelle,
24  Illinois, to pick up and arrest Anthony Kuri.  I

Page 35

1  remember a little bit about the trial.  About the extent
2  of it.
3      Q.  In the reports that you have reviewed in
4  preparation for today's deposition, were those the case
5  reports that you prepared?
6      A.  I did not prepare a case report.
7      Q.  Okay.  Maybe my terminology may be off.  Did
8  you review any reports that you yourself had prepared?
9      A.  Yes, sir.
10     Q.  And which ones were those?
11     A.  I recall reviewing the Cleared/Closed
12  Supplementary Report.
13     Q.  And did reviewing that report refresh your
14  recollection as to what happened during your
15  investigation of the Patel homicide?
16     A.  It did.
17     Q.  And in -- I'm trying to think of the way to
18  phrase this.  In preparing your reports, do you
19  typically go through events in a sequential manner, you
20  know, like time-wise, so what's at the beginning of the
21  report is the early steps of the investigation, and does
22  it flow in a linear manner?
23     A.  I do my best to try to present everything in
24  chronological order.

Page 36

1      Q.  Okay.  That's the better term.  Thank you.
2          And you said one of the reports you reviewed
3  was the Cleared/Closed Arrest and Investigation Report?
4      A.  That is correct.
5      Q.  So why don't we mark that as Exhibit 1.
6          (Deposition Exhibit Number 1 was marked for
7  identification.)
8  BY MR. FELDMAN:
9      Q.  Sir, you have just been handed a document
10  which has been marked as Exhibit 1.  Do you recognize
11  that document?
12     A.  I do.
13     Q.  And can you tell us what it appears to be?
14     A.  Well, without going through all 12 pages, the
15  cover sheet here is page 1 of 12 of the Cleared/Closed
16  (Arrest and Prosecution) Supplemental Report that I --
17  that I typed.
18     Q.  Okay.  And the fact that you typed, is that
19  indicated by virtue of the fact that it says "Reporting
20  Officer: Folino Junior John" on page 1?
21     A.  That is one, and the second is on page 12 of
22  12.  The way that I personally do it is usually the
23  first detective's name that appears, this time being
24  Detective John L. Folino, Junior, Number 20143, which is

Page 37

1  me, shows that I typed this report.
2      Q.  And then it also -- I guess you were looking
3  at page 12 of 12 there?
4      A.  Mm-hmm.
5      Q.  It also lists Detective McDermott and
6  Detective Kolman.  Does that indicate to you that they
7  helped you to prepare this report or what does that
8  signify?
9      A.  This here shows that they had a role in the
10  investigation as well.  They assisted me with the
11  investigation.  They may have provided information that
12  I typed in here, but I, you know -- I pretty much then
13  did all of the typing here.
14     Q.  Okay.  Now, on the first page, it says that
15  the primary detective assigned was Detective Kolman.  Do
16  you see that?
17     A.  I do.
18     Q.  So what does that signify to you?  I mean,
19  what does that mean, the primary detective assigned?
20         MS. BENJAMIN:  Objection.  Foundation.
21         THE WITNESS:  It just means that he was the
22  one initially assigned to it.
23  BY MR. FELDMAN:
24     Q.  Now, if you want to look at pages -- I guess

Page 38

1  the narrative of the report, it starts on page -- it's
2  the last line of page 8 and then 9, 10, 11, and 12.
3      A.  Sure.
4      Q.  If you don't mind just quickly reviewing the
5  narrative and I'll ask you some questions about it.
6      A.  Okay.  That was a quick peek at it.
7      Q.  Now, it appears that during the course of your
8  investigation you interviewed a few -- I guess you refer
9  to them here as alibi witnesses?  Do you see that?
10     A.  I do.
11     Q.  And the -- and with respect to the first one
12  listed here is a Chrystian Reyes, R-e-y-e-s?
13     A.  Okay.
14     Q.  It says that Detective Folino relocated to the
15  address.  Do you recall if you -- did you undertake
16  meeting with and interviewing the various alibi
17  witnesses by yourself or would you have done that with
18  your partner?
19     A.  I would say I would have a partner with me.
20     Q.  Okay.  Was that the normal procedure, to go
21  out and perform such interviews with a partner?
22     A.  Well, I don't know if you use the term normal,
23  but you always do your best to have your partner with
24  you.

Page 39

1      Q.   And do you recall meeting with -- is Chrystian
2   a male or female?
3      A.   Chrystian was a male.
4      Q.   I see.  Also called Tony.  And why did you go
5   meet with Mr. Reyes?
6      A.   Anthony Kuri stated that he was with him
7   either before, during or after the time of the murder,
8   which I felt was someone that needed to be interviewed.
9      Q.   And you interviewed Mr. Reyes it looked like
10   on September 9th?
11      A.   That is correct.
12      Q.   And did you prepare a -- well, strike that.
13         Did you take notes during your interview of
14   Mr. Reyes?
15      A.   I can't recall.
16      Q.   Is one of the documents that you reviewed in
17   preparation for today a -- was it a GPR of your
18   interview with Mr. Reyes?
19      A.   I didn't memorize all of which GPRs that I
20   actually reviewed.  But if I would have taken notes, it
21   would be on a GPR.
22      Q.   And what was, at the time, your normal
23   practice as far as memorializing interviews of people?
24      A.   I'm sorry.  What was my practice?

Page 40

1      Q.   Correct.
2      A.   I would take notes on a GPR, but it changes.
3   There was times I would just go and type into a computer
4   I had -- you know, the report was up.
5      Q.   And do you recall what Mr. Reyes told you
6   about -- I mean whether he was with Mr. Kuri at the time
7   of the underlying incident?
8      A.   My interview with Chrystian Reyes, also known
9   as Tony, revealed that Anthony Kuri was not forthright
10   in the information that he provided regarding his
11   so-called alibi witness.
12      Q.   And what made you reach that conclusion?
13      A.   The statement from Chrystian Reyes.
14      Q.   Did Mr. Reyes tell you that Mr. Kuri was
15   affirmatively not with him at that date and time in
16   question?
17      A.   I don't know about the term "affirmatively,"
18   but based on the dates, times, I was able to see that he
19   was not with him.
20      Q.   And does your report here accurately summarize
21   your interview of Mr. Reyes?
22      A.   It does.
23      Q.   So did Mr. Reyes tell you that he could not
24   recall if Kuri stayed with him on either July 23rd or

Page 41

1   July 24th, 2009?
2      A.   "Reyes then related he could not recall if
3   Kuri stayed with him on either July 23, 2009, or
4   July 24, 2009," that is correct.
5      Q.   Okay.  Now, it looks like you also interviewed
6   a woman by the name of Teresa Luis, L-u-i-s; is that
7   correct?
8      A.   That is correct.
9      Q.   And why did you go to Miss Luis's house?
10      A.   I believe part of the alibi -- part of the
11   alibi, part of the investigation where Kuri stated he
12   was at a specific location.
13      Q.   And was that specific location Tony and
14   Nicky's residence at 1841 North Kostner?
15      A.   It looks like here for Teresa Luis I went to
16   1935 North Tripp.
17      Q.   Do you recall which location Mr. Kuri said
18   that he was at on the night of the murders?  Was it the
19   Kostner location or the Tripp location?
20      A.   I believe it was the Kostner location.
21      Q.   So do you recall why you went over to the
22   Tripp location?
23      A.   Part of the investigation.
24      Q.   And does your report accurately reflect what

Page 42

1   you learned from Miss Luis?
2      A.   It does.
3      Q.   On the next page, page 11 of 12, it reflects
4   your account of a meeting with Nicole Campos; is that
5   correct?
6      A.   That is correct.
7      Q.   And does -- if you want to just read that
8   paragraph under Nicole Campos.
9      A.   Read it.
10      Q.   Okay.  And does that accurately reflect again
11   what Miss Campos told you?
12      A.   It does.
13      Q.   So she told you that she arrived at Reyes's
14   house around noon on July 24, 2009?
15      A.   Correct.
16      Q.   And do you recall:  What time was the murder
17   of Mr. Patel?
18      A.   That was sometime after midnight.
19      Q.   On the 24th?
20      A.   That is correct.
21      Q.   I believe you said that you interviewed one of
22   the victims at the hospital; is that correct?
23      A.   That is correct.
24      Q.   And is that Tony Fernandez?

## Page 43

1    A.  That is also correct.

2    Q.  And do you recall:  How many times did you

3  meet with Mr. Fernandez at the hospital?

4    A.  Several times.  Three plus times.

5    Q.  And do you recall the date of the first time

6  that you met with Mr. Fernandez at the hospital?

7    A.  I do not.

8    Q.  Would looking at your reports help refresh

9  your recollection?

10    A.  Yes, sir.

11    Q.  Actually, before we do that, do you guys mind

12  if we take a few minute break here?

13    MS. BENJAMIN:  Sure.

14    THE WITNESS:  Sure.

15    (A short recess was taken.)

16    (Deposition Exhibit Number 2 was marked for

17  identification.)

18  BY MR. FELDMAN:

19    Q.  Sir, you've been handed a document which has

20  been marked as Exhibit 2.  Can you tell us what this

21  document is?

22    A.  Based on the cover page and not going through

23  all ten pages here, this is a Field Investigation

24  Progress Report listing my name as the reporting

## Page 44

1  officer.

2    Q.  Okay.  And is this one of the documents that

3  you reviewed in preparation for today's deposition?

4    A.  I believe it is.

5    Q.  And it looks like it says on the first page

6  the date submitted, August 14, 2009, at 1754 hours.  Do

7  you see that?

8    A.  I do.

9    Q.  And what does that signify to you?

10    A.  That signifies the date that I so-called hit

11  "Send" and sent it off to the supervisor.

12    Q.  And does that in any way indicate to you when

13  you started preparing this report?

14    A.  It does not.

15    Q.  So that's just when it was -- you know, I

16  guess internally in your computer system is there a --

17  can you work on a document like this over time and then,

18  I guess, hit "Send" at a later date and that becomes the

19  date submitted?

20    A.  That is correct.

21    Q.  Okay. And it looks like on page 10 of 10, it

22  lists yourself and Detective McDermott.  Do you see

23  that?

24    A.  I do, sir.

## Page 45

1    Q.  So the both of you who, I guess, provided the

2  information which then was memorialized in this report?

3    A.  That is correct, sir.

4    Q.  So Officer or Detective Kolman was not

5  involved in this one?

6    A.  He was not.

7    Q.  And it looks like the narrative on this one is

8  on pages 8, 9 and 10, so if you want to quickly take a

9  look at that.

10    A.  I have it started on page 7, but I noted --

11    Q.  Oh, is it 7?  I'm sorry.

12    A.  I'm on page 8 now for you.

13    Q.  Okay.  If you just wouldn't mind reviewing 8,

14  9 and 10, and then I'll ask you some questions.

15    A.  Sure.

16    Eight, nine and ten are complete.

17    Q.  So it says -- it looks like on August 1st,

18  looking at page 8, August 1st at 2055 hours, you and

19  Detective McDermott met with Mr. Fernandez; is that

20  correct?

21    A.  That is correct.

22    Q.  And it says that you presented Mr. Fernandez

23  with a series of data warehouse photographs.  Do you see

24  that?

## Page 46

1    A.  Yes, sir.

2    Q.  And what are data warehouse photographs?

3    A.  Basically what it is, it's an IR image

4  computer-generated, so data warehouse is the -- I hate

5  to say it -- the warehouse that stores the data on the

6  computer system, and that's probably the best way.  So

7  you go in, access the CPD databank and pull out

8  different images, place them into, you know, the format

9  for a photo array and print.

10    Q.  And at the time that you -- strike that.

11    So did you -- you had that -- those

12  photographs -- strike that too.

13    When did you gather those photographs?

14    A.  It would be on the 1st of August, 2009, just

15  prior to 2055 hours.

16    Q.  Okay.  And how did you go about choosing

17  photographs for purposes of showing them to

18  Mr. Fernandez?

19    A.  The way it works is, if we are, you know, at

20  this time focusing on a particular gang, we can pull up

21  pictures from that gang, the computer then will conduct

22  its own internal search looking for anyone with similar

23  demographics:  Approximate height and weight,

24  approximately, you know, skin tone, if we want tattoos

## Page 47

1    or piercing, and it kind of will break it down so you
2    have your -- you know, it could be six images that are
3    similar in appearance.
4        Q.   And at that stage of the investigation were
5    you focusing on a particular gang?
6        A.   The Spanish Cobras did come up as a gang
7    within our investigation, so that was a focus of our
8    investigation.
9        Q.   And do you recall how you learned that the
10   Spanish Cobras were perhaps involved?
11       A.   I believe it was from intelligence gathered
12   that Spanish Cobras are a problem in this specific area
13   where this homicide occurred.
14       Q.   And then it says in that first paragraph that
15   "Mr. Fernandez stated he would be able to identify the
16   two offenders in this incident and was willing to
17   cooperate."  Do you see that?
18       A.   The last sentence of that paragraph?  Yes,
19   sir, I do.
20       Q.   And at that point in time were you looking for
21   two offenders?
22       A.   Specifically two, no.
23       Q.   I mean, did you know how many -- at that point
24   in time had the investigation revealed how many

## Page 48

1    offenders were involved?
2        A.   It did not at that point.
3        Q.   Did Mr. Fernandez tell you that there were two
4    people involved when you met with him on August 1st?
5        A.   Yeah, he stated he would be able to identify
6    two offenders.
7        Q.   And do those paragraphs that relate to your
8    meeting with Mr. Fernandez on August first accurately
9    reflect what you learned or did not learn from
10   Mr. Fernandez?
11       A.   Yes, sir.
12       Q.   Okay.  And Mr. Fernandez wasn't able to
13   identify anyone from the pictures you showed him on
14   August first?
15       A.   That is correct, sir.
16       Q.   And then it looks like on August second you
17   contacted Mr. Rusell?
18       A.   That is correct.
19       Q.   And do you recall how -- did you meet with
20   him?  Did you call him?
21       A.   We met with him.
22       Q.   And do you recall where you met with him?
23       A.   I believe it was his residence.
24       Q.   And when you went to see Mr. Rusell, it looks

## Page 49

1    like here he told you who the two offenders were in this
2    incident; is that correct?
3        A.   Yes, sir.
4        Q.   And he told you that it was Little David and
5    Rowdy?
6        A.   That is correct.
7        Q.   And did he tell you the names, the actual
8    names, of who Little David and Rowdy were?
9        A.   He did not.
10       Q.   And then turning to the next page, was it
11   after your meeting with Mr. Rusell you met with Officers
12   Gonzalez and Acevedo; is that correct?
13       A.   Acevedo, yes, sir.
14       Q.   Acevedo?  And how is it you came to meet with
15   him?  Or I should say why.  Why did you go meet with
16   them?
17       A.   Two reasons:  One being is that they were very
18   familiar with the gangs and conflicts specifically
19   within the 17th District; number two is they were
20   currently detailed to the Area Five Detective Division
21   as officers on a task force assisting other detectives.
22       Q.   Was that similar to the gang task force that
23   you at one point were affiliated with?
24       A.   No affiliation whatsoever.

## Page 50

1        Q.   I mean, was it the same type of task force
2    though?
3        A.   No, it was not.
4        Q.   And what did you hope to learn from Officers
5    Gonzalez and Acevedo?
6        A.   If they could assist with identifying some of
7    the images in the POD video, which is the Police
8    Observational Device, video footage from that area in
9    the 17th District where they were very familiar with.
10       Q.   Okay.  And then did you also ask them if they
11   could identify the real names of the two people named by
12   Mr. Rusell being someone who went by Rowdy and someone
13   who went by Little David?
14       A.   I don't know if I asked that formally, but
15   once we said the nicknames, they may have just provided
16   that, again with that experience and knowledge of the
17   gangs and the active members within the 17th District.
18       Q.   Okay.  And from your report here, can you
19   tell:  Were they able to identify Rowdy and Little
20   David?
21       A.   Yes, sir, they were.
22       Q.   And it looks like later that day, also on
23   August 2, 2009, you then went to meet again with
24   Mr. Fernandez at the hospital; is that correct?

**Page 51**

1       A.   That is correct.

2       Q.   And at that point in time you had a photo

3   array, two separate photo arrays, one that contained

4   Anthony Kuri and one which contained David Gomez; is

5   that correct?

6       A.   That is correct, sir.

7       Q.   And did that -- did you put together those

8   photo arrays or -- strike that.

9           Did Officers Gonzalez and Acevedo provide you

10   pictures of Mr. Kuri and Mr. Gomez?

11       A.   They did not.

12       Q.   So how did you go about locating pictures of

13   Mr. Kuri and Mr. Gomez?

14       A.   You go back into that data warehouse, you

15   enter in nicknames, specifically 17th District, and

16   that's when the images appeared.

17       Q.   And so you were able to do that after you

18   spoke with Detectives Gonzalez and Acevedo?

19       A.   They're officers, and --

20       Q.   I'm sorry.

21       A.   -- it was after that they specifically

22   identified Anthony Kuri as Rowdy and David Gomez as

23   Little David.

24       Q.   So based on that information, you were then

**Page 52**

1   able to locate and pull up the pictures of Kuri and

2   Gomez?

3       A.   That is correct, sir.

4       Q.   And then you went back and interviewed

5   Mr. Fernandez again.  And what can you tell me about

6   your meeting with Mr. Fernandez on August 2, 2009?

7       A.   Detective McDermott and I met with him again

8   in the hospital, presented him with a photo array

9   containing six different images where Mr. Fernandez

10   looked at these images and positively identified Anthony

11   Kuri as one of the offenders in this homicide

12   investigation.

13       Q.   And, also, what's the name of the form that

14   someone such as Mr. Fernandez signs when they look at

15   the photo array?

16       A.   It's the -- I haven't been a detective in a

17   couple years, and so I haven't presented one.  Photo --

18   Photo Array Lineup Advisory Form.

19       Q.   And did you have those -- is there a separate

20   form for each photo array that an individual looks at?

21       A.   When you say is there one, you don't need to

22   have one as long as you present it to the individual

23   and -- I mean, you don't need to do it for two of them.

24   I mean, as long as you present it with them so they have

**Page 53**

1   an understanding of it, they read it, they sign it,

2   they're good.

3       Q.   So someone can look -- if you were presenting

4   someone, let's say, with five different photo arrays,

5   you don't need five separate of those forms that you

6   mentioned?

7       A.   That is correct.

8       Q.   And Mr. Fernandez signed that consent form?

9       A.   He did.  He read it, signed and acknowledged.

10       Q.   And so you showed him the photo array that

11   contained Mr. Kuri?

12       A.   That is correct, sir.

13       Q.   And what happened after you showed him the

14   photo array that contained Mr. Kuri?

15       A.   He immediately and positively identified

16   Anthony Kuri as one of the offenders in this homicide

17   investigation.

18       Q.   And did he relate to you the information which

19   is contained here where it says that "Mr. Kuri was the

20   subject he observed riding the Huffy bicycle."  I don't

21   have to read the whole paragraph.  But if you can read

22   that paragraph there which is the third one on the page,

23   does that accurately reflect what Mr. Fernandez told

24   you?

**Page 54**

1       A.   Yes, sir.  It is.

2       Q.   And what happened after you showed him that

3   first photo array?

4       A.   He circled the image of Kuri, he signed and

5   dated it showing the identification.

6       Q.   And then did you show him the second photo

7   array?

8       A.   I made an attempt to.

9       Q.   And what does that mean?

10       A.   Attempted to present it to him, but he was

11   shot several times.  He was not feeling well.  He was

12   just not in the state of mind to deal with this at the

13   time and asked us if we could come back the following

14   day.

15       Q.   I mean, did he tell you that he didn't want

16   to --

17       A.   He was physically in pain and could not go any

18   further.  I don't know if it stressed him out.  I'm not

19   a doctor.  It's just that no one -- We're not going to

20   force it on him.  And we left and came back the

21   following day.

22       Q.   And was anyone else present in the room

23   besides you and your partner and Mr. Fernandez?

24       A.   At which point, sir?

Page 55

1      Q.  When he expressed to you that he was in pain
2  and/or -- and asked you to come back the next day?
3      A.  There was just the three of us.
4      Q.  And did you go get assistance for
5  Mr. Fernandez?
6      A.  Yes, sir.
7      Q.  And who did you get?
8      A.  A nurse or a doctor.  Just told them, "This
9  guy in here is not feeling well, he's in pain.  He needs
10  some assistance."
11      Q.  Okay.  And then it looks like this took place
12  at a little after nine in the evening, is that correct,
13  on August 2nd?
14      A.  Correct, sir.
15      Q.  And it says at about 9:40 you met with
16  Mr. Rusell; is that correct?
17      A.  That is correct.
18      Q.  And it looks like it says here that you
19  presented him -- it's called a CPD Advisory Form and he
20  signed it?
21      A.  Yes, sir.  He did.
22      Q.  And then it says here that you presented
23  Mr. Rusell with two separate photo arrays; is that
24  correct?

Page 56

1      A.  That is correct, sir.
2      Q.  And those were the two photo arrays that you
3  were able to put together following your meeting with
4  Officers Gonzalez and Acevedo?
5      A.  That is correct, sir.
6      Q.  And does your report accurately reflect what
7  Mr. Rusell told you both with respect to Mr. Kuri and
8  Mr. Gomez?
9      A.  Yes, sir.  It does.
10      Q.  So Mr. Rusell told you that Anthony Kuri was
11  riding the Huffy bicycle and Mr. Gomez was standing on
12  the rear pegs; is that correct?
13      A.  That is correct, sir.  Just so you know, to
14  clarify:  It's Rowdy and Little David.  He didn't say
15  Gomez or Kuri.  He used the nicknames.
16      Q.  Got you.  Thank you.
17          Now, when putting together photo arrays such
18  as the one that you showed both Mr. Rusell and
19  Mr. Fernandez, do you show them the same photo arrays?
20  Do you mix up the pictures?  How does that work?  If
21  that makes sense to you.
22      MS. BENJAMIN:  Object to the form.
23      THE WITNESS:  Yeah, slightly confused.  If you
24  can maybe ask it a little different way.

Page 57

1  BY MR. FELDMAN:
2      Q.  I mean, are the pictures presented in the same
3  format?  Well, first, how many people were in the
4  pictures?  Do you recall?
5      A.  I believe it was six images in each photo
6  array.
7      Q.  And were the photo arrays shown to
8  Mr. Fernandez and Mr. Rusell the same in that the six
9  individuals that appeared in each photo array were in
10  the same positions?
11      A.  I understand your question.  I cannot recall.
12  But inventory number, whatever was assigned to this,
13  would obviously assist me with that.
14      Q.  But as a detective, are you, as part of
15  your -- strike that.
16          Did you receive any training in putting
17  together a photo array such as the ones that you showed
18  the two individuals here?
19      A.  Yes, sir.
20      Q.  And is that -- as part of that training, are
21  you instructed to mix up the photographs such that, you
22  know, the people are in different positions?
23      A.  No specific rule regarding that, except that
24  never -- and, again, this is probably from an

Page 58

1  experienced detective.  Just never put the offender in
2  position number one.  That's what I was always trained.
3      Q.  Okay.  And as far as choosing the other five
4  people who appeared in each of the photo arrays, how did
5  you go about finding pictures?  Did you try to match the
6  look or how do you do that?
7      A.  Remember I was explaining earlier how the
8  computer does that for you?
9      Q.  Yeah.
10      A.  So what would do is, for example, Anthony
11  Kuri, when you -- when someone's arrested, you enter in
12  their demographics and their height and weight and their
13  skin tone, et cetera.  So once I hit "Search similar
14  demographics," the computer then puts it together for
15  you, so you go down and you look, "Okay.  This guy looks
16  somewhat similar, this one," and it fills in the other
17  five, we call them fillers.  The other five spots are
18  then filled by these individuals.  Some you don't use.
19  For example, if, you know, he has a bandage on him or
20  something or there was maybe a facial tattoo so you
21  would pull that out, so you try to do the best you can
22  to have similar images of your suspect in the case.
23      Q.  Okay.  So it looks like the next day you went
24  back in with Mr. Fernandez again?

## Page 59

1    A.  Yes, sir.
2    Q.  And at that time was he able to look at the
3  second photo array?
4    A.  He was.
5    Q.  And does the summary that you have here
6  accurately reflect what Mr. Fernandez told you?
7    A.  Yes, sir.
8    Q.  Now, after you -- Mr. Fernandez was able to
9  positively identify the second offender when you met
10 with him the next day, what was the next step in your
11 investigation?
12    A.  Heading back to the Detective Division, and I
13 believe we went out to make an attempt to locate
14 arrestable individuals.
15    Q.  And were you successful?
16    A.  We were not.
17    Q.  Ultimately, were you able to track down
18 Mr. Kuri?
19    A.  Yes, sir.
20    Q.  And at some point was Mr. Kuri administered a
21 polygraph examination?
22    A.  He was.
23    Q.  And was that something that you had requested?
24    How did the polygraph come about, if you know?

## Page 60

1    A.  I recall Anthony Kuri actually making the
2  request for it.
3    Q.  And is that something that you then arranged?
4    A.  That is correct.
5    Q.  And did you meet with the person who
6  administered the polygraph?
7    A.  Yes, sir.
8    Q.  And do you recall who that was?
9    A.  I believe it was Detective Figueroa.
10    Q.  And had you worked with Detective Figueroa
11 before?
12    A.  I have.
13    Q.  Now, how does that process work?  Do you
14 provide someone such as Detective Figueroa with
15 information about the case so she could then formulate
16 whatever questions she asked the person who's giving the
17 exam?
18    A.  That's a pretty basic explanation of what she
19 does, along with the detective.
20    Q.  So what sort of information, if you recall,
21 did you give Detective Figueroa?
22    A.  Usually the best and easiest way that we've
23 always done it is, you hand her the case report and
24 maybe any submitted reports so she gets a basic idea of

## Page 61

1  where the investigation is at the point of her
2  conducting her part of the investigation.
3    Q.  And did both you and your partner meet with
4  her?
5    A.  I can't recall if it was both of us or not.
6    Q.  Did she work out of the same location that you
7  were stationed at?
8    A.  She does not.
9    Q.  I guess there's not enough poly -- what's the
10 proper word, polygraphers, polygraph examiners?  There's
11 not one at each district?
12    A.  There is not.
13    Q.  So you would call someone in when you would
14 want to administer a polygraph?
15    A.  That is correct.
16    Q.  Do you recall being party to a lawsuit filed
17 by a gentleman by the name of Andre Wilson?
18    A.  I think I do.  I vaguely recall it, but I do
19 remember Andre Wilson.
20    Q.  And what do you remember of Mr. Wilson?
21    A.  What I recall is basically Anthony -- I'm
22 sorry -- Andre Wilson got away with murder.
23    Q.  What do you mean by that?
24    A.  He's not in custody today for that murder,

## Page 62

1  which he should be.
2    Q.  And then did Mr. Wilson -- I don't have copies
3  of this, but did Mr. Wilson file a civil lawsuit against
4  yourself and other Chicago police officers?
5    A.  Yes, sir.
6    Q.  And do you recall:  Did you give a deposition
7  in connection with that lawsuit?
8    A.  I cannot recall.
9    Q.  Was that -- is this -- the Mr. Wilson lawsuit,
10 is that the one that you mentioned earlier where you
11 were deposed?
12    A.  It is not.  The earlier one was an
13 officer-involved shooting.  I just did not recall that
14 one.
15    Q.  Okay.  And was Mr. Wilson's, that was not an
16 officer-involved shooting?
17    A.  It was specifically a homicide investigation.
18    Q.  And do you know how this lawsuit was resolved,
19 "this lawsuit" being the Mr. Wilson lawsuit?
20    A.  I vaguely recall the city settling I believe
21 for -- I can't recall what dollar amount, but providing
22 Wilson or the attorney some sort of settlement.
23    Q.  And were you involved in the investigation of
24 the murder which Mr. Wilson was I guess accused of, for

## Page 63

1  lack of a better word?

2      Committed?  Yes, I was.

3      Q.  And what was your role in that investigation?

4      A.  One of the assigned detectives.

5      Q.  And were you assigned to that together with

6  Officer McDermott?

7      A.  Detective McDermott?  Yes, I was.

8      Q.  I'm sorry.  Do you recall from that case that

9  there were -- whether there was a video which showed

10  that Mr. Wilson could not have committed the murder?

11      A.  I recall that was presented by a private

12  attorney to -- to the prosecutors in the investigation,

13  yes.

14      Q.  And do you know what that video showed?

15      A.  The video showed that Andre Wilson was in a --

16  it was either a liquor or food store on Division Street.

17  There was also, which probably is not there, that his

18  family worked in the place and they were able to

19  manipulate it to get him on video.

20      Q.  Oh.  So it's your belief that that videotape

21  was doctored?

22      A.  One hundred percent.

23      Q.  Was Mr. Wilson ever prosecuted for the murder?

24      A.  He was released -- well, he was charged, but

## Page 64

1  he was subsequently released.

2      Q.  But you did not agree with that?

3      A.  And I still do not.

4      Q.  Now, in preparation for today's deposition,

5  did you meet with counsel?

6      A.  I did.

7      Q.  I'm not going to ask you the substance of

8  anything that was discussed, but how many times did you

9  physically meet with counsel in preparation for today's

10  deposition?

11      A.  I'd say four times.

12      Q.  And how about:  Did you also speak over the

13  phone regarding today's deposition?

14      A.  Maybe once or twice.

15      Q.  And I know your deposition was scheduled for a

16  few weeks ago.  My apologies for being trapped downtown.

17  But did you meet prior to that first scheduled date and

18  time?

19      A.  We did.

20      Q.  And how long did you meet for at that meeting?

21      A.  A handful of hours.  Four or five hours

22  approximately.

23      Q.  And then did you also meet sometime over the

24  past couple of weeks?

## Page 65

1      A.  We did.

2      Q.  And how many times did you meet over the past

3  couple of weeks?

4      A.  I think just once.

5      Q.  And how long was that meeting?

6      A.  Again, another four or five hours.

7      Q.  And was it at those meetings that you reviewed

8  the documents that you mentioned earlier?

9      A.  It was.

10      Q.  And at any of those meetings did counsel --

11  or, strike that.

12          At any of those meetings did you review any of

13  the criminal trial testimony?  The criminal trial of

14  Mr. Kuri and Mr. Gomez.

15      A.  I honestly can't recall reviewing criminal --

16  the transcripts from the criminal trial.

17      Q.  Now, after Mr. Kuri took the polygraph

18  examination what was the next step in your

19  investigation?

20      A.  Mr. Kuri was then released from the Area Five

21  Detective Division.

22      Q.  And at that point in time did you meet with a

23  State's Attorney?

24      A.  We were meeting with State's Attorneys during

## Page 66

1  the entire course of the investigation, so at that exact

2  time I can't recall, but within -- within an hour or so,

3  yes.  I just can't recall if the State's Attorney was

4  present at the time or not, but, yes, I did meet with

5  State's Attorneys during the course of the

6  investigation.

7      Q.  And what is the purpose of those meetings

8  throughout the course of the investigation?

9      A.  Well, you work hand in hand.  We arrest, they

10  charge.  So we present the case to the state, they make

11  suggestions on things that should or should not be done

12  to assist in moving the investigation forward, and it's

13  just a -- sometimes a -- you know, it's team work to

14  support the case and work hand in hand on every homicide

15  investigation with them.

16      Q.  So during the course of the investigation as

17  you're gathering information and gathering evidence, do

18  you, throughout the investigation, present that to the

19  State's Attorney and say, "Hey, is there enough here to

20  arrest and charge?"  How does that process work?

21      MS. BENJAMIN:  Object to form.

22      THE WITNESS:  Ask that one more time for me,

23  please.

24

## Page 67

BY MR. FELDMAN:

 Q.  As you're investigating a case such as this and working with the State's Attorney, do you have them review whatever evidence you've gathered to date and get their opinion as to whether or not there is enough evidence to arrest and charge?

 MS. BENJAMIN:  Object to form.  Compound.

 THE WITNESS:  They do not make decisions on arrest, we do.  They charge.  It -- no investigation is the same.  If I have a question, they are there to assist and/or answer the question or questions, but eventually the State's Attorney is the agency that makes the final decision to charge or to release.

BY MR. FELDMAN:

 Q.  And in this investigation, and I guess -- well, strike that.

 Just generally, in a -- let's say a case such as this, are you working with the same State's Attorney throughout the process or is it, you know, on September 1st, you know, State's Attorney Jones who you may be working with and September 15th it's a different State's Attorney?

 A.  It varies.  If -- you know, with their day-off

## Page 68

groups.  And if they come in and they're fresh, they're able to go through the course of the investigation.  There are some times where you will get different State's Attorneys, so I spend three hours presenting it to them and I may have to spend another three hours with another State's Attorney presenting it to them.  But there are specific supervisors that, again, make the ultimate decision and they always stick with that specific supervisor, so he and/or she has a pretty complete understanding of the case.

 Q.  So you're not starting over from scratch every shift?

 A.  Not every time, but there is times where someone's on vacation, someone's sick.  I mean, there are times where it happens.

 Q.  And do you recall in this investigation:  Were you working primarily with one State's Attorney throughout?

 A.  Unfortunately, I cannot recall.  But if I was to take a peek at the reports and the State's Attorney's name would be listed and who I dealt with.

 Q.  Why don't we mark this as Exhibit 3.

## Page 69

 (Deposition Exhibit Number 3 was marked for identification.)

BY MR. FELDMAN:

 Q.  Sir, you've just been handed a document which has been marked as Exhibit 3.  Can you tell me what this document is?

 A.  This is a Field Investigation Progress Report regarding the homicide of Mr. Gaurav Patel.

 Q.  And is this a report that you prepared?

 A.  It is.

 Q.  And it looks like this is also a report that you prepared based on information provided by your partner?

 A.  I'm sorry.  Is this information --

 Q.  Well, did your partner help you prepare this report?

 A.  Yes, sir.

 Q.  How did you guys divide up report-writing responsibilities?

 A.  Back and forth.  "It's your turn.  You're up." You know, we just --

 Q.  Would you divide it up, like, typically by case, like, Okay.  I'll -- I, Detective Folino, I'll do most of the reports for the Patel investigation and,

## Page 70

Detective McDermott, you do the next one?

 A.  That's -- that's kind of what it is.  I mean, you know, in the middle this investigation you can get called out on another one, so obviously I'm not going to type both of them.  The partner would pick up the second.  If another came in, then I would come back and get that, so it's just kind of back and forth.

 Q.  And what does this report -- if you want to look at the investigative notes on page 7 and page 8, and I'll ask you a couple of questions about that.

 A.  Okay.

 Q.  It looks like this report primarily deals with the polygraph examination of Mr. Kuri; is that correct?

 A.  It does.

 Q.  Now, I don't see it stated here, but did you memorialize anywhere your meeting with Detective Figueroa?

 A.  It states here:  "At the conclusion of the examination Detective Figueroa-Mitchell informed detectives of her findings where deception was indicated in the polygraph exam."  Something she stated, something I typed.

 Q.  I meant your initial meeting with Detective Figueroa where you go over the incident.

**Page 71**

1    A.  She -- you know, she completed a separate
2  report, so I'm assuming that she would have made note of
3  that.
4    Q.  It says, "After Mr. Kuri took the test" that,
5  it says here, "Kuri was confronted with the results of
6  the examination."  Do you see that?
7    A.  Yes.
8    Q.  And was it at this point in time that Mr. Kuri
9  provided you with his alibi?
10    A.  One of the times, yes.
11    Q.  And does this accurately reflect what Mr. Kuri
12  told you?
13    A.  That is correct.
14    Q.  And then that 1935 North Tripp address, that's
15  the one I think we went over earlier, where there was --
16  you ultimately spoke with two people, Chrystian Reyes
17  and Tony?  Tony was Chrystian.  And then who is the
18  other one, Nicole Campos?
19    A.  I thought they lived at the Kostner one.  I
20  might be a little backwards here, or maybe it's me or
21  maybe it's you, I'm not sure.  But I think that address
22  was the lone female.
23    Q.  It looks like this meeting with Mr. Kuri took
24  place on August 5th; correct?

**Page 72**

1    A.  Correct.
2    Q.  And after Mr. Kuri told you on the 5th that he
3  goes home every night to a friend's house located at
4  1935 North Tripp, at that point in time did you attempt
5  to verify that information?
6    A.  I don't know if it was that exact time, but
7  subsequently we went to 1935 North Tripp and spoke to a
8  female at that location.
9    Q.  Now, ultimately did you conduct any lineups in
10  this case?
11    MS. BENJAMIN:  Object to the form of the
12  question.
13    THE WITNESS:  Could you ask that again?
14  BY MR. FELDMAN:
15    Q.  Did you conduct any lineups in this case?
16    A.  I believe we did.
17    Q.  And do you recall who viewed lineups in this
18  case?
19    A.  I recall I believe it was Tony Fernandez and
20  Zay Rusell.
21    Q.  And was it you and your partner who conducted
22  those lineups?
23    A.  There would have probably been another
24  detective or so that assisted us, but I -- off the top

**Page 73**

1  of my head, I can't recall unless I looked at the Lineup
2  Supplementary Report.
3    Q.  And what is your procedure for conducting a
4  lineup?
5    A.  When you say what is my procedure, I mean --
6    Q.  How do you conduct lineups?
7    A.  When I have a suspect, I then go into the
8  police -- the police -- into our computer database and
9  look at individuals in custody within, you know, a
10  couple miles of the location I'm at conducting the
11  physical lineup.  If there's someone similar in
12  appearance, I then make a request or sometimes I go out
13  on my own to get the individual, sign them out of
14  custody and bring them to my location as fillers in this
15  lineup.
16    Q.  And is that the procedure that you undertook
17  in this case?
18    A.  I believe it is.
19    Q.  And then, how about -- Is there one officer in
20  the room with the person viewing and then another
21  officer in the room with the people that are in the
22  lineup?
23    A.  Mostly it would be a detective, not an
24  officer, and yes.

**Page 74**

1    Q.  And would that be -- I mean, if you and your
2  partner were doing the lineup, one of you would be in
3  the room with the person viewing and one would be in the
4  room with the people being viewed?
5    A.  In theory.  I mean, that's the way it's
6  conducted, but, again, it changes.
7    Q.  And then is the suspect allowed to choose
8  where he's at in the lineup?
9    A.  Always.
10    Q.  And is that memorialized in some fashion?
11    A.  It's usually mentioned in the lineup sup.
12    Q.  I mean, do they sign like a form saying, "I
13  want to be in position three," or is it not that formal?
14    A.  No, it's not.  They'll just tell us.  They'll
15  walk in the room and, "Anywhere you want to sit.  You
16  know, you pick the spot," and they sit down.
17    Q.  Do you tell them to stay away from position
18  one?
19    A.  No, that's just for -- that's just for photo
20  arrays.  If they want to sit in position number one,
21  it's their choice.  You never tell them to -- to go for
22  something specific.  "Sit down.  Find a spot and sit
23  down, anywhere you want."
24    Q.  And then, in this case do you recall if you

Page 95

1    victim of a shooting or an attempted shooting?
2        A.   Well, they fired at him.  They just missed
3    him.
4        Q.   So he wasn't injured?
5        A.   He was not physically injured.
6        Q.   Yes.
7             And do you recall or can you tell me what
8    other cases in which Mr. Wachaa has helped your
9    investigation?
10       A.   They are confidential Organized Crime Division
11   investigations.
12       Q.   And so that's things that are currently
13   ongoing?
14       A.   That is correct.
15       Q.   Apart from any current investigations --
16   excuse me -- current organized crime investigations, has
17   Mr. Wachaa provided help to you in any investigations
18   following the Patel homicide?
19       A.   Yes, sir.
20       Q.   And what investigations are those?
21       A.   Specifically the one where he was shot at.
22       Q.   Apart from the one that he was shot at and the
23   ones which are currently ongoing, has Mr. Wachaa
24   provided assistance to you in any other investigations?

Page 96

1        A.   Nothing else that I can recall.
2        Q.   Why don't we take a few minutes here, if
3    that's okay.
4             (A short recess was taken.)
5    BY MR. FELDMAN:
6        Q.   Okay.  Sir, when you first got in touch with
7    Mr. Wachaa regarding the Patel murder, did he have any
8    information regarding the murder?
9        A.   From what I recall, he did not.  It was all
10   kind of stuff you heard on the street that he provided
11   to the officers is from what my recollection is.
12       Q.   And when you say the information that he heard
13   on the street that he provided to the officers, what
14   officers are you referring to?
15       A.   Officers from the 17th District that completed
16   a supplementary report.  I personally don't know them,
17   and I just can't recall their names as of this date and
18   time.
19       Q.   And was that -- would that be an Officer C.
20   Lopez?  Does that ring a bell?
21       A.   Vaguely.
22       Q.   Or how about Officer N. Sanchez?
23       A.   Vaguely.
24       Q.   Could those be the officers from the -- I'm

Page 97

1    sorry.  What district did you say it was?
2        A.   I thought 17th District.
3        Q.   But --
4        A.   But I'm not a hundred percent sure.  I believe
5    17, that's where the murder happened.  I believe what --
6    whatever hospital, whatever district Swedish Covenant is
7    in.
8        Q.   And did you, I believe, see the copy of
9    that -- was it a sup report or a GPR or what --
10       A.   If you're asking me, I believe it was a
11   supplementary report.
12       Q.   And did you have a copy of that supplemental
13   report at the time that you first contacted Mr. Wachaa
14   regarding the Patel investigation?
15       A.   That's what I believe actually led me to
16   Mr. Wachaa, that report.
17       Q.   Okay.  And, again, I apologize if I asked
18   this.  But prior to being provided that report had you
19   had prior dealings with Mr. Wachaa?
20       A.   Earlier I stated I just wasn't sure.  Now,
21   after kind of visualizing the sup report and the content
22   of it, that would have been my first contact with
23   Mr. Wachaa.  So the answer to your question would be no,
24   I did not know or have any contact with Mr. Wachaa prior

Page 98

1    to that report being submitted.
2        Q.   Okay.  But you testified that you -- once you
3    got in touch with Mr. Wachaa, you -- you instructed him
4    to contact Mr. Rusell to see if he could get Mr. Rusell
5    to cooperate in the investigation?
6        A.   That's a fair response.
7        Q.   Well, how would you say it?
8        A.   Just asked him that, in so many words, "Get in
9    and do the right thing."
10       Q.   And that conversation with Mr. Wachaa took
11   place prior to you meeting Zay Rusell on August 2, 2009?
12           MS. BENJAMIN:  Could you read back that
13   question?
14           (A portion of the record was read by the
15   reporter.)
16           THE WITNESS:  No, it did not.
17   BY MR. FELDMAN:
18       Q.   So you had already met with Zay Rusell as of
19   the time that you first had contact with Mr. Wachaa?
20       A.   That is correct.
21       Q.   And at that first meeting with Mr. Rusell he
22   gave you the names of Rowdy and Little David?
23       A.   That is correct.
24       Q.   And did you physically meet with Mr. Wachaa

## Page 99

1    during the course of the Patel investigation apart from
2    the time where you said you saw him at the Grand Jury
3    proceedings?
4       A.  I vaguely recall meeting with him at some
5    point in the investigation prior to the contact at the
6    Grand Jury.
7       Q.  And did you seek him out?  How did that
8    meeting take place?
9       A.  I believe I sought him out.
10      Q.  And for what purpose?
11      A.  To verify the content of the supplementary
12   report that was provided by the police officers that I
13   believe you said a Lopez and a Sanchez provided or
14   submitted.
15      Q.  I don't have copies of it, but is this the
16   report that you're referring to?  And, for the record, I
17   guess we can mark this as an exhibit.  I just don't have
18   copies.  But it's a --
19      MS. BENJAMIN:  Just mark it.
20      MR. FELDMAN:  Mark it?
21      MS. BENJAMIN:  Or just call it by its Bates
22   stamp number.
23   BY MR. FELDMAN:
24      Q.  It's RFC 000010 and 11.

## Page 100

1       A.  This is the supplemental report, except this
2    is just missing the date and time of occurrence up on
3    top, it was cut off.
4       Q.  The date and time of occurrence being?
5       A.  You see right here?
6       Q.  Yeah.
7       A.  It's kind of cut off?  There's something up
8    there.  I believe it's date and time of occurrence or
9    there's at least some date and time up there that was
10   missing from this report.
11      Q.  And that indicated -- I mean, to the best of
12   your recollection, the date and time of what occurrence
13   would that be?
14      A.  Well, it all depends on the interpretation.
15   The occurrence of the time of this interview or the
16   occurrence of the time of the initial crime that they're
17   referencing.
18      Q.  Oh.  In this case, it appears to be this
19   incident report prepared in connection with the Patel
20   investigation?  Does that appear to be the case?
21      A.  That is correct.
22      Q.  And this report memorializes a conversation
23   between Mr. Wachaa and it looks like a couple of police
24   officers.  And, I'm sorry, you said when you spoke to

## Page 101

1    Mr. Wachaa, were you attempting to verify the
2    information which is set forth here?
3       A.  That is correct.
4       Q.  And what happened during that meeting with
5    Mr. Wachaa?
6       A.  I believe he said all the information
7    contained was just hearsay, it's what he heard on the
8    street.
9       Q.  So did Mr. Wachaa tell you that Mr. Rusell had
10   given him information regarding the incident?
11      A.  I'm sorry.  So was -- did Mr. Rusell provide
12   Mr. Wachaa -- I just want to make sure I'm not saying --
13      Q.  Yeah.
14      A.  Sorry to interrupt.  So did --
15      Q.  Yeah.  Sorry.
16      A.  So did Wachaa tell me that Rusell provided
17   info?
18      Q.  Yes.
19      A.  No.
20      Q.  So the information which you gathered from
21   Mr. Wachaa, it's your testimony that he was telling you
22   things that he just, you know, quote/unquote, "heard on
23   the street"?
24      A.  Yeah.  Word on the street, exactly.

## Page 102

1       Q.  Did you -- in that later conversation with
2    Mr. Wachaa, did you ask him whether he had spoken with
3    Mr. Rusell regarding the Patel murder?
4       A.  When you say "later conversation," is there a
5    specific one you're referencing?  I'm just not sure.
6       Q.  Well, I guess how many conversations and/or
7    meetings did you have with Mr. Wachaa during the course
8    of this investigation?
9       A.  I can recall one to verify the information
10   contained within this supplementary report; the phone
11   call trying to get him to talk to Mr. Rusell, to
12   cooperate; the phone call to -- I believe it was to
13   provide transportation to Mr. Rusell to the Grand Jury;
14   and then the specific face-to-face contact that I had
15   with him when I observed him at the Grand Jury.
16      Q.  And now, at the time that you first spoke to
17   Mr. Wachaa, Mr. Rusell had already given you the names
18   of Rowdy and Little David; correct?
19      A.  That is correct.
20      Q.  So what further cooperation were you looking
21   for from Mr. Rusell that you thought Mr. Wachaa could
22   help out with?
23      A.  Mr. Rusell was at the point of liking the
24   police -- well, actually, no.  He started off disliking

Page 103

1    the police, then he liked the police, and then he
2    didn't. So it was just like, you know, "we're in this,
3    let's get through this" kind of a thing, and he kind of
4    was just a -- a mediator that helped a couple of times
5    just to get him to fully cooperate with the police.
6         Q.   Like cooperate with things such as the Grand
7    Jury testimony?
8         A.   Exactly. Exactly.
9         Q.   I may be done. I'm just looking through my
10   notes here.
11        Just a few more questions. Did you ever have
12   any contact with William Jotzat, J-o-t-z-a-t?
13        A.   I vaguely recall them living within the
14   vicinity of the homicide. So I can't recall if I
15   directly spoke with him, but I know at least a Chicago
16   Police Department detective spoke to them regarding
17   their observations on the night, day, time of the murder
18   of Mr. Patel.
19        Q.   Okay. And that would be William Jotzat and I
20   believe his wife is Kate Jotzat?
21        A.   I -- Jotzat sits in my head. It's just --
22   it's a different name that jumps out, and I believe they
23   live somewhere within a couple houses, a couple doors, a
24   block, something like that, and that's about the extent

Page 104

1    of it. I just can't recall specifically if it was me or
2    not. And I -- yeah, that's about it.
3         Q.   Okay. Well, it's -- if you had met with
4    William Jotzat, would there be a report documenting that
5    meeting?
6         A.   If I met with them, there would, at a minimum,
7    I don't know about a report, but at a minimum there
8    should be some sort of GPR, a General Progress Report.
9         Q.   And I guess this is just the same question for
10   the record. If you had met personally with Kate Jotzat,
11   would there be some report, a GPR, whatever,
12   memorializing that meeting?
13        A.   Yeah. I mean, it wouldn't have to be two
14   separate for them, but at least something documenting
15   what they had to say or -- or actually what they
16   observed or what they did not observe.
17        Q.   Okay. And did you take place -- or, take
18   place. Excuse me. Did you take part in a lineup with
19   the Jotzats?
20        A.   I recall -- I vaguely recall that I had some
21   sort of a role in it either by me requesting them to
22   come in, being present, some sort of contact.
23        Q.   But you don't recall specifically whether or
24   not, what your involvement in those lineups?

Page 105

1         A.   I'm leaning more towards I assisted in the
2    lineup part, but I can't a hundred percent commit to it
3    unless I took a peek at my report.
4         Q.   Okay. Throughout this deposition I've asked
5    you questions about what you recall or what happened in
6    certain instances. Is it fair to say that your reports
7    and the reports of the other officers have provided you
8    with, you know, a recollection of the events from this
9    investigation?
10        MS. BENJAMIN: Object to form.
11   BY MR. FELDMAN:
12        Q.   Another way to phrase it is, Do you have an
13   independent recollection of your first meeting with Zay
14   Rusell and your first meeting with Mr. Fernandez, or is
15   it your -- does your knowledge really come from your
16   reports?
17        A.   My knowledge comes mostly from my reports.
18        Q.   Could we go off the record for a second?
19        (Discussion held off the record.)
20        MR. FELDMAN: I think that will do it.
21        MS. BENJAMIN: Okay. We'll reserve.
22        (Witness excused.)
23        (The deposition was concluded at 1:27 p.m.)
24

Page 106

1                I N D E X
2    WITNESS:      DIRECT  CROSS  REDIRECT  RECROSS
3    DETECTIVE JOHN FOLINO, JR.
4    BY MR. FELDMAN      3
5            E X H I B I T S
6    NUMBER           DESCRIPTION          PAGE
7    DEPOSITION EX. 1   CLEARED/CLOSED (ARREST AND   36
                PROSECUTION) SUPPLEMENTAL
8               REPORT
     DEPOSITION EX. 2    FIELD INVESTIGATION    43
9               PROGRESS REPORT
     DEPOSITION EX. 3    FIELD INVESTIGATION    69
10              PROGRESS REPORT
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 107

1     STATE OF ILLINOIS )
               ) SS.
2     COUNTY OF COOK   )
3
4          I, BETH SKLAR, Certified Shorthand Reporter
     and Registered Professional Reporter, do hereby certify
5     that on the 16th day of March, 2015, the deposition of
     the witness, DETECTIVE JOHN FOLINO, JR., called by the
6     Plaintiff, was taken before me, reported
     stenographically and was thereafter reduced to
7     typewriting under my direction.
          The said deposition was taken at the offices
8     of Loevy & Loevy, 312 North May Street, Chicago,
     Illinois 60607, and there were present Counsel as
9     previously set forth.
          The said witness, DETECTIVE JOHN FOLINO, JR.,
10    was first duly sworn to tell the truth, the whole truth,
     and nothing but the truth, and was then examined upon
11    oral interrogatories.
          I further certify that the foregoing is a
12    true, accurate and complete record of the questions
     asked of and answers made by the said witness, DETECTIVE
13    JOHN FOLINO, JR., at the time and place hereinabove
     referred to.
14         The signature of the witness, DETECTIVE JOHN
     FOLINO, JR., was not waived and the deposition was
15    submitted pursuant to Rules 207 and 211(d) of the Rules
     of the Supreme Court of Illinois to the deponent per
16    copy of the attached letter.
          The undersigned is not interested in the
17    within, case, nor of kin or counsel to any of the
     parties.
18
19
20
21          Beth Sklar, CSR, RPR
22          License No. 084-002148
23
24

## Page 108

1        REPORTER: BETH SKLAR

        DEPOSITION OF: DETECTIVE JOHN FOLINO, JR.
2        TAKEN: 3/16/15
3        DEPOSITION ERRATA SHEET
4    Page No._____Line No._____Change to:_____
5    _____
6    Reason for change:_____
7    Page No._____Line No._____Change to:_____
8    _____
9    Reason for change:_____
10   Page No._____Line No._____Change to:_____
11   _____
12   Reason for change:_____
13   Page No._____Line No._____Change to:_____
14   _____
15   Reason for change:_____
16   Page No._____Line No._____Change to:_____
17   _____
18   Reason for change:_____
19   Page No._____Line No._____Change to:_____
20   _____
21   Reason for change:_____
22
23    SIGNATURE:_____DATE:_____
24       DETECTIVE JOHN FOLINO, JR.

# Exhibit E

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

```
ANTHONY KURI, (a.k.a. RAMSEY        )
QURASH),                            )
                    Plaintiff,      )
                                    )
        vs.                         )   No. 1:13-1653
                                    )
THE CITY OF CHICAGO,                )
DETECTIVES SZWEDO, VALKNER,         )
FOLINO, McDERMOTT, KOLMAN,          )
CORDARO, FIGUEROA-MITCHELL,         )
OFFICERS LOPEZ, SANCHEZ, And        )
As-Yet UNKNOWN CHICAGO              )
POLICE DEPARTMENT MEMBERS,          )
                                    )
                    Defendants.     )
```

The deposition of

DETECTIVE THOMAS KOLMAN, taken under oath

at 311 North Aberdeen Street, Suite 300C,

Chicago, Illinois, 12:01 P.M., on Tuesday,

December 16, 2014, pursuant to the Rules of the

United States District Court, Northern District

of Illinois, before Carol M. Siebert-LaMonica,

CSR No. 084.001355 in and for the County of

Cook and State of Illinois, pursuant to notice.

**Page 3**

1     DETECTIVE THOMAS KOLMAN,
2  having been first duly sworn, was examined and
3  testified as follows:
4           EXAMINATION
5  BY MR. FELDMAN:
6     Q.  Sir, could you please state and spell
7  your name for the record?
8     A.  Thomas Kolman, K O L M A N.
9     Q.  And, Mr. Kolman, my name is Joel
10  Feldman.  I am an attorney, and I am
11  representing Anthony Kuri in connection with a
12  lawsuit that Mr. Kuri has brought against
13  yourself and various other current and former
14  Chicago Police officers in the City of Chicago.
15           Are you familiar with that
16  lawsuit?
17     A.  Vaguely, yes.
18     Q.  Have you ever given or had your
19  deposition taken before?
20     A.  Yes.
21     Q.  Approximately how many times?
22     A.  Three approximately.
23     Q.  I won't hold you to that. And were
24  those in connection with -- tell me what you

**Page 4**

1  recall of those depositions, what were they
2  for?
3     A.  I believe it was all action against
4  the City from your wonderful company was one of
5  them, and then there was a couple of other,
6  where I was deposed as basically a witness.
7     Q.  So the one that you mentioned that you
8  think may have been a lawsuit that Loevy &
9  Loevy was involved in, were you a defendant in
10  that lawsuit?
11     A.  No.
12     Q.  You were just sort of a third party
13  witness?
14     A.  One of the detectives that was out on
15  the scene.
16     Q.  And then another one you mentioned,
17  I'm sorry, what do you think it was?
18     A.  Probably something similar to some
19  police-involved shooting or something like
20  that.
21     Q.  Okay.  Even though you have had two or
22  three prior depositions, let me just give you
23  some basic ground rules.
24           We have a court reporter here,

**Page 5**

1  who is dutyfully taking everything down.  She
2  does a very good job. In order to make it so
3  she is not mean to us, it is helpful if you
4  allow me to finish asking my question before
5  you begin to answer.  And by the same token, I
6  will allow you to finish answering any
7  question I may have prior to asking another
8  one, is that fair?
9     A.  Fair.
10     Q.  Also to make her job easier, unlike
11  normal human conversation, it is important that
12  you make all of your responses verbal, as Carol
13  cannot take down nods of the head or uh uhs and
14  ugh ughs, okay?
15     A.  Sure.
16     Q.  And while I will do my best to ask
17  questions that are clear and concise, I often
18  fail at that endeavor, so if you don't
19  understand a question that I've posed, we will
20  take no offense to that, so please let me know,
21  okay?
22     A.  Yes.
23     Q.  By the same token, if you go ahead, if
24  you answer a question, I will assume that you

**Page 6**

1  understood what I've asked, fair enough?
2     A.  Yes.
3     Q.  And, finally, if you wish to take a
4  break at any time, we can do so at your
5  leisure, I only ask that we don't take a break
6  while there is a question pending, okay?
7     A.  Yes.
8     Q.  Prior to being informed of this
9  lawsuit, did you have any independent
10  recollection of this case, and I should clarify
11  this case, this case could mean this lawsuit.
12  Do you have any independent recollection of the
13  Patel homicide?
14           MS. MASTERS: Object to the form of the
15  question, vague as to the timeframe.
16           THE WITNESS:  Very little.
17  BY MR. FELDMAN:
18     Q.  What did you remember?
19     A.  That we were assigned to work on a
20  homicide that occurred at Lawrence and Central
21  Park.
22     Q.  And was that an unusual assignment?
23     A.  No.
24     Q.  How long have you been a Chicago

**Page 7**

1  Police Officer?
2    A.  Almost 21 years.
3    Q.  So like early 90's, '92, '93?
4    A.  '94.
5    Q.  And were you a police officer prior to
6  being employed by the Chicago Police
7  Department?
8    A.  Yes.
9    Q.  And where --
10   A.  I was a Cook County sheriff.
11   Q.  I guess I can go back to the
12  beginning. What was your first position in law
13  enforcement?
14   A.  Cook County.
15   Q.  Approximately do you recall when that
16  started?
17   A.  1984.
18   Q.  Are you from the Chicago area?
19   A.  Yes.
20   Q.  Whereabouts?
21   A.  Northwest side of Chicago near O'Hare
22  Airport.
23   Q.  Where did you go to high school?
24   A.  Webber.

**Page 8**

1    Q.  What year did you graduate?
2    A.  1981.
3    Q.  Any -- what did you do when you
4  graduated?
5    A.  Went to work for the Illinois Tollway.
6    Q.  In what capacity?
7    A.  Maintenance.
8    Q.  And how long did you do that for?
9    A.  About three years.
10   Q.  And was your next job with the Cook
11  County Sheriff's Department?
12   A.  Yes.
13   Q.  What made you want to get involved in
14  law enforcement?
15   A.  I thought it was a good profession.
16   Q.  And what did you do at the Cook County
17  Sheriff's Office?
18   A.  I started out in corrections.  I
19  worked in the receiving room for several years,
20  and then I went into the Electronic Monitoring
21  Unit as an investigator.
22        And I was subsequently promoted
23  to the Deputy Chief of the Electronic
24  Monitoring Unit's Fugitive Section.

**Page 9**

1        It was all during my ten years of
2  service with the sheriff's.
3    Q.  And you said initially you were in
4  receiving, was that at Cook County Jail?
5    A.  Yes.
6    Q.  And what is the Electronic Monitoring
7  Unit?
8    A.  It is a program that was designed to
9  let out supposedly non-violent criminals, all
10  their cases pending in the Court's, relieve
11  overcrowding.
12   Q.  And that was sort of pre-computer
13  internet age, correct?
14   A.  I believe the unit was started in '86
15  or '87, somewhere in that area, so I don't
16  know.
17   Q.  How did the monitoring work at that
18  time?
19   A.  It was done by phone. You had to
20  plug your monitor into the phone almost like a
21  dial-up modem, and it would call Kankakee and
22  that's where our contract was with the company.
23  And they would make random calls throughout the
24  day and tell you to --

**Page 10**

1    Q.  Plug in?
2    A.  -- plug in.
3    Q.  I never knew that. That's interesting.
4        And then -- then you moved from
5  there to the Chicago Police Department?
6    A.  Yes.
7    Q.  And why did you make that switch?
8    A.  More money.
9    Q.  Did you take a test to join the
10  Chicago Police Department?
11   A.  Yes.
12   Q.  And were you immediately hired
13  following that test or how did that work?
14   A.  No, I took the test and it was
15  probably a year and a half or so, two years
16  maybe before, you know, I was hired after going
17  through all of the steps that they require.
18   Q.  And what -- when you are hired, is
19  that when you go to the academy?
20   A.  Yes.
21   Q.  And how long did you spend at the
22  academy?
23   A.  I don't know, six months, whatever was
24  the amount of time at that time.

**Page 95**

1  STATE OF ILLINOIS )
2                   ) SS:
3    COUNTY OF COOK )
4        The within and foregoing deposition
5  of the aforementioned witness was taken before
6  Carol M. Siebert-LaMonica, C.S.R, at the place,
7  date and time aforementioned.
8        There were present during the taking
9  of the deposition the previously named counsel.
10        The said witness was first duly sworn
11  and was then examined upon oral interrogatories;
12  the questions and answers were reported in
13  shorthand by the undersigned and transcribed
14  via computer-aided transcription.
15        The within and foregoing is a true,
16  accurate and complete record of all of the
17  questions asked of and answers made by the
18  forementioned witness at the time and place
19  hereinabove referred to.
20        The signature of the witness was
21  not waived and the deposition was submitted
22  pursuant to Rules 207 and 211 (d) of the Rules
23  of the Supreme Court of Illinois to the
24  deponent per copy of the attached letter.

**Page 96**

1        The undersigned is not interested in
2  the within case, nor of kin or counsel to any
3  of the parties.
4        Witness my official signature in and
5  for Cook County Illinois on January 1
6
7
8    Carol M. Siebert-LaMonica
9    C.S.R. No. 084.001355
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 97**

C O R R E C T I O N   P A G E
    I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON: _____
___ ___ _____
            REASON:

(Signed)_____

**Page 98**

WITNESS CERTIFICATION


        I hereby certify that I
have read the foregoing transcript of my
deposition consisting of Pages 1 through 101,
inclusive.  Subject to the changes set forth on
the preceding pages, the foregoing is a true
and correct transcript of my deposition taken
on December 16, 2014.



        (Signed) _____



SUBSCRIBED AND SWORN TO
Before me this __ day of
_____,2015.



_____


Notary Public

# Exhibit F

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ANTHONY KURI, (a.k.a. RAMSEY      )
QURASH),                          )
                     Plaintiff,   )
                                  )
          vs.                     )   No. 1:13-1653
                                  )
THE CITY OF CHICAGO,              )
DETECTIVES SZWEDO, VALKNER,       )
FOLINO, McDERMOTT, KOLMAN,        )
CORDARO, FIGUEROA-MITCHELL,       )
OFFICERS LOPEZ, SANCHEZ, And      )
As-Yet UNKNOWN CHICAGO            )
POLICE DEPARTMENT MEMBERS,        )
                                  )
                     Defendants.  )


          The VIDEOTAPED deposition of

TIMOTHY MCDERMOTT, taken under oath

at 312 North May, Suite 100, and 311 North

Aberdeen Street, Suite 300C, Chicago, Illinois,

2:21 P.M., on Wednesday, September 15, 2015,

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Carol M. Siebert-LaMonica, CSR No.

084.001355 in and for the County of Cook and

State of Illinois, pursuant to notice.

## Page 19

1  know if you count that, it is more like
2  security, I mean -- but as far as actual state
3  certified police, no.
4      Q.  Okay.  And was that your job prior to
5  joining the force?
6      A.  It was.
7      Q.  And when did you join the Chicago
8  Police Department?
9      A.  May of 1997.
10     Q.  And did you -- were you hired the
11 first time that you applied?
12     A.  It is an interesting question. I took
13 the test years years ago, and I got called, I
14 never followed up on it. I took the test again,
15 went through the testing, and got hired.
16     Q.  And the first time you did it, was
17 that prior to your DePaul employment?
18     A.  I don't recall if it was prior or
19 during.
20     Q.  I guess briefly just a little
21 background, are you from the Chicago area?
22     A.  Yes.
23     Q.  And whereabouts did you grow up, not
24 the address?

## Page 20

1      A.  Northwest side.
2      Q.  And did you attend high school on the
3  northwest side?
4      A.  It was in the suburbs but across the
5  street from the northwest side, yes.
6      Q.  Where did you attend high school?
7      A.  River Grove, Illinois.
8      Q.  And did you graduate from River Grove?
9      A.  Yes, sir.
10     Q.  What year did you graduate?
11     A.  1985.
12     Q.  And any education following graduating
13 from River Grove High School?
14     A.  I had some college off and on, but no
15 degree.
16     Q.  And where did you take classes,
17 college classes?
18     A.  I took classes at Loras College in
19 Dubuque, Iowa, City Colleges of Chicago, and I
20 believe I took one class at DePaul when I was
21 working there.
22     Q.  And when you were hired in May at the
23 Chicago Police Department, in May of '97, did
24 you attend the Chicago Police Academy?

## Page 21

1      A.  I did.
2      Q.  Was that shortly after you were hired
3  in May of '97?
4      A.  Yes.
5      Q.  And where was the academy located at
6  that time?
7      A.  Same present location, I believe it is
8  1300 West Jackson.
9      Q.  And did you graduate from the academy?
10     A.  Yes, I did.
11     Q.  And where were stationed to after you
12 graduated from the academy?
13     A.  The 24th District, Rogers Park.
14     Q.  And how long did you serve in the 24th
15 District at Rogers Park?
16     A.  From '97 through Fall of '99.
17     Q.  And were you a patrolman at that time?
18     A.  Yes.
19     Q.  And what happened in the Fall of '99?
20     A.  I transferred out of there.
21     Q.  To where?
22     A.  The Special Operations Section, 153.
23     Q.  I didn't catch the end of that.
24 Special Operations --

## Page 22

1      A.  Unit 153.
2      Q.  Unit 153. And what was Unit 153 in the
3  Special Operations Section?
4      A.  It was a city -- I believe what they
5  actually called it was a citywide felony
6  interdiction team.
7      Q.  Interdiction?
8      A.  Yes.
9      Q.  And what was your understanding of
10 what citywide felony interdiction team was
11 supposed to be doing?
12     A.  We were assigned all over the city in
13 hot spots they called them; drugs, guns, that
14 sort of thing.
15     Q.  And when you were assigned there in
16 Fall of '99 where were you stationed out of?
17     A.  That is the Homan Square facility. I
18 don't know the address off of the top of my
19 head.
20     Q.  And how long did you serve in the
21 Special Operations Unit 153?
22     A.  I made detective the Monday after --
23 I started detectives school the Tuesday after
24 Labor Day in 2003. I don't recall the exact

## Page 23

1  date.
2      Q.  So probably early September, 2003?
3      A.  I take that back, Memorial Day because
4  it was May. It was Memorial Day.
5      Q.  The Tuesday after Memorial Day, that's
6  when you started detective school?
7      A.  Detective school, yes.
8      Q.  Prior to that time you had sat for the
9  detective exam?
10     A.  Yes.
11     Q.  And did you complete detective school?
12     A.  I did.
13     Q.  And where were you assigned once you
14 completed detective school?
15     A.  Area 1. The Area 1 Detective Division.
16     Q.  And were you assigned to a particular
17 unit at the Area 1 Detective Division?
18     A.  After my training, rotation of six
19 periods, I was assigned to homicide, sex and
20 gangs.
21     Q.  And how long did you serve in the
22 Homicide Sex and Gangs Unit of Area 1?
23     A.  I transferred out in June of 2006.
24     Q.  And where did you go in June of '06?

## Page 24

1      A.  The Area 5 Detective Division.
2      Q.  And was that a transfer that you had
3  requested?
4      A.  Yes.
5      Q.  And what were -- did you have the same
6  assignment as you did at Area 1 when you were
7  in homicide, sex and gangs?
8      A.  Yes.
9      Q.  Did you transfer over by yourself or
10 did your partner transfer with you?
11     A.  By myself.
12         MR. GIVEN: Objection to the form.
13 BY MR. FELDMAN:
14     Q.  And how long did you serve in Area 5
15 Detective Division?
16     A.  I was in the Area 5 Detective Division
17 until March of 2012 when they re- --  they
18 revamped the entire Detective Division.
19     Q.  And what do you mean by that?
20     A.  They reorganized the whole unit,
21 instead of five areas, as there had been
22 previously for generations, there were now only
23 three.
24     Q.  And so where were you transferred to

## Page 25

1  when that happened?
2      A.  Back to 51st and Wentworth, which was
3  now called the Area Central Detective Division.
4      Q.  And did you remain at Area Central
5  until you were no longer with the force?
6      A.  Yes.
7      Q.  And when did that take place?
8      A.  I was separated in April of 2014.
9      Q.  And are you currently employed?
10     A.  Yes, I am.
11     Q.  And were you present -- are you
12 currently employed?
13     A.  Is that relevant?  MT Transit is the
14 name the company.
15     Q.  MT Transit?
16     A.  Yes.
17     Q.  How long have you been employed with
18 MT Transit?
19     A.  May 18, 2014.
20     Q.  Now when you were with the -- when you
21 went to Special Operations, were you still a
22 patrol officer?
23     A.  Yes.
24         MS. BENJAMIN: Do you understand the

## Page 26

1  question?
2         THE WITNESS:  I was, yes.
3  BY MR. FELDMAN:
4      Q.  When you went from the 24th District,
5  Rogers Park, and went to Special Operations
6  Unit 153, was that a promotion or a lateral
7  move?
8      A.  It was a lateral move.
9      Q.  And was that -- had you requested to
10 be transferred over to Special Operations?
11     A.  Yes, I did.
12     Q.  And the Special Operations Unit 153,
13 was that a team that you were working with or
14 did you work with a particular partner?  How
15 did that work?
16     A.  Anything more substantive about the
17 Special Operations Section I'm not going to
18 answer on the advise of my attorneys.  I have
19 pending litigation relative to my time spent
20 there.
21     Q.  And is that the advice that
22 Miss Benjamin gave you?
23     A.  No.
24     Q.  You are involved in litigation in

**Page 47**

1   and place him in custody.  So I was not there.
2          So Detective Folino himself went
3   out to that address.
4          Q.  I believe now you were looking back
5   on --
6          A.  I believe I flipped back to page 9.
7          Q.  Okay. That looks like that was on
8   September 8th?
9          A.  Yes.
10          Q.  At 2230, so that would be 10:30 at
11   night, Detective Folino and Olson went out to
12   Rochelle to take Mr. Kuri into custody?
13          A.  Yes.
14          Q.  So based on that you believe that you
15   were not working on September 8th, 2009?
16          A.  That's correct.
17          Q.  Now, it looks like the trip out to
18   Kostner, described on the next page, took place
19   on September 9th, so the next morning.
20          So do you, as you sit here today,
21   know if you were working that morning with
22   Detective Folino?
23          A.  Again, based on my memory and based on
24   the way the report is written, I am going to

**Page 48**

1   say that I came in, my regular shift on
2   September 9th in the afternoon.
3          Again just based on my working
4   knowledge of when John and I were together, if
5   I was there, it would have said that I was
6   there.
7          Q.  Okay.  And then earlier I believe you
8   said one of the things that you reviewed in
9   preparation for today's deposition was a
10   transcript of an interview with Nicole Campos?
11          A.  Yes.
12          Q.  And would that be the encounter
13   described on the next page, page 11?
14          A.  Yes.
15          Q.  The second full paragraph it says:
16          On September 9, 2009, at
17   approximately 2310 hours, Campos arrived at
18   Area 5.  And then it describes an interaction
19   with her in the presence of you and Detective
20   Folino?
21          A.  Yes.
22          Q.  At that point, was that -- did she
23   give a statement at that point in time?
24          A.  No, I believe she gave a statement --

**Page 49**

1   yes, she gave a statement to Folino and I, and
2   then several hours later or -- let's see, that
3   was 2310.
4          And then later in the narrative,
5   myself and the State's Attorney got a
6   memorialized statement from Nicole Campos.
7          Q.  Then later on on that page --
8          A.  Still page 11?  I'm sorry.
9          Q.  Yes.  It looks like you along with the
10   Assistant State's Attorney and Detective Folino
11   went out into the field to interview Chrystian
12   Reyes?
13          A.  Yes.
14          Q.  Backing up to Page 10, it is your
15   belief, as you sit here today, that you are not
16   present for Detective Folino's encounter with
17   Chrystian Reyes as described here?
18          A.  His initial one, yes, that is correct.
19          Q.  And then would the same be true for
20   the next encounter that's described on that
21   page, Page 10 of 12 where Detective Folino
22   describes going to 1935 North Tripp in an
23   attempt to interview Teresa Luis?
24          A.  Yes.  At 7:30 in the morning.

**Page 50**

1          Q.  Yes.
2          A.  Yes.
3          Q.  You were not present for that
4   interview either?
5          A.  That is correct. That is my
6   recollection, yes.  If I was there, again just
7   like in the rest of the narrative, my name
8   would be clearly present.
9          Q.  Now, in a report such as this you
10   believe where you testified based on how it is
11   written that Detective Folino would have been
12   the one to prepare it, your name appears as one
13   of the reporting officers, did you guys have a
14   procedure in place where you would review his
15   report before it was submitted for approval?
16          A.  Certainly.
17          Q.  And do you recall doing that in this
18   case?
19          A.  Not specifically, no.
20          Q.  That was your general procedure?
21          A.  Yes.
22          Q.  Now, prior to your involvement in the
23   Patel homicide investigation, had you ever had
24   any dealings with Chrystian Reyes?

**Page 55**

1    A.  I believe it is the CLEAR System.
2    Q.  Now, during the course of your
3  investigation, did you deal with an individual
4  by the name of Addul lack Kawasaki?
5    A.  Yes.
6    Q.  And what -- prior to your involvement
7  in the Patel homicide investigation, did you
8  know Abdul Wachaa?
9    A.  I don't recall specifically if that
10  was our first meeting with Abdul or if that was
11  one of the subsequent ones, but I dealt with
12  Abdul a couple of times.
13    Q.  And how in what capacity did you deal
14  with him in this investigation?
15    A.  He -- there was something about a
16  phone call, he claimed to have received a phone
17  call from Zay in the car or immediately after
18  the shooting or maybe he was on the phone
19  during the event. So as almost a witness.
20    Q.  And how did you come to learn that
21  that Abdul Wachaa had learned information over
22  the phone from Zay Russell?
23    A.  I don't recall specifically how we
24  learned that.

**Page 56**

1    Q.  And in this case what was your first
2  interaction with Mr. Wachaa, did you speak with
3  him on the phone?
4    A.  I don't believe I spoke to him on the
5  phone. I believe I spoke to him up in the
6  Detective Division.
7    Q.  And how did that meeting come about?
8    A.  I believe he offered some information.
9  It may have been to other officers who kind of,
10  you know, unsure what to do or something, but
11  yes, it was -- yes, specifically I don't recall
12  how we were led to Abdul.
13    Q.  But you believe that your initial
14  meeting with him took place at the police
15  station?
16    A.  I believe so, yes.
17    Q.  Did he, just for lack of a better
18  phrase, appear in front your desk, how was it
19  that you met with him at the police station?
20    A.  Like I said he may have presented
21  himself to other officers or, you know -- he
22  may have -- he may have presented himself,
23  saying, hey, I was talking to him on the phone
24  when this happened.

**Page 57**

1        But how specifically he was
2  brought into my contact I don't recall.
3    Q.  And what do you recall of that initial
4  meeting with Mr. Wachaa?
5    A.  Yes. Specifically my direct meeting
6  with him was kind of weird. He kept asking me
7  about my workouts. I mean on and on and on. It
8  was actually kind of disturbing by the end of
9  it. I mean how many times a week do I workout?
10  How many times do I bench?  Do I do regular
11  curls?  Or do I get in a preacher.  I mean it
12  was bizarre.  He might have had me to arm
13  wrestle at one point in time, too, yes, I'm
14  positive he did.
15    Q.  Is he someone who, by appearances,
16  works out alot?
17    A.  No.
18    Q.  How would you describe him physically?
19    A.  Just average.
20    Q.  And apart from him inquiring as to
21  your fitness routine, what do you recall of
22  your first meeting with Mr. Wachaa?
23    A.  That's pretty much my recollection of
24  my first meeting with him.

**Page 58**

1    Q.  And did he provide you with any
2  information relating to the Patel homicide?
3    A.  I don't specifically believe he did. I
4  think that the biggest thing to come out of
5  that was that he was tight with Zay Russell.
6    Q.  Now, at the point where you met with
7  Mr. Wachaa, had you already visited
8  Mr. Fernandez at the hospital for the first
9  time?
10    A.  I don't know.  I don't know
11  specifically when Mr. Wachaa got involved in
12  the investigation.
13    Q.  Had, at the time of your first meeting
14  with Mr. Wachaa, had you met with Zay Russell?
15    A.  I don't recall specifically if we did
16  or not.
17    Q.  And what else did Mr. Wachaa tell you
18  during that encounter with him?
19    A.  I believe the substance of the thing
20  was his phone conversation, it was either just
21  after the shooting occurred or he was on the
22  phone while the shooting was happening.
23    Q.  And did you document that interaction
24  with Abdul Wachaa?

## Page 59

1    A. I don't recall.

2    Q. Did Mr. Wachaa have information

3 pertinent to your investigation?

4    A. I think the most pertinent thing to

5 come out of Abdul was that he was friends with

6 Zay.

7    Q. And did you ask Mr. Wachaa to do

8 anything?

9    A. I don't recall if it was that meeting

10 or a subsequent meeting or a phone call from

11 John or a phone call from I, but I think at

12 some point in time we tried to use Abdul to get

13 in touch with Zay, because you read in the

14 reports Zay made himself scarce during large

15 segments of the investigation.

16    Q. I find that hard to believe.

17    MS. BENJAMIN: He was not there when

18 Joel went to pick him up for his deposition.

19    THE WITNESS: So you know of which I

20 speak.

21    MS. BENJAMIN: Joel has firsthand

22 knowledge. If we can just find Abdul, we can

23 get him to drive him to the dep.

24 BY MR. FELDMAN:

## Page 60

1    Q. You stated that there was then either

2 a second meeting or a second phone conversation

3 with Mr. Wachaa?

4    A. I believe so, yes.

5    Q. And what do you recall -- do you

6 recall if that was an in-person meeting or a

7 phone conversation?

8    A. I don't. I don't.

9    Q. What do you recall of that second

10 interaction, whether it have been by phone or

11 in person?

12    A. Just at that point I believe we were

13 trying to use Abdul, so we could track down

14 Zay.

15    Q. And did he agree to help make that

16 happen?

17    A. He did, I believe he helped us get Zay

18 to the Grand Jury. He helped us locate Zay to

19 get him to the Grand Jury.

20    Q. So to -- now, I believe you said you

21 have worked with Mr. Wachaa in connection with

22 other investigations, is that accurate?

23    A. Yes.

24    Q. And in what capacity have you worked

## Page 61

1 with him on other investigations?

2    A. I believe he was a victim on an

3 attempt agg battery, like they shot up his van

4 one night, and I believe we talked to him

5 relative to that investigation.

6    Like I said, specifically do I

7 recall if that was before or after the Patel

8 homicide, I don't recall specifically.

9    Q. So apart from the contact with

10 Mr. Wachaa and the incident you described where

11 his car or van was shot up, have you had any

12 other dealings with Mr. Wachaa?

13    A. I may very well have, but specifically

14 no direct recollection.

15    Q. Have you ever used -- well, in the

16 course of your detective work, have you had

17 occasion to work with people you would deem

18 informants?

19    A. Yes.

20    MR. GIVEN: Object to the form.

21    THE WITNESS: I mean I've received

22 information from people relative to the

23 investigation, but actually, you know, any

24 reoccurring thing like that no, I personally I

## Page 62

1 have not.

2

3 BY MR. FELDMAN:

4    Q. Now, during the course of your

5 investigation, did you have occasion to meet

6 with Mr. Russell?

7    A. Yes.

8    Q. And where did the first such meeting

9 with Mr. Russell take place?

10    A. I don't specially recall.

11    Q. When you first were assigned to work

12 on the investigation, did you review any of

13 that initial Incident Report?

14    A. I don't recall specifically if we did

15 or if it was just word of mouth from other

16 detectives.

17    Q. Well, when you were first assigned a

18 case -- well, I guess to be specific in this

19 case.

20    When you were first assigned to

21 do work on this case, what were you assigned to

22 do?

23    A. Follow-up on the homicide.

24    Q. And what does that mean?

**Page 67**

1    being the two perpetrators, is that correct?
2        A.  Yes.
3        Q.  And were you present when he
4    identified, when he named, I believe he
5    actually named, did he use their real names or
6    did he use their street names?
7        A.  I believe he used their street names.
8        Q.  And do you recall where that
9    interaction with Mr. Russell took place?
10       A.  I don't.
11       Q.  And was that before or after your
12   meeting with Mr. Wachaa?
13       A.  I want to say before, but I don't
14   recall specifically.
15       Q.  Now, did you ever have occasion to
16   meet with Mr. Russell after he identified
17   Rowdy and Little David as being the
18   perpetrators?
19       A.  Do you mean either identified them by
20   name or identified them in photo arrays,
21   because there were two separate -- so if you
22   mean by name, yes, I did, because he identified
23   them in photo arrays.
24       Q.  Where did that photo array

**Page 68**

1    identification take place?
2        A.  I want to say his residence, but again
3    I'm not 100% sure.
4        Q.  How about after that photo array
5    identification, did you have any meetings or
6    interactions with Mr. Russell?
7        A.  Again I believe -- I believe we
8    transported him to the Grand Jury. I could be
9    mistaken, but I believe we did.
10       Q.  Now, was Mr. Wachaa at the building
11   where the Grand Jury proceeding took place on
12   the date that the Grand Jury met?
13       A.  I have no idea.
14       Q.  Did you see Mr. Wachaa down at the
15   Grand Jury building when Mr. Russell was there?
16       A.  I have no recollection of that.
17       Q.  And have you had any contact with
18   Mr. Wachaa following that second incident that
19   you described where his vehicle was shot up?
20       A.  Not to my recollection. Not to my
21   recollection.
22       Q.  Did you communicate with him in any
23   manner?
24       A.  No, not willingly.

**Page 69**

1        MR. FELDMAN: Do you mind if we take
2    five minutes, as I see my wife has called me
3    five times?
4        (Recess.)
5
6    BY MR. FELDMAN:
7        Q.  We are going to do Exhibit 2.
8            (Deposition Exhibit No. 2 was
9            marked for identification.)
10       Q.  Sir, you have just been handed down a
11   document that's been marked as Exhibit 2.
12           And is this a document that you
13   looked at in preparation for today's
14   deposition?
15       A.  It is.
16       Q.  And it looks like this one also on the
17   first page lists Detective Folino as the
18   reporting officer and then on the last page it
19   lists both your name and Detective Folino's
20   name because Detective Folino is listed first.
21           Does that indicate to you that
22   Detective Folino would have been the one to
23   type up this report?
24       A.  It does.

**Page 70**

1        Q.  And now the narrative of the report
2    starts on page 8.
3        A.  Yes.
4        Q.  Okay. And it describes a meeting with
5    Mr. Fernandez at Illinois Masonic Hospital, do
6    you see that?
7        A.  Yes, I do.
8        Q.  And based on reviewing this report and
9    your recollection, is that your first meeting
10   with Mr. Fernandez?
11       A.  Yes.
12       Q.  And it says that he was shown a series
13   of data warehouse photographs, do you see that?
14       A.  Yes.
15       Q.  And were those the photographs you
16   described earlier that you generated based on
17   using the -- was it the CLEAR System?
18       A.  Yes.
19       Q.  And Mr. Fernandez was not able to
20   identify someone -- anyone from those two
21   separate photo arrays?
22       A.  That is correct.
23       Q.  Now, that first paragraph under
24   investigation at the end, the last sentence it

Page 71

1   says Tony Fernandez stated he would be able to
2   identify the two offenders, do you see that?
3       A.   I do.
4       Q.   Prior to that meeting with
5   Mr. Fernandez did you know how many offenders
6   you were looking for?
7       A.   Yes.
8       Q.   And how did you know that information?
9       A.   I believe Zay Russell indicated to the
10  scene detectives that he might be able to
11  identify the two offenders.
12      Q.   And now later on in -- on page 8, it
13  says that you then contacted Zay Russell, do
14  you see that?
15      A.   Yes, on August 2nd, yes.
16      Q.   Do you recall how did you contact him
17  was that -- did you call him?  Did you track
18  him down on the street?
19      A.   I don't recall.  It might have been a
20  phone call.  It might have been a knock on his
21  door.
22      Q.   And at that point when you met with
23  him on August 12th he said he wanted to
24  cooperate with this investigation?

Page 72

1       A.   Yes.
2       Q.   And do you believe that that contact
3   with Zay Russell was at his house?
4       A.   I believe so, but I can't be 100%
5   positive.
6       Q.   And it goes on to say that Russell
7   stated the night of the incident he didn't like
8   the way the police treated him, do you see
9   that?
10      A.   I do.
11      Q.   And did he tell you how he was
12  treated?
13      A.   I believe he was placed in custody.
14      Q.   And was he taken down to the station
15  that night?
16      A.   I don't know.  I wasn't present.
17      Q.   Now, at the time of this August 2nd
18  meeting with Zay Russell, does this report
19  refresh your recollection as to whether or not
20  this meeting described here occurred before or
21  after your meeting with Abdul Wachaa?
22      A.   It does not.
23      Q.   Now, in reviewing any of the reports
24  prepared by you or Detective Folino in

Page 73

1   preparation for today's deposition, did you
2   ever see the name Abdul Wachaa?
3       A.   I don't understand what you are
4   asking, sir?
5       Q.   Is his name listed in any of the
6   reports prepared by yourself or Mr. Folino?
7       A.   I do not believe it is.
8       Q.   It goes on to say that Mr. Russell
9   stated the names of Little David and Rowdy, do
10  you see that?
11      A.   I do.
12      Q.   And do you recall him telling --
13  giving you that information?
14      A.   I do.
15      Q.   Did you ask him for their real names
16  of those two individuals?
17      A.   Yes.
18      Q.   And what did he say?
19      A.   He did not know their given names.
20      Q.   It goes on to state that you list --
21  two officers are listed on the following page,
22  Officer Gonzalez and Acevedo?
23      A.   Yes.
24      Q.   Who were they?

Page 74

1       A.   I believe they were 17th District, as
2   I believe they are tact officers, yes.
3       Q.   And did you seek them out?  How did
4   you become involved with those two?
5       A.   I don't recall specifically if we --
6   we may have just gotten on the radio and asked
7   if they were available tact units in 17th to
8   meet with us. I do not recall specifically how
9   we came in contact with Acevedo and Gonzalez.
10      Q.   And what would be your goal in
11  contacting the 17th District tact officers?
12      A.   They are -- part of the assignment of
13  a tactical or gang officer is to be aware of
14  gang members in their district of assignment.
15  So if we had nicknames of gang members we would
16  ask them if they were aware of who belonged to
17  these nicknames.
18      Q.   And they were able to provide you with
19  the name, the name Anthony Kuri and the name
20  David Gomez?
21      A.   That is correct.
22      Q.   And what did you do once you had the
23  actual names the people being Mr. Kuri and
24  Mr. Gomez?

Page 75

1    A.  I believe we entered into the computer
2    system and found that they were in fact names
3    that matched those nicknames and generated
4    photo arrays.
5    Q.  And by generated, what do you mean by
6    generated photo arrays?
7    A.  Created them on the computer through,
8    I believe, the CLEAR System.
9    Q.  Would that -- by "array" do you mean
10   multiple pictures of Anthony Kuri and multiple
11   pictures of David Gomez or what do you mean by
12   that?
13   A.  No, I mean it would be a picture of
14   Anthony Kuri on one array.
15       A picture of David Gomez on
16   another array, and people with similar physical
17   characteristics and demographics for the
18   individual.
19       So it would have been Anthony
20   Kuri and 4 or 5 different people.
21       And David Gomez and 4 or 5
22   different people, matching physical, you know,
23   age, weight, height, race.
24   Q.  And the CLEAR System allows you to

Page 76

1    generate such photo arrays?
2    A.  Yes.
3    Q.  And then did you take those photo
4    arrays and go back to meet with Mr. Russell?
5    A.  No, I believe we went and talked to
6    Fernandez first.
7    Q.  Why did you go speak to Mr. Fernandez
8    versus going back to Mr. Russell?
9    A.  I don't specifically know, an educated
10   guess would be because we know where
11   Mr. Fernandez was.
12   Q.  And now did you go back to -- Strike
13   that.
14       Did you seek out the assistance
15   of the 17th District tact officers immediately
16   following your meeting with Mr. Russell?
17   A.  I mean immediately, it appears to be
18   the same evening, as opposed to did we do it, I
19   mean did we walk out of Zay's house and call,
20   I don't recall specifically, or you know we
21   discussed stuff, I don't recall if we did it
22   immediately.
23   Q.  And the -- where would you have
24   generated the photo arrays, would that have

Page 77

1    been back at your office?
2    A.  I don't specifically recall, however
3    it could be our off -- it could have been in
4    the 17th District. It could have been any CPD
5    facility has the CLEAR system.
6    Q.  Where at that point in time was your
7    office located at?
8    A.  The intersection, the southeast corner
9    of Grand and Central.
10   Q.  I'm sorry.  What area again?
11   A.  Area 5.
12   Q.  And where was the 17th District office
13   at?
14   A.  I don't recall if it was the new 17 or
15   the old 17 at the time.
16       If it was the old 17 it was
17   approximately Pulaski and Montrose.
18       The new 17 is just a few blocks
19   north of that on the opposite side of the
20   street.
21   Q.  And do you recall where Mr. Russell
22   was living at the time?
23   A.  Yes. I believe he was over off of --
24   right where the shooting happened, I believe

Page 78

1    the shooting happened right in front of his
2    house, right in front of his residence.
3    Q.  So around 4600-block of North Central
4    Park?
5    A.  Yes. You know what I'm not 100% sure,
6    but that may be his address, that 4628, as you
7    see on Page 1 is the address of occurrence.
8    Q.  Is that's pretty close to the 17th
9    District office regardless of whether it was
10   the old or the new location?
11   A.  It is closer than Area 5, certainly.
12   Q.  But as you sit here today do you know
13   whether or not you went back to Area 5 to seek
14   out the assistance of the 17th District tact
15   officers or if you simply went to the 17th
16   District itself?
17   A.  I don't recall specifically.
18   Q.  Now it goes on to say that on
19   August 2nd at 2100 hours you went back to
20   Illinois Masonic, do you see that?
21   A.  I do.
22   Q.  And is it that encounter with
23   Mr. Fernandez at Illinois Masonic, the one you
24   described earlier, where you recalled your

Page 79

1    impressions of Mr. Fernandez's physical
2    condition?
3        A.  It is. It is.
4        Q.  And how -- do you recall how long you
5    met with Mr. Fernandez on that occasion, which
6    looks like it was a little bit after 9:00 in
7    the evening on August 2, 2009?
8        A.  It would have been a few minutes, 10
9    or 15 minutes tops.
10       Q.  And so you showed him, it looks like,
11   the photo array of Mr. Kuri?
12       A.  Yes.
13       Q.  Did you show him the second photo
14   array?
15       A.  No.
16       Q.  At that point in time?
17       A.  No. I don't specifically recall, but
18   if we would have showed it to him, we would
19   have said in here, we showed it to him. Since
20   there is no mention we showed it to him here,
21   I'm positive we did not.
22       Q.  It goes on to say -- well, do you
23   recall anything else of your interactions with
24   Mr. Fernandez at the hospital on that occasion,

Page 80

1    apart from what is set forth here?
2        A.  Other than thanking him for his time,
3    and you know we would come back to show him the
4    second one at another time, no.
5        Q.  And now it looks like you went from
6    the hospital directly over to Mr. Russell's
7    house?
8        A.  Uh hum.
9        Q.  That's a yes?
10       A.  Yes. I'm sorry. That's yes. By the
11   timeframe of the report, yes.
12       Q.  I mean the time listed here it says
13   you were meeting with Mr. Fernandez at
14   2105 hours, and then you met with Mr. Russell
15   it was just 35 minutes later?
16       A.  Right.
17       Q.  And did you show Mr. Russell was it
18   the same photo array that you had shown -- with
19   respect to the photo array contained in Anthony
20   Kuri's picture, was it the exact same photo
21   array you showed Mr. Fernandez?
22       A.  It would have been a copy of the same
23   array. It wouldn't have been the same physical
24   one, because he had already signed that one. It

Page 81

1    had to be a little leading.
2        Q.  I wasn't meaning it the way,
3    nefariously --
4        MR. GIVEN: You tried to catch him and
5    he foiled your plan.
6        MR. FELDMAN: Thank you for pointing
7    out the deficiency of my question.
8        Q.  What I meant to say was were the
9    pictures lined up in the exact same manner in
10   the two photo arrays?
11       A.  I believe they were, yes.
12       Q.  And then you proceeded to show
13   Mr. Russell a photo array containing Mr. Gomez?
14       A.  That's correct.
15       Q.  And he identified Mr. Gomez?
16       A.  Yes.
17       Q.  And it looks like the next evening you
18   went back to Illinois Masonic?
19       A.  Correct. The 3rd.
20       Q.  And at which point in time you showed
21   him the photo array, it is your testimony that
22   he was in too much pain to look at the night
23   before, is that correct?
24       A.  Correct.

Page 82

1        Q.  And was that photo array, not the same
2    initial one, was it the same where the pictures
3    in that same location in the photo array you
4    showed Mr. Russell and then the one that you
5    showed Mr. Fernandez?
6        A.  Again I believe it was.
7        Q.  Just to be perfectly clear, I'm
8    talking about the one with Mr. Gomez's picture.
9        A.  Right. Yes.
10       Q.  Now is that sort of your standard
11   operating procedure, if you have a photo array
12   containing a person, let's say Mr. Kuri, and
13   you are showing that, and you want multiple
14   potential witnesses to look and see hey, do
15   they recognize Mr. Kuri, to use the exact same
16   photo array, by that I mean the pictures are in
17   the exact same order from showing person A,
18   person B, person D and so forth?
19       MS. BENJAMIN: Object to form and
20   foundation.
21       THE WITNESS: I believe it is, yes.
22   It has been a couple of years since I've done
23   it but --
24   BY MR. FELDMAN:

## Page 95

1     Q.  When you are asked to bring someone to
2  testify, whether it be for the Grand Jury or in
3  connection with a criminal trial, is that
4  something that you document, like write, I
5  don't know what you write, a GPR, a report
6  anything?
7     A.  No.
8     Q.  Did you interview David Gomez after he
9  was arrested?
10    A.  I do not believe so.
11    Q.  How about during the course of your
12  investigation, did you have any meetings with
13  Mr. Gomez?
14    A.  I don't think so.
15    Q.  How about do you know if your partner
16  had any dealings with him during the course of
17  the investigation?
18    A.  I don't know.
19    Q.  Has Mr. Folino mentioned any dealings
20  that he has had with Mr. Wachaa over the years?
21    A.  No.
22    Q.  Now, Mr. Kuri and Mr. Gomez were
23  ultimately found not guilty, is that your
24  understanding?

## Page 96

1     A.  That is my understanding.
2     Q.  Have you reviewed any of the
3  transcript from the criminal trial?
4     A.  I have not.
5     Q.  Were you present outside of the
6  courtroom on days that the trial took place?
7     A.  If I had other things going on in the
8  building, which I don't recall, I may very well
9  have, is it possible that I walked outside,
10  certainly.  I have no recollection of being out
11  there.
12    MR. FELDMAN:  Let me look through my
13  notes for a couple of minutes, but I think that
14  might be it.
15    (Recess.)
16
17  BY MR. FELDMAN:
18    Q.  Mark this as Exhibit 4.
19    (Deposition Exhibit No. 4 was
20    marked for identification.)
21    Q.  Sir, is this one of the reports you
22  reviewed in preparation for today's deposition?
23    A.  Yes, it is.
24    Q.  Now, on the first page it lists the

## Page 97

1  reporting officer as Thomas Kolman and lists
2  the primary detective assigned, Arlen
3  Pietrowski, P E T R O W S K I?
4     A.  Yes.
5     Q.  Who is Pietrowski?
6     A.  I don't know him personally, I believe
7  at he was working in the DNA unit and what
8  happens, what happened at the time is when
9  there was, when something got sent to the DNA
10  Unit, this small group of detectives had to
11  generate something, in order for them, this
12  group to do it, a sergeant had to temporarily
13  reassign them the case. And then when it was
14  over and approved it would get reassigned back
15  to the original assigned detective.
16    Q.  Okay.
17    A.  That may have changed since I've been
18  gone, but at the time that's how it went.
19    Q.  Now, turning to page 12 of 16.
20    A.  Sure.
21    Q.  No, the last paragraph on page 12 of
22  16.
23    A.  Yes. On August 2nd.
24    Q.  Correct. It describes your meeting

## Page 98

1  with Mr. Russell at 4628 where you picked
2  Mr. Gomez and Mr. Kuri from the photo spreads,
3  do you see that?
4     A.  I do.
5     Q.  Could you read that paragraph and
6  tell me does that accurately reflect what
7  Mr. Russell told you?
8     A.  On August 2, 2009 --
9     Q.  You can read it to yourself.
10    A.  Pretty good summation.
11    Q.  I'm sorry to interrupt you.
12    A.  Yes.
13    MS. BENJAMIN: Anything else to add?
14    THE WITNESS:  Yes. Unless Zay Russell
15  has got x-ray superman vision, how he would
16  know it is a Huffy bike, but other than that --
17  BY MR. FELDMAN:
18    Q.  But those are your recollection of the
19  facts that he related to you?
20    A.  A pretty good summation, yes.
21    Q.  And how about on the next paragraph
22  where Russell --
23    A.  You want me to read it out loud or to
24  myself?

**Page 99**

1    Q.  No, to yourself.

2    A.  Again a good summation.  Unless Zay

3  has got super human vision, the Huffy bike, how

4  he could tell they were the pegs and not just

5  the axel is beyond me but --

6    Q.  To your recollection did he use the

7  word "pegs"?

8    A.  I don't know if he used the term

9  "pegs" or not.

10    Q.  If you were typing this report would

11  you have used the word "pegs" if he didn't say

12  pegs?

13    A.  Personally?

14    Q.  Yes.

15    A.  I would not have, but if he did or the

16  other person, you know, I can't speak to

17  another detective's habits but --

18    Q.  How about the next paragraph

19  describing --

20    A.  03 August.

21    Q.  -- describing the third Fernandez

22  hospital visit.

23    A.  Yes. Again the same, except for the,

24  you know, the brand of the bike in quotation

**Page 100**

1  marks, you know that, and good summation.  Half

2  these guys don't know brand of cars, but they

3  are going to know the brand of a bicycle.

4    Q.  Now, sir during the course of your

5  tenure with the Police Department were -- and

6  I'm not asking about the incident which led to

7  your separation from the department, so let me

8  get that right out there off the bath.

9         Were you ever accused of any

10  physical misconduct towards someone you were

11  dealing with?

12    A.  Not to my knowledge, no.

13    Q.  But were you subject to any

14  discipline, again leaving out the one?

15    A.  Yes. One big one.

16    Q.  Were you subject to any discipline,

17  ever suspended?

18    A.  No.

19    Q.  Ever docked pay?

20    A.  No.

21    Q.  Or reprimanded?

22    A.  No.

23    Q.  Now, in this investigation was the

24  weapon ever recovered?

**Page 101**

1    A.  To my knowledge, no. Subsequently

2  could it have been, certainly, but I have no

3  knowledge of that.

4    Q.  Now, do you recall being named as a

5  defendant in a civil lawsuit brought by a

6  gentleman by the name of -- last name Wilson?

7    A.  No.

8    Q.  And I apologize if I asked this

9  earlier, did you ever arrest Mr. Russell in

10  connection with any incidents after the Patel

11  homicide investigation?

12    A.  I don't believe I've ever arrested Zay

13  Russell.

14    Q.  Have you ever been involved in

15  investigating any crimes where he was a

16  suspect?

17    A.  Not to my recollection.

18    MR. FELDMAN: I think that's all I

19  have.

20    MS. BENJAMIN: Reserve. I assumed you

21  didn't have any questions.

22    MR. GIVEN: I did not.

23         -0-o-0-

24

**Page 102**

1  STATE OF ILLINOIS  )

2             ) SS:

3  COUNTY OF COOK  )

4         The within and foregoing deposition

5  of the aforementioned witness was taken before

6  Carol M. Siebert-LaMonica, C.S.R, at the place,

7  date and time aforementioned.

8         There were present during the taking

9  of the deposition the previously named counsel.

10         The said witness was first duly sworn

11  and was then examined upon oral interrogatories;

12  the questions and answers were reported in

13  shorthand by the undersigned and transcribed

14  via computer-aided transcription.

15         The within and foregoing is a true,

16  accurate and complete record of all of the

17  questions asked of and answers made by the

18  forementioned witness at the time and place

19  hereinabove referred to.

20         The signature of the witness was

21  not waived and the deposition was submitted

22  pursuant to Rules 207 and 211 (d) of the Rules

23  of the Supreme Court of Illinois to the

24  deponent per copy of the attached letter.

**Page 103**

1      The undersigned is not interested in
2 the within case, nor of kin or counsel to any
3 of the parties.
4      Witness my official signature in and
5 for Cook County Illinois on January 28, 2016.
6
7
8      Carol M. Siebert-LaMonica
9      C.S.R. No. 084.001355
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 105**

WITNESS CERTIFICATION


     I hereby certify that I
have read the foregoing transcript of my
deposition consisting of Pages 1 through 108,
inclusive. Subject to the changes set forth on
the preceding pages, the foregoing is a true
and correct transcript of my deposition taken
on September 15, 2015.



(Signed) _____



SUBSCRIBED AND SWORN TO
Before me this __ day of
_____,2016.



_____

Notary Public

**Page 104**

CORRECTION PAGE
     I made the following changes for the
following reasons:
PAGE LINE CHANGE:
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____
___ ___ ___ _____
     REASON: _____

(Signed)_____

# Exhibit G

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ANTHONY KURI, (a.k.a. RAMSEY      )
QURASH),                          )
                    Plaintiff,    )
                                  )
         vs.                      )   No. 1:13-1653
                                  )
THE CITY OF CHICAGO,              )
DETECTIVES SZWEDO, VALKNER,       )
FOLINO, McDERMOTT, KOLMAN,        )
CORDARO, FIGUEROA-MITCHELL,       )
OFFICERS LOPEZ, SANCHEZ, And      )
As-Yet UNKNOWN CHICAGO            )
POLICE DEPARTMENT MEMBERS,        )
                                  )
                    Defendants.   )


         The deposition of

OFFICER CARMEN G. LOPEZ, taken under oath

at 312 North May Street, Chicago, Illinois,

9:54 a.m., on Wednesday, October 22, 2014,

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Janice H. Heinemann, CSR, CRR, RDR, CSR

No. 084-001391 in and for the County of Du Page

and State of Illinois, pursuant to notice.

## Page 3

1    OFFICER CARMEN G. LOPEZ,
2  having been first duly sworn, was examined and
3  testified as follows:
4              EXAMINATION
5  BY MS. GOODWIN:
6      Q.  Could you please state and spell your
7  name for the record.
8      A.  Sure.  My name is Carmen G. Lopez,
9  C-a-r-m-e-n, G for Grisel, G-r-i-s-e-l,
10 L-o-p-e-z.
11     Q.  And are you currently employed?
12     A.  Yes.
13     Q.  And where are you employed?
14     A.  I'm employed at the 17th District.
15     Q.  With the Chicago Police Department?
16     A.  Chicago Police Department.
17     Q.  And how long have you worked at the
18 Chicago Police Department?
19     A.  It will be 13 years October 29, 2014.
20     Q.  And how long have you been within the
21 17th District?
22     A.  I would say I have been in the 17th
23 District approximately 12, 12 years.
24     Q.  And have you always been an officer

## Page 4

1  within the 17th District?
2      A.  Yes.
3      Q.  Have your responsibilities changed
4  within those 12 years?
5      A.  Yes.
6      Q.  So why don't you take me back to when
7  you started with the 17th District and tell me
8  what you did.
9      A.  I would say after being on the job for
10 about three and a half years, I made it to the
11 tactical team, which I worked on the tactical
12 team for approximately nine and a half years.
13 And then currently I'm working in the
14 commander's office, I would say for the last
15 six months approximately.
16     Q.  What tactical team, was there a
17 specific name?
18     A.  Yes.  It's the 1763 team, tactical
19 team of the 17th District.  There is three
20 teams.  It's just the tactical team C, I guess.
21     Q.  Is it like gang enforcement or drug
22 enforcement, or is there any sort of issue like
23 that?
24     A.  No.  It's just a tactical team, and we

## Page 5

1  focus on a little bit of everything I would
2  say, gangs, narcotics.
3      Q.  So let's see, back in August of 2009,
4  is it fair to say then you were on that
5  tactical team within the 17th District?
6      A.  Yes.
7      Q.  All right.  Now, you wrote a report in
8  regards to a witness statement that was taken
9  at Swedish Covenant Hospital; is that correct?
10     A.  Could you rephrase the question,
11 please?
12     Q.  Sure.  Well, did you write a report in
13 regards to a witness statement that was taken
14 at Swedish Covenant Hospital in August of 2009?
15     A.  I would say that it wasn't taken.  Is
16 that what you mean, like written at Swedish
17 Covenant Hospital, the report?  No.  It wasn't
18 written at the hospital.
19     Q.  Where was it written?
20     A.  In the 17th District.
21     Q.  Do you independently -- Well, strike
22 that.
23         Did you prepare for today's
24 deposition, for example, by talking with your

## Page 6

1  counsel or reviewing documents?
2      A.  Yes.
3      Q.  What documents did you review before
4  today's deposition?
5      A.  I looked at a case report and an
6  arrest report.  And that piece of paper, what
7  would that be called?
8      Q.  The interrogatories?
9         MS. MASTERS:  Yes.
10 BY MS. GOODWIN:
11     Q.  Prior to preparing for the deposition
12 today, did you have an independent memory of --
13 excuse me -- of taking or of writing the report
14 or speaking with the witness reflected in your
15 case report?
16         MS. MASTERS:  Objection, form.  Go
17 ahead.
18 BY MS. GOODWIN:
19     Q.  Do you understand?
20     A.  No.  Can you repeat the question for
21 me, please?
22     Q.  Sure.  And what I mean by an
23 independent recollection or an independent
24 memory, without reviewing the reports could you

Page 7

1    remember being in the room with the witness and
2    what he said and you said and remembering it as
3    though it was something that happened yesterday
4    that was clear in your mind?
5        A.  Right.  I would say very vaguely.
6        Q.  Okay.  Because you have spoken with
7    numerous witnesses, I'm sure, as a tactical
8    officer?
9        A.  If I have spoken to numerous witnesses
10   in the past?
11       Q.  Yes.
12       A.  Regarding different cases?
13       Q.  Yes.
14       A.  Yes.
15       Q.  Right.  I mean isn't that your job as
16   a tactical officer to interact with the public?
17       A.  Yes.
18       Q.  And to speak with witnesses and
19   citizens in regards to crimes?
20       A.  At times, yes.
21       Q.  So since 2009, is it fair to say that
22   you have spoken with numerous citizens about
23   witness statements or crimes that had occurred?
24       A.  Yes.

Page 8

1        MS. GOODWIN:  Now, we can go ahead and
2    look at what we will mark as Exhibit 1 for the
3    record.  It's Bates RFC 10 and 11.
4        (Deposition Exhibit No. 1 was
5            marked for identification.)
6    BY MS. GOODWIN:
7        Q.  Go ahead and look at this document and
8    let me know when you are ready to talk about
9    it.
10       A.  I'm ready.
11       Q.  Is this the case report that you
12   referenced reviewing before today's deposition?
13       A.  It's a supplemental case report, yes.
14       Q.  Is this one that you reviewed before
15   today's deposition?
16       A.  Yes.
17       Q.  Did you review any other case report
18   before today's deposition?
19       A.  Yes.
20       Q.  Do you recall what the substance of
21   that case report was?
22       MS. MASTERS:  Objection, form.  Which
23   do you mean "that"?
24       MS. GOODWIN:  She said that she

Page 9

1    reviewed another case report.
2        THE WITNESS:  Yes.  The arrest report
3    that's right over there.
4        MS. MASTERS:  And for --
5        MR. GRILL:  For clarification, I
6    believe she is referring to Wachaa.
7        THE WITNESS:  Wachaa, correct.
8    BY MS. GOODWIN:
9        Q.  Now, you stated earlier that this
10   report was written back at the 17th district?
11       A.  To my recollection, I believe it was,
12   yes.
13       Q.  Do you recall being at Swedish
14   Covenant Hospital and speaking with the witness
15   in this report, the Abul Wachaa or Wachaa?
16       MR. GRILL:  Wachaa.
17   BY MS. GOODWIN:
18       Q.  Wachaa.
19       A.  Wachaa, yes.  Vaguely I remember
20   speaking with him.
21       Q.  What do you remember about speaking
22   with him?
23       A.  I remember him giving me information
24   regarding the incident that's on this report,

Page 10

1    my supplemental case report.
2        Q.  What information do you recall him
3    giving you?
4        A.  The details on this report pretty
5    much.  Like verbatim I can't recollect that
6    information, but I remember him telling me
7    about this incident that I had documented.
8        Q.  Do you recall when speaking with him,
9    do you recall what his demeanor was like when
10   you were interacting with him?
11       A.  No, I do not.
12       Q.  Do you recall what he looks like?
13       A.  Yes.
14       Q.  And how is it that you recall what he
15   looks like?
16       A.  Because I have encountered him I would
17   say numerous times.
18       Q.  Did you know who he was prior to this
19   arrest in 2009?
20       A.  Yes.
21       Q.  So you had encountered him before the
22   2009 arrest?
23       A.  Yes.
24       Q.  And have you encountered him since the

Page 15

1          THE WITNESS:  Other than 2009 is that
2    what you mean?
3    BY MS. GOODWIN:
4       Q.  Yes.
5       A.  Okay.  Because we assisted so I don't
6    know if that's considered that we arrested, you
7    know.
8       Q.  Okay.  Thanks.
9       A.  You are welcome.
10      Q.  Just to be clear did you ever actually
11   arrest Abul --  Am I saying that right, Abul?
12      A.  Or Abdul Wachaa.
13          MR. GRILL:  Abdul Wachaa.
14          THE WITNESS:  That's how I say it,
15   Abdul.  I don't recall.
16   BY MS. GOODWIN:
17      Q.  Okay.  Did you ever fill out any
18   contact cards for any encounters with him?
19      A.  Yes.
20      Q.  Do you recall the circumstances of
21   filling out contact cards for him?
22      A.  We usually document contact cards when
23   we encounter them loitering in the vicinity
24   where the gangs are usually congregating so I

Page 16

1    may have filled out contact cards.
2       Q.  Now, in the times that you did respond
3    to his family store or the vicinity of his
4    family's store, were those times prior to the
5    August 2009 arrest?
6       A.  I don't recall.
7       Q.  Do you recall how many contact cards
8    you filled out for him?
9       A.  I don't.  I do not recall.
10      Q.  Do you recall any approximation?  Was
11   it a lot, was it maybe just once, do you
12   recall?
13      A.  Probably --  I don't recall.
14      Q.  Okay.
15          MR. GRILL:  And just for
16   clarification, are you referring to gang
17   contact cards specifically for Wachaa or Wachaa
18   or any gang contact card?
19   BY MS. GOODWIN:
20      Q.  Just for Abdul.  Does that clarify
21   your answer at all?
22      A.  I believe we did one.  I -- I don't
23   know.  Maybe, I don't want to just give out a
24   number.  And I'm not sure, so I'm going to say

Page 17

1    I don't recall, but I know that I have had
2    contact with him.
3       Q.  Okay.
4       A.  Okay.
5       Q.  In any of the times that you
6    encountered Abdul, did he ever give you any
7    information on any other homicide?
8       A.  Only the circumstances in this report
9    is what he has given me.
10      Q.  Did he ever, in any of the times that
11   you have encountered him, did he ever give you
12   any other information in any other crime?
13      A.  No.
14      Q.  Did he ever give you any information
15   on gang members or gangs in general?
16      A.  In general, only this document here.
17      Q.  Now, you stated earlier that you
18   assisted in the arrest of Mr. Wachaa in
19   August of 2009?
20      A.  We assisted I would say not typing up
21   the arrest, but we assisted in the process of
22   him being at the hospital.
23      Q.  Did you respond to the scene of the
24   underlying battery?

Page 18

1       A.  I do not recall that.
2       Q.  Did you review any reports or
3    documents before today's deposition that
4    referenced you responding to the scene of the
5    battery?
6       A.  Yeah.  The case report states that
7    there was a call already responded to, but I
8    don't recall.  You know, that would be other
9    officers speaking to him.  I don't recall if we
10   actually responded or if we just responded to
11   the hospital.
12      Q.  So you have no recollection of being
13   at the scene of the battery?
14      A.  No.
15      Q.  Do you recall who told you or who
16   ordered you to go to Swedish Covenant Hospital?
17          MS. MASTERS:  Objection, form,
18   foundation.  Go ahead.
19          THE WITNESS:  I do not.
20   BY MS. GOODWIN:
21      Q.  Do you recall what shift you were
22   working back on August 3rd of 2009?
23      A.  According to the paperwork, I would
24   say I was working days.

Page 19

1    Q.  What are the hours of the day shift?
2    A.  Either, I think we started at that
3  time at 9 or 10 o'clock in the morning.
4    Q.  And went until?
5    A.  Eight hours from there.  Or if you had
6  something going, you might work overtime.
7    Q.  What is the first thing that you
8  remember about the incident that's documented
9  in Exhibit 1 here?
10    MS. MASTERS:  Objection, form,
11  "incident."
12        If you understand the question, you
13  can answer.
14        THE WITNESS:  The first thing that I
15  remember about this incident?
16  BY MS. GOODWIN:
17    Q.  Uh-huh.
18    A.  Basically what's on the report.
19    Q.  Okay.  Do you recall what hospital
20  room Mr. Wachaa was in?
21    A.  No.
22    Q.  Were you standing in the hospital room
23  or outside of it?
24    A.  I was standing outside of the hospital

Page 20

1  room.
2    Q.  During your conversation -- Well,
3  strike that.
4        How long were you at Swedish
5  Covenant Hospital in total on August 3rd of
6  2009?
7    A.  I don't recall.
8    Q.  And how long were you standing outside
9  of Mr. Wachaa's room?
10    A.  I don't recall exactly.
11    Q.  Who was with you at the time that you
12  were standing outside of his room?
13    A.  My partner.
14    Q.  And who is your partner?
15    A.  Officer Noe Sanchez.
16    Q.  Okay.  And you were both standing
17  outside of his room?
18    A.  I don't recall where he was standing.
19  I don't recall where Officer Sanchez was
20  standing.
21    Q.  Do you recall were you in uniform or
22  plainclothes?
23    A.  Plainclothes.
24    Q.  Do you recall what you were wearing?

Page 21

1    A.  I don't recall exactly what I was
2  wearing.  But I normally wear jeans and a
3  T-shirt and my vest, duty belt.
4    Q.  Did you have a radio with you that
5  day?
6    A.  Yes.  We always have a radio.
7    Q.  Do you recall speaking with any
8  medical personnel while at Swedish Covenant
9  Hospital?
10    A.  I don't recall who I spoke to.  But
11  normal protocol is that the doctor does give us
12  release papers that go with the person.
13    Q.  Do you recall the doctor actually
14  handing you the release papers?
15    A.  I don't recall a doctor handing me
16  release papers.
17    Q.  Do you recall the doctor's name that
18  you spoke with --
19    MS. MASTERS:  Objection.
20  BY MS. GOODWIN:
21    Q.  I'm sorry -- that may have handed you
22  the release papers?
23    A.  By the reports that I have that were
24  written, the name of the doctor is on the

Page 22

1  report.
2    Q.  Okay.
3    A.  And I think it says Dr. Johansson or
4  something like that.
5    Q.  And do you independently recall
6  interacting with Dr. Johansson?
7    A.  No.
8    Q.  Do you recall what the paperwork he
9  gave you, if any, said about Mr. Wachaa's
10  condition?
11    A.  No.
12    Q.  In fact, do you remember what his
13  injuries were?
14    A.  According -- I didn't remember what
15  his injuries were.  But according to the arrest
16  report, it said something that he had a
17  laceration to his arm and something with the
18  back of his head, I believe.
19    Q.  Okay.  And do you remember seeing him
20  in the hospital bandaged or being treated for
21  those injuries?
22    MS. MASTERS:  Objection, form.
23    THE WITNESS:  Go ahead.  I remember
24  him being in the room.  I don't remember

## Page 23

1  standing there looking and he being treated or
2  anything like that.
3  BY MS. GOODWIN:
4      Q.  What do you remember about him being
5  in the room?
6      A.  I remember him sitting down and just
7  talking, he just likes to talk.
8      Q.  In the other encounters that you have
9  had with him, has he been talkative in the
10  past?
11     A.  Yes.
12     Q.  What sort of things has he talked to
13  you about in the past?
14     A.  He just likes to socialize with, with
15  officers I would say.  He just likes to talk
16  and say, I'm a good guy or you, know, things
17  like that.  That's probably about it, it's
18  just -- He said so much stuff at one time, I
19  can't recollect everything that he says.
20     Q.  Can you think of any specific stories
21  or things that he has told you in any of the
22  other times that you have interacted with him?
23     A.  No.
24     Q.  What else did he tell you, if

## Page 24

1  anything, on August 3rd of 2009?
2      A.  This is pretty much it as far as what
3  was important that I felt that I had to
4  document.
5      Q.  Do you recall him being talkative on
6  August 3rd of 2009?
7      A.  Yes.
8      Q.  And just so I'm clear, did he tell you
9  anything else -- Well, strike that.
10         Did you talk about anything else
11  aside from what's documented in this report?
12     A.  I don't recall, yeah.
13     Q.  Now, understanding that you are
14  outside of the room or standing outside of his
15  room, at any point did you go inside of his
16  room?
17     A.  I don't recall.  The door was open and
18  I was in the hallway.
19     Q.  Were you facing out into the hallway
20  or facing towards his room?
21     A.  Facing towards his room.
22     Q.  Did he have any family members or
23  friends in the room at any point in time?
24     A.  Not that I can recall.

## Page 25

1      Q.  Did he have his cell phone with him in
2  the room?
3      A.  Normally we don't let them have
4  personal belongings with them in the room.
5      Q.  Because he, is it correct, that he was
6  under arrest at the time that he was being
7  treated at the hospital?
8      A.  Yes.
9      Q.  Did he tell you anything about the
10  battery that had occurred for which he had been
11  arrested?
12     A.  I don't recall.
13     Q.  Was he handcuffed in any way at the
14  time that he was at the hospital?
15     A.  I don't recall if he was handcuffed in
16  the room.
17     Q.  Was it a single room or a double room
18  at the hospital?
19     A.  It was a -- That I remember, it was a
20  single room.
21     Q.  How was it that Mr. Wachaa started
22  relaying this information about the Patel
23  homicide?
24     A.  We normally, you know, routine,

## Page 26

1  when --  This incident had occurred on our days
2  off.  So we would ask:  Hey, did you hear
3  anything, any information regarding that; and
4  then he just openly started talking about the
5  incident.
6      Q.  And I'm sorry, did you say that the
7  Patel homicide occurred on your day off?
8      A.  Yes.  I believe we were off that day.
9      Q.  Why is it that you think you were off
10  that day?
11     A.  Because I wasn't on the scene.
12     Q.  Do you recall the date that the Patel
13  homicide took place?
14     A.  No, I do not.
15     Q.  But it was, would you agree a few days
16  prior to your conversation with Mr. Wachaa?
17     A.  Yes.
18     Q.  Within those few days, did you
19  interact with other people on the street or
20  anywhere else about the Patel homicide?
21     A.  No.
22     Q.  Were you working between the days of
23  the Patel homicide and August 9?
24     A.  I think we had just came off from our

Page 27

1    days off.  And I was working days so, no, I did
2    not.
3        Q.  Did you have two days off a week?
4        A.  Yes.  Normally we have two days.
5        Q.  Back in August of 2009, do you recall
6    when you were off work?
7        A.  No.  We are assigned day-off groups,
8    and that's never changed.  So it would be
9    stay-off group -- What?  2009, we had a new
10   contract.
11           We're day off group 65 on the tac
12   team, so I don't recall if we were off -- what
13   specific days of the week, because they rotate
14   all the time.
15       Q.  Do you recall in the days following
16   the Patel homicide or the days prior to
17   August 3rd of 2009 whether the Patel homicide
18   was discussed during roll call at all?
19       A.  Normal protocol is that a sergeant or
20   a lieutenant will direct us and inform us if
21   there was a shooting that had occurred to make
22   us aware that there might be conflicts.
23       Q.  In the days in between -- Well, in
24   the days following the Patel homicide, were

Page 28

1    there any gang conflicts that were taking place
2    as a result of that homicide?
3        A.  I do not recall.
4        Q.  Was it your practice to talk to people
5    on the street, to talk to citizens or gang
6    members and find out if they have information
7    of recent shootings?
8        A.  If it was my practice?
9        Q.  Yes.
10       A.  I would say it's something we
11   routinely do, yes.  If we have a reason to stop
12   and talk to someone, yeah.
13       Q.  Now, you stated earlier -- and correct
14   me if I'm wrong -- that in regards to your
15   conversation with Mr. Wachaa you would have
16   asked him:  Hey, did you hear anything; at
17   which point he started openly talking?
18       A.  Either my partner or I may have
19   brought up the question, and he openly related
20   this information to us.  And that's why I
21   documented it, yes.  Specifically did you hear,
22   I may have phrased it that way or do you know
23   something or --  Yes.
24       Q.  Did you ask him at the time that you

Page 29

1    were in the hospital with him about any other
2    gang conflicts or homicides?
3        A.  No.
4        Q.  Or crimes that had occurred?
5        A.  No, not that I can recall.
6        Q.  Now, when he started talking, did you
7    take notes at all on what he was saying?
8        A.  No.
9        Q.  Did you observe your partner take
10   notes?
11       A.  Not that I remember, no.
12       Q.  Did you record his statement in any
13   fashion?
14       A.  No.  No.
15       Q.  Did you observe your partner record
16   his statement in any fashion?
17       A.  No.
18       Q.  After speaking with Mr. Wachaa, did he
19   ever ask you if he could get any sort of deal
20   on the battery case in exchange for the
21   information that he gave you?
22       A.  No.
23       Q.  Did you ever speak with a state's
24   attorney in regards to the information that he

Page 30

1    gave you?
2        A.  No.
3        Q.  Did you ever speak with any of the
4    detectives who were working on the Patel
5    homicide about any of the information that he
6    gave you?
7        A.  No.
8        Q.  Did you speak with your sergeant or
9    any supervisor about the information that he
10   gave you?
11       A.  Yes.
12       Q.  Who did you speak with?
13       A.  I don't remember who I spoke to, but
14   it had to have been my immediate supervisor,
15   which would be a sergeant or a lieutenant.
16       Q.  And do you remember that conversation,
17   do you remember having it?
18       A.  I don't remember having the
19   conversation, but it's important so I know I
20   talked to somebody about it.
21       Q.  Now, as Mr. Wachaa was speaking, why
22   weren't you taking notes or recording what he
23   was saying?
24       A.  Because we were going to go back to

Page 87

1    STATE OF ILLINOIS.  )
2                        ) SS:
3    COUNTY OF DU PAGE   )
4
5         The within and foregoing deposition
6    of the aforementioned witness was taken before
7    Janice H. Heinemann, CSR, CRR, RDR, at the
8    place, date, and time aforementioned.
9         There were present during the taking
10   of the deposition the previously named counsel.
11        The said witness was first duly sworn
12   and was then examined upon oral interrogatories;
13   the questions and answers were reported in
14   shorthand by the undersigned and transcribed
15   via computer-aided transcription.
16        The within and foregoing is a true,
17   accurate, and complete record of all of the
18   questions asked of and answers made by the
19   aforementioned witness at the time and place
20   hereinabove referred to.
21         The signature of the witness was
22   not waived and the deposition was submitted
23   pursuant to Rules 207 and 211 (d) of the Rules
24   of the Supreme Court of Illinois to the

Page 88

1    deponent per copy of the attached letter.
2         The undersigned is not interested in the
3    within case, nor of kin or counsel to any of
4    the parties.
5          Witness my official signature in and
6    for Du Page County, Illinois, on this 15th day
7    of May, 2015.
8
9
10        Janice H. Heinemann
11        IL CSR No. 084-001391
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 89

OFFICER CARMEN LOPEZ

C O R R E C T I O N   P A G E
I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____
____  ____ REASON: _____
____  ____  _____.
(Signed)_____
        CARMEN G. LOPEZ

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779  cmsreporters@comcast.net

Page 90

OFFICER CARMEN LOPEZ

WITNESS CERTIFICATION

         I hereby certify that I have read
the foregoing transcript of my deposition
consisting of Pages 1 through 85, inclusive.
Subject to the changes set forth on the
preceding pages, the foregoing is a true and
correct transcript of my deposition taken
on January 30, 2015.

          (Signed) _____
          CARMEN G. LOPEZ

SUBSCRIBED AND SWORN TO
Before me this __ day of
_____, 2015.

_____
Notary Public

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779  cmsreporters@comcast.net

# Exhibit H

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| ANTHONY KURI, (a.k.a. RAMSEY QURASH), | ) ) |
| Plaintiff, | ) |
| vs. | ) ) |
| | ) No. 1:13-1653 |
| THE CITY OF CHICAGO, | ) |
| DETECTIVES SZWEDO, VALKNER, | ) |
| FOLINO, McDERMOTT, KOLMAN, | ) |
| CORDARO, FIGUEROA-MITCHELL, | ) |
| OFFICERS LOPEZ, SANCHEZ, And | ) |
| As-Yet UNKNOWN CHICAGO | ) |
| POLICE DEPARTMENT MEMBERS, | ) |
| | ) |
| Defendants. | ) |

The deposition of

OFFICER NOE SANCHEZ, taken under oath at

312 North May Street, Chicago, Illinois,

11:58 a.m., on Wednesday, October 22, 2014,

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Janice H. Heinemann, CSR, CRR, RDR, CSR

No. 084-001391 in and for the County of Du Page

and State of Illinois, pursuant to notice.

## Page 3

1           NOE SANCHEZ,
2   having been first duly sworn, was examined and
3   testified as follows:
4           EXAMINATION
5   BY MS. GOODWIN:
6       Q.  Could you please state and spell your
7   name for the record.
8       A.  My name is Noe Sanchez.  N-o-e.  Last
9   name is S-a-n-c-h-e-z.
10      Q.  And are you currently employed?
11      A.  Yes.
12      Q.  And where are you employed at?
13      A.  Chicago Police Department, 17th
14  District.
15      Q.  And how long have you been with the
16  17th District at the Chicago Police Department?
17      A.  Pretty much my career so that's 13
18  years.
19      Q.  And are you a tactical officer there?
20      A.  Yes.
21      Q.  How would you describe your job duties
22  as a tactical officer in the 17th district?
23          MS. MASTERS:  At this time?  Is that
24  time specific or --

## Page 4

1   BY MS. GOODWIN:
2       Q.  Sure.  Well, are you still a tactical
3   officer within the 17th district?
4       A.  Yes.
5       Q.  How would you describe your
6   responsibilities as a tactical officer within
7   the 17th district?
8       A.  We focus primarily on gang and
9   narcotic activity.
10      Q.  What gangs are within the 17th
11  district?
12      A.  There are numerous.  Do you want me to
13  go through all of them or --
14      Q.  Sure.
15      A.  I don't -- I can't recall all of them
16  at the time.  But the main ones, SGDs, Spanish
17  Gangster Disciples, Conservative Vice Lords,
18  Spanish Cobras, Latin Kings.  Oh, and -- A
19  baby sect of Ambrose.  I don't really recall
20  them, though -- I'm trying to think, going to
21  the other side.  There is a couple more, but I
22  can't think of them.
23      Q.  Now, you sat in on your -- Well, you
24  sat in on the deposition of Officer Lopez?

## Page 5

1       A.  Excuse me?
2       Q.  You sat in on the deposition of
3   Officer Lopez, is that correct?
4       A.  Yes.
5       Q.  Was there anything about the
6   deposition -- Well, strike that.
7           Was there anything that
8   Officer Lopez said during her deposition that
9   you disagreed with?
10          MS. MASTERS:  Object.
11          MR. GRILL:  Objection to form.
12  BY MS. GOODWIN:
13      Q.  Go ahead.
14      A.  No.
15      Q.  Outside the presence of your counsel
16  did you speak with Officer Lopez about her
17  deposition?
18      A.  Just now?
19      Q.  Outside of the presence of your
20  counsel did you speak with her?
21      A.  No.
22      Q.  How about prior to coming in today
23  outside the presence of your counsel, did you
24  speak with Officer Lopez about the deposition

## Page 6

1   or the report that she wrote that we looked at
2   during her deposition?
3           MS. MASTERS:  Object to the form.
4   BY MS. GOODWIN:
5       Q.  You can answer.
6       A.  I believe we discussed it briefly.
7       Q.  Okay.  And again, just outside the
8   presence of your counsel, what did you speak
9   with her about?
10      A.  Just the supplemental report that was
11  entered.
12      Q.  Did you talk about maybe what she
13  remembered, what you remembered, in regards to
14  the report?
15      A.  I believe so, yes.
16      Q.  And what did you say to her and what
17  did she say to you?
18      A.  Nothing.  We just went over what's on
19  the supplementary report and that's pretty much
20  how we remembered.  Outside of that, we have
21  not much recollection of the -- of anything
22  else because we were not involved in the actual
23  arrest and all that.
24      Q.  Okay.  So do you independently

Page 7

1 remember being in the hospital room with Abdul
2 Wachaa and hearing the information that's
3 recorded in this report?
4    A.  Yes.
5    Q.  And again by independently
6 remembering, I mean without the aid of looking
7 at the report or speaking with your partner
8 about the events?
9    A.  Yes.
10    Q.  So what do you remember about August 3
11 when you were speaking with Abdul Wachaa?
12    A.  I remember him just volunteering
13 information in regards to the incident that had
14 occurred.
15    Q.  What information did he volunteer?
16    A.  What's written on the report.
17    Q.  Do you recall him volunteering any
18 other information aside from what is contained
19 within the report?
20    A.  Pertaining to that incident or any?
21    Q.  Yes.  Pertaining to the incident.
22    A.  No.  Anything that he was blurting out
23 was put in the report.
24    Q.  Do you recall him saying anything else

Page 8

1 on August 3, 2009, aside from what's recorded
2 in the report?
3    A.  No.  Pretty much what he said is put
4 on the report.
5    Q.  Do you recall any other stories that
6 he told or, you know, anything else that he was
7 saying in regards to other incidents?
8       MS. MASTERS:  Objection to form.
9       THE WITNESS:  No.  He didn't talk
10 about anything else besides that report.
11 BY MS. GOODWIN:
12    Q.  Do you recall going to the scene of
13 the underlying battery for which he was
14 arrested for?
15    A.  I don't recall.
16    Q.  Do you recall how it was you ended up
17 at Swedish Covenant Hospital?
18    A.  I don't recall.  I don't know if we
19 were summoned by our coworkers that were there,
20 the actual arresting beat officers needing some
21 assistance, or if our supervisor instructed us
22 to go help them.
23    Q.  Were any other officers at Swedish
24 Covenant Hospital in relation to the battery

Page 9

1 that had occurred?
2       MS. MASTERS:  Objection, form.
3       THE WITNESS:  Were there any others?
4 I don't recall.
5 BY MS. GOODWIN:
6    Q.  Do you recall speaking with any
7 medical personnel when you were at the
8 hospital?
9    A.  I recall that we got information from
10 one of them, but I don't recall who or --
11    Q.  Do you recall what kind of information
12 you got?
13    A.  The release papers to release Abdul
14 Wachaa.
15    Q.  Do you recall what was on those
16 release papers?
17    A.  It gives -- No, I don't recall.
18    Q.  Do you know generally what release
19 papers are in that you have dealt with them in
20 other instances?
21    A.  I believe it gives a brief description
22 of his injuries and that he's able to leave the
23 hospital.
24    Q.  But you don't recall specifically what

Page 10

1 was recorded in Mr. Wachaa's release papers?
2    A.  No.
3    Q.  And you don't recall the name of the
4 doctor or nurse or medical personnel who handed
5 you those papers?
6    A.  No.
7    Q.  Do you recall where you were when you
8 received those papers?
9    A.  In the hallway.
10    Q.  You remember being in the hallway?
11    A.  Yes.
12    Q.  Who else was near you in the hallway
13 when you received those papers?
14       MS. MASTERS:  Objection to form.
15       THE WITNESS:  I believe my partner
16 would be around the same vicinity as me.
17 BY MS. GOODWIN:
18    Q.  Do you recall her being there, or is
19 that something that you would assume?
20    A.  I don't recall.
21    Q.  How many times have you responded to
22 Swedish Covenant Hospital in regards to your
23 work as a tactical officer?
24    A.  Numerous times.

Page 31

1    Q. Do you recall any questions that you
2  asked him?
3    A. I don't recall.
4    Q. Do you recall any questions that your
5  partner asked him?
6    A. I don't recall.
7        MR. GRILL: Objection, foundation.
8  BY MS. GOODWIN:
9    Q. Let's go ahead and look at Exhibit 1,
10  which will be RFC 10 through 11. Officer, did
11  you write this report?
12    A. No.
13    Q. Do you know who did write the report?
14    A. Yes.
15    Q. And who is that?
16    A. My partner, Carmen Lopez.
17    Q. Now, were you with your partner when
18  she wrote the report?
19    A. Yes.
20    Q. Were you standing right next to her?
21    A. I don't recall if we were standing or
22  sitting, but I was with her the whole time.
23    Q. Did you have input into what was
24  written in this report?

Page 32

1        MS. MASTERS: Object to form.
2        THE WITNESS: I don't recall.
3  BY MS. GOODWIN:
4    Q. Do you recall Officer Lopez asking you
5  any questions about what she should include in
6  the report?
7        MS. MASTERS: Object to form.
8        THE WITNESS: I don't recall.
9  BY MS. GOODWIN:
10    Q. Did you read the report at the end
11  once it was written?
12    A. Yes.
13    Q. What was your purpose in reading the
14  report?
15    A. Excuse me? I didn't hear you.
16    Q. What was your purpose in reading
17  through the report once it was written?
18    A. To -- to make sure that all the
19  information that he was saying to both of us
20  was put on the report and that she didn't leave
21  anything out.
22    Q. Once you read through the report, did
23  you tell your partner that she had left
24  anything out?

Page 33

1    A. No.
2        MS. MASTERS: Object to form. Sorry.
3  BY MS. GOODWIN:
4    Q. Did you remind her of anything else
5  that you had heard from Mr. Wachaa that maybe
6  wasn't included in the report?
7        MS. MASTERS: Object to form.
8        THE WITNESS: No.
9  BY MS. GOODWIN:
10    Q. Now, is it fair to say that this
11  report is written about information that was
12  obtained from Mr. Wachaa at Swedish Covenant
13  Hospital?
14        MR. GRILL: Objection, form.
15        THE WITNESS: Yes.
16  BY MS. GOODWIN:
17    Q. I'm sorry. Is that a yes?
18    A. Yes, from the information we started
19  receiving from the hospital and was repeated at
20  the station.
21    Q. Where in this report does it say that
22  the information was repeated in the station?
23    A. It doesn't say that in the report.
24    Q. Okay. Was the information repeated

Page 34

1  word for word at the station?
2    A. What's on the report is what was
3  repeated at the station.
4    Q. Did Mr. Russell volunteer the
5  information when he reported it at the station?
6        MS. MASTERS: Objection.
7  BY MS. GOODWIN:
8    Q. Or was he prompted to do so?
9        MS. MASTERS: You said --
10        THE WITNESS: Mr. Russell is not the
11  one.
12  BY MS. GOODWIN:
13    Q. Mr. Wachaa.
14    A. So repeat it again because you threw
15  me off with saying "Russell."
16    Q. Sure. Mr. --
17    A. Wachaa?
18    Q. When you were at the station, did
19  Mr. Wachaa repeat the information voluntarily;
20  or was he prompted to do so?
21    A. Voluntarily.
22    Q. Why did you and your partner not write
23  a report about the information that was
24  obtained from Mr. Wachaa at the station?

Page 55

1    deponent per copy of the attached letter.
2        The undersigned is not interested in the
3    within case, nor of kin or counsel to any of
4    the parties.
5        Witness my official signature in and
6    for Du Page County, Illinois, on this 14th day
7    of May, 2015.
8
9
10       Janice H. Heinemann
11       IL CSR No. 084-001391
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 56

OFFICER NOE SANCHEZ

C O R R E C T I O N   P A G E
    I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ ___ _____
    REASON: _____
___ _____.
    (Signed)_____
       NOE SANCHEZ

    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
     (773) 851-7779  cmsreporters@comcast.net

Page 57

OFFICER NOE SANCHEZ

WITNESS CERTIFICATION


    I hereby certify that I have read
the foregoing transcript of my deposition
consisting of Pages 1 through 53, inclusive.
Subject to the changes set forth on the
preceding pages, the foregoing is a true and
correct transcript of my deposition taken
on October 22, 2014.



    (Signed) _____
       NOE SANCHEZ


SUBSCRIBED AND SWORN TO
Before me this __ day of
_____, 2015.

_____
Notary Public


    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
     (773) 851-7779  cmsreporters@comcast.net

# Exhibit I

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

ANTHONY KURI, (a.k.a. RAMSEY    )
QURASH),                        )
              Plaintiff,   )
                        )
       vs.              )  No. 1:13-1653
                        )
THE CITY OF CHICAGO,        )
DETECTIVES SZWEDO, VALKNER,  )
FOLINO, McDERMOTT, KOLMAN,   )
CORDARO, FIGUEROA-MITCHELL,  )
OFFICERS LOPEZ, SANCHEZ, And  )
As-Yet UNKNOWN CHICAGO      )
POLICE DEPARTMENT MEMBERS,   )
                        )
             Defendants.  )

The deposition of

DETECTIVE FRANK SZWEDO, taken under oath

at 312 North May Street, Suite 100, Chicago,

Illinois, 10:07 A.M., on Wednesday, October 15,

2014, pursuant to the Rules of the United

States District Court, Northern District of

Illinois, before Carol M. Siebert-LaMonica, CSR

No. 084.001355 in and for the County of Cook

and State of Illinois, pursuant to notice.

## Page 3

1    THE SOTOS LAW FIRM, P.C.
2    MR. ANDREW J. GRILL
3    550 East Devon, Suite 150
4    Itasca, IL 60143
5        Appeared on behalf of the defendant
6        City of Chicago.
7
8                    * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1        DETECTIVE FRANK SZWEDO,
2    having been first duly sworn, was examined and
3    testified as follows:
4                EXAMINATION
5    BY MS. GOODWIN:
6        Q. Sir, can you please state and spell
7    your name for the record?
8        A. Detective Frank Szwedo, S Z W E D O.
9        Q. And are you currently employed?
10       A. I am.
11       Q. And where are you employed?
12       A. The Chicago Police Department.
13       Q. And how long have you worked for the
14    Chicago Police Department?
15       A. I was hired in 1996. I am entering my
16    18th year of service.
17       Q. Could you just walk me through your
18    time at the Chicago Police Department?
19       A. Sure.
20       Q. When in 1996 did you start?
21       A. I entered the academy in December of
22    1996. Graduated from the police academy in, I
23    believe it was, July or June -- Strike that.
24    May of '97.

## Page 5

1        Q. Okay.
2        A. I was assigned to the 17th District,
3    Albany Park, where I worked primarily on beat
4    cars on -- mostly the third watch, which is
5    afternoons, and I did some time on midnights as
6    manpower dictated.
7            1999 I was invited to join the
8    17th District Tactical Gang Unit where I was
9    assigned to the 1761 Adam team, that was in
10   roughly the Fall of 1999 until my promotion to
11   detective in 2004.
12           Would you like me to continue?
13       Q. When you were promoted to a detective
14   in 2004 were you assigned to a certain area?
15       A. Yes. Area 5 which was at Grand and
16   Central.
17       Q. And how long did you hold that
18   position at Area 5 for?
19       A. Until roughly 2012 where the Detective
20   Division was realigned. That particular
21   location closed, and I was transferred to what
22   is now known as Area Central, Bureau of
23   Detectives, which is out of 2nd District
24   building at 5101 South Wentworth, and I'm still

## Page 6

1    assigned there.
2        Q. And your current assignment is
3    detective?
4        A. Yes.
5        Q. Aside from your background with the
6    Chicago Police Department do you have any other
7    background in law enforcement?
8        A. No.
9        Q. Do you have any secondary jobs,
10   part-time jobs?
11       A. I happen to.
12       Q. And what do you do?
13       A. I'm actually a Teamster livery driver
14   for the funeral industry.
15       Q. And how long have you had that for?
16       A. Since '98. It is part time.
17       Q. Any other like security jobs you have
18   held aside from the Chicago Police Department?
19       MS. MASTERS: Objection, form.
20       MS. GOODWIN: You can answer.
21       MS. MASTERS: Yes.
22       THE WITNESS: Could you rephrase the
23   question?
24

Page 15

1    Q.  Well, when you say pretty much it, did
2  you review trial testimony, for example?
3    A.  Oh, yes, I did. My testimony that I
4  had given covering basically the layout of the
5  crime scene.
6    Q.  Did you review any photographs before
7  coming here today?
8    A.  Yes, I did.
9    Q.  Did you review any audio or video
10  recordings?
11    A.  No.
12    Q.  When did you last look over the
13  documents, the reports and photographs and
14  such?
15    A.  About a week ago.
16    Q.  How would you characterize your role
17  within the Patel homicide?
18      MS. MASTERS: Objection, form.
19      THE WITNESS:  I was assigned the crime
20  scene with my partner John Valkner.
21      So at that point you could say
22  that we were -- at that point in the
23  investigation we would be doubled the lead
24  detectives, if you will.

Page 16

1
2  BY MS. GOODWIN:
3    Q.  What does it mean to be assigned the
4  crime scene?
5    A.  You are responsible for gathering as
6  many facts as possible, witness interviews,
7  preparation of reports, location of -- be able
8  to piece together the initial investigation, if
9  you will.
10    Q.  Were you the only two detectives who
11  were assigned the crime scene?
12      MS. MASTERS: Objection, foundation.
13      THE WITNESS:  Yes.
14  BY MS. GOODWIN:
15    Q.  And you went to the scene of the
16  crime, correct?
17    A.  There was two scenes, but, yes, I went
18  to initially the Wilson address, I believe.
19    Q.  At either scene when you were out
20  there that night were there other detectives
21  who were there?
22    A.  I don't recall.
23    Q.  Do you have an independent
24  recollection of responding to the scene of the

Page 17

1  Patel homicide?
2    A.  By independent what are you looking
3  for? How I got there?
4    Q.  Sure. Well, sitting here today do you
5  independently remember without the aide of any
6  reports or photographs, what the scene looked
7  like, what you did and who you spoke with,
8  those types of details?
9    A.  I thought you had asked how I got
10  there or -- I'm sorry --
11    Q.  Sure.
12    A.  Yes.  I have independent recollection
13  of the scene. How I got there?  You know, I'm
14  guessing it was in a department vehicle.
15      MS. MASTERS: If I could just caution
16  the witness. Just to answer the question as
17  asked. Listen to the question.
18  BY MS. GOODWIN:
19    Q.  Sure. And just to clarify further. I
20  want to be able to talk about this.
21      When I say an independent
22  recollection, I mean you could most likely
23  independently sitting here today remember what
24  you had for breakfast this morning, it is fresh

Page 18

1  in your mind, you just did it and you can
2  remember it.
3      Whereas going out to the scene of
4  the Patel homicide, I understand that it was a
5  few years back, so there may be details you
6  remember and details you don't remember, okay?
7    A.  Okay.
8    Q.  There may be some you independently
9  remember in the sense they stuck in your mind?
10    A.  Yes.
11    Q.  In terms of responding to the scene of
12  the Patel homicide, when I say scene, I mean
13  globally, both scenes, when you responded on
14  the night in July in 2009, what do you remember
15  when you arrived at that scene?  What did you
16  see, for example, or who did you speak with?
17    A.  It was a minivan facing westbound on
18  Wilson. It had been presumably struck by gun
19  fire. It had some blown out windows. There was
20  some red stains, presumably blood, in the van.
21  There was police, uniformed police personnel on
22  the scene. There was crime scene tape cordoning
23  off or protecting that area from citizens
24  crossing.

Page 19

1      I recall speaking with a 17th
2  District female sergeant regarding the
3  preliminary facts as she had gotten them, which
4  indicated that the shooting happened north
5  of -- northeast of that location on Central
6  Park.
7      I was told there was a witness
8  who was in police custody, person that was
9  later found to be Zay Russell. Z A Y. Russell,
10  common spelling, two S, two Ls.
11      I was not necessarily directed
12  towards him. I was told he was in a patrol
13  division car. He had been placed into custody
14  for creating a disturbance, obstruction.
15      I didn't know the facts
16  surrounding that, why he was arrested, but I
17  was told he was available for an interview, if
18  I wanted to attempt that.
19      Back on Central Park there was
20  some expended shell cases on the west curb of
21  Central Park about midway down the block.
22      There was shattered glass, glass
23  rather, that corresponded with what we believe
24  to be the window that was broken out from the

Page 20

1  victim's minivan.
2      There was also a bicycle to the
3  north on the west parkway sidewalk on Central
4  Park.
5      Again that scene on Central Park
6  was protected by uniformed personnel and there
7  was tape. There wasn't much resident activity
8  at that time of night.
9      Q. Were there citizens or a lot of
10  resident activity up at the Wilson scene when
11  you were there?
12      A. No. I don't recall that.
13      Q. And do you recall citizens standing
14  out by the crime scene tape at the Central Park
15  location?
16      A. I recall people looking out their
17  windows but not necessarily standing right on
18  the tape.
19      Q. Did you speak with anyone, if you
20  recall, who was standing outside, any citizens?
21      A. I don't recall speaking with anybody
22  that wasn't an immediate part of the incident.
23      Q. Did you ever find out the
24  circumstances surrounding Zay Russell's arrest,

Page 21

1  creating the disturbance or obstructing, what
2  led to those charges?
3      A. I did not.
4      Q. You never asked an officer what he did
5  in order to get arrested?
6      A. I was told -- I was told by that
7  Patrol Division Sergeant that he had created a
8  disturbance and was quote unquote acting a
9  fool, and getting in the way of the duties of
10  the officers at the time. I didn't inquire any
11  further.
12      Q. Did you then go speak with him, with
13  Zay Russell?
14      A. I did.
15      Q. Where was he when you talked to him?
16      A. I believe I spoke with the officers
17  that had him under arrest, and I asked if I
18  could take off his handcuffs and put him in a
19  little bit more comfortable setting.
20      I believe I might have spoken to
21  him on the street or perhaps in my back seat of
22  my squad car, but I don't recall.
23      Q. Who were the officers that had him
24  under arrest?

Page 22

1      A. I don't remember.
2      Q. They were uniformed officers?
3      A. Yes.
4      Q. Do you recall what -- was it from the
5  17th District?
6      A. Yes.
7      Q. Okay. Why did you want to put him in a
8  more comfortable setting before you spoke with
9  him?
10      A. He was a witness and believed to be
11  the only witness at that time to the murder
12  and --
13      Q. Go ahead.
14      A. So --
15      Q. Did you agree with the decision to put
16  him under arrest?
17      MS. MASTERS: Objection, form,
18  foundation.
19      THE WITNESS: I didn't agree or
20  disagree.
21  BY MS. GOODWIN:
22      Q. When you spoke with Zay Russell while
23  at the scene of the shooting was he free to
24  leave?

**Page 23**

1      MS. MASTERS: Objection.
2      MR. GRILL: Objection.
3      MS. GOODWIN:  Basis?
4      MR. GRILL: Form, foundation.
5      THE WITNESS:  No, he was under arrest.
6    BY MS. GOODWIN:
7      Q.  He was still under arrest when he
8    spoke with you. Okay.
9      A.  Correct.
10      Q.  And did you advise him when you spoke
11    with him that he was still under arrest?
12      A.  Yes.
13      Q.  Did he say anything about why he was
14    under arrest or he disagreed with the fact he
15    was under arrest or anything of that nature?
16      A.  I don't recall.
17      Q.  What was his demeanor like when you
18    spoke with him?
19      A.  He was cooperative with me.
20      Q.  Was anybody else with you during that
21    conversation?
22      A.  I don't recall.
23      Q.  Do you recall if anybody else was
24    standing nearby at the time that you spoke with

**Page 24**

1    Zay Russell?
2      A.  I do not.
3      Q.  About what time was it that you spoke
4    with Zay Russell?
5      A.  I can't recall.
6      Q.  Do you have any sense of how long
7    after you arrived at the scene of the shooting
8    that you spoke with him?
9      A.  Between 15 and 20 minutes.
10      Q.  Okay.  And how long was your
11    conversation with him?
12      A.  Probably around 10 minutes.
13      Q.  What did he tell you during that
14    conversation?
15      A.  He gave me an account of what he
16    remembered from the incident.
17      Q.  And what was that account that you can
18    recall?
19      A.  Summarized that he was being dropped
20    off, prior to being dropped off by the victim,
21    Patel, there was some kind of altercation.
22      As he was being dropped earlier
23    in the evening, I don't remember the timeframe,
24    but as he was being dropped off, one or more

**Page 25**

1    male Hispanics on bicycles approached from the
2    sidewalk on the west side of Central Park and
3    opened fire on the van.
4      The van drove away and that's
5    pretty much it.
6      He gave a cursory description of
7    an offender.
8      I remember asking him if he were
9    presented with this individual in the future,
10    would you remember what that individual looked
11    like, and he said yes, possibly.
12      Q.  What was the cursory description of
13    the offender that he gave?
14      A.  I can't recall exactly, male Hispanic,
15    I believe short hair. He might have had an
16    article of clothing detailed, hoodie or a
17    T-shirt, I can't recall exactly.
18      Q.  But he gave the description of one
19    offender?
20      MS. MASTERS: Objection. Sorry,
21    objection, form.
22      THE WITNESS:  At least one.
23    BY MS. GOODWIN:
24      Q.  Okay.  When you got the description,

**Page 26**

1    what did you do with it?
2      A.  Entered it into my notes.
3      Q.  Did you tell any supervisors that you
4    had a description of at least one offender?
5      MS. MASTERS: Objection, form.
6      THE WITNESS:  No.
7    BY MS. GOODWIN:
8      Q.  Did you broadcast it over the radio at
9    all?
10      A.  No, I did not.
11      Q.  Why not?
12      MS. MASTERS: Objection.
13      THE WITNESS:  For a number of reasons.
14    Number one, the time that had elapsed from the
15    incident to my receiving that description and
16    the fact that it was too vague of a
17    description. There was nothing really specific
18    to go with.
19    BY MS. GOODWIN:
20      Q.  Any other reasons?
21      A.  Not that I could think of.
22      Q.  How much time had elapsed since the
23    incident to the time that you got the
24    description?

Page 31

1       THE WITNESS: From 1999 to roughly
2   2004, correct.
3   BY MS. GOODWIN:
4       Q. Okay. What were your responsibilities
5   in the Gang Tactical Unit in the 17th District?
6       MS. MASTERS: Objection, relevance.
7       THE WITNESS: Basically to
8   aggressively fight crime, including narcotics,
9   gang activity, robbery patterns, burglary
10  patterns while in plain clothes and not
11  generally receiving radio assignments.
12  BY MS. GOODWIN:
13      Q. So without receiving radio assignments
14  how would you receive assignments for your
15  shift?
16      MS. MASTERS: Objection, foundation,
17  form.
18      THE WITNESS: A lot of our activities
19  were self generated.
20  BY MS. GOODWIN:
21      Q. Okay. So you would go out on patrol,
22  is that fair to say?
23      A. Correct.
24      Q. And then in what ways would you

Page 32

1   interact with the public or in patrol?
2       MS. MASTERS: Objection, form.
3       THE WITNESS: We would do
4   surveillance. We would monitor different hot
5   spots, narcotic locations, narcotic sales
6   locations, gang blocks, gang members, robbery
7   burglary patterns.
8   BY MS. GOODWIN:
9       Q. What gangs were in the 17th District
10  during that time period when you were a gang
11  tactical officer there?
12      A. Spanish Gangster Disciples, La Familia
13  Stones, Spanish Cobras, Latin Kings, Vice
14  Lords, Maniac Latin Disciples, Pachucos,
15  Orchestra Albany, Assyrian Kings, Latin Eagles.
16  Satan Disciples, is Simon City Royals. I think
17  that's the major ones.
18      Q. Were there any that had more influence
19  within that area than others?
20      MS. MASTERS: Objection, form,
21  foundation.
22      THE WITNESS: That's subjective. I
23  don't recall the strengths, weaknesses of any
24  gang at one particular time.

Page 33

1
2   BY MS. GOODWIN:
3       Q. Now, did the Spanish Cobras and the
4   Latin Kings during 2009, did they get along at
5   all?
6       MS. MASTERS: Objection, form,
7   foundation.
8       THE WITNESS: I can't speak
9   confidently to answer whether -- what their
10  status was.
11  BY MS. GOODWIN:
12      Q. Between the Spanish Cobras and the
13  Latin Kings, is one a folk type of a gang?
14      MS. MASTERS: Objection, foundation.
15      THE WITNESS: I would have to look at
16  the breakdown. I don't have that affiliation
17  chart in front of me.
18  BY MS. GOODWIN:
19      Q. During the years that you were a Gang
20  Tactical Unit Officer, is it fair to say that
21  at that point in time you did know the
22  breakdown and you were working with these
23  people everyday?
24      A. No.

Page 34

1       Q. No. Why is that not fair to say?
2       A. Because it wasn't significant. Any
3   gang member could be a victim, an affiliate,
4   enemy, rival, whatever you want to call it on
5   any given day. I didn't prescribe to those
6   affiliations.
7       Q. Okay. During the time that you were
8   in the Gang Tactical Unit, did you have any
9   runins with Anthony Kuri?
10      A. I had no idea who he was.
11      Q. Or Ramsey Qurash?
12      A. Don't know him.
13      Q. Okay. What about with Zay Russell?
14      A. No.
15      Q. Or a David Gomez?
16      A. No.
17      Q. Or Gaurav Patel, the victim of the
18  homicide?
19      A. No.
20      Q. Or a Tony Fernandez?
21      A. Fernandez I knew.
22      Q. You knew from the past, from the time
23  that you were in the Gang Tactical Unit?
24      A. Yes. Correct.

## Page 43

1  witness' recollection, cloud their
2  recollection, from my personal perspective as a
3  detective.
4      Q.  Were you trained or told by any
5  supervisors that showing a photo array without
6  a suspect in it could damage or cloud a
7  witness' perspective?
8          MR. GRILL: Objection, form, foundation
9  as well.
10         THE WITNESS:  I was never told
11 specifically. That's how I was trained. It is
12 common practice.
13             A photo array is utilized when
14 there is a suspect or enough information that
15 would learned itself to a possible
16 identification.
17 BY MS. GOODWIN:
18     Q.  Okay.  Was Zay Russell taken to the
19 police station on the night of the Patel
20 shooting?
21         MS. MASTERS: Objection, foundation.
22         THE WITNESS:  I presumed, yes.
23 BY MS. GOODWIN:
24     Q.  Why do you presume?

## Page 44

1      A.  Because he had a booking photo.
2      Q.  Did you take him back to the Police
3  Department?
4      A.  I did not.
5      Q.  While he was at the Police Department
6  did you talk with him again?
7      A.  No.
8      Q.  Do you know who did, if anyone?
9      A.  I don't recall.
10     Q.  Did you ask anyone to interview him
11 about the Patel shooting, you know, after he
12 was taken back to the station?
13     A.  No.
14     Q.  Did you ask anyone to -- Well, strike
15 that.
16         Do you recall what your shift was
17 back on July 24th of 2009 or the night of the
18 Patel homicide?
19     A.  I was working first watch, midnights.
20     Q.  Midnight until what?
21     A.  Roughly 9:00 A.M.
22     Q.  How did your shift start, for example,
23 do you have roll call?
24     A.  Sometimes.

## Page 45

1      Q.  Do you recall back on July 24th if you
2  had a roll call?
3      A.  No, I do not.
4      Q.  When you do have a roll call how are
5  you made aware of that, that one is taking
6  place?
7      A.  When a roll call is taking place?
8          MS. MASTERS: Objection, form.
9  BY MS. GOODWIN:
10     Q.  If it doesn't take place every shift,
11 how do you know when a roll call is going to
12 take place?
13     A.  On midnights the supervisor would come
14 out and make an audible announcement verbally.
15     Q.  As a detective what sort of things are
16 discussed during roll calls?
17         MS. MASTERS: Objection, form.
18         THE WITNESS:  Administrative
19 mostly-type things, information sharing
20 pertaining to administrative, largely
21 administrative things.
22 BY MS. GOODWIN:
23     Q.  When you say "administrative", what do
24 you mean?

## Page 46

1      A.  Weapons qualification starts next
2  week. Former detective is retiring, his party
3  is this date, this type of thing.
4      Q.  When you work, well, as a detective
5  working midnights do you have your own case
6  load or do you pick up cases that occur during
7  the day and continue investigating them?
8          MS. MASTERS: Objection, form.
9          THE WITNESS:  Sometimes there was
10 interaction between the first watch and third
11 watch officers as well as the first and second
12 watch.
13             My case load there would be
14 assignments that were given out during your
15 tour of duty, you weren't -- on first watch you
16 weren't given reports to follow-up on from the
17 Patrol Division like occurs on second and third
18 watch.
19 BY MS. GOODWIN:
20     Q.  Did you receive any other assignments
21 on the night of the Patel homicide?
22     A.  I don't recall receiving any other
23 assignment.
24     Q.  Is it possible that you did and you

## Page 55

1   location.
2       Q.  What was the gang presence there back
3   in 2009?
4           MS. MASTERS:  Objection, form.
5           THE WITNESS:  2009, I'm not
6   specifically sure.  From my own experience in
7   that district, there was a presence of Spanish
8   Cobras, Spanish Gangster Disciples, Latin Kings
9   and Simon City Royals.  In and out of that, if
10  you want to call it four-block radius, presence
11  active.
12  BY MS. GOODWIN:
13      Q.  Was that four-block radius controlled
14  by any specific gang back in 2009 or was that
15  an area that gangs fought over?
16      A.  I'm not sure.
17      Q.  Did you tell your suspicions that this
18  was a gang-related shooting to anybody within
19  the Police Department?
20          MS. MASTERS: Objection, form, as to
21  timeframe as well.
22          THE WITNESS:  I most likely conferred
23  with my partner.
24  BY MS. GOODWIN:

## Page 56

1       Q.  Do you remember that conversation?
2       A.  No.
3       Q.  Do you recall if your partner agreed
4   or disagreed with your suspicion?
5       A.  I can't recall.
6       Q.  On the night of the shooting, did you
7   have any suspicion as to what gang was
8   involved?
9       A.  Yes.
10      Q.  And what was that?
11      A.  Possibly the Spanish Cobras.
12      Q.  And what made you suspect the Spanish
13  Cobras as being involved?
14      A.  Zay Russell offered the nickname of a
15  known Spanish Cobra as being present during the
16  altercation that preceded the shooting
17  incident.
18      Q.  And what was that nickname?
19      A.  Funk.
20      Q.  And did you know who Funk was?
21      A.  Yes.
22      Q.  Do you know his real name?
23      A.  I knew it at one time, I can't recall
24  it right now.

## Page 57

1       Q.  How was it that you knew who Funk was
2   or that he was a known Spanish Cobra?
3       A.  My previous experience.
4       Q.  Did you talk to Funk that night?
5       A.  Did not.
6       Q.  Why not?
7       A.  I had other duties.
8       Q.  What were your other duties?
9       A.  To complete the scene investigation.
10      Q.  How long were you on scene for?
11      A.  I can't recall.
12      Q.  And when you say complete the scene
13  investigation, what goes into completing that?
14          MS. MASTERS: Objection, form.
15          THE WITNESS:  Witness interviews,
16  evidence documentation, working with the mobile
17  crime lab, forensic investigators, conducting a
18  canvass, if it lend itself to that, compiling a
19  report of all of your findings at that time.
20  BY MS. GOODWIN:
21      Q.  Did you send a uniformed officer to go
22  out to speak with Funk?
23      A.  No.
24      Q.  Why not?

## Page 58

1       A.  Didn't have enough information at that
2   time and my investigation was not complete.
3       Q.  Fair to say though that you wanted to
4   speak with witnesses on the night of the
5   shooting?
6       A.  Witnesses, yes.
7       Q.  Was Funk considered a witness to the
8   earlier incident with the men in the car?
9       A.  I would imagine, yes.
10      Q.  And you are allowed to, as a
11  detective, was it within your purview to be
12  able to send an officer out to speak with a
13  witness or ask a uniformed officer to do
14  something for you?
15          MS. MASTERS: Objection, form.
16          THE WITNESS:  If need be.
17  BY MS. GOODWIN:
18      Q.  Did you know in 2009 what Funk looked
19  like, did you work with him enough to know who
20  he was and what he looked like?
21          MS. MASTERS: Objection to work with
22  him.  If you understand the question, you can
23  answer.
24          THE WITNESS:  I never worked for Funk.

Page 63

1      A. I don't recall.
2      Q. Did you tell your supervisor that Funk
3  was somebody you thought should be followed up
4  with?
5      A. I don't recall.
6      Q. Did you tell your supervisor that
7  Funk's name had come up in the context of the
8  conversation?
9      A. I don't recall.
10      Q. When you say that that night of the
11  shooting you were compiling your reports, what
12  reports are you referring to?
13      A. Scene, violent crime scene work.
14      Q. Anything else?
15      A. Logging evidence, reviewing
16  handwritten notes.
17      Q. Are there certain -- well, anything
18  else you can think of?
19      A. Not at this time.
20      Q. Are there certain reports that you as
21  the detective assigned to the scene of a
22  homicide are suppose to turn in at the end of
23  your shift?
24          MS. MASTERS: Objection, form.

Page 64

1          THE WITNESS: At least a draft, I say
2  draft, not finalized nor approved report that
3  is a summary of your investigation as a
4  detective responding to the scene of a murder
5  or any other crime that necessitates a report.
6  BY MS. GOODWIN:
7      Q. Did you turn in a draft report on the
8  night of the Patel homicide?
9      A. I'm sure I did.
10      Q. One that was not finalized or approved
11  yet?
12      A. Correct.
13      Q. Did you ever then go back and finalize
14  that draft?
15      A. Yes.
16      Q. And when did you do that?
17      A. I can't recall.
18      Q. Do you think or -- Strike that.
19          Do you recall if you did, if you
20  went back to finalize the draft multiple times
21  to work on it or if it was just one time that
22  it was finalized?
23      A. I can't recall.
24      Q. Did you speak with your supervisor

Page 65

1  about the draft report that you turned in on
2  the night of the homicide?
3          MS. MASTERS: Objection, form,
4  timeframe.
5          THE WITNESS: I don't recall any
6  discussions.
7  BY MS. GOODWIN:
8      Q. When you say that you logged evidence
9  or that you had to log evidence I think --
10      A. Document evidence.
11      Q. How do you go about doing that?
12      A. Typically you will await the Forensic
13  Services Crime Scene Processing Report, take
14  the information that the forensic investigators
15  have compiled in their report and you
16  extrapolate that information and put it into
17  your report.
18      Q. So did you have the forensic
19  investigator's report on the night of the
20  shooting?
21      A. I don't recall.
22      Q. Do you recall if you worked overtime
23  on the night of the Patel shooting?
24      A. I do not recall.

Page 66

1      Q. Did you ever respond to a hospital on
2  the night of the shooting?
3      A. I did not.
4      Q. Did you ask any officers or instruct
5  any uniformed officers to respond to the
6  hospital?
7      A. I did not.
8      Q. Did you talk with any of the victim's
9  family on the night of the shooting?
10      A. I attempted to.
11      Q. How did you attempt to?
12      A. I believe I went to a few addresses
13  that we had gathered for Mr. Patel. I don't
14  recall how we came to those addresses.
15      Q. Did you speak with anyone at those
16  addresses?
17      A. I believe my attempts to locate a
18  family member were unsuccessful.
19      Q. Did you speak with anybody at the
20  addresses though?
21      A. I don't recall.
22      Q. Did anyone go with you to those
23  addresses?
24      A. I believe I went by myself.

Page 107

1    Q.  Okay.  But you wouldn't record that?
2    A.  No.
3    Q.  If -- did you feel like Zay Russell
4  was being truthful when you talked to him?
5    A.  Again that's subjective. I was getting
6  his initial interview. At that time I had no
7  other facts to refute Mr. Russell's account or
8  to probe further from what he was telling me.
9    Q.  Okay.
10    A.  So at that point I felt that was an
11  accurate account.
12    Q.  And a truthful account?
13    A.  Correct.
14    Q.  Was Zay Russell in your opinion scared
15  when you spoke with him?
16    A.  He didn't appear to be.
17    Q.  In looking at this report, continuing
18  on to page 12 and 13, does that refresh your
19  recollection if you took part in any canvass
20  while you were at either scene?
21    A.  There is additional interviews of some
22  individuals that presented themselves to us.
23    Q.  So when you -- go ahead.
24        When you say "us", did you speak

Page 108

1  with them, the witnesses?
2    A.  I didn't personally, no.
3    Q.  Did you ever go back to either of the
4  Central Park or Wilson scene to conduct any
5  canvass?
6    A.  No.
7    Q.  Okay. Have you ever had a citizen
8  complaint filed against you during your time as
9  a Chicago Police Officer?
10    A.  Yes.
11    Q.  How many times has that occurred?
12    A.  I'm not sure. Less than 10.
13    Q.  When was the last time it occurred?
14    A.  I believe there was a complaint
15  sometime in 2004, '05 or '06, but that was not
16  from detective duties.
17    Q.  What was that from?
18    A.  It was from an arrest when I was a
19  member of the 17th District tactical team.
20    Q.  What was -- what did the arrestee
21  allege in the citizen's complaint?
22    A.  It was a narcotics investigation.
23    Q.  What did they allege you did wrong?
24    A.  I don't recall.

Page 109

1    Q.  Can you recall any citizen complaint
2  that was filed against you and any allegations
3  that were alleged you did wrong?
4    A.  As a result of conducting legal and
5  approved search warrants, frequently get a
6  blanket complaint by the resident of that
7  target location. So I have a few of those.
8  Might have been an allegation of theft of
9  money. Also related to events where we had
10  confiscated suspected narcotics proceeds.
11        There was, I believe, a
12  complaint, again from a narcotics investigation
13  that alleged an lawful search or something to
14  that effect.
15    Q.  Did any of the citizens complain that
16  you had inaccurately reported events of the
17  investigation?
18    A.  From the citizen allegations?
19    Q.  Yes.
20    A.  Entirely.
21    Q.  Okay. All of them?
22    A.  To my recollection, yes.
23    Q.  Okay.  Did any supervisor or -- Strike
24  that.

Page 110

1        Have any of your supervisors ever
2  disciplined you for inaccurate or untruthful
3  report writing?
4    A.  No.
5    Q.  Have any CRs against you been
6  sustained?
7    A.  No.
8    Q.  Do you know if there were any CRs that
9  were opened against you in regards to the Patel
10  investigation?
11    A.  No.
12    Q.  You testified at the criminal trial of
13  Anthony Kuri and David Gomez, is that correct?
14    A.  I did.
15    Q.  Prior to testifying did you prepare
16  with the Assistant State's Attorneys who were
17  working on the case?
18    A.  Of course.
19    Q.  Who were those that you prepared with?
20    A.  MaryJo Murtaugh, she is an Assistant
21  State's Attorney.
22    Q.  How many times did you meet with her
23  in preparation for your testimony?
24    A.  I don't recall.

Page 111

1      Q.  Was anybody else present when you met
2  with her?
3      A.  I don't recall.  M U R T A U G H.
4      Q.  Did you meet with any witnesses who
5  testified at that trial?
6      A.  No, I did not.
7      Q.  After you testified did you sit in on
8  the trial?
9      A.  No.
10     Q.  Did you take part in the arrest of
11 Anthony Kuri?
12     A.  I did not.
13     Q.  At the time that Anthony Kuri was
14 arrested did you know that he was going to
15 arrested, did you know he was wanted for the
16 shooting?
17     A.  I did not.
18     Q.  And did you take part in this
19 investigation at any point after the July 24th
20 shooting?
21     A.  No.
22     Q.  Okay.  So you responded to the scene,
23 wrote the reports and did not take part in the
24 investigation, is that accurate?

Page 112

1      A.  Correct.
2      Q.  Until you testified at trial?
3      A.  Correct.
4      Q.  Did any of the detectives who further
5  investigated the shooting, did they ever come
6  back and talk with you about your observations
7  from that night?
8      A.  I don't recall.
9      Q.  Did your supervisors ever talk with
10 you about your role in the investigation and
11 your observations from that night?
12     A.  I don't recall.
13         MS. GOODWIN: Okay. I don't have any
14 further questions.  Thank you.
15         MS. MASTERS: Could we take a short
16 break? I may have a couple.
17         (Recess.)
18         MS. MASTERS: I just have a couple
19 follow-ups.
20
21
22
23
24

Page 113

1              EXAMINATION
2  BY MS. MASTERS:
3      Q.  Detective Szwedo, do you recall being
4  asked about your independent recollection of
5  arriving at the crime scene and what you
6  observed there, that series of questions?
7      A.  Yes.
8      Q.  Okay. And your response, based on what
9  you observed at the scene and what you remember
10 and who you remember speaking to, was that
11 based on your -- simply on your independent
12 recollection or was it a combination of your
13 independent recollection and your recent review
14 of police reports that you had authored?
15     A.  Yes, it was a combination of both.
16     Q.  And then following up on you were
17 asked about citizen complaints that you had
18 received, do you remember that line of
19 questioning?
20     A.  Yes.
21     Q.  And one of the questions was, do you
22 recall citizen complaints or citizens
23 complaining of you not accurately reporting
24 what the citizen had said or what had occurred,

Page 114

1  do you recall that question?
2      A.  Yes.
3      Q.  Okay.  And do you recall there being
4  citizen complaints specifically alleging that
5  you had not accurately reported what had
6  occurred or what the citizen had told you?
7      A.  No, there was none of that nature.
8      Q.  And you testified that you had
9  testified at the criminal trial against Kuri
10 and Gomez, is that correct?
11     A.  Correct.
12     Q.  Other than your testimony and
13 preparing for that testimony, did you offer any
14 other assistance to the prosecutors with
15 respect to the charges brought against Anthony
16 Kuri?
17     A.  No.
18         MS. MASTERS: I think that's all I
19 have.
20         MR. GRILL: No questions.
21         MS. GOODWIN: Signature.
22         MS. MASTERS: Reserve.
23
24

Page 115

1           MS. GOODWIN: Thank you for coming in
2    today.
3                    -0-o-0-
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 117

1           The undersigned is not interested in
2    the within case, nor of kin or counsel to any
3    of the parties.
4           Witness my official signature in and
5    for Cook County Illinois on January 20___.
6
7           Carol M. Siebert-LaMonica
8           Carol M. Siebert-LaMonica
9           C.S.R. No. 084.001355
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 116

1    STATE OF ILLINOIS  )
2                       ) SS:
3      COUNTY OF COOK  )
4           The within and foregoing deposition
5    of the aforementioned witness was taken before
6    Carol M. Siebert-LaMonica, C.S.R, at the place,
7    date and time aforementioned.
8           There were present during the taking
9    of the deposition the previously named counsel.
10          The said witness was first duly sworn
11   and was then examined upon oral interrogatories;
12   the questions and answers were reported in
13   shorthand by the undersigned and transcribed
14   via computer-aided transcription.
15          The within and foregoing is a true,
16   accurate and complete record of all of the
17   questions asked of and answers made by the
18   forementioned witness at the time and place
19   hereinabove referred to.
20          The signature of the witness was
21   not waived and the deposition was submitted
22   pursuant to Rules 207 and 211 (d) of the Rules
23   of the Supreme Court of Illinois to the
24   deponent per copy of the attached letter.

Page 118

CORRECTION PAGE
       I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON: _____
____ ____ _____
       REASON:

(Signed)_____

Exhibit J

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

```
ANTHONY KURI, (a.k.a. RAMSEY       )
QURASH),                           )
                      Plaintiff,   )
                                   )
          vs.                      )   No. 1:13-1653
                                   )
THE CITY OF CHICAGO,               )
DETECTIVES SZWEDO, VALKNER,        )
FOLINO, McDERMOTT, KOLMAN,         )
CORDARO, FIGUEROA-MITCHELL,        )
OFFICERS LOPEZ, SANCHEZ, And       )
As-Yet UNKNOWN CHICAGO             )
POLICE DEPARTMENT MEMBERS,         )
                                   )
                      Defendants.  )
```

The deposition of

DETECTIVE JOHN VALKNER, taken under oath at

312 North May Street, Chicago.  Illinois,

10:15 a.m., on Friday, October 10, 2014,

pursuant to the Rules of the United States

District Court, Northern District of Illinois,

before Janice H. Heinemann, CSR, CRR, RDR, CSR

No. 084-001391 in and for the County of Du Page

and State of Illinois, pursuant to notice.

Page 3

1        JOHN VALKNER,
2   having been first duly sworn, was examined and
3   testified as follows:
4            EXAMINATION
5   BY MS. GOODWIN:
6        Q.  Sir, could you please state and spell
7   your name for the record.
8        A.  Detective John Valkner, V-a-l-k-n-e-r.
9   My star number is 20111.
10       Q.  And you are currently employed with
11  the Chicago Police Department?
12       A.  Yes.
13       Q.  And how long have you been employed
14  with the Chicago Fire Department?
15       A.  21 years.
16       Q.  And what is your current assignment
17  with the department?
18       A.  I'm assigned to Detective Bureau
19  North.  I'm assigned to a homicide team.
20       Q.  And thinking back to July of 2009, was
21  your assignment different at that point in
22  time?
23       A.  Yes.  I was on the 1st Watch.
24       Q.  Were you still in area north?

Page 4

1        A.  No.  Back then it was area 5.
2        Q.  What area or portion of the city does
3   area 5 cover?
4        A.  They are the north and northwest
5   portion of the city.
6        Q.  Are there streets that kind of tie it
7   all together?
8        A.  Area 5?
9        Q.  Yes.
10       A.  Yes.  It went as far south as
11  Roosevelt, as far west as the western suburbs
12  that border the city, and same on the north
13  end.  And on the east end I think it went to
14  the river.
15           MR. SZWEDO:  Yes, the river.
16           THE WITNESS:  From the peanut gallery
17  over there.  Yeah, the river.
18           MS. MASTERS:  You will get your chance
19  in a week.
20           MR. SZWEDO:  He looked at me.
21  BY MS. GOODWIN:
22       Q.  And that's one of your fellow officers
23  in the room?
24       A.  Yes.

Page 5

1        Q.  And what is his name?
2        A.  Detective Frank Szwedo.
3        Q.  And do you and Detective Szwedo work
4   together currently in area north?
5           MS. MASTERS:  It's Szwedo.  He's one
6   of the defendants.
7           MS. GOODWIN:  All right.  How did I
8   pronounce it?
9           MS. MASTERS:  I thought I heard Freedo
10  (phonetic).
11          MR. GRILL:  I thought I heard the
12  same.
13          MS. GOODWIN:  Well, I will be more
14  clear.
15  BY MS. GOODWIN:
16       Q.  I meant Szwedo.  Do you work together
17  in area north?
18       A.  No.
19       Q.  Have you ever worked together?
20       A.  Yes.
21       Q.  And what areas or what roles have you
22  worked together within the Chicago Police
23  Department?
24       A.  When we were detectives at area 5.

Page 6

1        Q.  You mentioned earlier that you were on
2   the 1st Watch back in July of 2009.
3        A.  Yes.
4        Q.  What is the 1st Watch?
5        A.  Normal start time would be midnight.
6   We would work till 9:00 in the morning.
7        Q.  And as a detective in area 5 on 1st
8   Watch, what were your responsibilities then?
9        A.  I was primarily a violent crimes
10  detective, but pretty much we would handle
11  whatever came in.
12       Q.  Did you have a partner at the time?
13       A.  We weren't really assigned to
14  partners, but Frank and I would work together
15  on stuff.
16       Q.  Was that something that you were told
17  to work together, or did you just decide to?
18       A.  No.  Most of the time we were assigned
19  to handle something together or just depending
20  on what kind of a job it was.
21       Q.  How many detectives were in area 5 who
22  worked the 1st Watch back in July of 2009?
23       A.  I want to say it was somewhere around
24  19 or 20 we were probably assigned on 1st

**Page 7**

1  Watch.
2      Q.  How many would work on any given shift
3  like each day, did it rotate?
4      A.  Yes.  There would be -- I don't
5  remember exactly how many.  It would depend.
6      Q.  Could just give me an estimate?  Would
7  there be like 5 detectives working every night?
8      A.  Sometimes you would have 2, sometimes
9  you would have 10, just depends on what was
10  going on.
11      Q.  What do you mean by "what was going
12  on"?
13      A.  Vacations, day-off groups, that kind
14  of thing.
15      Q.  Are you aware of a set schedule of how
16  many detectives were supposed to be there every
17  night?
18      MS. MASTERS:  Objection, foundation.
19      THE WITNESS:  No.
20  BY MS. GOODWIN:
21      Q.  What was your schedule in terms of
22  days off if you recall?
23      A.  I don't remember.
24      Q.  Okay.  So we are here today to talk

**Page 8**

1  more about a shooting that occurred in July of
2  2009, the homicide of Mr. Patel.  Do you recall
3  being assigned to that case?
4      A.  Yes.
5      Q.  Do you recall who your supervisor was
6  on the night of the shooting, the Patel
7  shooting?
8      A.  I think it was Sergeant Mills,
9  M-i-l-l-s.
10      Q.  Was he the one who assigned you to
11  take part in that investigation?
12      A.  I believe so.
13      Q.  Do you recall how it was he told you,
14  whether he called you up, if you were at work,
15  or how it all began?
16      A.  No.
17      Q.  When you are on duty -- Or strike
18  that.
19          When you were on duty back in July of
20  2009, did you have a department-issued cell
21  phone?
22      A.  No.
23      Q.  Did you carry your own personal cell
24  phone?

**Page 9**

1      A.  Yes.
2      Q.  And is that something that officers or
3  supervisors would use to contact you on during
4  your shift?
5      A.  Sometimes, yes.
6      Q.  Did you also have a radio that you
7  carried?
8      A.  On the street, yes.
9      Q.  Like a department-issued radio?
10      A.  Yes.
11      Q.  And is that something that you
12  routinely carried?
13      A.  At least one officer would have a
14  radio.  I mean if I was out by myself, I would
15  have one.  If there were two of us, I may not
16  have one.
17      Q.  Do you recall receiving any radio
18  correspondence from your sergeant about the
19  Patel homicide?
20      A.  No.
21      Q.  If you are assigned to go out to a
22  homicide, is that something that your
23  assignment or your sergeant would specifically
24  tell you to go out to the scene of the

**Page 10**

1  homicide; or would the assignment come from
2  OEMC or dispatch at all?
3      MS. MASTERS:  Object to the form of
4  the question.
5      THE WITNESS:  No.  If I was assigned,
6  it would be from a supervisor.
7  BY MS. GOODWIN:
8      Q.  Do you recall going to the scene of
9  the Patel shooting?
10      A.  Yes.
11      Q.  And where was it?
12      A.  There were two portions of the crime
13  scene.
14      Q.  Do you recall where those two portions
15  were?
16      A.  One was 3716 North Wilson.  And the
17  other portion was 4628 North -- I'm sorry --
18  3616 West Wilson and 30 -- and 4228 -- I'm
19  sorry.  Let me get this right.
20          4628 North on Central Park.
21      Q.  Okay.  Now, are those addresses that
22  you remembered from reviewing reports prior to
23  today's deposition?
24      A.  Yes.

Page 11

1    Q.  Or do you independently remember going
2  to those two addresses in such specifics?
3    A.  No.
4    Q.  So what did you review before coming
5  to today's deposition?
6    A.  I reviewed the crime scene report that
7  Detective Szwedo prepared.
8    Q.  Any other documents?
9    A.  No.
10    Q.  Aside from your attorneys, did you
11  talk with anybody about today's deposition?
12    A.  No.
13    Q.  What do you remember about -- Well,
14  strike that.
15        How far away are the two scenes
16  that you just related?
17    A.  Not far.
18    Q.  So what do you recall then about
19  arriving to the general area of the scene?
20    A.  I recall going on the Wilson address
21  first.  And I remember a vehicle that the
22  victims were in.  It was a van.  There was
23  windows broke and shattered.  And there was --
24  I think, I believe there was also blood in the

Page 12

1  van.
2    Q.  What did you know, what details did
3  you know about the shooting prior to arriving
4  on the scene?
5    A.  I don't remember.
6    Q.  Do you recall where you were coming or
7  where you were right before you went to the
8  scene?
9    A.  No.
10    Q.  Do you recall if you arrived with
11  Detective Szwedo or whether you met him there?
12    A.  I was by myself.
13    Q.  When you arrived at the Wilson
14  address, what did you do or who did you talk
15  with?
16    A.  I just remember inspecting that van.
17  I don't really recall talking with anybody.
18    Q.  Do you recall seeing any supervisors
19  on scene?
20    A.  There was I believe a female
21  supervisor there.
22    Q.  Do you recall her name?
23    A.  No.
24    Q.  Do you recall if she was a part of

Page 13

1  area 5, if she worked there?
2    A.  She was not.
3    Q.  Generally what was your assignment or
4  your purpose in going to the scene of the
5  crime?
6    A.  We were investigating the initial
7  shooting that happened.
8    Q.  In terms of investigating a shooting
9  when you as a detective arrive on scene, what
10  are your responsibilities?
11    A.  To find out what happened.
12    Q.  And how do you go about doing that?
13    A.  Talk to people, observe things.
14    Q.  Do you take direction from supervisors
15  or any other type of officer who is on scene?
16    A.  Sometimes.
17    Q.  Do you recall doing that in the Patel
18  shooting?
19    A.  No.
20    Q.  Who did you speak with when you were
21  on scene?
22    A.  I don't remember.
23    Q.  So you first inspected the van, is
24  that correct?

Page 14

1    A.  Yes.
2    Q.  And you actually looked inside the van
3  and did a thorough inspection of it?
4        MS. MASTERS:  Object to the form of
5  that question.
6        THE WITNESS:  No.
7  BY MS. GOODWIN:
8    Q.  Well, tell me about how you inspected
9  the van.
10    A.  I looked inside of it.
11    Q.  And what did you see?
12    A.  I remember one door, the sliding door,
13  was open.  And I remember seeing a little, toy
14  little pistol that was by the console.  I think
15  there was some bullet evidence in the van, too.
16    Q.  Were there forensic investigators
17  there who marked up the scene at all?
18    A.  Not when I was there.
19    Q.  Had ambulances -- Well, strike that.
20        Were ambulances already on scene
21  when you were there?
22    A.  I believe that they had already left
23  by the time I got there.
24    Q.  Do you have a sense of how long after

Page 19

1        Q.  When you say that you think he was in
2    a car, did you see him in a car?
3        A.  I don't remember.
4        Q.  Did you ever speak with, that night --
5    Sorry.  Did you ever speak with anybody who had
6    spoken with him?
7        A.  Yes.
8        Q.  And who was that?
9        A.  My partner.
10       Q.  And what did he say?
11       A.  I don't remember.
12       Q.  Did he give you any details about why
13   one of the victims of the shooting was put
14   under arrest that night?
15       A.  There was some type of disturbance, I
16   don't recall the details of it.
17       Q.  Do you know if he was taken to the
18   police station or released from the scene?
19       A.  I'm not sure.
20       Q.  Aside from the cartridge cases and the
21   glass, did you observe any other evidence at
22   the Central Park scene?
23       A.  There was a bicycle that was half on
24   the sidewalk, half on the parkway, at 4636 on

Page 20

1    North Central Park.  It was a Huffy-type
2    mountain bike.
3        Q.  And was that bike within the crime
4    scene tape?
5        A.  I'm not sure.
6        Q.  Did you speak with anyone who said
7    that the bike had been used in the commission
8    of the crime?
9        A.  I do not.
10       Q.  Now, you did speak with some citizens
11   when you were at the Central Park scene?
12       A.  Yes.
13       Q.  Who did you speak with if you recall?
14       A.  I don't recall.
15       Q.  Did you speak with people already
16   outside, or did you go knocking on people's
17   doors like a traditional canvass?
18       A.  I don't remember.
19       Q.  Do you recall if anybody approached
20   you to speak with you or tell you what
21   happened?
22       A.  I don't remember.
23       Q.  When you were at the Central Park
24   scene, did you take any notes, handwritten

Page 21

1    notes?
2        A.  I did, yes.
3        Q.  What was your purpose in taking
4    handwritten notes at that scene?
5        A.  Just to remember what was there.
6        Q.  Did you speak with your partner when
7    you were at the Central Park scene?
8        A.  I don't remember.
9        Q.  How long did you spend at the Central
10   Park scene?
11       A.  I don't remember.
12       Q.  Were you there when the scene was
13   cleared and the tape was taken down?
14       A.  I don't know.
15       Q.  Do you recall what you did after you
16   left the Central Park scene?
17       A.  No.
18       Q.  Do you recall if you went back to the
19   Wilson scene, or did you leave the scene as a
20   whole in general?
21       A.  I don't remember.
22       Q.  After you left the Central Park scene,
23   what else did you do to work on this case?
24       A.  Eventually we went back to the office

Page 22

1    and I remember we were trying to make
2    notification to the family.  But that's -- I
3    don't remember if we were able to or not.
4        Q.  At any point in time do you recall
5    speaking to the family of those involved in
6    this shooting?
7        A.  I don't.
8        Q.  After you went back to the office and
9    attempted to make notification to the family,
10   what else did you do on this investigation?
11       A.  I don't remember what else we did.
12       Q.  In the days that followed, did you do
13   any work on this case?
14       A.  No.
15       Q.  Working the -- Is it the 1st Watch
16   working at night?  Do you pass cases off to
17   those working dayshifts?
18       A.  That's pretty much how the practice
19   was back then.
20       Q.  So how does that work, how would you
21   share information or pass an investigation off
22   to a dayshift?
23       A.  Usually it would be -- If it was the
24   dayshift, it would be a face-to-face kind of

Page 23

1    tell them what's going on with the case.
2        Q.  So did your shift and the next shift
3    then overlap such that you would have time to
4    talk to one another?
5        A.  Yes.
6        Q.  And what do you recall about passing
7    off information in this case to the dayshift?
8        A.  Nothing.
9        Q.  Do you give them reports or any
10   documents at the time that you speak with them?
11       A.  Usually you would type up a scene, and
12   that would stay with the file.  So they could
13   look at that and see what you did.
14       Q.  And then when you start your shift on
15   later days, the next day you come in to start
16   your shift, would you have any type of
17   face-to-face meetings on the shift just
18   previous to yours?
19       A.  No.
20       Q.  No?
21       A.  No.
22       Q.  Well, would you being, on the
23   nightshift, continue investigations that you
24   have been doing?

Page 24

1        A.  It would depend.
2        Q.  On what?
3        A.  Pretty much what you are told to do.
4        Q.  And who tells you what to do?
5        A.  Your supervisor or immediate sergeant
6    would pretty much tell you what to do.
7        Q.  Do you recall your supervisor telling
8    you any updates about the Patel shooting?
9        A.  No.
10       Q.  Do you recall an arrest being made in
11   the Patel shooting?
12       A.  Just after reviewing the reports.
13       Q.  Well, thinking back to the summer of
14   2009, do you recall an arrest being made at
15   that time?
16       A.  No.
17       Q.  Did you take part in the arrest?
18       A.  No.
19       Q.  On the night of the shooting, did you
20   ever respond to the hospital?
21       A.  No.
22       Q.  And while you were at either the
23   Wilson or the Central Park scene, did you take
24   any photographs?

Page 25

1        A.  No.
2        Q.  Or record the scene in any way other
3    than making your observations and writing them
4    down?
5        A.  No.
6        Q.  At the time that you were on scene,
7    did you know one way or the other that was a
8    shooting that involved gang members?
9        A.  I don't know if I had direct --
10   That's what I suspected it to be, but I don't
11   remember anyone telling me that.
12       Q.  Why did you suspect that that was the
13   case?
14       A.  Just by the individuals that were in
15   the, the victims that were in the vehicle and
16   just my experience.
17       Q.  That area around Central Park, is that
18   a territory that's claimed by any gang?
19           MS. MASTERS:  Object to the form of
20   the question.  If you could just narrow it to
21   2009 in July, that would be better.
22   BY MS. GOODWIN:
23       Q.  Yes.  Back in 2009.
24       A.  I'm sure it was, but I don't really

Page 26

1    have a lot of experience with the gangs from
2    that corner.
3        Q.  Have you ever been within your time at
4    the Chicago Police Department in a gang
5    tactical unit or anything of that nature?
6        A.  Yes.
7        Q.  When was that?
8        A.  Prior to 2004.
9        Q.  And what assignment did you have with
10   that?
11       A.  I was on a gang team for quite a
12   while -- I'm sorry -- on a tactical team for
13   quite a while in the 15th District, which is on
14   the west side.
15       Q.  Did the tactical team have a name or
16   what was it called?
17       A.  15th District Tactical Team.
18       Q.  And what area is the 15th District,
19   you said it's on the west side?
20       A.  It's the Austin neighborhood.
21       Q.  What gangs did you typically deal with
22   in the Austin neighborhood?
23       A.  Primarily Vice Lords.
24       Q.  And how long did you stay within that

**Page 31**

1      A.  No.
2      Q.  Do you recognize the handwriting on
3  this document?
4      A.  No.
5      Q.  Have you ever seen this type of
6  document in any other case folder?
7      A.  Yes.
8      Q.  Do you know the purpose of this
9  document or how it's used within your
10  department?
11      A.  It's usually in the Homicide Folder,
12  and it just keeps track of what's in that
13  folder.
14      Q.  Have you ever had to put together this
15  type of document, like type it up?
16      A.  No.
17      Q.  For any of your cases?
18      A.  No.
19      Q.  Do you see your name by "Case Manager
20  Detective"?
21      A.  Yes.
22      Q.  What is a Case Manager Detective?
23      MS. MASTERS:  Objection, foundation.
24      THE WITNESS:  I don't know.

**Page 32**

1  BY MS. GOODWIN:
2      Q.  Have you ever been called that before?
3      A.  No.
4      Q.  Were you aware of having that title at
5  any time or for any case?
6      MS. MASTERS:  Object to the form of
7  the question.
8      THE WITNESS:  No.
9  BY MS. GOODWIN:
10      Q.  Are you aware of any responsibilities
11  that are specific to a Case Manager Detective?
12      A.  No.
13      Q.  Do you work with Sergeant Prugar, who
14  is next to your name by "Assigned Sergeant"?
15      A.  No.
16      Q.  Do you recall conversations with
17  Sergeant Prugar about the Patel investigation
18  back in July of 2009?
19      A.  No.
20      Q.  Do you know who that is?
21      A.  Yes.
22      Q.  Was he in area 5 with you at the time
23  of the shooting?
24      A.  Yes.

**Page 33**

1      Q.  And did he work the night shift?
2      A.  No.
3      Q.  Do you know what shift he worked?
4      A.  Well, he did not work the night
5  shift -- I'm not sure what shift he was
6  working.
7      Q.  Okay.  Have you ever pulled out the
8  homicide case folder for the Patel shooting and
9  gone through it?
10      A.  I don't believe so.
11      MS. GOODWIN:  Let's look at this
12  document.
13      (Deposition Exhibit No. 2 was
14      marked for identification.)
15  BY MS. GOODWIN:
16      Q.  Take a look at this document and let
17  me know when you are ready to talk about it.
18      A.  It looks like, with what's cut off on
19  the top I'm really not sure about this one.
20      Q.  Well, that was going to be my first
21  question is if you knew, if you recognized this
22  document or knew what its title would be.
23      A.  It would help if the part that's cut
24  off would be there, so I don't know what this

**Page 34**

1  is.
2      Q.  Do you know if you provided any
3  information that was put into this report?
4      A.  I don't know.
5      Q.  Have you ever seen this type of
6  document in any other case homicide folder?
7      A.  I'm not sure what this is so I can't
8  answer that.
9      Q.  If you look to the right-hand column,
10  it starts out with "No. of Counts: 1" and then
11  "Other Details."  Do you see that?
12      A.  Yes.
13      Q.  This lists Offender 2 as being Anthony
14  Kuri.  And then underneath it at the very
15  bottom of that column, it says, "Involved
16  Personnel."  And your name is listed as a
17  "Detective Assigned."  Do you see that?
18      A.  Yes.
19      Q.  Does that refresh your recollection in
20  any way as to whether you had involvement with
21  the arrest of Anthony Kuri?
22      MS. MASTERS:  Object to the form of
23  the question.
24      THE WITNESS:  I did not have

Page 35

1    involvement with the arrest.
2    BY MS. GOODWIN:
3        Q.   Now, you mentioned earlier that you
4    looked over -- Well, strike that.
5            Did you review the Case
6    Supplementary Report that your partner prepared
7    in this matter?
8        A.   Yes.
9        Q.   Before coming to today's deposition?
10       A.   Yes.
11       Q.   Thinking back to when the report was
12   written, did you work with your partner on
13   creating that report?
14       A.   No.
15       Q.   Is that something that you would
16   typically do in an investigation, sit down with
17   your partner and create the report together?
18       A.   Well, he typed it.  I wasn't
19   necessarily watching him type.
20       Q.   Did you provide input into what he was
21   typing?
22       A.   Yes.
23       Q.   And how did you do that?
24       A.   Through notes and conversation.

Page 36

1        Q.   Were you with him when he was typing
2    it up and talking about what was going into the
3    report?
4        A.   I don't remember.
5        Q.   Now, if you are assigned to a homicide
6    investigation and your partner submits the
7    report, do you, as a practice within the police
8    department, do you have to sit down and review
9    the report before it's submitted?
10       A.   You don't have to, but I prefer to do
11   that.
12       Q.   Because your name goes on the report?
13       A.   Yes.
14       Q.   Do you remember talking to
15   Detective Szwedo about any motives or anything
16   like that in regards to the investigation?
17       A.   I don't remember.
18       Q.   Do you remember talking about any
19   suspects on the night that the shooting had
20   occurred?
21       A.   No.
22       Q.   Do you recall when he typed up the
23   Case Supplementary Report?
24       A.   No.

Page 37

1        Q.   Do you recall if it was the night of
2    the shooting?
3        A.   It wouldn't have been that night
4    because -- It could have been in the morning
5    but I don't recall.
6        Q.   Did you work overtime the night that
7    the Patel shooting occurred?
8        A.   I don't believe I did, but I'm not
9    sure.
10           (Deposition Exhibit No. 3 was
11           marked for identification.)
12   BY MS. GOODWIN:
13       Q.   Take a look at this document and let
14   me know when you are ready to talk about it.
15       A.   Okay.
16       Q.   And what is this document that we have
17   marked as Exhibit 3?
18       A.   This is just a general sketch I did of
19   the area where the cartridge casings were
20   observed on Central Park.
21       Q.   Does this picture include any part of
22   the Wilson scene?
23       A.   No.
24       Q.   If you look on the right-hand side, I

Page 38

1    think it's the first row of rectangles that we
2    see, there is some handwriting which I think
3    the first one says "parkway grass"?
4        A.   Yes.
5        Q.   Is that what all of them say?  I
6    couldn't quite read your handwriting.
7        A.   Yes.
8        Q.   And the 4624 -- Okay.  Now, on the
9    left-hand side, are those the cars that were
10   parked on Central Park?
11       A.   Yes.
12       Q.   Did you ever follow up with any of the
13   car owners?
14       A.   I don't remember.
15       Q.   If you had followed up with any of the
16   car owners, would you have written in your
17   report about that?
18       MS. MASTERS:  Objection, calls for
19   speculation.
20       THE WITNESS:  It depends what they had
21   to say.
22   BY MS. GOODWIN:
23       Q.   And what do you mean by that?
24       A.   If they had relevant information, I'm

## Page 55

BY MS. GOODWIN:

1  BY MS. GOODWIN:
2      Q.  My question is do you recognize the
3  name of that officer.
4      A.  No.
5      Q.  Do you see your name written at the
6  bottom of this report?
7      A.  Yes.
8      Q.  Do you know why your name is written
9  at the bottom of this report?
10     A.  Kind of.
11     Q.  Why, or why do you think so?
12     A.  This report was not generated in our
13  office so, when it goes through police
14  channels, it eventually comes over to the
15  Detective Division and my name is at the bottom
16  because I'm one of the detectives assigned to
17  the case at that point.
18     Q.  Do you recall receiving this report?
19     A.  No.
20     Q.  Did you receive any other reports, you
21  know, that were not generated within your
22  office but had to do with the Patel shooting?
23     A.  I don't remember.
24     Q.  Did you ever speak with this police

## Page 56

1  officer about her experience at the scene of
2  the Patel shooting?
3      A.  No.
4      Q.  Did you ever speak with any police
5  officer as to whether or not that -- whether or
6  not the crowd was rowdy when out at the scene
7  of the crime?
8      A.  I don't remember.
9      Q.  And you never responded to a hospital
10 on the night of the shooting?
11     A.  No.
12         MS. GOODWIN:  Let's take a quick
13 break, and then I think I can wrap things up.
14         THE WITNESS:  Okay.
15             (Recess taken.)
16         MS. GOODWIN:  I don't have any other
17 questions.  Thank you for coming in today.
18         THE WITNESS:  Okay.
19         MS. MASTERS:  I just have a couple of
20 quick questions.
21
22
23
24

## Page 57

1              EXAMINATION
2  BY MS. MASTERS:
3      Q.  Did you arrest Anthony Kuri?
4      A.  No.
5      Q.  Did you participate in any interviews
6  of Anthony Kuri at the area 5 Detective
7  Division at any time he was present?
8      A.  No.
9      Q.  Did you speak to any state's attorneys
10 about charging Anthony Kuri with any crime?
11     A.  No.
12     Q.  Did you testify in any grand jury
13 proceedings with relation to Anthony Kuri?
14     A.  No.
15     Q.  Did you testify at any criminal
16 proceedings at any either hearing or trial with
17 respect to Anthony Kuri?
18     A.  No.
19         MS. MASTERS:  That's all I have.
20         MS. GOODWIN:  Anyone else?
21         THE REPORTER:  Signature?
22         MS. MASTERS:  Yes.  Reserved.
23             * * *
24

## Page 58

1  STATE OF ILLINOIS.  )
2                 ) SS:
3  COUNTY OF DU PAGE  )
4
5      The within and foregoing deposition
6  of the aforementioned witness was taken before
7  Janice H. Heinemann, CSR, CRR, RDR, at the
8  place, date, and time aforementioned.
9      There were present during the taking
10 of the deposition the previously named counsel.
11     The said witness was first duly sworn
12 and was then examined upon oral interrogatories;
13 the questions and answers were reported in
14 shorthand by the undersigned and transcribed
15 via computer-aided transcription.
16     The within and foregoing is a true,
17 accurate, and complete record of all of the
18 questions asked of and answers made by the
19 aforementioned witness at the time and place
20 hereinabove referred to.
21         The signature of the witness was
22 not waived and the deposition was submitted
23 pursuant to Rules 207 and 211 (d) of the Rules
24 of the Supreme Court of Illinois to the

**Page 59**

1    deponent per copy of the attached letter.
2        The undersigned is not interested in the
3    within case, nor of kin or counsel to any of
4    the parties.
5        Witness my official signature in and
6    for Du Page County, Illinois, on this 26th day
7    of January, 2016.
8
9
10      Janice H. Heinemann
11      IL CSR No. 084-001391
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 61**

WITNESS CERTIFICATION

    I hereby certify that I have read
the foregoing transcript of my deposition
consisting of Pages 1 through 57, inclusive.
Subject to the changes set forth on the
preceding pages, the foregoing is a true and
correct transcript of my deposition taken
on October 10, 2014.

(Signed) _____
      DETECTIVE JOHN VALKNER

SUBSCRIBED AND SWORN TO
Before me this __ day of
_____, 2016.

_____

Notary Public

**Page 60**

C O R R E C T I O N   P A G E
    I made the following changes for the
following reasons:
PAGE LINE  CHANGE:
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____
      REASON: _____
___ ___  _____.

(Signed)_____
    DETECTIVE JOHN VALKNER

# Exhibit K

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13 C 1653 |
| | ) | |
| THE CITY OF CHICAGO, | ) | Judge Joan B. Gottschall |
| DET. SZWEDO (Star No. 20813), | ) | |
| DET. VALKNER (Star No. 20111), | ) | |
| DET. FOLINO (Star No. 20143), DET. | ) | |
| McDERMOTT (Star No. 21084), DET. | ) | Jury Demand |
| KOLMAN (Star No. 20448), DET. CORDARO | ) | |
| (Star No. 20680), OFFICER | ) | |
| FIGUEROA-MITCHELL (Star No. 20445), | ) | |
| OFFICER LOPEZ (Star No. 9341), | ) | |
| OFFICER SANCHEZ (Star No. 6439), And | ) | |
| As-Yet UNKNOWN CHICAGO POLICE | ) | |
| DEPARTMENT MEMBERS | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS FOLINO, McDERMOTT, KOLMAN, AND CORDARO'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants John Folino, Jr., Timothy McDermott, Thomas Kolman and Robert Cordaro,

(collectively, "Detective Defendants"), by and through their undersigned attorneys, in answer to

Plaintiff's First Amended Complaint, state as follows:

### Introduction

1.      By this action, Plaintiff seeks redress for having spent more than three years in the Cook County Jail for a murder he did not commit, a crime that another man has since confessed to having committed.

**ANSWER:**   Detective Defendants deny that Plaintiff has any basis to seek redress in

this case.  Defendants lack knowledge or information sufficient to form a belief as to the truth of

**Exhibit A**

the remaining allegations in paragraph 1.

2.     This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

**ANSWER:**     The Detective Defendants admit that this action is brought pursuant to 42 U.S.C. Section 1983 for alleged deprivation of Plaintiff's constitutional rights.  Defendants deny any such deprivation occurred.

3.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331 and 1367.

**ANSWER:**     Detective Defendants admit that this court has jurisdiction in this matter.

4.     Venue is proper under 28 U.S.C. §1391(b).  On information and belief, all Detective Defendants reside in this judicial district and Defendant City is a municipality located in this judicial district.  The events giving rise to the claims asserted herein occurred within the district.

**ANSWER:**     Detective Defendants admit that the incident at issue occurred in this judicial district and that they reside in this judicial district. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4.

**Factual Allegations**

5.     In the early morning hours of July 24, 2009, a shooting occurred on the 4600 block of North Central Avenue in Chicago, Illinois.

**ANSWER:**     Detective Defendants admit the allegations contained in paragraph 5 and further add that the street name is N. Central Park Avenue.

6.     According to witnesses who gave reports to the on-scene officers immediately following the shooting, a male Hispanic rode up on a bicycle and fired 5-6 shots at a minivan double-parked in the street.

**ANSWER:**     Detective Defendants admit that two witnesses reported seeing a male Hispanic shooter.  Specifically, Antionett Russell related that she observed a male Hispanic fire a pistol in the direction of a vehicle double parked in front of 4628 N. Central Park and that after approximately six shots, the shooter fled northbound on the sidewalk, out of sight; Demetria

2

Russell related that after she heard approximately four to six shots she looked out the window and observed a male Hispanic across the street approximately three buildings to the south, looking in her direction from the gangway who disappeared when she observed a police vehicle approaching. Additional witness provided no information about a shooter but described the number of shots heard. Witness Zay Russell related that he observed two unknown male Hispanics on bicycles approach the van and that one of the Hispanics produced a handgun and fired approximately five times. Defendants deny any remaining allegations.

7. The driver of the car, Gaurav Patel, was fatally injured. Tony Fernandez, who was seated on the passenger side of the van in the middle row of seats, sustained serious injuries. A third passenger, Zae Russell, who was seated in the third row of seats behind the driver, escaped unharmed.

**ANSWER:** Defendants admit upon information and belief the seating arrangement described in this paragraph and admit the remaining allegations contained in this paragraph.

8. The man on the bike who shot and killed Patel was David Gomez. Gomez has since confessed to the murder, stating that he was alone at the time.

**ANSWER:** Detective Defendants admit that David Gomez was brought to the scene on a bike and that he shot and killed Patel. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 8.

9. After the shooting, Gomez ran away, leaving his bike at the scene.

**ANSWER:** Detective Defendants admit that based upon reports David Gomez ran away after the shooting and that a bike was recovered from the scene of the shooting. Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.

10. Paramedics arrived on scene and transported Patel and Fernandez to the hospital. Russell, the victim who escaped unharmed, was arrested on scene by one or more of the Defendants, placed in handcuffs, and transported to the police station for questioning.

**ANSWER:**    Detective Defendants admit that Patel and Fernandez were transported to the hospital by paramedics and that Russell was arrested on scene.  Detective Defendants deny that they handcuffed or transported Russell to a police station of for questioning.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10.

11.    One or more of the Defendants proceeded to accuse Russell of committing the shooting, stating that the shots could have been fired from inside the car.  Russell was released later that day after hours of questioning.

**ANSWER:**    Defendants deny the allegations in this paragraph to the extent that the allegations seek to describe their conduct.  Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11.

12.    Eight days after the shooting, on August 1, 2009, one or more of the Defendants obtained photographs of known gang members and showed them to Fernandez, who remained hospitalized from his injuries.  Fernandez could not identify anyone in the pictures as being the shooter.

**ANSWER:**    Defendants admit that photographs of gang members known to frequent the area of Lawrence Ave. and Lawndale Ave. were obtained and shown to Fernandez on August 1, 2009 while Fernandez was in the hospital, and that Fernandez stated that the two offenders were not present amongst the photographs.  Defendants deny any remaining allegations in paragraph 12.

13.    On August 2, 2009 Defendants reviewed POD footage of an altercation that occurred previously between the victims, Patel, Fernandez and Russell, and Plaintiff and David Gomez. Although this POD footage did not show any footage of the July 24 shooting, Defendants seized upon it and used the footage to develop a theory of the case that included both Gomez as the shooter and Plaintiff as an accomplice.

**ANSWER:**    Detective Defendants admit that on August 2, 2009 Defendants Folino and McDermott reviewed POD footage taken earlier in the evening of July 24, 2009 which showed

4

Patel and Fernandez engaged in a physical altercation with rival Cobra street gang members, identified by tactical officers from the area as Plaintiff and Gomez. Defendants further admit that the POD footage did not capture the July 24 shooting. Detective Defendants deny the remaining allegations in paragraph 13.

14.     To further this theory, Defendants falsely indicated in a handwritten police report taken while Russell was held at the station on July 24, that Russell had supposedly witnessed two male Hispanics in white t-shirts involved in the shooting. This was false. On-scene investigators took the statements of three independent witnesses immediately following the shooting, yet Russell's statement taken by one or more of the Defendants after the shooting is the only one that falsely implicates multiple persons involved with the shooting and thereby fits with the Defendants' false theory.

**ANSWER:**     Detective Defendants deny the allegations in this paragraph.

15.     On August 2, 2009 Defendants showed Russell a photo spread that included Plaintiff, and told Russell that they "knew" that Plaintiff was involved in the shooting. Defendants further explained to Russell that if he picked Plaintiff from the photo spread as having been riding on the back of the shooter's bike at the time of the shooting, Russell would be able to help his friend Fernandez because the Defendants could give Fernandez money for being the victim of a crime. In this way, the Defendants improperly secured that Russell would pick out Plaintiff from the photo spread, which he did.

**ANSWER:**     Defendants admit that on August 2, 2009 Folino and McDermott showed Russell a photo array that included Plaintiff. Defendants deny the remaining allegations contained in paragraph 15.

16.     Russell then spoke with Fernandez, who was still hospitalized, and relayed to him the information that Defendants had told him; namely, to pick out Plaintiff from a photo spread as having been riding on the back of the shooter's bike at the time of the shooting. That same day, on August 2, 2009, the Defendants visited Fernandez in the hospital and Fernandez picked out Plaintiff from the photo spread, as instructed.

**ANSWER:**     Defendants admit that on August 2, 2009 Folino and McDermott showed Fernandez a shown a photo array while he was in the hospital and that Fernandez identified Plaintiff. Defendants deny the remaining allegations in paragraph 16.

17.     Based only on these two false photo identifications, an investigative alert was issued with probable cause for Plaintiff's arrest.

5

**ANSWER:** Defendants admit that investigative alerts were issued as to Plaintiff and Gomez with probable cause for arrest based on the positive identifications by Fernandez and Russell. Defendants deny the remaining allegations in paragraph 17

18. On August 5, 2009 Plaintiff was arrested by the Area 5 Robbery Mission Team pursuant to the investigative alert. Plaintiff denied any involvement in the shooting, and offered to take a polygraph test. Defendants then falsely told Plaintiff that he had allegedly failed the polygraph test, which he did not, all in an effort to coerce Plaintiff into providing Defendants with more information, which he did not have.

**ANSWER:** Detective Defendants admit that Plaintiff was arrested on August 5, 2009 by the Area 5 Robbery Mission Team and was interviewed by Defendants Folino and McDermott and that he denied involvement in the shooting and agreed to take a polygraph examination. Defendants Folino and McDermott admit and Defendants Kolman and Cordero admit upon information and belief that Plaintiff was advised that the results of the polygraph exam showed deception. Defendants deny the remaining allegations of paragraph 18.

19. There was no physical evidence linking Plaintiff to the scene of the shooting, and there were no witness accounts—aside from the falsely procured ones— that placed him at the scene. The Defendants could not locate Russell, and Fernandez remained hospitalized, so a live line-up could not be conducted on August 5. Plaintiff was then allowed to leave.

**ANSWER:** Defendants admit they are aware of no physical evidence linking Plaintiff to the scene of the shooting, Russell could not be located and Fernandez was still hospitalized preventing a live line-up on August 5, and that Plaintiff was allowed to leave. Defendants deny any witness accounts were "falsely procured" and therefore deny the remaining allegations in paragraph 19.

20. On August 8, 2009, two independent witnesses came forward and voluntarily gave statements to the Defendants to aid in their investigation of the July 24 shooting. Both witnesses stated that there was only person involved in the shooting, just as the original witnesses had reported on the night of the shooting.

**ANSWER:** Detective Defendants admit that two individuals were interviewed

6

voluntarily on August 8, 2009 in relation to the Patel homicide investigation. Defendants deny the remaining allegations in paragraph 20.

21.     On the same day, Russell was located and transported to the police station where he was fed details of the Defendants' version of the shooting, and gave a recorded statement implicating two persons, including Plaintiff, in the July 24 shooting.

**ANSWER:**     Detective Defendants admit that Russell gave a videotaped statement in the presence of Assistant State's Attorney Ruth Gaudino and Defendant Cordaro implicating Plaintiff and David Gomez in the July 24 shooting. Detective Defendants deny the remaining allegations in paragraph 21.

22.     Based only on the false photo identifications and the false statement of Russell, an arrest warrant was issued for Plaintiff.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 22.

23.     Plaintiff was re-arrested in Rochelle, Illinois on September 8, 2009 and transported to Chicago to be questioned by one or more of the Defendants, where he again denied any involvement in the shooting. Despite over a month of further investigation, there was still no physical evidence linking Plaintiff to the scene of the shooting, and there were still no witness accounts—aside from the falsely procured ones—that placed him at the scene.

**ANSWER:**     Defendants Folino and McDermott admit that Plaintiff was arrested in Rochelle, Illinois on Sepember 8, 2009, transported to Chicago by Defendant Folino and Detective Olson and that Plaintiff continued to deny involvement in the shooting. Defendants further admit that on September 9, 2009 they still were aware of no physical evidence linking Plaintiff to the shooting.  Defendants deny falsely procuring witness accounts and therefore deny the remaining allegations in this paragraph.

24.     At the time of Plaintiff's re-arrest, Russell could not be located by Defendants, and Fernandez, now released from the hospital, could not be located either; thus, a live line-up could not be conducted with the Defendants' only two witnesses. Despite this, Defendants caused charges to be brought against Plaintiff for the July 24 murder of Patel and attempted murder of Fernandez and Russell.

**ANSWER:**     Detective Defendants admit that a live line-up could not be conducted

7

because Russell and Fernandez could not be located. Detective Defendants further admit that Assistant State's Attorney Ashley Moore approved charges of murder and attempted murder against Plaintiff. Detective Defendants deny the remaining allegations contained in paragraph 24.

25.     Plaintiff spent three and a half years in maximum security divisions in the Cook County Jail where he contested the charges at every step. Within the three and a half years, forensic testing was performed on the bike that was left behind by the shooter on July 24. Plaintiff's fingerprints were not found on the handlebars, and his DNA was not found anywhere on the bike.

**ANSWER:**     Detective Defendants admit that forensic testing did not identify Plaintiff's DNA on samples taken from the handlebars of the bicycle or his fingerprints from the latent impressions suitable for comparison found on the bicycle. Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 25.

26.     Moreover, the bike left at the scene of the shooting did not have pegs on the back for carrying an additional rider, a fact which contradicted the false statements Defendants had procured from the aforementioned witnesses.

**ANSWER:**     Detective Defendants admit, upon information and belief, that the bicycle found at the scene did not have pegs on the back of it at the time it was recovered. Detective Defendants deny procuring false statements from any witnesses and deny the remaining allegations in paragraph 26.

27.     With the knowledge that he was facing serious prison time if convicted of the charges, Plaintiff experienced daily hardship and stress, and additional damages associated with having to live in the harsh maximum security divisions at the Cook County Jail.

**ANSWER:**     Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27.

28.     Plaintiff's bench trial began on March 8, 2012 in front of the Honorable Judge Sheehan. Plaintiff's co-defendant was David Gomez, the true, and sole, perpetrator.

8

**ANSWER:** Defendants admit, upon information and belief, that a bench trial began on March 8, 2012 before the Honorable Judge Kevin M. Sheehan and that Plaintiff and David Gomez were co-defendants. Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 28.

29. Both Fernandez and Russell testified at Plaintiff's criminal trial.

**ANSWER:** Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29.

30. Russell testified that when Defendants visited him with photo arrays, he did not make an actual identification because, "[t]he police officer already told me who they were." Russell further testified that when he was shown the photo arrays Defendants "said that they knew who it was" and that "they said they just needed me to say that these is them."

**ANSWER:** Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30.

31. Russell then testified that Defendants told him, "if I was to say that it was them [Gomez and Plaintiff] then they was going to give Tony Fernandez money for being a victim of a crime. So they told me to really just help Tony out."

**ANSWER:** Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31.

32. Fernandez corroborated Russell's testimony when he stated on the witness stand that the only reason that he picked out both Plaintiff and Gomez from the Defendants' photo arrays as being involved in the shooting is because his friend, Russell, told him to. Fernandez testified truthfully that there was only one shooter that he saw "a little bit."

**ANSWER:** Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32.

33. After all of the evidence was presented, Plaintiff was found not guilty of all of the charges against him, in a manner indicative of his innocence.

**ANSWER:** Detective Defendants admit that, upon information and belief, Plaintiff

9

was found not guilty. Detective Defendants deny the remaining allegations in paragraph 33.

34. Gomez has since confessed to the shooting on July 24, 2009, and has stated, truthfully, that he acted alone. Notwithstanding the Defendants' falsely procured statements, that there never was a second perpetrator.

**ANSWER:** Detective Defendants deny that any statements relating to this incident were falsely procured, and upon information and belief deny that Gomez acted alone. Detective Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 34.

### Count I—42 U.S.C. Section 1983
### Violation of Due Process

35. Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:** Each of the Detective Defendants' responses to the paragraphs of this Complaint are incorporated herein.

36. As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER:** Detective Defendants deny the allegations in paragraph 36.

37. In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and denied him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:** Detective Defendants deny the allegations in paragraph 37.

38. As of result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:** Detective Defendants deny the allegations contained in paragraph 38.

39. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 39.

40.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Detective Defendants deny the allegation contained in this paragraph.

41.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the Defendant City's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**     Detective Defendants deny the allegations contained in this paragraph.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count II—42 U.S.C. Section 1983
### False Arrest / Unlawful Detention

Plaintiff's claims in Count II were dismissed by the Court. (*See* Docket 57). Consequently, Detective Defendants make no answer to paragraph 42-48 of this Complaint.

### Count III—42 U.S.C. Section 1983
### Conspiracy to Deprive Constitutional Rights

49.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of the Detective Defendants' responses to the paragraphs of this Complaint are incorporated herein.

50.     Defendants reached an agreement among themselves to unlawfully detain and deprive Plaintiff of his constitutional rights, all as described in the various paragraphs of this Complaint.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 50.

51.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

11

**ANSWER:**   Detective Defendants deny the allegations in paragraph 51.

52.   As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated and he suffered injury, including but not limited to emotional distress.

**ANSWER:**   Detective Defendants deny the allegations contained in paragraph 52.

53.   The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**   Detective Defendants deny the allegations in paragraph 53.

54.   The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**   Detective Defendants deny the allegations contained in this paragraph.

55.   As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**   Detective Defendants deny the allegations contained in this paragraph.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count IV—42 U.S.C. Section 1983
### Failure to Intervene

56.   Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**   Each of the Detective Defendants' responses to the paragraphs of this Complaint are incorporated herein.

57.   As described more fully above, one or more Defendants had a reasonable

12

opportunity to prevent the violation of Plaintiff's constitutional rights as set forth above had they been so inclined, but failed to do so.

**ANSWER:**    Detective Defendants deny the allegations in paragraph 57.

58.    Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights. As a result of Defendants' failure to intervene, Plaintiff suffered injury, including emotional distress.

**ANSWER:**    Detective Defendants deny the allegations in paragraph 58.

59.    The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**    Detective Defendants deny the allegations contained in paragraph 59.

60.    As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**    Detective Defendants deny the allegations contained in paragraph 60.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor

on this Count, award costs and fees as allowed by law, and grant such further relief as this Court

deems just and proper.

### Count V—State Law Claim
### False Imprisonment

Plaintiff's claims in Count II were dismissed by the Court. (*See* Docket 57). Consequently, Detective Defendants make no answer to paragraph 61- 64 of this Complaint.

### Count VI—State Law Claim
### Malicious Prosecution

65.    Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**    Each of the Detective Defendants' responses to the paragraphs of this

Complaint is incorporated herein.

66.     In the manner described more fully above, Plaintiff was improperly subjected to judicial proceedings unsupported by probable cause to believe that he had committed a crime.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 66.

67.     The judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of his innocence.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 67.

68.     Specifically, the Defendant Officers accused Plaintiff of criminal activity knowing that those accusations were without probable cause and made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 68.

69.     The Defendant Officers made statements regarding Plaintiff's alleged culpability with knowledge that the statements were false and perjured. In so doing, the Defendant Officers fabricated evidence and withheld exculpatory information.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 69.

70.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 70.

71.     As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:**     Detective Defendants deny the allegations contained in paragraph 71.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## Count VII – State Law Claim
## Civil Conspiracy

72.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of the Detective Defendants' responses to the paragraphs of this Complaint is incorporated herein.

73.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 73.

74.     In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 74.

75.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Detective Defendants deny the allegations in paragraph 75.

76.     As a proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including emotional distress and anguish, as is more fully alleged above.

**ANSWER:**     Detective Defendants deny the allegations contained in paragraph 76.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count VIII—State Law Claim
### Respondent Superior

77.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of the Detective Defendants' responses to the paragraphs of this Complaint is incorporated herein.

78.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all times within the scope of their employment.

**ANSWER:**     Detective Defendants make no answer to paragraph 78 as Count VIII is

not directed to Detective Defendants.

79.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**     Detective Defendants make no answer to paragraph 79 as Count VIII is not directed to Detective Defendants.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count IX—State Law Claim
### Indemnification

80.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of the Detective Defendants' responses to the paragraphs of this Complaint is incorporated herein.

81.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**     Detective Defendants make no answer to paragraph 81 as Count IX is not directed to Detective Defendants.

82.     The Defendant Officers are or were employees of the City of Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

**ANSWER:**     Detective Defendants make no answer to paragraph 82 as Count IX is not directed to Detective Defendants.

WHEREFORE, Detective Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## **AFFIRMATIVE DEFENSES**

1.      At all times during the events alleged in Plaintiff's Complaint, a reasonable police officer in the position of the Detective Defendants objectively viewing the facts and circumstances that confronted Detective Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Detective Defendants possessed.  Thus, Detective Defendants are entitled to qualified immunity for their actions.

2.      To the extent that Detective Defendants were acting within the scope of their employment, they are not liable for their acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes wilful and wanton conduct.  Detective Defendants were not wilful and wanton and, therefore, are not liable.  745 ILCS 10/2-202 (2014).

3.      Detective Defendants are not liable for any injury caused by the act or omission of another person. 745 ILCS 10/2-204 (2014).  *See also Wolf-Lillie v. Sonquist*, 699 F.2d 864 (7th Cir. 1983).

4.      Under the Illinois Tort Immunity Act, Detective Defendants are not liable for any injury resulting from their acts or omissions when acting in the exercise of discretion even though abused.  745 ILCS 10/2-201 (2014).

5.      As to the state law claims, Detective Defendants are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208 (2014).

6.      Detective Defendants are not liable to Plaintiff on his malicious prosecution claim because they relied upon the advice of the State's Attorney who had the sole discretion to approve felony charges against the plaintiff and did so approve felony charges against the

plaintiff.

7.      To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

## JURY DEMAND

Detective Defendants demand a trial by jury.

Date:   March 3, 2014                          Respectfully Submitted,
                                               JOHN    FOLINO,    JR.,    TIMOTHY
                                               MCDERMOTT, THOMAS KOLMAN, and
                                               ROBERT CORDARO,

                                               By: /s/  Eileen E. Rosen
                                                     One of their Attorneys

Eileen E. Rosen
Stacy A. Benjamin
Silvia Mercado Masters
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
(312) 494-1001
erosen@rockfuscoconnelly.com

# Exhibit L

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13 C 1653 |
| | ) | |
| THE CITY OF CHICAGO, | ) | Judge Joan B. Gottschall |
| DET. SZWEDO (Star No. 20813), | ) | |
| DET. VALKNER (Star No. 20111), | ) | |
| DET. FOLINO (Star No. 20143), DET. | ) | |
| McDERMOTT (Star No. 21084), DET. | ) | Jury Demand |
| KOLMAN (Star No. 20448), DET. CORDARO | ) | |
| (Star No. 20680), OFFICER | ) | |
| FIGUEROA-MITCHELL (Star No. 20445), | ) | |
| OFFICER LOPEZ (Star No. 9341), | ) | |
| OFFICER SANCHEZ (Star No. 6439), And | ) | |
| As-Yet UNKNOWN CHICAGO POLICE | ) | |
| DEPARTMENT MEMBERS | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS SZWEDO AND VALKNER'S ANSWER AND
## AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants Frank Szwedo and John Valkner, by and through their undersigned attorneys,

in answer to Plaintiff's First Amended Complaint, state as follows:

### Introduction

1.      By this action, Plaintiff seeks redress for having spent more than three years in the Cook County Jail for a murder he did not commit, a crime that another man has since confessed to having committed.

**ANSWER:**    Defendants Szwedo and Valkner deny that Plaintiff has any basis to seek

redress in this case.  Defendants Szwedo and Valkner lack knowledge or information sufficient

to form a belief as to the truth of the remaining allegations in paragraph 1.

2.      This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation

**Exhibit B**

under color of law of Plaintiff's rights as secured by the United States Constitution.

**ANSWER:**    Defendants Szwedo and Valkner admit that this action is brought pursuant

to 42 U.S.C. Section 1983 for alleged deprivation of Plaintiff's constitutional rights.  Defendants

deny any such deprivation occurred.

3.    This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331 and 1367.

**ANSWER:**    Defendants Szwedo and Valkner admit that jurisdiction is proper.

4.    Venue is proper under 28 U.S.C. §1391(b).  On information and belief, all
Individual Defendants reside in this judicial district and Defendant City is a municipality
located in this judicial district.  The events giving rise to the claims asserted herein occurred
within the district.

**ANSWER:**    Defendants Szwedo and Valker admit that the incident at issue occurred in

this judicial district and that they reside in this judicial district. Defendants Szwedo and Valkner

lack knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 4.

**Factual Allegations**

5.    In the early morning hours of July 24, 2009, a shooting occurred on the 4600
block of North Central Avenue in Chicago, Illinois.

**ANSWER:**    Defendants Szwedo and Valkner admit the allegations contained in

paragraph 5 and further add that the street name is North Central Park Avenue.

6.    According to witnesses who gave reports to the on-scene officers immediately
following the shooting, a male Hispanic rode up on a bicycle and fired 5-6 shots at a minivan
double-parked in the street.

**ANSWER:**    Detective Defendants admit that two witnesses reported seeing a male

Hispanic shooter.  Specifically, Antionett Russell related that she observed a male Hispanic fire a

pistol in the direction of a vehicle double parked in front of 4628 N. Central Park and that after

approximately six shots, the shooter fled northbound on the sidewalk, out of sight; Demetria

2

Russell related that after she heard approximately four to six shots she looked out the window and observed a male Hispanic across the street approximately three buildings to the south, looking in her direction from the gangway who disappeared when she observed a police vehicle approaching. Additional witness provided no information about a shooter but described the number of shots heard. Witness Zay Russell related that he observed two unknown male Hispanics on bicycles approach the van and that one of the Hispanics produced a handgun and fired approximately five times. Defendants deny any remaining allegations.

7.     The driver of the car, Gaurav Patel, was fatally injured. Tony Fernandez, who was seated on the passenger side of the van in the middle row of seats, sustained serious injuries. A third passenger, Zae Russell, who was seated in the third row of seats behind the driver, escaped unharmed.

**ANSWER:**     Defendants Szwedo and Valkner admit, upon information and belief, that Gaurav Patel, the driver, was fatally injured, that Tony Fernandez received a gunshot to his leg, and that Zay Russell was not shot. Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7 concerning the location of Fernandez and Russell inside the vehicle.

8.     The man on the bike who shot and killed Patel was David Gomez. Gomez has since confessed to the murder, stating that he was alone at the time.

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.     After the shooting, Gomez ran away, leaving his bike at the scene.

**ANSWER:**     Defendants Szwedo and Valkner admit that witness Antionett Russell related that the shooter fled the scene and that a bicycle was discovered at the scene. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.

10.     Paramedics arrived on scene and transported Patel and Fernandez to the hospital. Russell, the victim who escaped unharmed, was arrested on scene by one or more of the Defendants, placed in handcuffs, and transported to the police station for questioning.

**ANSWER:**     Defendants Szwedo and Valkner admit, upon information and belief, that

Patel and Fernandez were transported to the hospital by paramedics.  Defendants Szwedo and

Valkner admit that they were informed by on-scene police officers that Russell was arrested for

causing a disturbance.  Defendants Szwedo and Valkner admit that Russell was interviewed at

the scene of the shooting.  Defendants Szwedo and Valkner deny the remaining allegations in

this paragraph 10.

11.     One or more of the Defendants proceeded to accuse Russell of committing the shooting, stating that the shots could have been fired from inside the car.  Russell was released later that day after hours of questioning.

**ANSWER:**     Defendants Szwedo and Valkner deny that they accused Russell of

committing the shooting or stating that the shots could have been fired from inside the car.

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in paragraph 11.

12.     Eight days after the shooting, on August 1, 2009, one or more of the Defendants obtained photographs of known gang members and showed them to Fernandez, who remained hospitalized from his injuries.  Fernandez could not identify anyone in the pictures as being the shooter.

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient

to form a belief as to the truth of the allegations in paragraph 12.

13.     On August 2, 2009 Defendants reviewed POD footage of an altercation that occurred previously between the victims, Patel, Fernandez and Russell, and Plaintiff and David Gomez. Although this POD footage did not show any footage of the July 24 shooting, Defendants seized upon it and used the footage to develop a theory of the case that included both Gomez as the shooter and Plaintiff as an accomplice.

**ANSWER:**     Defendant Szwedo believes that he may have viewed POD footage of an

altercation that occurred previously between the victims and others which did not show footage

4

of the July 24 shooting. Defendants deny the remaining allegations to the extent they allege conduct by them. Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13.

14.     To further this theory, Defendants falsely indicated in a handwritten police report taken while Russell was held at the station on July 24, that Russell had supposedly witnessed two male Hispanics in white t-shirts involved in the shooting.  This was false. On-scene investigators took the statements of three independent witnesses immediately following the shooting, yet Russell's statement taken by one or more of the Defendants after the shooting is the only one that falsely implicates multiple persons involved with the shooting and thereby fits with the Defendants' false theory.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 14.

15.     On August 2, 2009 Defendants showed Russell a photo spread that included Plaintiff, and told Russell that they "knew" that Plaintiff was involved in the shooting. Defendants further explained to Russell that if he picked Plaintiff from the photo spread as having been riding on the back of the shooter's bike at the time of the shooting, Russell would be able to help his friend Fernandez because the Defendants could give Fernandez money for being the victim of a crime.  In this way, the Defendants improperly secured that Russell would pick out Plaintiff from the photo spread, which he did.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15.

16.     Russell then spoke with Fernandez, who was still hospitalized, and relayed to him the information that Defendants had told him; namely, to pick out Plaintiff from a photo spread as having been riding on the back of the shooter's bike at the time of the shooting.  That same day, on August 2, 2009, the Defendants visited Fernandez in the hospital and Fernandez picked out Plaintiff from the photo spread, as instructed.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16.

17.     Based only on these two false photo identifications, an investigative alert was issued with probable cause for Plaintiff's arrest.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to

the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 17.

18.     On August 5, 2009 Plaintiff was arrested by the Area 5 Robbery Mission Team
pursuant to the investigative alert.  Plaintiff denied any involvement in the shooting, and
offered to take a polygraph test.  Defendants then falsely told Plaintiff that he had allegedly
failed the polygraph test, which he did not, all in an effort to coerce Plaintiff into providing
Defendants with more information, which he did not have.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to

the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 18.

19.     There was no physical evidence linking Plaintiff to the scene of the shooting, and
there were no witness accounts—aside from the falsely procured ones— that placed him at the
scene.  The Defendants could not locate Russell, and Fernandez remained hospitalized, so a live
line-up could not be conducted on August 5.  Plaintiff was then allowed to leave.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to

the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 19.

20.     On August 8, 2009, two independent witnesses came forward and voluntarily
gave statements to the Defendants to aid in their investigation of the July 24 shooting.  Both
witnesses stated that there was only person involved in the shooting, just as the original
witnesses had reported on the night of the shooting.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to

the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 20.

21.     On the same day, Russell was located and transported to the police station where
he was fed details of the Defendants' version of the shooting, and gave a recorded statement
implicating two persons, including Plaintiff, in the July 24 shooting.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to

the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in paragraph 21.

22.     Based only on the false photo identifications and the false statement of Russell, an arrest warrant was issued for Plaintiff.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22.

23.     Plaintiff was re-arrested in Rochelle, Illinois on September 8, 2009 and transported to Chicago to be questioned by one or more of the Defendants, where he again denied any involvement in the shooting.  Despite over a month of further investigation, there was still no physical evidence linking Plaintiff to the scene of the shooting, and there were still no witness accounts—aside from the falsely procured ones—that placed him at the scene.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23.

24.     At the time of Plaintiff's re-arrest, Russell could not be located by Defendants, and Fernandez, now released from the hospital, could not be located either; thus, a live line-up could not be conducted with the Defendants' only two witnesses. Despite this, Defendants caused charges to be brought against Plaintiff for the July 24 murder of Patel and attempted murder of Fernandez and Russell.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in this paragraph to the extent it alleges conduct undertaken by them.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24.

25.     Plaintiff spent three and a half years in maximum security divisions in the Cook County Jail where he contested the charges at every step.  Within the three and a half years, forensic testing was performed on the bike that was left behind by the shooter on July 24. Plaintiff's fingerprints were not found on the handlebars, and his DNA was not found anywhere on the bike.

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25.

26.     Moreover, the bike left at the scene of the shooting did not have pegs on the back

for carrying an additional rider, a fact which contradicted the false statements Defendants had procured from the aforementioned witnesses.

**ANSWER:**    Defendants Szwedo and Valkner admit that a bicycle was found at the scene and the bicycle did not have pegs on the back of it at the time it was recovered. Defendants Szwedo and Valkner deny procuring false statements. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26.

27.    With the knowledge that he was facing serious prison time if convicted of the charges, Plaintiff experienced daily hardship and stress, and additional damages associated with having to live in the harsh maximum security divisions at the Cook County Jail.

**ANSWER:**    Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27.

28.    Plaintiff's bench trial began on March 8, 2012 in front of the Honorable Judge Sheehan. Plaintiff's co-defendant was David Gomez, the true, and sole, perpetrator.

**ANSWER:**    Defendant Szwedo and Valkner admit that a bench trial took place before Judge Sheehan and that David Gomez was Plaintiff's co-defendant. Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 28.

29.    Both Fernandez and Russell testified at Plaintiff's criminal trial.

**ANSWER:**    Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 29.

30.    Russell testified that when Defendants visited him with photo arrays, he did not make an actual identification because, "[t]he police officer already told me who they were." Russell further testified that when he was shown the photo arrays Defendants "said that they knew who it was" and that "they said they just needed me to say that these is them."

**ANSWER:**    Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30.

8

31.     Russell then testified that Defendants told him, "if I was to say that it was them [Gomez and Plaintiff] then they was going to give Tony Fernandez money for being a victim of a crime. So they told me to really just help Tony out."

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31.

32.     Fernandez corroborated Russell's testimony when he stated on the witness stand that the only reason that he picked out both Plaintiff and Gomez from the Defendants' photo arrays as being involved in the shooting is because his friend, Russell, told him to.  Fernandez testified truthfully that there was only one shooter that he saw "a little bit."

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 32.

33.     After all of the evidence was presented, Plaintiff was found not guilty of all of the charges against him, in a manner indicative of his innocence.

**ANSWER:**     Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 33.

34.     Gomez has since confessed to the shooting on July 24, 2009, and has stated, truthfully, that he acted alone.  Notwithstanding the Defendants' falsely procured statements, that there never was a second perpetrator.

**ANSWER:**     Defendants Szwedo and Valkner deny that any statements relating to this incident were falsely procured.  Defendants Szwedo and Valkner lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 34.

### Count I—42 U.S.C. Section 1983
### Violation of Due Process

35.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

36.     As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

9

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 36.

37.     In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and denied him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 37.

38.     As of result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 38.

39.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 39.

40.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 40.

41.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the Defendant City's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 41.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

**Count II—42 U.S.C. Section 1983**
**False Arrest / Unlawful Detention**

10

Plaintiff's claims in Count II were dismissed by the Court. (*See* Docket 57). Consequently, Defendants Szwedo and Valkner make no answer to paragraphs 42-48 of this Complaint.

### Count III—42 U.S.C. Section 1983
### Conspiracy to Deprive Constitutional Rights

49.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

50.     Defendants reached an agreement among themselves to unlawfully detain and deprive Plaintiff of his constitutional rights, all as described in the various paragraphs of this Complaint.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 50.

51.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 51.

52.     As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated and he suffered injury, including but not limited to emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 52.

53.     The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 53.

54.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 54.

55.     As a result of the unjustified violation of Plaintiff's rights by Defendants,

11

undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 55.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count IV—42 U.S.C. Section 1983
### Failure to Intervene

56.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

57.     As described more fully above, one or more Defendants had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights as set forth above had they been so inclined, but failed to do so.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 57.

58.     Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights. As a result of Defendants' failure to intervene, Plaintiff suffered injury, including emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 58.

59.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 59.

60.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**    Defendants Szwedo and Valkner deny the allegations in paragraph 60.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count V—State Law Claim
### False Imprisonment

Plaintiff's claims in Count V were dismissed by the Court. (*See* Docket 57). Consequently, Defendants Szwedo and Valkner make no answer to paragraphs 61-64 of this Complaint.

### Count VI—State Law Claim
### Malicious Prosecution

65.    Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**    Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

66.    In the manner described more fully above, Plaintiff was improperly subjected to judicial proceedings unsupported by probable cause to believe that he had committed a crime.

**ANSWER:**    Defendants Szwedo and Valkner deny the allegations in paragraph 66.

67.    The judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of his innocence.

**ANSWER:**    Defendants Szwedo and Valkner deny the allegations in paragraph 67.

68.    Specifically, the Defendant Officers accused Plaintiff of criminal activity knowing that those accusations were without probable cause and made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

**ANSWER:**    Defendants Szwedo and Valkner deny the allegations in paragraph 68.

69.    The Defendant Officers made statements regarding Plaintiff's alleged culpability

with knowledge that the statements were false and perjured. In so doing, the Defendant Officers fabricated evidence and withheld exculpatory information.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 69.

70.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 70.

71.     As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 71.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## Count VII – State Law Claim
## Civil Conspiracy

72.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

73.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 73.

74.     In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 74.

75.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 75.

76.     As a proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including emotional distress and anguish, as is more fully alleged above.

**ANSWER:**     Defendants Szwedo and Valkner deny the allegations in paragraph 76.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## Count VIII—State Law Claim
## Respondent Superior

77.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

78.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all times within the scope of their employment.

**ANSWER:**     Defendants Szwedo and Valkner make no answer to paragraph 78 as Count VIII is not directed to these Defendants.

79.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**     Defendants Szwedo and Valkner make no answer to paragraph 79 as Count VIII is not directed to these Defendants.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## Count IX—State Law Claim
## Indemnification

80.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:** Each of Defendants Szwedo and Valkner's responses to the paragraphs of this Complaint is incorporated herein.

81. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:** Defendants Szwedo and Valkner make no answer to paragraph 81 as Count IX is not directed to these Defendants.

82. The Defendant Officers are or were employees of the City of Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

**ANSWER:** Defendants Szwedo and Valkner make no answer to paragraph 82 as Count IX is not directed to these Defendants.

WHEREFORE, Defendants Szwedo and Valkner pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## AFFIRMATIVE DEFENSES

1. At all times during the events alleged in Plaintiff's Complaint, a reasonable police officer in the position of Defendants Szwedo and Valkner objectively viewing the facts and circumstances that confronted Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Defendants possessed. Thus, Defendants Szwedo and Valkner are entitled to qualified immunity for their actions.

2. To the extent that Defendants Szwedo and Valkner were acting within the scope of their employment, they are not liable for their acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes wilful and wanton conduct. Defendants Szwedo and Valkner were not wilful and wanton and, therefore, are not liable. 745

16

ILCS 10/2-202 (2014).

3.      Defendants Szwedo and Valkner are not liable for any injury caused by the act or omission of another person. 745 ILCS 10/2-204 (2014).  *See also Wolf-Lillie v. Sonquist*, 699 F.2d 864 (7th Cir. 1983).

4.      Under the Illinois Tort Immunity Act, Defendants Szwedo and Valkner are not liable for any injury resulting from their acts or omissions when acting in the exercise of discretion even though abused.  745 ILCS 10/2-201 (2014).

5.      As to the state law claims, Defendants Szwedo and Valkner are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208 (2014).

6.      Defendants Szwedo and Valkner are not liable to Plaintiff on his malicious prosecution claim because they relied upon the advice of the State's Attorney who had the sole discretion to approve felony charges against the plaintiff and did so approve felony charges against the plaintiff.

7.      To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

## **JURY DEMAND**

Defendants Szwedo and Valkner demand a trial by jury.

Date:   March 3, 2014

Respectfully Submitted,
FRANK SZWEDO and JOHN VALKNER,

By: /s/  Eileen E. Rosen
     One of their Attorneys

Eileen E. Rosen
Stacy A. Benjamin
Silvia Mercado Masters
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
(312) 494-1001
erosen@rockfuscoconnelly.com

18

Exhibit M

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 13 C 1653 |
| | ) | |
| THE CITY OF CHICAGO, | ) | Judge Joan B. Gottschall |
| DET. SZWEDO (Star No. 20813), | ) | |
| DET. VALKNER (Star No. 20111), | ) | |
| DET. FOLINO (Star No. 20143), DET. | ) | |
| McDERMOTT (Star No. 21084), DET. | ) | Jury Demand |
| KOLMAN (Star No. 20448), DET. CORDARO | ) | |
| (Star No. 20680), OFFICER | ) | |
| FIGUEROA-MITCHELL (Star No. 20445), | ) | |
| OFFICER LOPEZ (Star No. 9341), | ) | |
| OFFICER SANCHEZ (Star No. 6439), And | ) | |
| As-Yet UNKNOWN CHICAGO POLICE | ) | |
| DEPARTMENT MEMBERS | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SANCHEZ, LOPEZ AND FIGUEROA-MITCHELL'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S FIRST AMENDED COMPLAINT

Defendants Carmen Lopez, Noé Sanchez and Tina Figueroa-Mitchell, herein referred to as "Defendants," by and through their undersigned attorneys, in answer to Plaintiff's First Amended Complaint, state as follows:

### Introduction

1.     By this action, Plaintiff seeks redress for having spent more than three years in the Cook County Jail for a murder he did not commit, a crime that another man has since confessed to having committed.

**ANSWER:**     Defendants deny that Plaintiff has any basis to seek redress in this case. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 1.

**Exhibit C**

2.      This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

**ANSWER:**      Defendants admit that this action is brought pursuant to 42 U.S.C. Section 1983 for alleged deprivation of Plaintiff's constitutional rights.   Defendants deny any such deprivation occurred.

3.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331 and 1367.

**ANSWER:**      Defendants admit that this Court has jurisdiction in this matter.

4.      Venue is proper under 28 U.S.C. §1391(b).   On information and belief, all Individual Defendants reside in this judicial district and Defendant City is a municipality located in this judicial district.  The events giving rise to the claims asserted herein occurred within the district.

**ANSWER:**      Defendants admit that the incident at issue occurred in this judicial district and that they reside in this judicial district. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 4.

## Factual Allegations

5.      In the early morning hours of July 24, 2009, a shooting occurred on the 4600 block of North Central Avenue in Chicago, Illinois.

**ANSWER:**      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5.

6.      According to witnesses who gave reports to the on-scene officers immediately following the shooting, a male Hispanic rode up on a bicycle and fired 5-6 shots at a minivan double-parked in the street.

**ANSWER:**      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6.

7.      The driver of the car, Gaurav Patel, was fatally injured.  Tony Fernandez, who was seated on the passenger side of the van in the middle row of seats, sustained serious injuries.  A third passenger, Zae Russell, who was seated in the third row of seats behind the driver, escaped unharmed.

2

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 7.

8.     The man on the bike who shot and killed Patel was David Gomez.  Gomez has since confessed to the murder, stating that he was alone at the time.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 8.

9.     After the shooting, Gomez ran away, leaving his bike at the scene.

**ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 9.

10.     Paramedics arrived on scene and transported Patel and Fernandez to the hospital. Russell, the victim who escaped unharmed, was arrested on scene by one or more of the Defendants, placed in handcuffs, and transported to the police station for questioning.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 10.

11.      One or more of the Defendants proceeded to accuse Russell of committing the shooting, stating that the shots could have been fired from inside the car.  Russell was released later that day after hours of questioning.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 11.

12.     Eight days after the shooting, on August 1, 2009, one or more of the Defendants obtained photographs of known gang members and showed them to Fernandez, who remained hospitalized from his injuries.  Fernandez could not identify anyone in the pictures as being the shooter.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a

3

belief as to the truth of the remaining allegations in paragraph 12.

13.     On August 2, 2009 Defendants reviewed POD footage of an altercation that occurred previously between the victims, Patel, Fernandez and Russell, and Plaintiff and David Gomez. Although this POD footage did not show any footage of the July 24 shooting, Defendants seized upon it and used the footage to develop a theory of the case that included both Gomez as the shooter and Plaintiff as an accomplice.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 13.

14.     To further this theory, Defendants falsely indicated in a handwritten police report taken while Russell was held at the station on July 24, that Russell had supposedly witnessed two male Hispanics in white t-shirts involved in the shooting.  This was false. On-scene investigators took the statements of three independent witnesses immediately following the shooting, yet Russell's statement taken by one or more of the Defendants after the shooting is the only one that falsely implicates multiple persons involved with the shooting and thereby fits with the Defendants' false theory.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14.

15.     On August 2, 2009 Defendants showed Russell a photo spread that included Plaintiff, and told Russell that they "knew" that Plaintiff was involved in the shooting. Defendants further explained to Russell that if he picked Plaintiff from the photo spread as having been riding on the back of the shooter's bike at the time of the shooting, Russell would be able to help his friend Fernandez because the Defendants could give Fernandez money for being the victim of a crime.  In this way, the Defendants improperly secured that Russell would pick out Plaintiff from the photo spread, which he did.

**ANSWER:**     Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15.

16.     Russell then spoke with Fernandez, who was still hospitalized, and relayed to him the information that Defendants had told him; namely, to pick out Plaintiff from a photo spread as having been riding on the back of the shooter's bike at the time of the shooting.  That same day, on August 2, 2009, the Defendants visited Fernandez in the hospital and Fernandez picked

4

out Plaintiff from the photo spread, as instructed.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 16.

17.    Based only on these two false photo identifications, an investigative alert was issued with probable cause for Plaintiff's arrest.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 17.

18.    On August 5, 2009 Plaintiff was arrested by the Area 5 Robbery Mission Team pursuant to the investigative alert. Plaintiff denied any involvement in the shooting, and offered to take a polygraph test. Defendants then falsely told Plaintiff that he had allegedly failed the polygraph test, which he did not, all in an effort to coerce Plaintiff into providing Defendants with more information, which he did not have.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendant Figueroa-Mitchell admits Plaintiff voluntarily took a polygraph test and that the results indicated deception. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 18.

19.    There was no physical evidence linking Plaintiff to the scene of the shooting, and there were no witness accounts—aside from the falsely procured ones— that placed him at the scene. The Defendants could not locate Russell, and Fernandez remained hospitalized, so a live line-up could not be conducted on August 5. Plaintiff was then allowed to leave.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 19.

20.    On August 8, 2009, two independent witnesses came forward and voluntarily

gave statements to the Defendants to aid in their investigation of the July 24 shooting. Both witnesses stated that there was only person involved in the shooting, just as the original witnesses had reported on the night of the shooting.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 20.

21. On the same day, Russell was located and transported to the police station where he was fed details of the Defendants' version of the shooting, and gave a recorded statement implicating two persons, including Plaintiff, in the July 24 shooting.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 21.

22. Based only on the false photo identifications and the false statement of Russell, an arrest warrant was issued for Plaintiff.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22.

23. Plaintiff was re-arrested in Rochelle, Illinois on September 8, 2009 and transported to Chicago to be questioned by one or more of the Defendants, where he again denied any involvement in the shooting. Despite over a month of further investigation, there was still no physical evidence linking Plaintiff to the scene of the shooting, and there were still no witness accounts—aside from the falsely procured ones—that placed him at the scene.

**ANSWER:** Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23.

24. At the time of Plaintiff's re-arrest, Russell could not be located by Defendants, and Fernandez, now released from the hospital, could not be located either; thus, a live line-up could not be conducted with the Defendants' only two witnesses. Despite this, Defendants caused charges to be brought against Plaintiff for the July 24 murder of Patel and attempted murder of Fernandez and Russell.

6

**ANSWER:**    Defendants deny the allegations in this paragraph to the extent it alleges conduct undertaken by them. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 24.

25.    Plaintiff spent three and a half years in maximum security divisions in the Cook County Jail where he contested the charges at every step.  Within the three and a half years, forensic testing was performed on the bike that was left behind by the shooter on July 24. Plaintiff's fingerprints were not found on the handlebars, and his DNA was not found anywhere on the bike.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25.

26.    Moreover, the bike left at the scene of the shooting did not have pegs on the back for carrying an additional rider, a fact which contradicted the false statements Defendants had procured from the aforementioned witnesses.

**ANSWER:**    Defendants deny procuring false statements. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 26.

27.    With the knowledge that he was facing serious prison time if convicted of the charges, Plaintiff experienced daily hardship and stress, and additional damages associated with having to live in the harsh maximum security divisions at the Cook County Jail.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.    Plaintiff's bench trial began on March 8, 2012 in front of the Honorable Judge Sheehan.  Plaintiff's co-defendant was David Gomez, the true, and sole, perpetrator.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 28.

29.    Both Fernandez and Russell testified at Plaintiff's criminal trial.

**ANSWER:**    Defendants lack knowledge or information sufficient to form a belief as to

7

the truth of the allegations in paragraph 29.

30.     Russell testified that when Defendants visited him with photo arrays, he did not make an actual identification because, "[t]he police officer already told me who they were." Russell further testified that when he was shown the photo arrays Defendants "said that they knew who it was" and that "they said they just needed me to say that these is them."

        **ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 30.

31.     Russell then testified that Defendants told him, "if I was to say that it was them [Gomez and Plaintiff] then they was going to give Tony Fernandez money for being a victim of a crime. So they told me to really just help Tony out."

        **ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 31.

32.     Fernandez corroborated Russell's testimony when he stated on the witness stand that the only reason that he picked out both Plaintiff and Gomez from the Defendants' photo arrays as being involved in the shooting is because his friend, Russell, told him to.  Fernandez testified truthfully that there was only one shooter that he saw "a little bit."

        **ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 32.

33.     After all of the evidence was presented, Plaintiff was found not guilty of all of the charges against him, in a manner indicative of his innocence.

        **ANSWER:**     Defendants lack knowledge or information sufficient to form a belief as to

the truth of the allegations in paragraph 33.

34.     Gomez has since confessed to the shooting on July 24, 2009, and has stated, truthfully, that he acted alone.  Notwithstanding the Defendants' falsely procured statements, that there never was a second perpetrator.

        **ANSWER:**     Defendants deny that any statements relating to this incident were falsely

procured.  Defendants lack knowledge or information sufficient to form a belief as to the truth of

the remaining allegations in paragraph 34.

## Count I—42 U.S.C. Section 1983
## Violation of Due Process

35.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

36.     As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

**ANSWER:**     Defendants deny the allegations in paragraph 36.

37.     In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and denied him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

**ANSWER:**     Defendants deny the allegations in paragraph 37.

38.     As of result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:**     Defendants deny the allegations contained in paragraph 38.

39.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

**ANSWER:**     Defendants deny the allegations in paragraph 39.

40.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Defendants deny the allegations in paragraph 40.

41.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the Defendant City's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**    Defendants deny the allegations in paragraph 41.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count II—42 U.S.C. Section 1983
### False Arrest / Unlawful Detention

Plaintiff's claims in Count II were dismissed by the Court. (*See* Docket 57). Consequently, Defendants make no answer to paragraphs 42-48 of this Complaint.

### Count III—42 U.S.C. Section 1983
### Conspiracy to Deprive Constitutional Rights

49.    Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**    Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

50.    Defendants reached an agreement among themselves to unlawfully detain and deprive Plaintiff of his constitutional rights, all as described in the various paragraphs of this Complaint.

**ANSWER:**    Defendants deny the allegations in paragraph 50.

51.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

**ANSWER:**    Defendants deny the allegations in paragraph 51.

52.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated and he suffered injury, including but not limited to emotional distress.

**ANSWER:**    Defendants deny the allegations contained in paragraph 52.

53.    The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**    Defendants deny the allegations in paragraph 53.

54.    The misconduct described in this Count by Defendants was undertaken pursuant

10

to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**    Defendants deny the allegations in paragraph 54.

55.    As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**    Defendants deny the allegations in paragraph 55.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count IV—42 U.S.C. Section 1983
### Failure to Intervene

56.    Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**    Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

57.      As described more fully above, one or more Defendants had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights as set forth above had they been so inclined, but failed to do so.

**ANSWER:**    Defendants deny the allegations in paragraph 57.

58.    Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights. As a result of Defendants' failure to intervene, Plaintiff suffered injury, including emotional distress.

**ANSWER:**    Defendants deny the allegations in paragraph 58.

59.    The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and

control its officers, such that its failure to do so manifests deliberate indifference.

**ANSWER:**     Defendants deny the allegations in paragraph 59.

60.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

**ANSWER:**     Defendants deny the allegations in paragraph 60.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

## Count V—State Law Claim
## False Imprisonment

Plaintiff's claims in Count V were dismissed by the Court. (*See* Docket 57). Consequently, Defendants make no answer to paragraphs 61-64 of this Complaint.

## Count VI—State Law Claim
## Malicious Prosecution

65.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

66.     In the manner described more fully above, Plaintiff was improperly subjected to judicial proceedings unsupported by probable cause to believe that he had committed a crime.

**ANSWER:**     Defendants deny the allegations in paragraph 66.

67.     The judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of his innocence.

**ANSWER:**     Defendants deny the allegations in paragraph 67.

68.     Specifically, the Defendant Officers accused Plaintiff of criminal activity

12

knowing that those accusations were without probable cause and made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

**ANSWER:**     Defendants deny the allegations in paragraph 68.

69.     The Defendant Officers made statements regarding Plaintiff's alleged culpability with knowledge that the statements were false and perjured. In so doing, the Defendant Officers fabricated evidence and withheld exculpatory information.

**ANSWER:**     Defendants deny the allegations in paragraph 69.

70.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants deny the allegations in paragraph 70.

71.     As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

**ANSWER:**     Defendants deny the allegations contained in paragraph 71.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count VII – State Law Claim
### Civil Conspiracy

72.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

73.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

**ANSWER:**     Defendants deny the allegations in paragraph 73.

74.     In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

**ANSWER:**     Defendants deny the allegations in paragraph 74.

13

75.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**ANSWER:**     Defendants deny the allegations in paragraph 75.

76.     As a proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including emotional distress and anguish, as is more fully alleged above.

**ANSWER:**     Defendants deny the allegations contained in paragraph 76.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

### Count VIII—State Law Claim
### Respondeat Superior

77.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**     Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

78.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all times within the scope of their employment.

**ANSWER:**     Defendants make no answer to paragraph 78 as Count VIII is not directed to these Defendants.

79.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**ANSWER:**     Defendants make no answer to paragraph 79 as Count VIII is not directed to these Defendants.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

14

**Count IX—State Law Claim**
**Indemnification**

80.     Each of the Paragraphs of this Complaint is incorporated herein.

**ANSWER:**   Each of Defendants' responses to the paragraphs of this Complaint is incorporated herein.

81.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**ANSWER:**   Defendants make no answer to paragraph 81 as Count IX is not directed to these Defendants.

82.     The Defendant Officers are or were employees of the City of Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

**ANSWER:**   Defendants make no answer to paragraph 82 as Count IX is not directed to these Defendants.

WHEREFORE, Defendants pray that this Court enter judgment in their favor on this Count, award costs and fees as allowed by law, and grant such further relief as this Court deems just and proper.

**AFFIRMATIVE DEFENSES**

1.   At all times during the events alleged in Plaintiff's Complaint, a reasonable police officer in the position of the Defendants objectively viewing the facts and circumstances that confronted Defendants, could have believed their actions to be lawful, in light of clearly established law and the information that Defendants possessed.  Thus, Defendants are entitled to qualified immunity for their actions.

2.   To the extent that Defendants were acting within the scope of their employment,

they are not liable for their acts or omissions in the execution or enforcement of the law, unless such act or omission constitutes wilful and wanton conduct. Defendants were not wilful and wanton and, therefore, are not liable. 745 ILCS 10/2-202 (2014).

3. Defendants are not liable for any injury caused by the act or omission of another person. 745 ILCS 10/2-204 (2014). *See also Wolf-Lillie v. Sonquist*, 699 F.2d 864 (7th Cir. 1983).

4. Under the Illinois Tort Immunity Act, Defendants are not liable for any injury resulting from their acts or omissions when acting in the exercise of discretion even though abused. 745 ILCS 10/2-201 (2014).

5. As to the state law claims, Defendants are not liable for any of the claims alleged because a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause. 745 ILCS 10/2-208 (2014).

6. Defendants are not liable to Plaintiff on his malicious prosecution claim because they relied upon the advice of the State's Attorney who had the sole discretion to approve felony charges against the plaintiff and did so approve felony charges against the plaintiff.

7. To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that Plaintiff has a duty to mitigate, commensurate with the degree of failure to mitigate attributed to Plaintiff by the jury in this case.

## JURY DEMAND

Defendants Lopez, Sanchez and Figueroa-Mitchell demand a trial by jury.

16

Date:   March 3, 2014

Respectfully Submitted,
CARMEN LOPEZ, NOÉ SANCHEZ, and
TINA FIGUEROA-MITCHELL,

By: /s/  Eileen E. Rosen
      One of their Attorneys

Eileen E. Rosen
Stacy A. Benjamin
Silvia Mercado Masters
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, Illinois 60654
(312) 494-1000
(312) 494-1001
erosen@rockfuscoconnelly.com

# Exhibit N

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| Plaintiff, | ) | Case No. 1:13-1653 |
| | ) | |
| v. | ) | Honorable Judge Gottschall |
| | ) | |
| THE CITY OF CHICAGO, | ) | |
| DET. SZWEDO (Star No. 20813), | ) | |
| DET. VALKNER (Star No. 20111), | ) | |
| DET. FOLINO (Star No. 20143), DET. | ) | |
| McDERMOTT (Star No. 21084), DET. | ) | |
| KOLMAN (Star No. 20448), DET. | ) | |
| CORDARO (Star No. 20680), OFFICER | ) | |
| FIGUEROA-MITCHELL (Star No. 20445), | ) | |
| OFFICER LOPEZ (Star No. 9341), | ) | |
| OFFICER SANCHEZ (Star No. 6439), | ) | |
| And As-Yet UNKNOWN CHICAGO | ) | |
| POLICE DEPARTMENT MEMBERS, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, ANTHONY KURI (a.k.a. Ramsey Qurash), by and

through his attorneys, LOEVY & LOEVY, and complaining of Defendants CITY OF

CHICAGO, DET. SZWEDO (Star No. 20813), DET. VALKNER (Star No. 20111),

DET. FOLINO (Star No. 20143), DET. McDERMOTT (Star No. 21084), DET.

KOLMAN (Star No. 20448), DET. CORDARO (Star No. 20680), OFFICER

FIGUEROA-MITCHELL (Star No. 20445), OFFICER LOPEZ (Star No. 9341),

OFFICER SANCHEZ (Star No. 6439), and as-yet UNKNOWN CHICAGO POLICE

DEPARTMENT MEMBERS (hereinafter, collectively "Defendants"), and states as

follows:

**Introduction**

1.      By this action, Plaintiff seeks redress for having spent more than three years in the Cook County Jail for a murder he did not commit, a crime that another man has since confessed to having committed.

2.      This action is brought pursuant to 42 U.S.C. §1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

3.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331 and 1367.

4.      Venue is proper under 28 U.S.C. §1391(b).  On information and belief, all Individual Defendants reside in this judicial district and Defendant City is a municipality located in this judicial district.  The events giving rise to the claims asserted herein occurred within the district.

**Factual Allegations**

5.      In the early morning hours of July 24, 2009, a shooting occurred on the 4600 block of North Central Avenue in Chicago, Illinois.

6.      According to witnesses who gave reports to the on-scene officers immediately following the shooting, a male Hispanic rode up on a bicycle and fired 5-6 shots at a minivan double-parked in the street.

7.      The driver of the car, Gaurav Patel, was fatally injured.  Tony Fernandez, who was seated on the passenger side of the van in the middle row of seats, sustained serious injuries.  A third passenger, Zae Russell, who was seated in the third row of seats behind the driver, escaped unharmed.

2

8.      The man on the bike who shot and killed Patel was David Gomez.  Gomez has since confessed to the murder, stating that he was alone at the time.

9.      After the shooting, Gomez ran away, leaving his bike at the scene.

10.     Paramedics arrived on scene and transported Patel and Fernandez to the hospital.  Russell, the victim who escaped unharmed, was arrested on scene by one or more of the Defendants, placed in handcuffs, and transported to the police station for questioning.

11.     One or more of the Defendants proceeded to accuse Russell of committing the shooting, stating that the shots could have been fired from inside the car.  Russell was released later that day after hours of questioning.

12.     Eight days after the shooting, on August 1, 2009, one or more of the Defendants obtained photographs of known gang members and showed them to Fernandez, who remained hospitalized from his injuries.  Fernandez could not identify anyone in the pictures as being the shooter.

13.     On August 2, 2009 Defendants reviewed POD footage of an altercation that occurred previously between the victims, Patel, Fernandez  and Russell, and Plaintiff and David Gomez. Although this POD footage did not show any footage of the July 24 shooting, Defendants seized upon it and used the footage to develop a theory of the case that included both Gomez as the shooter and Plaintiff as an accomplice.

14.     To further this theory, Defendants falsely indicated in a handwritten police report taken while Russell was held at the station on July 24, that Russell had supposedly witnessed two male Hispanics in white t-shirts involved in the shooting.  This was false. On-scene investigators took the statements of three independent witnesses immediately

3

following the shooting, yet Russell's statement taken by one or more of the Defendants after the shooting is the only one that falsely implicates multiple persons involved with the shooting and thereby fits with the Defendants' false theory.

15.    On August 2, 2009 Defendants showed Russell a photo spread that included Plaintiff, and told Russell that they "knew" that Plaintiff was involved in the shooting.  Defendants further explained to Russell that if he picked Plaintiff from the photo spread as having been riding on the back of the shooter's bike at the time of the shooting, Russell would be able to help his friend Fernandez because the Defendants could give Fernandez money for being the victim of a crime.  In this way, the Defendants improperly secured that Russell would pick out Plaintiff from the photo spread, which he did.

16.    Russell then spoke with Fernandez, who was still hospitalized, and relayed to him the information that Defendants had told him; namely, to pick out Plaintiff from a photo spread as having been riding on the back of the shooter's bike at the time of the shooting.  That same day, on August 2, 2009, the Defendants visited Fernandez in the hospital and Fernandez picked out Plaintiff from the photo spread, as instructed.

17.    Based only on these two false photo identifications, an investigative alert was issued with probable cause for Plaintiff's arrest.

18.    On August 5, 2009 Plaintiff was arrested by the Area 5 Robbery Mission Team pursuant to the investigative alert.  Plaintiff denied any involvement in the shooting, and offered to take a polygraph test.  Defendants then falsely told Plaintiff that he had allegedly failed the polygraph test, which he did not, all in an effort to coerce Plaintiff into providing Defendants with more information, which he did not have.

4

19.     There was no physical evidence linking Plaintiff to the scene of the shooting, and there were no witness accounts—aside from the falsely procured ones—that placed him at the scene.  The Defendants could not locate Russell, and Fernandez remained hospitalized, so a live line-up could not be conducted on August 5.  Plaintiff was then allowed to leave.

20.     On August 8, 2009, two independent witnesses came forward and voluntarily gave statements to the Defendants to aid in their investigation of the July 24 shooting.  Both witnesses stated that there was only person involved in the shooting, just as the original witnesses had reported on the night of the shooting.

21.     On the same day, Russell was located and transported to the police station where he was fed details of the Defendants' version of the shooting, and gave a recorded statement implicating two persons, including Plaintiff, in the July 24 shooting.

22.     Based only on the false photo identifications and the false statement of Russell, an arrest warrant was issued for Plaintiff.

23.     Plaintiff was re-arrested in Rochelle, Illinois on September 8, 2009 and transported to Chicago to be questioned by one or more of the Defendants, where he again denied any involvement in the shooting.  Despite over a month of further investigation, there was still no physical evidence linking Plaintiff to the scene of the shooting, and there were still no witness accounts—aside from the falsely procured ones—that placed him at the scene.

24.     At the time of Plaintiff's re-arrest, Russell could not be located by Defendants, and Fernandez, now released from the hospital, could not be located either; thus, a live line-up could not be conducted with the Defendants' only two witnesses.

Despite this, Defendants caused charges to be brought against Plaintiff for the July 24 murder of Patel and attempted murder of Fernandez and Russell.

25.     Plaintiff spent three and a half years in maximum security divisions in the Cook County Jail where he contested the charges at every step.  Within the three and a half years, forensic testing was performed on the bike that was left behind by the shooter on July 24.  Plaintiff's fingerprints were not found on the handlebars, and his DNA was not found anywhere on the bike.

26.     Moreover, the bike left at the scene of the shooting did not have pegs on the back for carrying an additional rider, a fact which contradicted the false statements Defendants had procured from the aforementioned witnesses.

27.     With the knowledge that he was facing serious prison time if convicted of the charges, Plaintiff experienced daily hardship and stress, and additional damages associated with having to live in the harsh maximum security divisions at the Cook County Jail.

28.     Plaintiff's bench trial began on March 8, 2012 in front of the Honorable Judge Sheehan.  Plaintiff's co-defendant was David Gomez, the true, and sole, perpetrator.

29.     Both Fernandez and Russell testified at Plaintiff's criminal trial.

30.     Russell testified that when Defendants visited him with photo arrays, he did not make an actual identification because, "[t]he police officer already told me who they were." Russell further testified that when he was shown the photo arrays Defendants "said that they knew who it was" and that "they said they just needed me to say that these is them."

31.     Russell then testified that Defendants told him, "if I was to say that it was them [Gomez and Plaintiff] then they was going to give Tony Fernandez money for being a victim of a crime. So they told me to really just help Tony out."

32.     Fernandez corroborated Russell's testimony when he stated on the witness stand that the only reason that he picked out both Plaintiff and Gomez from the Defendants' photo arrays as being involved in the shooting is because his friend, Russell, told him to.  Fernandez testified truthfully that there was only one shooter that he saw "a little bit."

33.     After all of the evidence was presented, Plaintiff was found not guilty of all of the charges against him, in a manner indicative of his innocence.

34.     Gomez has since confessed to the shooting on July 24, 2009, and has stated, truthfully, that he acted alone.  Notwithstanding the Defendants' falsely procured statements, that there never was a second perpetrator.

## Count I—42 U.S.C. Section 1983
## Violation of Due Process

35.     Each of the Paragraphs of this Complaint is incorporated herein.

36.     As described more fully above, the Defendants, while acting individually, jointly, and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

37.     In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence, and fabricated false reports, false testimony, and other evidence. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued, and denied him his constitutional right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

38.     As of result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to emotional distress.

39.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

40.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

41.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the Defendant City's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

### Count II—42 U.S.C. Section 1983
### False Arrest / Unlawful Detention

42.     Each of the Paragraphs of this Complaint is incorporated herein.

43.     As described more fully above, the Defendant Officers falsely arrested and unlawfully detained Plaintiff twice without justification and without probable cause.

44.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

45.     The misconduct described in this Court was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

8

46.     As a result of the unjustified violation of Plaintiff's rights by the Defendants, Plaintiff has suffered injury, including emotional distress.

47.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

48.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the Defendant City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

### Count III—42 U.S.C. Section 1983
### Conspiracy to Deprive Constitutional Rights

49.     Each of the Paragraphs of this Complaint is incorporated herein.

50.     Defendants reached an agreement among themselves to unlawfully detain and deprive Plaintiff of his constitutional rights, all as described in the various paragraphs of this Complaint.

51.     In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

52.     As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated and he suffered injury, including but not limited to emotional distress.

9

53.     The misconduct described in this Court was undertaken with malice, willfulness, and reckless indifference to the rights of others.

54.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

55.     As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress

### Count IV—42 U.S.C. Section 1983
### Failure to Intervene

56.     Each of the Paragraphs of this Complaint is incorporated herein.

57.     As described more fully above, one or more Defendants had a reasonable opportunity to prevent the violation of Plaintiff's constitutional rights as set forth above had they been so inclined, but failed to do so.

58.     Defendants' actions were undertaken intentionally, with malice and reckless indifference to Plaintiff's rights. As a result of Defendants' failure to intervene, Plaintiff suffered injury, including emotional distress.

59.     The misconduct described in this Count by Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department in that as a matter of both policy and practice, the Chicago Police Department directly encourages, and is

thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise and control its officers, such that its failure to do so manifests deliberate indifference.

60.    As a result of the unjustified violation of Plaintiff's rights by Defendants, undertaken and allowed to continue due to the City of Chicago's policies and practices as implemented by its police department, as described above, Plaintiff suffered injuries, including but not limited to physical and emotional distress.

### Count V—State Law Claim
### False Imprisonment

61.    Each of the Paragraphs of this Complaint is incorporated herein.

62.    Twice, Plaintiff was arrested and imprisoned, and thereby had his liberty to move about unlawfully restrained, despite Defendants' knowledge that there was no probable cause for doing so.

63.    Defendant Officers' actions set forth above were undertaken intentionally, with malice and reckless indifference to Plaintiff's constitutional rights and to the rights of others.

64.    As a result of the above-described wrongful infringement of Plaintiff's rights, Plaintiff suffered injury, including emotional distress.

### Count VI—State Law Claim
### Malicious Prosecution

65.    Each of the Paragraphs of this Complaint is incorporated herein.

66.    In the manner described more fully above, Plaintiff was improperly subjected to judicial proceedings unsupported by probable cause to believe that he had committed a crime.

11

67.     The judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were terminated in Plaintiff's favor in a manner indicative of his innocence.

68.     Specifically, the Defendant Officers accused Plaintiff of criminal activity knowing that those accusations were without probable cause and made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings.

69.     The Defendant Officers made statements regarding Plaintiff's alleged culpability with knowledge that the statements were false and perjured. In so doing, the Defendant Officers fabricated evidence and withheld exculpatory information.

70.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

71.     As a proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to emotional distress.

### Count VII – State Law Claim
### Civil Conspiracy

72.     Each of the Paragraphs of this Complaint is incorporated herein.

73.     As described more fully in the preceding paragraphs, the Defendant Officers, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

74.     In furtherance of the conspiracy, the Defendant Officers committed overt acts and were otherwise willful participants in joint activity.

75.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

76. As a proximate result of the Defendant Officers' conspiracy, Plaintiff suffered damages, including emotional distress and anguish, as is more fully alleged above.

### Count VIII—State Law Claim
### Respondeat Superior

77. Each of the Paragraphs of this Complaint is incorporated herein.

78. In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all times within the scope of their employment.

79. Defendant City of Chicago is liable as principal for all torts committed by its agents.

### Count IX—State Law Claim
### Indemnification

80. Each of the Paragraphs of this Complaint is incorporated herein.

81. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

82. The Defendant Officers are or were employees of the City of Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

WHEREFORE, Plaintiff, ANTHONY KURI (a.k.a. Ramsey Qurash) respectfully requests that this Court enter judgment in his favor and against Defendants CITY OF CHICAGO, DET. SZWEDO (Star No. 20813), DET. VALKNER (Star No. 20111), DET. FOLINO (Star No. 20143), DET. McDERMOTT (Star No. 21084), DET.

KOLMAN (Star No. 20448), DET. CORDARO (Star No. 20680), OFFICER

FIGUEROA-MITCHELL (Star No. 20445), OFFICER LOPEZ (Star No. 9341),

OFFICER SANCHEZ (Star No. 6439), and as-yet UNKNOWN CHICAGO POLICE

DEPARTMENT MEMBERS, awarding compensatory damages, costs, and attorneys'

fees, along with punitive damages against the Defendants in their individual capacity, as

well as any other relief this Court deems just and appropriate.

## Jury Demand

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38(b) on all issues so triable.

Respectfully Submitted,

_____
Julie Thompson
*One of the Attorneys for Plaintiff*

Arthur Loevy
Jon Loevy
Julie Thompson
Loevy & Loevy
312 N. May St., Suite 100
Chicago, Illinois 60607
(312) 243-5900

Scott Frankel
Frankel & Cohen
53 W. Jackson Blvd., Suite 1615
Chicago, Illinois 60604
(312) 759-9600

# Exhibit O(1)

DVD Video of Z. Russell 8/8/09 Interview

# Exhibit O(2)

RE:    INVESTIGATION

VIDEO INTERVIEW

OF

ZAY RUSSELL

taken in an interview room, Area 5 Police Headquarters, Chicago Police
Department, Chicago, Illinois, on August 8, 2009.

PRESENT:    Detective Cordaro
            Chicago Police Department

            Ruth Gudino
            Assistant State's Attorney

TRANSCRIBED BY:  Elaine O'Brien

DISC 1

VIDEO SEGMENT 1 - 20:21:55 -- 20:42:18

> Q.    All right, wherever you would like to sit down.
>
> A.    Do you want to sit here?
>
> Q.    Yeah, yeah, you're better off right there.
>
> Q.    All right. It is August 8th, 2009. We are at Area 5 Police

Headquarters, which is located at Grand and Central. It is approximately 8:25

p.m. And my name is Ruth Gudino, I am an assistant state's attorney. Please

introduce yourself, please.

> A.    Zay Russell.
>
> Q.    Okay. And detective?
>
> A.    Bob Cordaro.

1

CCSAO  002779

Q.      Okay.  And we are in the interview room at Area 5 to take Mr.

Russell's statement regarding the homicide and shooting that happened on July

24th, 2009, at the location of 4628 North Central Park.  Mr. Russell, you and I met

a little while ago, is that correct?

A.      Yes.

Q.      And I introduced myself as a state's attorney, a prosecutor, a

lawyer, and I don't represent anybody that is involved in this investigation.  Do

you recall that conversation?

A.      Yes, ma'am.

Q.      And do you recall me explaining to you the ways that we can

memorialize your statement, one of those being a videotaped statement?

A.      Yes, ma'am.

Q.      And is it -- do I have your permission to videotape your statement

today?

A.      Yes, ma'am.

Q.      Okay.  If you could spell your first and last name for me?

A.      Z-A-Y, last name R-U-S-S-E-L-L.

Q.      And how old are you, Zay?

A.      19.

Q.      Okay.  And did you graduate high school?

A.      No.

Q.      Okay.  And are you currently employed?

A.      No, ma'am.

CCSAO 002780

Q.      And who do you live with?

A.      My grandmother.

Q.      And is that at the 4628 --

A.      28 North Central.

Q.      Okay.  And how long have you lived there with your grandmother?

A.      11 years.

Q.      Okay.  And who else lives there?

A.      My brothers and sisters.

Q.      Okay.  And you do have a pending city charge for drinking on the public way, is that correct?

A.      Yes, ma'am.

Q.      And do you understand that I can't make any promises, as well as the detective can't make any promises that we would assist you in disposing of that matter?

A.      Yes, ma'am.

Q.      And are you willing to speak to us about the homicide and the shooting of your friends in this case?

A.      Yes, ma'am.

Q.      Okay.  I'm gonna draw your attention first of all to July 23rd, 2009, at about 11:30 p.m., that would have been a late Thursday night, who were you hanging out with?

A.      I was with Tony, his brother, Patel and Tony's brother's two friends.

3

Q.    Okay.  When you say Tony, do you know Tony's full name?

A.    Yeah.

Q.    What's Tony's full name?

A.    Tony Fernandez.

Q.    Okay.  And does he have a nickname?

A.    TC.

Q.    Okay.  And how long have you known Tony Fernandez?

A.    For about 7 years.

Q.    All right.  And how did you meet Tony?

A.    Through his brothers from school.

Q.    Okay.  And is Tony in a gang?

A.    Yeah, I believe so.

Q.    And what gang would that be?

A.    Latin King.

Q.    From what area would he be a Latin King from?

A.    From Lawrence and Kedzie.

Q.    Okay.  And you said your friend Patel?

A.    (indicating)

Q.    And is Patel in a gang?

A.    No, I don't believe so.

Q.    Had you just met Patel?

A.    Yeah.

Q.    About how long ago?

4

A.      About a month and a half.  I know him for like a month and a half.

Q.      And how did you meet him?

A.      Through Tony.

Q.      Okay.  And did you know where Patel had come from?

A.      Yeah, he told me he came from California.

Q.      Okay.  Do you know Patel's first name?

A.      No, I don't.

Q.      Okay.  And when you say you were with Tony's brother, which brother were you with?

A.      His brother Ricky.

Q.      And then his brother Ricky's friend and a female?

A.      Uh-huh.

Q.      And were you driving or were you walking at that time?

A.      We was driving.

Q.      Okay.  And whose car were you driving?

A.      It was Tony's but Patel was driving.

Q.      Okay.  And what kind of car was it?

A.      A Caravan, maroon or purple.

Q.      Okay.  Where were you guys at at that time?

A.      Of the shooting?

Q.      No, at the incident that happened at 11:30 p.m. on the 23rd of July, with the bottle incident.

CCSAO  002783

A.     Oh, we was on Lawrence and Lawndale, driving up Lawrence coming to Lawndale.

Q.     Okay.  And whose gang territory is that?

A.     The Spanish Cobras.

Q.     Okay.  And do you hang out with a gang?

A.     Yeah.

Q.     And what gang is that?

A.     The CVL's.

Q.     Okay.  Now do the CVL's and the Latin Kings get along?

A.     Yeah.

Q.     And do the CVL's and the Kings get a long with the Cobras?

A.     No.

Q.     So right now there's a war going on between the Cobras versus the Kings and the CVL's?

A.     Yeah.

Q.     Now, when you were driving in that Lawndale area, whose territory is that?

A.     The Spanish Cobras.

Q.     Could you tell me what happened at that incident?

A.     Yeah, we was driving up Lawrence and there was a Spanish Cobra on the corner gangbanging.

Q.     What do you mean by gangbanging?

6

A.      He was like throwing up signs and dropping down signs.  And I guess Ricky's friend he got mad and he hopped out the car and he tried to run up towards dude.

Q.      Where was Ricky's friend sitted in the car?

A.      He was in the front passenger.

Q.      Okay.  And where was Ricky sitted?

A.      He was behind him.

Q.      And where was the female that was with him?

A.      She was next to me in the back.

Q.      Okay.  So Ricky's friend jumps out the front passenger?

A.      Uh-huh.

Q.      And he goes towards this Cobra on the corner?

A.      Yeah.

Q.      What happens next?

A.      Like a lot of them started popping out of, out of everywhere, you know, and --

Q.      When you say a lot of them, who do you mean?

A.      Like a lot of the Spanish Cobras.

Q.      Okay.  And then what happened?

A.      So we was pulling off and we told them to hop -- we told Ricky's friend to hop back in the car.  So he hopped back in the car and we drove back down Lawrence towards Kedzie.

Q.      What happened then?

7

A.      And Ricky and his guy and the girl they wanted to get dropped off back in they neighborhood.

Q.      When you say their neighborhood, what type of neighborhood are you referring to?

A.      To Lawrence and Kedzie, to the Kings' neighborhood.

Q.      Okay. And did they get dropped off in that neighborhood?

A.      Yeah.

Q.      What happened next?

A.      I told Patel to take me home.

Q.      Okay. I'm gonna talk about the way everybody was seating in the van, okay. Now you said Patel was driving, he was the front driver?

A.      Uh-huh.

Q.      Who was sitted in the front passenger at that time?

A.      Ricky's friend.

Q.      And then who was behind the front driver?

A.      Tony.

Q.      Okay. I'm gonna show you what's been marked as People's Exhibit Number 1 for identification. Who is his is a photo of, Zay?

A.      That's Tony.

Q.      If I can ask you to sign here indicating that you've identified Tony in this photo, your full name, please. Okay, now, I'm gonna sign to indicate that you've identified him in my presence. And, detective, if you can so sign. And where were you -- where did you sit in the van?

8

A.    I was behind Tony.

Q.    Okay. Now who was sitting next to Tony in the second row of the van?

A.    His brother.

Q.    And who was sitting next to you in the third row?

A.    The girl, Jaylo.

Q.    Okay. So when Tony's brother Ricky and his male friend and female friend all got out, would that have left the passenger side of the van completely empty?

A.    Yes, ma'am.

Q.    So everybody would have been on the driver side?

A.    Yeah.

Q.    After you drop off Ricky and his friends, where do you go?

A.    We went to my house to drop me off.

Q.    And what is your address?

A.    4628 North Central Park.

Q.    What happens as you're getting to your house?

A.    As we was driving up I was looking straight and I seen them coming on the sidewalk.

Q.    When you say them, who are you referring to?

A.    David and Rowdy. I seen them -- I seen two people coming on the bike.

Q.      Okay. I'm gonna show you two photos, one of them that I've marked as People's Exhibit Number 2 for identification. Who is this a photo of?

A.      Rowdy.

Q.      Okay, if you could please sign and indicate your identification of Rowdy. And you said you saw them on bikes? What was he doing with the bike?

A.      Who, Rowdy?

Q.      Yes.

A.      He was driving coming towards us.

Q.      Okay. I'm gonna show you what's been marked as People's Exhibit Number 3 for identification. Who is that?

A.      That is David.

Q.      Okay, and you know him as Little David?

A.      Yeah.

Q.      If you can please sign to identify him. Was Little David with Rowdy on the bike?

A.      Yes, ma'am.

Q.      Where was he in relation to Rowdy?

A.      He was on the back of the bike on the pegs.

Q.      Okay, and when you say the pegs, what do you mean? Are those spokes that stick out of the back --

A.      Yeah.

Q.      -- tire? I'm so indicating that you've identified People's Exhibit Number 2 as Rowdy and People's Exhibit Number 3 as Little David. And,

CCSAO 002788

detective, if you can please so sign. And you saw them they were coming head

onto the van?

A.      Yeah.

Q.      Okay. Were any of the windows down on the van?

A.      Yeah, the front passenger.

Q.      Okay. And --

Q.      Can I ask one thing?

Q.      Yes.

Q.      When you see Rowdy driving the bike, what type of bike was it?

A.      I didn't really look at it but it was like a, a trick bike.

Q.      One of those Huffy bikes?

A.      Yeah.

Q.      Okay. At that time Rowdy's sitting on the bike pedaling?

A.      Yeah.

Q.      Where -- is David standing or is he sitting on these pegs?

A.      He was standing.

Q.      So he's standing above where Rowdy is at --

A.      Uh-huh.

Q.      -- so you can see David's face?

A.      Yeah.

Q.      What's the lighting like in that area?

A.      It's -- it was like -- it's, it's, light, it's a bunch of street lights on

our block

Q.      Is there a street light outside of your home at 4628 North Central Park?

A.      Yeah, there's one right in the front.

Q.      Okay.  And as you see them coming, when you first spot them, how far away are they from you?

A.      They was like two houses away.

Q.      Okay, two city houses?

A.      Yeah.

Q.      And the passenger side of the van, was that parked on the side where your house is located?

A.      Yeah.

Q.      All right.  And you see them, are they getting closer or farther?

A.      They was getting closer.

Q.      And what happens next?

A.      I seen them, they stop like right on the side of the van.

Q.      When you say they, who are you talking about?

A.      Rowdy and David.

Q.      And what happens next?

A.      And I seen David hop off the back of the bike and pull a gun out of his shirt.

Q.      With what hand?

A.      With his right hand.  And I ducked.  And I heard the shots.

Q. When you saw David pull the gun out of his waistband with his right hand, how far away were you?

A. I was -- say this the sidewalk and, you know, the car's parked.

Q. Yes.

A. And we was right there.

Q. Did you see him head on at an angle or did you see them straight on?

A. I seen them like from the side cause I looked to the side out the window.

Q. What part of his face did you see?

A. I seen his whole face.

Q. Did you recognize him at that time?

A. Yeah.

Q. How did you recognize him?

A. Cause I knew him, I went to school with him.

Q. How long would you say you've known him?

A. For a good probably I'd say 7 years, 8 years. About the same as I know Tony.

Q. What school did you know him from?

A. I know him from Haugan.

Q. Is that a grammar school or a --

A. Yeah.

Q. -- high school?

A.    It's a grammar school.

Q.    Did you know Kuri/Rowdy?

A.    Yeah, but I didn't go to school with him.  I knew him from like the streets.

Q.    Okay.  So you say you saw Little David pull this gun out with his right hand?

A.    Yeah.

Q.    Is the street light -- where was the street light in a relationship to where David is now?

A.    The street light was like right above him.

Q.    Okay.  And what does he do when he does -- he reaches in the waistband and pulls out the gun?

A.    He started running up to the car.

Q.    Okay.  Did you have any weapons on you?

A.    No.

Q.    Did Tony have any weapons on you?

A.    No.

Q.    Did Patel have any weapons?

A.    No.

Q.    Okay.  When the bike pulls up, is anybody saying anything to anyone?

A.    When they pulled up and he hopped off they yelled King killer, bitch and all this.

Q.      Who yelled that?

A.      I don't know who exactly yelled it.

Q.      Okay.

A.      But, you know, but before they started shooting (inaudible).

Q.      Was it coming from them or from inside the van?

A.      It was coming from them.

Q.      And what does King killers mean?

A.      That mean they telling us that they don't like Kings.

Q.      Okay.  And then that is when Little David shot?

A.      Yeah.

Q.      And you -- what did you do when you heard the shots?

A.      I was ducked down in between the seats.

Q.      Okay.  How many shots did you hear?

A.      Heard like 5 or 6 shots.

Q.      Were you able to tell what type of gun it was that he pulled out of his waistband?

A.      No.

Q.      Okay.  And what happens next?

A.      After that I told -- I had looked up cause after the shots was finished I looked up and I told Patel to drive.  I told him to drive off.  And he was holding his neck saying he couldn't breathe.

Q.      What side of his neck was he holding?

A.      He was holding his -- the right side.

Q.    Okay.  At the time that Little David was starting to shoot at the van was he shooting from the passenger side towards the driver side or from the driver side towards the passenger side?

A.    He was shooting from the passenger side toward the driver.

Q.    Okay.  When you picked your head back up, had the shooting stopped?

A.    Yeah.

Q.    And that's when you tell Patel to drive off?

A.    Yeah.

Q.    And he says to you, what?

A.    He was saying that he couldn't breathe and Tony was saying that he was shot in the leg.

Q.    Okay.  And you're, you're grabbing your right leg, would you -- Tony was saying he was shot and pointing at his right leg?

A.    He was saying he got shot in the leg.

Q.    And you said Patel was holding his neck on the right side?

A.    (indicating)

Q.    What happens when you tell them to pull off and Tony's saying that he was shot and Patel is telling you he can't breathe?

A.    Like Patel, he like -- the car was moving a little bit I guess he wasn't pushing the gas so Tony had hopped in the, in the driver seat on, on Patel's lap to control the wheel and we drove down the block.  And, and I guess that's when it crashed.

Q.      When Little David was shooting at the van, was the van moving?

A.      No, we were, we were stopped cause -- we, we had stopped cause they was gonna drop me off.   We was in front of my house.

Q.      Okay.  And you say the van goes about a block and crashes?

A.      Yeah.

Q.      What happens next?

A.      Next, I had seen my friends and them all in front of they house so I hopped out and told them to call the ambulance.

Q.      What happened after that?

A.      The police and everybody and the ambulance came.

Q.      Did you talk to the police at the scene?

A.      Yeah, I did.

Q.      Did you tell them you knew who had done the shooting?

A.      No, I didn't.

Q.      Why not?

A.      Because they was, they was like giving me a hard time like arguing with me, saying that I been spray painting around the neighborhood and trying to lock me up.  And I was, I was mad at the time so I didn't really want to talk to anybody.

Q.      Okay.  Did you then -- what happened to your friends?

A.      To my friends?

Q.      Tony and Patel.

A.      They was getting in the ambulances, they was taking them to the ambulance.

Q.      Did you then learn that Patel had died?

A.      Yeah.

Q.      Did you then learn Tony was in the hospital?

A.      Yeah.

Q.      What hospital was Tony at?

A.      Illinois Masonic.

Q.      Okay.  And were you talking with Tony after the incident of July 24th?

A.      Yeah.

Q.      Okay.  And the shooting happened about an hour after the previous incident with the Cobras down on Lawndale?

A.      Yeah.

Q.      So the shooting would have happened in the early morning hours at about 12:30 a.m. on July 24th, 2009?

A.      Yeah.

Q.      And while you're talking to Tony, did he let you know that the detectives wanted to talk to you?

A.      Yes, ma'am.

Q.      Can you tell me about that conversation?

A.      He just called me and said that, that he just got through talking to the detectives and that, that he need me -- I mean that the detectives want to come

18

to my house and show me some pictures and talk to me and see what was going on.

Q.     Did the detectives then come to your house?

A.     Yeah.

Q.     Did you seem some photo arrays?

A.     Yes.

Q.     And at that time did you identify the individuals who had shot your friend Patel, had shot your friend Tony on July 24th, 2009, outside the front of your house?

A.     Yes, ma'am.

Q.     I'm gonna show you what's been marked as People's Exhibit Number 4, is this the photo array that you signed on August 2nd, 2009, at approximately 9:40 p.m.?

A.     Yes, ma'am.

Q.     I'm showing you the page where you have the word Rowdy signed, is that a photo array?

A.     Yeah.

Q.     Who wrote the word Rowdy?

A.     Me.

Q.     And you circled it?

A.     Yeah.

Q.     And you signed this?

A.     Yeah.

Q.      What did Rowdy do on July 24th, 2009, in front of your house when you guys were parked there?

A.      I didn't see him do anything, he was just driving the bike.

Q.      But he drove the bike in which Little David got off and shot at you guys, right?

A.      Yeah.

Q.      He was also there, him and Little David when they yelled King killers to you?

A.      Yeah.

Q.      And he and David got there together, is that correct?

A.      Yes, ma'am.

Q.      All right.   Then I'm gonna show you the second photo array, you circled a photo here and you wrote something, what did you write?

A.      Little, Little C and Little David.

Q.      Okay.  And you circled it?

A.      Yeah.

Q.      And you signed it?

A.      Yeah.

Q.      What did he do on July 24th, 2009, in front of your house when you guys were in the van?

A.      He shot at us.

Q.      Okay.  You then were contacted by the detective today, is that correct?

20

A.    Yes, ma'am.

Q.    And is that the detective who is in the room with us today?

A.    Yes, ma'am.

Q.    And did you come down to Area 5?

A.    Yes, ma'am.

Q.    And did you see a line-up?

A.    Yes, ma'am.

Q.    And did you sign a similar photo -- a line-up advisory form as in People's Exhibit Number 4?

A.    Yes, ma'am.

Q.    And did you see a line-up?

A.    Yes, ma'am.

Q.    And did you identify anyone in the line-up?

A.    Yes, I did.

Q.    Who did you identify?

A.    Little David.

Q.    Did anybody tell you who had identified?

A.    No.

Q.    Okay. And Little David is -- did what to you and your friends on that July 24th date?

A.    He shot at us.

Q.    Okay. You and I had a conversation regarding how the detectives have treated you, is that correct?

21

A.      Yes, ma'am.

Q.      How have they treated you?

A.      Nice.

Q.      Were you allowed to use the washroom?

A.      Yeah.

Q.      In fact you had your cell phone the entire time that you've been here?

A.      Yes, ma'am.

Q.      And you've had cigarettes to smoke?

A.      Yes, sir.

Q.      Did they offer you anything to eat or drink?

A.      Yeah.

Q.      Okay.  And currently you're not under the influence of drugs or alcohol?

A.      No.

Q.      Okay.  And then you met me about an hour, hour and a half ago, is that correct?

A.      Yes, ma'am.

Q.      It's a limited encounter but how would you say I treated you?

A.      Nice, you all right.

Q.      Is there anything that I have forgot to ask you when we had spoken on the previous occasion regarding the shooting of your friend Tony Fernandez and your friend Patel?

A.      No, ma'am.

Q.      Okay. And you are giving this statement freely and voluntarily?

A.      Yes, ma'am.

Q.      No one's made you any promises or threatened you in order to get you to give this statement?

A.      No, ma'am.

Q.      Detective, is there anything that we have left out?

Q.      No.

Q.      Okay. It is approximately 8:40 p.m. on August 8th, 2009. This now concludes the videotaped statement of Zi -- Zay Russell.

Q.      Sit tight.

Q.      Come on, Zay.

Q.      Come on.

A.      All right.

(ZAY RUSSELL LEAVES ROOM)

-------------------------------------------------------------------------------------

23

CCSAO 002801

Exhibit P

1   IN RE:   JOHN DOE INVESTIGATION

2          GJ# AUG 245

3

4

5

6   BEFORE THE GRAND JURY OF COOK COUNTY

7          AUGUST, 2009

8

9   REPORT OF GRAND JURY PROCEEDINGS
    on the 18th day of August, 2009, at the
10  Cook County Criminal Courts Building, 2600
    South California Avenue, Chicago, Illinois
11  60608.

12

13  PRESENT:
    HONORABLE ANITA ALVAREZ,
14  State's Attorney of Cook County, Illinois, by:
    MS. KRISTA PETERSON:
15  appeared on behalf of the People
    of the State of Illinois

16

17

18  WITNESS:

    ZAE RUSSELL
19

20

    REPORTED BY:
21  HELEN M. HACKNEY
    CERTIFIED SHORTHAND REPORTER
22  2650 SOUTH CALIFORNIA AVENUE
    CHICAGO, ILLINOIS 60608
23  ILLINOIS CSR LICENSE NO. 084-001452

24

PLAINTIFF  158

2

1    THE FOREPERSON:  Would you raise your right hand?

2    (Witness duly sworn.)

3    MS. PETERSON:  Okay.  I'm Assistant State's Attorney

4    Krista Peterson of the Homicide Sex Unit.  I'm appearing

5    today on Grand Jury Number August 245, which is a John Doe

6    investigation relating to the homicide of Gaurav Patel,

7    which occurred July 24th, 2009.  We are not seeking an

8    indictment at this time.  The RD Number is HR 445323.

9    The Grand Jury does have the right to

10   subpoena and question any person against whom the State's

11   Attorney is seeking a Bill of Indictment, or any other

12   person, and to obtain and examine any documents or

13   transcripts relevant to the matter being prosecuted by the

14   State's Attorney.

15   At this time I ask leave to call Zae Russell.

16   Z A E   R U S S E L L,

17   called as a witness herein, having been first duly sworn,

18   was examined and testified as follows:

19   EXAMINATION

20   BY: MS. PETERSON:

21   Q.  Zae, have you been sworn to tell the truth?

22   A.  Yes, ma'am.

23   Q.  Please state your full name.

24   A.  Zae Russell.

3

| | | |
|---|---|---|
| 1 | Q. | Zae, how old are you? |
| 2 | A. | 19. |
| 3 | Q. | What is your date of birth? |
| 4 | A. | May 24, 1990. |
| 5 | Q. | Were you born in Chicago? |
| 6 | A. | Yes. |
| 7 | Q. | Have you lived in Chicago your entire life? |
| 8 | A. | Yes, ma'am. |
| 9 | Q. | What high school do you attend? |
| 10 | A. | Roosevelt. |
| 11 | Q. | What year did you stop attending Roosevelt? |
| 12 | A. | Freshman. |
| 13 | Q. | Okay. Where do you live now? |
| 14 | A. | 4628 North Central Park. |
| 15 | Q. | Are you the member of a gang? |
| 16 | A. | No, naw. |
| 17 | Q. | Do people think that you are the member of a |
| 18 | gang? | |
| 19 | A. | Yeah. |
| 20 | Q. | What gang? |
| 21 | A. | CVL's. |
| 22 | Q. | What does that stand for? |
| 23 | A. | Conservative Vice Lords. |
| 24 | Q. | Do you know someone by the name of Tony |

4

1    Fernandez?

2        A.   Yeah.

3        Q.   How long have you known Tony?

4        A.   About 7 years.

5        Q.   Okay.  Have you known him since grammar school?

6        A.   Yeah.

7        Q:   Did you and he grow up in the same neighborhood?

8        A.   Yeah.

9        Q.   Okay.  You have to answer yes or no, okay, so

10   she can type it.

11       A.   Yes.

12       Q.   Thank you.  Do you know someone by the name of

13   Gaurav Patel?

14       A.   Yes, ma'am.

15       Q.   And, Gaurav Patel, how did you meet him?

16       A.   Through Tony.

17       Q.   Okay.  How long did you know Mr. Patel?

18       A.   For about a month and a half, almost two months.

19       Q.   Do you know someone who goes by the nickname

20   Rowdy?

21       A.   Yeah.

22       Q.   Do you know Rowdy to be the member of a gang?

23       A.   Yeah.

24       Q.   What gang?

1    A.   Spanish Cobras.

2    Q.   Do you know someone who goes by the nickname

3 Little David or Little C?

4    A.   Yeah.

5    Q.   Do you know him to be the member of a gang?

6    A.   Yeah.

7    Q.   Can you say yes or no?

8    A.   Yes, yes.

9    Q.   Thank you. Do you know his full name to be

10 David Gomez?

11    A.   Yes, ma'am.

12    Q.   How is it that you know Rowdy and David Gomez?

13    A.   From the neighborhood as I was growing up. We

14 grew up together.

15    Q.   And, do you get along with Little C or David

16 Gomez and Rowdy now?

17    A.   No.

18    Q.   Okay. Is David Gomez also the member of a gang?

19    A.   Yes.

20    Q.   What gang?

21    A.   Spanish Cobras.

22    Q.   Okay. And, does the Spanish Cobras and the

23 CVL's, do those two gangs get along?

24    A.   Naw. No.

6

1    Q.   Zae, I want to ask you some questions about July

2    24th, of 2009, at 12:30 in the morning.  Were you hanging

3    out with Tony and Gaurav Patel and some other people?

4        A.   Yes.

5        Q.   Okay.  At some point did you ask to be taken

6    home?

7        A:   Yes.

8        Q.   Okay.  And, at the point when you were driving

9    to your house who was in the van?

10       A.   Me, Tony, and Patel.

11       Q.   Okay.  Whose van is it?

12       A.   Tony's.

13       Q.   Who was driving?

14       A.   Patel.

15       Q.   Where were you and Tony seated?

16       A.   Behind him.

17       Q.   Behind Patel?

18       A.   Yeah.

19       Q.   Was anyone in the front seat at that time?

20       A.   No.

21       Q.   And, when Patel pulled up to your address, 4628

22   North Central Park, what happened?  What did you see?

23       A.   I seen Rowdy driving a bike toward us.

24       Q.   Okay.  Was anyone else on the bike with Rowdy?

1      A.   Rowdy and Little David was on the back holding

2  onto his shoulders, on the pads.

3      Q.   And, did Patel stop the van in front of your

4  house?

5      A.   Yes.

6      Q.   And, what happened when Patel stopped the van?

7      A.   He stopped in front of my house, and Rowdy

8  dropped the bike and David hopped off and started

9  shooting.

10      Q.   Okay.  And, when David started shooting where

11  was he shooting towards?

12      A.   Towards the van.

13      Q.   Okay.  Were you and Patel and Tony still in the

14  van?

15      A.   Yeah.

16      Q.   Okay.  And, did you see where David Gomez got

17  the gun from?

18      A.   Yeah.  He pulled it out of his shirt.

19      Q.   Okay.

20      A.   And, I seen him run, and I ducked.

21      Q.   Okay.  And, when you ducked down did you hear

22  gunshots?

23      A.   Yeah.

24      Q.   Yes or no?

8

1     A.   Yes.

2     Q.   How many gunshots did you hear?

3     A.   About 5 or 6 shots.

4     Q.   Okay.  What happened then?

5     A.   Then I guess they ran, and I looked up and Tony

6 was saying that he was shot in the leg, and I told Patel

7 to drive off, and he was saying that he couldn't breathe.

8     Q.   Who said that?

9     A.   Patel.

10     Q.   Okay.  And, so when Patel said he couldn't

11 breathe what happened then?

12     A.   He drove a little bit, but I don't know.  I

13 guess he like passed out, and Tony hopped in the front of

14 the driver's side like on his lap and took control of the

15 car, and then we had like got down to Wilson, and we made

16 a right, and the car had cut off, and we had like crashed

17 like right in front of my -- one of my guy's house.

18     Q.   Okay.  And, that was on Wilson?

19     A.   Yeah, Wilson and Lawndale.

20     Q.   And, did you at that point realize that Patel

21 and Tony had both been shot?

22     A.   Yes.

23     Q.   Did you see them go in an ambulance?

24     A.   Yes.

9

1       Q.   Did you later learn that Patel had died?

2       A.   Yes.

3       Q.   And, what -- did you learn what had happened to

4 Tony?

5       A.   Yes.

6       Q.   Where was he shot?

7       A.   In the leg.

8       Q.   On August 2nd, 2009, did some Chicago Police

9 detectives come to your house?

10      A.   Yes.

11      Q.   And, did they show you two photo arrays?

12      A.   Yes.

13      Q.   And, did you recognize anyone in the photo

14 arrays they showed you?

15      A.   Yes.

16      Q.   Who did you recognize?

17      A.   David and Rowdy.

18      Q.   And, did you tell the detectives that you

19 recognized those two people in the photo arrays?

20      A.   Yes.

21      Q.   Did anyone tell you who to pick out of the photo

22 arrays?

23      A.   No.

24      Q.   On August 8th, 2009, did you go to the police

1    station at Grand and Central?

2         A.   Nope -- no.

3         Q.   I'm sorry?  No?

4         A.   I mean what?

5         Q.   On August 8th, 2009, did you go to the police

6    station at Grand and Central?

7         A.   Yeah.

8         Q.   All right.  And, is that a yes?

9         A.   Yes, yes.

10        Q.   While you were there did you view a lineup?

11        A.   Yes.

12        Q.   And, did you recognize anyone in the lineup?

13        A.   Yes.

14        Q.   Who was in the lineup?

15        A.   David.

16        Q.   David Gomez?

17        A.   David Gomez.

18        Q.   Is that the person that you saw pull out the gun

19   and shoot at the van?

20        A.   Yes.

21        Q.   Did you tell the police that you recognized

22   David Gomez in the lineup?

23        A.   Yes.

24        Q.   And, did anyone tell you who to pick out of the

1    lineup?

2        A.   No.

3        Q.   Did you also speak to a state's attorney by the

4    name of Ruth Gudino, G-u-d-i-n-o, while you were at Grand

5    and Central on August 8th?

6        A.   Yes.

7        Q.   Did she introduce herself to you and explain

8    that she was a state's attorney, which meant she was a

9    lawyer, not your lawyer or a lawyer for anyone involved in

10   the case?

11       A.   Yes.

12       Q.   And, did you agree to talk to her?

13       A.   Yes.

14       Q.   Did you also agree to have your conversation

15   with her videotaped?

16       A.   Yes.

17       Q.   Did you tell the state's attorney the same

18   things that you are telling the Grand Jury today?

19       A.   Yes.

20       Q.   Did she also show you some photos of people

21   while she was talking to you?

22       A.   Yes.

23       Q.   Did you tell her who was in those photos and

24   sign your name on them?

12

1      A.   Yes.

2      Q.   Did anyone else -- did anyone in the van with

3 you have any weapons on July 24th, 2009?

4      A.   No.

5      Q.   As far as your contact with the police today,

6 how did the police treat you?

7      A.   It was good.

8      Q.   Okay. And, while you were at Grand and Central

9 on August 8th, did they offer you something to eat and

10 drink?

11      A.   Yes.

12      Q.   Did they allow you to use the bathroom?

13      A.   Yes.

14      Q.   Were you ever handcuffed?

15      A.   Naw.

16      Q.   Did anyone, the police, the state's attorney, or

17 anyone else, force you or threaten you in any way to get

18 you to speak with them?

19      A.   No.

20      Q.   Did you speak with the police and the state's

21 attorneys freely and voluntarily?

22      A.   Yes.

23      Q.   Did anyone promise you anything to get you to

24 speak with them?

1     A.   No.

2     Q.   Were you under the influence of drugs or alcohol

3 when you spoke to the police and state's attorney?

4     A.   No.

5     Q.   You came here today to this building and spoke

6 with me, correct?

7     A.   Yes.

8     Q.   Did you come here on your own?

9     A.   Yes.

10    Q.   Did you speak with me freely and voluntarily?

11    A.   Yes.

12    Q.   Before we spoke did I explain to you that I was

13 a state's attorney?

14    A.   Yes.

15    Q.   Did you understand what my position was?

16    A.   Yes.

17    Q.   You told me the same things that you're telling

18 the Grand Jury right now, correct?

19    A.   Yes.

20    Q.   Did anyone, me or anyone else, force you or

21 threaten you in any way to get you to testify today?

22    A.   No.

23    Q.   Are you doing so freely and voluntarily?

24    A.   Yes.

1   Q.   Are you under the influence of drugs or alcohol

2   today?

3   A.   No.

4   Q.   You have a pending misdemeanor battery case in

5   Branch 23.  The next court date is September 24th; is that

6   right?

7   A.   Yes.

8   Q.   Did anyone make you any promises or deals in

9   regard to that case to get you to cooperate in this case?

10  A.   No.

11  Q.   You also had a case for drinking on a public

12  way.  You plead guilty on August 11th, 2009, and you

13  received time considered served; is that right?

14  A.   Yes.

15  Q.   Did anyone make any deals or promises with you

16  in regard to that case to get you to cooperate in this

17  case?

18  A.   No.

19  Q.   I'm showing you what I have marked as Grand Jury

20  Exhibit Number One.  Who is shown in that photograph?

21  A.   David.

22  Q.   Is that the person that you saw shooting at the

23  van on July 24th?

24  A.   Yes.

1    Q.  Can you sign your name on Grand Jury Exhibit

2  Number One?

3                    (Indicating

4    Q.  Showing you what's been marked Grand Jury

5  Exhibit Number Two.  Who is in that photograph?

6    A.  Rowdy.

7    Q.  Is this the person that was with David Gomez

8  when he was shooting at the van or July 24th?

9    A.  Yeah.

10    Q.  Please sign your name on Grand Jury Exhibit

11  Number Two.

12                    (Indicating)

13  MS. PETERSON:  I have no further questions for Zae

14  Russell.  Do the members of the Grand Jury have any

15  questions?

16                    (No response)

17

18                    (Witness excused.)

19                    (Investigation continues)

20

21

22

23

24

1   STATE OF ILLINOIS)
                     ) SS:
2   COUNTY OF C O O K)

3

4

5

6

7          I, HELEN M. HACKNEY, a licensed Shorthand

8   Court Reporter in the State of Illinois, do hereby certify

9   that I reported in shorthand the hearing of the

10  aforementioned cause before the Grand Jury of Cook County,

11  Illinois; that I thereafter caused the foregoing to be

12  transcribed into typewriting, which I hereby certify to be

13  a true and accurate transcript of the proceedings had.

14

15

16

17  _____

18  Helen M. Hackney
    Certified Shorthand Reporter
19  License No. 084-001452

20

21

22

23

24

# Exhibit Q

```
 1   STATE OF ILLINOIS )
                       )SS
 2   COUNTY OF COOK    )

 3

     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
 4   CRIMINAL DEPARTMENT/CRIMINAL DIVISION

 5           THE PEOPLE OF THE        )
             STATE OF ILLINOIS,       )
 6                                    )
             PLAINTIFF,               )
 7                                    )
             VS.                      )09CR1990301
 8                                    )
             DAVID GOMEZ &            )
 9                                    )
             ANTHONY KURI,            )
10                                    )
             DEFENDANTS.              )
11

12           REPORT OF PROCEEDINGS had at the

13   hearing of the above-entitled cause, before the

14   HONORABLE KEVIN M. SHEEHAN, on the 15th day of May,

15   A.D., 2012.

16           PRESENT:

17           HON. ANITA M. ALVAREZ,
             State's Attorney of Cook
18           County, by MS. MARY JO MURTAUGH,
             Assistant State's Attorney,
19           appeared on behalf of the People;

20           MR. ABISHI CUNNINGHAM,
             Public Defender of Cook County,
21           by MS. JEAN HERIGODT,
             Assistant Public Defender,
22           appeared on behalf of Kuri.

23

24
```

                                              1

RFC 003117

```
 1              MR. MICHAEL KREJCI,
                Attorney at Law,
 2              on behalf of Gomez.

 3

 4   GAIL DUFF, C.S.R./R.P.R.,
     Official Court Reporter
 5   Circuit Court of Cook County
     Criminal Division
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

2

RFC 003118

```
 1          Date:     5-15-12

 2          Page No:   1 through 59

 3                    I N D E X

 4                    DX    CX    RDX   RCX

 5   Mr. Russell

 6     by Ms. Murtaugh         5

 7     by Mr. Krejci                38

 8     by Ms. Herigodt             46

 9

10

11                    E X H I B I T S

12                    MARKED          ADMITTED

13   People's 8              49

14

15

16

17

18

19

20

21

22

23

24
```

3

RFC 003119

1        THE CLERK:  David Gomez and Anthony Kuri.

2        THE COURT:  Court's back in session.

3    Mr. Michael Krejci, you represent Mr. Gomez.  And

4    Ms. Herigodt and Ms. Graham represent Mr. Kuri.

5        By way of history the last time testimony

6    was heard in this case was March 8.  It was

7    continued until April 11, May 8, and May 12; and we

8    are still in the State's case, is that right?

9        MS. MURTAUGH:  Yes.

10       THE COURT:  Am I correct the State has

11   called two witnesses?

12       MS. MURTAUGH:  Three witnesses.

13       THE COURT:  Three.  So this is witness

14   number four?

15       MS. MURTAUGH:  Yes, Judge.

16       THE COURT:  All right.  You may join your

17   respective lawyers at counsel table.

18       All parties prepared to proceed?

19       MS. MURTAUGH:  Yes.

20       THE COURT:  I take it a motion to exclude

21   is still joined in?

22       MS. MURTAUGH:  Yes.

23       MR. KREJCI:  Yes.

24       THE COURT:  State, you may call your next

4

1  witness.

2        MS. MURTAUGH:  Zay Russell.

3        THE COURT:  Also present on behalf of Ms.

4  Gomez is Ms. Stacy Kling.

5        Sir, raise your right-hand.

6        THE CLERK:  Do you swear or affirm to tell

7  the truth, the whole truth, and nothing but the

8  truth?

9        THE WITNESS:  Yeah.

10       THE COURT:  Ms. Murtaugh, you may begin

11  questioning Mr. Russell.

12                    **ZAY RUSSELL,**

13  called as a witness, having been first duly sworn,

14  was examined and testified as follows:

15                 **DIRECT EXAMINATION**

16  BY MS. MURTAUGH:

17       Q    Sir, in a loud voice tell us your first

18  name, tell us your last name, and spell both for the

19  court reporter.

20       A    First name Zay, name Russell,

21  R-u-s-s-e-l-l.

22       Q    Mr. Russell, how old are you?

23       A    Twenty-one.

24       Q    Where do you live?

                                        5

```
1       A    4628 North Central Park.

2       Q    Is that in the City of Chicago?

3       A    Yes, ma'am.

4       Q    What's your birthdate?

5       A    5-4-90.

6       Q    How long have you lived in the City of

7  Chicago?

8       A    Twenty-one years.

9       Q    And do you know a person by the name of

10 Tony Hernandez?

11      A    Yes, ma'am.

12      Q    How long have you known Tony Fernandez?

13      A    For at least five or six -- five years

14 now.

15      Q    Did you go to school with him?

16      A    Did I go to school with him?

17      Q    Right.

18      A    Yes, Roosevelt.

19      Q    And is he your friend?

20      A    Yes, ma'am.

21      Q    Did he grow up in the same neighborhood as

22 you have?

23      A    Yes, he did.

24      Q    Do you know a person by the name of Gaurav
```

6

1    Patel?

2        A    Yes.

3        Q    How long have you known Gaurav Patel for?

4        A    I've known him for like four months before

5    he passed.

6        Q    And how did you meet Gaurav Patel?

7        A    I met him through Fernandez.

8        Q    Did Tony and Gaurav Patel hang around

9    together?

10       A    Yes, ma'am.

11       Q    Do you know a person called Little Davis?

12       A    Yes, ma'am.

13       Q    And how do you know him?

14       A    Since we was young.

15       Q    And did he stay in the same neighborhood

16   that you were.

17       A    Yes, ma'am.

18       Q    Does he have another nickname besides

19   Little David?

20       A    I believe so.

21       Q    Do you know what that is?

22       A    Little C.

23       Q    Do you know his real name?

24       A    Yes.

RFC 003123

1      Q    What is it?

2      A    His real name is David.

3      Q    Do you see him in court today?

4      A    Yeah, I see him right now.

5      Q    Can you point to him and describe

6  something he's wearing?

7      A    He right there.  He's wearing glasses.

8           THE COURT:  Indication for the record

9  in-Court identification of Mr. Gomez.

10  BY MS. MURTAUGH:

11     Q    Do you know a person by the name of --

12  nickname of Rowdy?

13     A    Yes, I know him.

14     Q    How do you know Rowdy?

15     A    I know him since we was young.  I use to

16  let him sleep at my house when he had no where to

17  go, you know.

18     Q    About how many years have you known him?

19     A    I've known him for quite a long time.  I

20  can't remember how many years but I've known him for

21  a minute.

22     Q    Do you know what his real name, Mr.

23  Russell?

24     A    No, I don't.

8

1      Q      Do you see Rowdy in court today?

2      A      Yes, I see him.

3      Q      Can you point to him and describe

4  something he's wearing?

5      A      He's right there.  He's right there.  He's

6  wearing the same thing I'm wearing, long hair.

7              THE COURT:  Indication for the record

8  identification of Mr. Anthony Kuri.

9  BY MS. MURTAUGH:

10     Q      I'm going to call your attention to

11  July 24, 2009, do you remember that day?

12     A      Yeah, I remember that day.

13     Q      And on that day about 12:30 in the

14  morning, were you at home?

15     A      Yes, ma'am.

16     Q      Were you with Gaurav Patel?

17     A      Yes, ma'am.

18     Q      How long had you been with those guys on

19  July 24 of 2009 at about 12:30?

20     A      How long was I with them?  I was with them

21  for about the whole day probably.

22     Q      Were you with them the night before, which

23  would have been July 23 at 2009 into the early

24  morning hours of July 24?

                                                    9

1        A     Yes, I believe that is right.

2        Q     And were you guys in a vehicle?

3        A     Yes, we was in a vehicle.

4        Q     What kind of a vehicle was it?

5        A     We was in a purple mini-van.

6        Q     Had you been in a purple mini-van prior to

7    July 24, 2009?

8        A     Yes.

9        Q     Whose purple mini-van was it?

10       A     It was Tony's.

11       Q     About how long had you had it, do you

12   know?

13       A     I can't recall.

14       Q     About 12:30 at night, were you inside

15   that van?

16       A     12:30 at night?

17       Q     Yes.

18       A     Yes.

19       Q     Now, who was driving that van?

20       A     Patel was driving.

21             THE COURT:  Who, sir?

22             THE WITNESS:  Patel.

23

24

10

1    BY MS. MURTAUGH:

2        Q    And where were you seated in the van?

3        A    I was in the third row in the back.

4        Q    Was anybody next to you?

5        A    No.

6        Q    Was Tony Fernandez in the van?

7        A    Yes, he was in the van.

8        Q    Do you know where he was seated?

9        A    Yes.  He was seated in front of me.

10       Q    And was he seated in the front passenger

11   seat or some place else in the van?

12       A    He was seated behind the driver's seat.

13       Q    So was he next to you?

14       A    No.  I was way in the back in the third

15   row.  It's three rows.

16       Q    Was anybody next to Tony when Tony was in

17   the back seat behind the driver?

18       A    No, ma'am.

19       Q    Now, about 12:30 at night, were you

20   getting dropped off at your house?

21       A    Yes, ma'am.

22       Q    Now, what had you guys been doing prior to

23   getting dropped off at your house?

24       A    We was driving around and just chilling.

11

RFC 003127

1      Q     Now, beside you three guys, were there

2   other people that had been in the van prior to you

3   getting dropped off?

4      A     Yes, ma'am.

5      Q     Now, when you got dropped off, who was

6   driving the vehicle?

7      A     Patel.

8      Q     And did he stop the van to drop you off?

9      A     Yes, ma'am.

10     Q     Where did he stop the van?

11     A     He stopped the van in front of my house.

12     Q     And when he stopped the van in front of

13  your house, is that the same location that you

14  testified that you went back earlier?

15     A     Yes, ma'am, 4628 North Central Park.

16     Q     And, Mr. Russell, when he stopped the van,

17  was the driver's side of the van or the passenger

18  side of the van closest to your house?

19     A     The passenger's side of the van.

20     Q     And did he stop in the middle of the

21  street?

22     A     Yes, he did.

23     Q     When he stopped in the middle of the

24  street, did you see — what did you see?

12

1      A     When he stopped in the middle of the

2   street, when he stopped in the middle of the street

3   some guys have rode up on a bicycle.

4      Q     You say some guys had rolled up on a

5   bicycle, how many guys?

6      A     Two.

7      Q     Do you know what kind of bicycle?

8      A     Nah.

9      Q     Did you see anybody that you see in court

10  on that bicycle?

11     A     No, ma'am.

12     Q     Is it true that Rowdy drove the bike

13  towards you?

14     A     I can't remember.

15           THE COURT:  Who drove the bike towards him

16  is your question?

17           MS. MURTAUGH:  Rowdy.

18  BY MS. MURTAUGH:

19     Q     You don't remember?

20     A     No, I can't remember.

21     Q     Was anybody on the back of the bike at the

22  time that Patel, Mr. Patel stopped at your house?

23     A     I can't remember.

24     Q     When you say that it was two guys rode up

13

1    on the bike then what happened?

2        A    I can't remember.  I went to the

3    penitentiary.  My head got kind of messed up.  I

4    can't hardly remember what happened that day.

5        Q    Just besides you bringing that up, now you

6    have an aggravated battery conviction to a police

7    officer, correct?

8        A    Yes, ma'am.

9        Q    You just initially received probation,

10   correct?

11       A    Yes, ma'am, parole.

12       Q    Going to penitentiary for three years i

13   October 2010, correct?

14       A    Yes, ma'am.

15       Q    Is that what you're talking about you went

16   to the penitentiary?

17       A    Yes, ma'am.

18       Q    Do you remember hearing the shooting?

19       A    Nah, I don't remember.

20       Q    Were gunshots fired at your vehicle, the

21   vehicle that you were in?

22       A    I can't remember.

23       Q    Did you get shot?

24       A    Nah.

                                        14

1    Q    Did Mr. Patel get shot?

2    A    Yeah.

3    Q    Where did he get shot?

4    A    I don't know.

5    Q    Did Mr. Fernandez get shot?

6    A    Yeah.

7    Q    Where did he get shot?

8    A    I don't know.  I think in his leg.

9    Q    Now, did that shooting happen when you

10   were getting out of the van or attempt to get out of

11   the van at your house?

12   A    I believe so.

13   Q    After the shooting, what happened inside

14   the van?

15   A    I can't remember.

16   Q    Well, was Mr. Patel able to drive?

17   A    Nah, I don't think so.

18        MR. KREJCI:  Your Honor, I object to the

19   speculation.

20        THE COURT:  Overruled.

21   BY MS. MURTAUGH:

22   Q    After the shooting, did the van stay right

23   there?

24   A    Nah.

15

RFC 003131

1    Q    Where did it go?

2    A    I believe it drove to the corner and it

3 cut off.

4    Q    The corner of what street would that be?

5    A    Wilson.

6    Q    Did you drive the van there?

7    A    Nah.

8    Q    Who drove the van?

9    A    I believe Tony jumped in the driver's

10 seat.

11    Q    Did you remain in the van when Tony jumped

12 in the driver's seat?

13    A    Yes, ma'am.

14    Q    Then what happened when Tony got into the

15 driver's seat and the van went to Wilson?

16    A    I believe he made a -- he made a right and

17 I believe it shut off on Lawndale and Wilson in

18 front of the row houses.

19    Q    Then what happened?

20    A    And it was I believe it was a group of our

21 friends at the row-houses, and they had helped us

22 outside the car and they rushed TC inside the house.

23    Q    Now, whose TC?

24    A    That's Tony.

16

1    Q   And they did what to him?

2    A   They helped him in the house and they put

3 water and stuff on his gun wound.

4    Q   And where was his gun wound?

5    A   I believe it was in his leg.

6    Q   Did you stay in the house?

7    A   Nah, I stayed outside.

8    Q   Then did the police come?

9    A   Yes, the police came.

10   Q   Did you talk to the police when the police

11 came?

12   A   They arrested me.

13   Q   They arrested you when you were outside?

14   A   Yes, ma'am.

15   Q   Did they take you to the police station?

16   A   Yes, ma'am.

17   Q   Did you tell them anything that you knew

18 about what happened?

19   A   Not at the moment.  They had tried to say

20 that I had to be in an investigation because I

21 probably could have did the shooting from inside.

22 They were saying they had to investigate and do all

23 of this other stuff so.

24   Q   Did you eventually tell them something

RFC 003133

1   when you got to the police station there?

2       A    Nah.

3       Q    Did you tell them -- did you talk to them

4   at all?

5       A    Not at the police station.  They had came

6   to my house like days later.

7       Q    You remember that there was a shooting

8   now, did you see where the person that had the gun

9   got the gun from?

10      A    No, I can't remember.

11      Q    When you heard the shooting, what did you

12  do inside the van?

13      A    I ducked.

14      Q    How many gun shots did you hear?

15      A    I can't remember.

16      Q    Before the shooting, did you hear any of

17  the people outside anything to you guys?

18      A    No, ma'am.

19      Q    Did you hear any gang references?

20      A    Any what?

21      Q    Gang reference?

22      A    No.

23      Q    Are you in a gang?

24      A    Nah.

18

RFC 003134

1    Q   Do you hang around with gang members?

2    A   Yeah, from time to time.

3    Q   The gang members that you hang around

4 with, what gang are they in?

5    A   Familiar Stones (phonetic).

6    Q   Is that the only gang members that you

7 hang out with?

8    A   Yeah.

9    Q   Is Rowdy a member of a gang?

10    A   I don't know.

11    Q   Is Little David a member of a gang?

12    A   I don't know.

13    Q   Mr. Russell, did you testify before the

14 grand jury on August 18, 2009?

15    A   Did I?

16    Q   You testified at the grand jury on

17 August 18, 2009?

18    A   Yes, ma'am.

19    Q   You went into this building, the criminal

20 court building on the fourth floor, is that correct?

21    A   Yes, ma'am.

22    Q   When you went into that room, there were

23 citizens inside that room grand jurors, correct?

24    A   Yes, ma'am.

19

RFC 003135

1      Q    And you were sworn by the jury foreman to

2  tell the truth, is that correct?

3      A    Yes, ma'am.

4      Q    And it was only you, the State's attorney,

5  and the court reporter inside the room?

6      A    Yes, ma'am.

7      Q    Do you remember that State's attorney's

8  name was Krista Peterson?

9      A    I don't remember.

10      Q    Well, it was a female State's attorney,

11  right?

12      A    I don't know.

13      Q    And after you were sworn to tell the

14  truth, the State's attorney asked you certain

15  questions and you provided certain answers with

16  respect to those questions, correct?

17      A    Yes, ma'am.

18      Q    Mr. Russell, page six, were you asked this

19  question and did you give this answer.  Line 21.

20  Question:  And when Patel pulled up to your address,

21  4628 North Central Park, what happened, what did you

22  see?

23          Answer:  I seen Rowdy driving a bike towards

24  us.

20

RFC 003136

1          Question:  Okay.  Was anyone else on the

2    bike with Rowdy?

3          Answer:  Rowdy and Little David was on the

4    back holding on to his shoulders on the pass.

5          Question:  And did Patel stop the van in

6    front of your house?

7          Answer:  Yes.

8          Question:  And what happened when Patel

9    stopped the van?

10         Answer:  He stopped in front of my house

11   and Rowdy dropped the bike and David hopped off and

12   started shooting.

13         Were you asked those questions and did you

14   given those answers before the grand jury,

15   Mr. Russell?

16     A     The police officer --

17         THE COURT:  Sir, answer the question.

18   Were you asked those questions, did you give those

19   answers?

20         THE WITNESS:  Yes, I believe so.

21   BY MS. MURTAUGH:

22     Q     Mr. Russell, were you asked these

23   questions and did you give these answers?

24         Question -- line 10, page 7.

21

1        Okay.  When David started shooting, where

2  was he shooting towards?

3        Answer:  Towards the van.

4        Question:  Okay.  And you were with Patel

5  and Tony still in the van?

6        Answer:  Yeah .

7        Question:  And did you see where Dave Gomez

8  got the gun from?

9        Answer:  Yeah.  He pulled it out of his

10  shirt.  Okay.

11        Were you asked those questions and did you

12  give those answers before the grand jury?

13     A   No, I don't remember.

14     Q   Mr. Russell, did you have a conversation

15  with Assistant State's Attorney Ruth Gudino and

16  Detective Cordera at Area 5, Police Department on

17  August 8, 2009?

18     A   I don't remember that.  No, I don't

19  believe so.

20     Q   It was about 8:21 at night and when you

21  were at the area, you talked about the events of

22  July 29 — I'm sorry, July 24, 2009, and you

23  consented to have your conversation videotaped with

24  the State's attorney and the detective, correct?

RFC 003138

1       A    No, I don't believe so.

2       Q    And she asked you certain questions and

3   you gave Ruth Gudino certain answers with respect to

4   the events of July 24, 2009, right?

5       A    No.

6       Q    Isn't it true that you told Assistant

7   State's Attorney Ruth Gudino in response to her

8   question about what happened when you were getting

9   to your house, you told her that you were driving

10  up, and you were looking straight and you seen them

11  coming to the sidewalk and she asked you who and you

12  said David and Rowdy, you seen those two people

13  coming on the bike, isn't that true?

14      A    I can't remember.

15      Q    And then you tell ASA Ruth Gudino that the

16  bike that Rowdy was driving was a Husky bike and a

17  Trek bike, isn't that true?

18      A    No, I don't remember that.

19      Q    Didn't you also tell ASA Ruth Gudino that

20  at the time Rowdy was sitting on the bike peddling

21  and that David was standing on the pegs.

22      A    No, ma'am.

23      Q    Didn't you tell Ruth Gudino that you could

24  see David's face?

23

RFC 003139

1    A    No, ma'am.

2    Q    How's the light on your street at 4628

3 North Central, there's street lights there, correct?

4    A    Yes, ma'am.

5    Q    Page 12, during your conversation with

6 Ruth Gudino, ASA Ruth Gudino and Detective Cordera,

7 didn't you tell ASA Gudino in response to her

8 question that what happened when the bike came up on

9 you that you seen them.  They stopped right on the

10 side of the van, that being Rowdy and David, that

11 you seen David hop off the back of the bike and pull

12 a gun out of his shirt, didn't you tell her that,

13 isn't that true?

14    A    No, ma'am.

15    Q    Didn't you tell her that he even pulled

16 his gun out with his right-hand, that being David?

17    A    I can't remember.

18    Q    Page 13, didn't you also tell Ruth Gudino

19 that you could see his face, his whole face, that

20 being David?

21    A    I can't remember that neither.

22    Q    You guys didn't have any weapons in the

23 car, did you?

24    A    Nah, I don't believe so.

24

1    Q    Now, you told us that you didn't hear two

2  people on the bike say any, make any gang references

3  at that time, is that correct?

4    A    Nah, I didn't hear none.

5    Q    Didn't you tell ASA Ruth Gudino that when

6  they pulled up and they hopped off the bike and they

7  yelled king, killer bitch and all this?

8    A    No, I don't remember that.

9    Q    Do you remember who yelled that?

10   A    Nah.

11   Q    What is King killer mean?

12   A    King killer.

13   Q    What does it mean?

14   A    I don't know.

15   Q    You told the assistant State's attorney

16  that King killer means that they were telling you

17  guys that they didn't like the Kings?

18   A    I guess so.

19        MS. MURTAUGH:  Judge, may I approach.

20        THE COURT:  Yes.  What were the numbers?

21        MS. MURTAUGH:  It's going to be People's

22  1, People's 7, and People's 8.

23        THE COURT:  All right.

24

25

1  BY MS. MURTAUGH:

2      Q    Showing you first People's 7 for

3  identification, do you see that photograph?

4      A    Yeah.

5      Q    Does that picture show your house that you

6  lived at on July 24, 2009?

7      A    Yes, ma'am.

8      Q    Does that show your street where the

9  shooting happened?

10     A    Yeah.

11     Q    Where is your house in relation to those

12 cars on the street on the right-hand side of the

13 photo?

14     A    It's in the middle of the mini van and the

15 blue car.

16     Q    And that mini-van that's there, that's not

17 the minivan that you were in, correct?

18         MR. KREJCI:  Just for clarification of the

19 record, what photo are we talking about?

20         THE COURT:  People's 7.

21         MR. KREJCI:  Thank you.

22 BY MS. MURTAUGH:

23     Q    Then People 8 for identification, does

24 that show your house too and the street what

                              26

1  happened?

2      A    Yes, ma'am.

3      Q    Do you know when there was the shooting,

4  where did the -- was the shooter at in that

5  photograph, when he got shot at.

6      A    Looks like he was in the grass.

7      Q    Now, showing you People's No. 1, is that

8  the van that you guys were in?

9      A    Yes, ma'am.

10     Q    Do you know what location than van is at

11  in that picture?

12     A    It's in the middle of Hamlin and Lawndale

13  on Wilson.

14         MS. HERIGODT:  I'm sorry, what number is

15  that?

16         MS. MURTAUGH:  That's People's 1.

17         MR. KREJCI:  That was the house?

18         THE COURT:  One's a photo of the purple

19  van, right.

20         MS. MURTAUGH:  Yes.

21         THE COURT:  At Hamlin and Lawndale.  Two

22  is the witness's street.  Three is also the

23  witness's house -- I'm sorry, 1, 7, and 8 in that

24  order.

RFC 003143

1          MS. MURTAUGH:  Yes.

2  BY MS. MURTAUGH:

3      Q    Is that where the van ended up after

4  Mr. Patel was shot and Tony was shot?

5      A    I believe so yeah.

6      Q    Mr. Russell, you indicated that you talked

7  to the police at that time when they came to your

8  house?

9      A    Yeah.

10     Q    When they came to your house, did they

11 show you some photographs like photo arrays?

12     A    Yeah, they did.

13          MR. KREJCI:  Could we have a foundation

14 please?

15          THE COURT:  Do you want to get a date and

16 time.

17          MR. KREJCI:  Thank you.

18 BY MS. MURTAUGH:

19     Q    Did they come to your house at 4628 North

20 Central Park on August 2, 2009 at night time after

21 9:00 o'clock?

22     A    I don't remember that.  I don't think.  I

23 don't know.

24          THE COURT:  What number is this?

                                          28

1          MS. MURTAUGH:  It's going to be 40.  I

2     know that 39 has not been used yet.

3     BY MS. MURTAUGH:

4          Q     People's Exhibit No. 40 for

5     identification, and People's Exhibit No. 40 is a

6     photo spread advisory form, correct?  Do you see

7     your name on it?

8          A     Yeah, I see my name.

9          Q     And then your signature there?

10         A     Um hum.

11         Q     What's the date on the form?

12         A     August 2.

13         Q     2009?

14         A     2009.

15         Q     And there's a time, a military time on

16    there.  Do you know anything about military time?

17         A     No, ma'am.

18         Q     And do you remember signing this form with

19    Detective Calino?

20         A     I don't know who that is, but I guess.

21         Q     Is that your signature?  Did you write

22    that?  Did you sign that?

23         A     Yeah it look like it.

24         Q     And the detective read that form to you

29

1    and then you signed it, right?

2          A    Um hum.

3          Q    Is that in the same condition today just

4    the original one?

5          A    Original what?

6          Q    Original photo array.  This is your

7    signature, the original one, right?

8          A    It looks like it.

9          Q    Okay.  Then after you signed it, you

10   looked at some photo arrays?

11         A    Yes, I believe.

12         Q    Did you make any identification in those

13   photo arrays?

14         A    Nah.  The police officer already told me

15   who they were.

16              THE COURT:  Sir, tell you answer the

17   question asked.  The lawyers will have an

18   opportunity to cross-examine you.  If you are asked

19   a question and you don't understand it, say you

20   don't understand it.  Do not volunteer information.

21   Do you understand that?

22              THE WITNESS:  Yes, sir.

23              THE COURT:  Re-ask the question.

24

                                                  30

1    BY MS. MURTAUGH:

2        Q    Did you make any identification in those

3    photo arrays?

4        A    Nah.

5        Q    All right.  41.

6             THE COURT:  What number?

7             MS. MURTAUGH:  Forty-one and 42.

8    BY MS. MURTAUGH:

9        Q    Showing you 41, People's 41, is that the

10   pictures that you were shown by police on August 2,

11   2009, those are the pictures, right?

12       A    I don't remember.

13       Q    You see your signature on the form in the

14   pictures?

15       A    It looks like it.

16       Q    That's your signature, right?

17       A    It looks like it.

18       Q    How many picture do you see in total?

19       A    Six.

20       Q    Is there three photographs on top and

21   three on the bottom?

22       A    Yes, ma'am.

23       Q    And there is -- is there a circle on one

24   of the photographs?

31

```
1       A    Yes, ma'am.

2       Q    And from one to three, which one is

3  circled?

4       A    The second one.

5       Q    Who is that a picture of?

6       A    It looks like Rowdy.

7       Q    And it's circled.  You made that circle,

8  right?

9       A    Nah, I don't believe so.

10      Q    You put Rowdy on there, right, you wrote

11 Rowdy?

12      A    No.

13      Q    That says August 2, 2009 at 9:45, Zay

14 Russell is your signature, right?

15      A    I don't remember writing that.

16      Q    And you made that identification, right?

17      A    I don't remember.

18      Q    Did you tell the police that this is the

19 person, Rowdy, that he was riding the bike that came

20 at you at the time you were getting out of the van

21 carrying David --

22      A    No, ma'am.

23      Q    Showing you People's 42 for

24 identification, is that also a photo array?
```

RFC 003148

```
 1      A    Yes.

 2      Q    How many pictures are on the top?

 3      A    Six.

 4      Q    That's in total, right, six pictures?

 5      A    Yes.

 6      Q    How many on top?

 7      A    Three.

 8      Q    How many are on the bottom?

 9      A    Three.

10      Q    Is one of those pictures circled?

11      A    Yes, it is.

12      Q    What picture is circled?

13      A    The first one.

14      Q    Who is that a picture of?

15      A    Looks like David.

16      Q    And your signature appears over Dave,

17 correct?

18      A    Looks like it.

19      Q    You circled David, correct?

20      A    Nah.

21      Q    Did you tell the police at that time that

22 David, Little David was the shooter that shot into

23 the van that you were getting out of?

24      A    No, I don't remember.
```

33

```
 1      Q    Isn't it true that you told them that?

 2      A    No.

 3      Q    And that appears to be the same signature

 4  as on People's 41, right?

 5      A    Looks like it.

 6      Q    Mr. Russell, do you remember going to the

 7  police station, Area 5 begin, and looking at a

 8  lineup?

 9           THE COURT:  Date and time, Ms. Murtaugh?

10  BY MS. MURTAUGH:

11      Q    August 8, 2009 in the afternoon at about

12  five o'clock at night, a little bit before five

13  o'clock at night?

14      A    I don't remember.

15      Q    You were with Detective Coleman of Area

16  five, and he asked to you look up in a lineup,

17  correct?

18      A    I don't remember.

19      Q    And you made an identification in that

20  lineup, correct?

21      A    I can't remember.

22      Q    I will show you People's Exhibit No. 39,

23  what's that?

24      A    It's showing four people.
```

                                        34

1          THE COURT:  That's 39, State?

2          MS. MURTAUGH:  Yes, Judge.

3    BY MS. MURTAUGH:

4      Q    Do you recognize anybody in that lineup?

5      A    I see David.

6      Q    And of those four people, where is David

7    sitting?  Is he one, two, three, or four?

8      A    He's first.

9      Q    He's the first one?

10         THE COURT:  From what side?

11         THE WITNESS:  From the left.

12         THE COURT:  Thanks.

13   BY MS. MURTAUGH:

14     Q    From the left to the right, correct.  I'll

15   show you People's Exhibit No. 43 for identification,

16   that's a lineup advisory form, correct?

17     A    Um hum.

18     Q    And you see your signature there?

19     A    I see a signature.

20     Q    That's yours, right?

21     A    Nah.

22     Q    Now that one's not yours now.  And there's

23   a date.  What's the date on that?

24     A    August 8, 2009.

35

1     Q    There's a Detective Coleman there too,

2 correct?

3     A    Yes, it says it.

4     Q    Was this read and shown to you before you

5 looked at the lineup?

6     A    I don't remember.

7     Q    Did you pick David Gomez out of the lineup

8 as being the shooter in this case?

9     A    I don't remember that.

10    Q    Did you tell Detective Coleman that it was

11 David Gomez who was the shooter and he was number

12 one?

13    A    No, ma'am, I don't think so.

14    Q    And, Mr. Russell, you have a pending

15 contempt of court petition, correct?

16    A    I don't know.

17    Q    Well, you didn't come to court and you got

18 a warrant issued for your arrest, correct?

19    A    Yes, I believe that's why.

20    Q    After you were personally served with a

21 subpoena you failed to come to court, correct?

22    A    I believe.

23    Q    What?

24    A    I think so yes.

36

1     Q   And on that was pending case you weren't

2  made any promises in exchange for your testimony

3  here today, right?

4     A   Any what?

5     Q   You weren't made any promises about your

6  pending case in exchange for your testimony here

7  today, correct?

8     A   Nah, I don't think, nah.

9     Q   Mr. Russell, when you first saw the police

10  on the night of the shooting or the morning of the

11  shooting, isn't it fair to say that you didn't

12  cooperate with the police at all?

13     A   Yeah, that's right.

14     Q   And your friend Tony Fernandez, did he got

15  to the hospital?

16     A   Yeah, I think so.

17     Q   And when you looked at the photo arrays

18  with the detective Tony wasn't with you, correct?

19     A   When I did what?

20     Q   When you looked at the photo arrays with

21  the detective, Tony wasn't present, correct, it was

22  just you and the detective?

23     A   I can't remember.

24         MS. MURTAUGH:  I have nothing further.

37

1          THE COURT:  Cross, Mr. Krejci on behalf of

2    Mr. Gomez.

3                    CROSS EXAMINATION

4    BY MR. KREJCI:

5          Q    Mr. Russell, I'm going to talk to you

6    about that night of the shooting that you testified

7    about, that evening you were together with Tony and

8    Patel hanging out, is that right?

9          A    Yes, sir.

10         Q    And that evening, that night did you

11   consume any alcohol?

12         A    I can't remember.

13         Q    Did you smoke weed?

14         A    Um, no, I believe I was on probation I

15   couldn't smoke.

16         Q    So you couldn't smoke weed because you

17   were on probation at the time?

18         A    I think I was.  I can't remember.

19         Q    At some point, I believe you testified

20   that you don't really remember who did the shooting

21   but you remember that there was a shooting, correct,

22   someone got shot that night, right?

23         A    Yes, sir.

24         Q    It was Mr. Patel who was in the van,

                                                38

1    correct?

2         A    Yes, sir.

3         Q    And at some point and time after that

4    shooting, you were in the van and the van went down

5    Central to Wilson and kind of stopped, correct?

6         A    On Central or Central Park?

7         Q    Central Park.

8         A    That is correct.

9         Q    And is it fair to say that your friend

10   Tony also got shot, do you remember that?

11        A    Yeah, yeah.

12        Q    Okay.  And at some time the police

13   arrived, correct?

14        A    Yes, I believe so, yes, correct.

15        Q    And you say you got arrested?

16        A    Yes, I got arrested.

17        Q    What did you get arrested for?

18        A    I don't really know.  The police they

19   don't too much like me over there so they put me in

20   handcuffs.  They put me in the car, and they said

21   that they had to investigate and see if I had

22   something to do with it.

23        Q    At some point either at the scene or later

24   on you did talk to some of the police officers, did

                                                    39

1   you not?

2       A    Yeah, I believe so.

3       Q    In fact, you told the police officers, you

4   told them about the incident that occurred before

5   the shooting, remember telling the police officers

6   about that?

7       A    Nah, I don't remember.

8       Q    Did you tell the police officers that you,

9   Tony, Patel, and two members of the Latin Kings

10  street gang, who you don't know by their name were

11  driving in Patel's mini-van in the area of Lawrence

12  and Lawndale about a half hour prior to the

13  shooting.

14          MS. MURTAUGH:  Objection.

15          THE COURT:  Overruled.

16  BY THE WITNESS:

17      A    I don't recall telling them that.

18  BY MR. KREJCI:

19      Q    Did you tell the police officers near the

20  intersection of Lawrence and Lawndale two Cobras

21  known to you as Funk and a long hair Cobras known to

22  you as Chino begin to yell gang slogans, did you

23  tell them that?

24      A    I don't remember that.

40

1      Q    Did you tell the police officers that two

2    unknown male Latin Kings exited the van and

3    confronted Funk and Chino on the street?

4           MS. MURTAUGH:  Objection.

5           THE COURT:  Overruled.

6    BY THE WITNESS:

7      A    Nah.

8    BY MR. KREJCI:

9      Q    And that Funk and Chino begin to throw

10   bottles so the Kings returned to the van and Patel

11   drove off.  Do you remember telling that to the

12   police officers?

13     A    No.

14     Q    Giving them those names about throwing

15   bottles, you don't remember that?

16     A    Nah.  It might have been Tony not me.

17     Q    And then did you tell the police officers

18   that you drove to the area of Argyle and Kedzie and

19   dropped off the two unknown Latin Kings?

20     A    For.

21     Q    And you told the police officers at that

22   point and time you asked Patel to drive you home to

23   the area of Central Park and Wilson?

24     A    I can't remember that.

41

1      Q     At this time that you and Fernandez were

2 both in the rear of the van while Patel was driving,

3 do you remember telling that to the police?

4      A     Excuse me. I didn't hear you. You say

5 what?

6      Q     That you and Fernandez were in the rear of

7 the van while Patel was driving, do you remember

8 telling that to the police in the same conversation

9 shortly after the shooting?

10        MS. MURTAUGH: Objection.

11        THE COURT: I'm assuming he's going to

12 prove this up. It's impeachment. He's asking a

13 predicate question. I hope anybody who asks a

14 predicate question is going to prove this up with

15 the appropriate witness.

16        MR. KREJCI: I will, your Honor.

17        THE COURT: Okay.

18 BY MR. KREJCI:

19      Q     Did you tell the police officers that you

20 observed two unknown male Hispanics on bicycles

21 approach the van from between some parked cars and

22 yell King killers. Do you remember saying that to

23 the police officers?

24      A     No, sir.

42

1     Q    You don't remember saying that?

2     A    No, sir, I can't remember.

3     Q    And you gave a description of one of the

4   male Hispanics wearing a white t-shirt and having

5   short hairstyles, do you remember telling that to

6   the police officers?

7     A    No.

8     Q    You said one of the subjects produced a

9   handgun and fired in the direction approximately

10   five times, do you remember telling that to the

11   police officers?

12     A    Nah, I don't remember that.

13     Q    You even told them that the guys that you

14   did know by the name Funk or Chino weren't present

15   at the time of the shooting. Do you remember giving

16   that detail to the police officers?

17     A    Nah.

18     Q    Now, your friend Tony went to the

19   hospital, is that right?

20     A    I believe so. I think so. I wasn't

21   there.

22     Q    You did know at some point the next day he

23   was still in the hospital, right?

24     A    Yeah, I believe -- I don't know. I can't

43

RFC 003159

1    remember.

2         Q    At Illinois Masonic Hospital, you don't

3    remember talking to him?

4         A    I don't remember.

5         Q    You don't remember if you called or not or

6    talked about what happened?

7         A    Nah.

8         Q    Okay.  At some point and time, sir, the

9    police they came and talked to you on August 2nd, do

10   you remember that counsel just talked to you about

11   you looking at some lineups and talking to the

12   police?

13        A    They came where?

14        Q    To your house, if you remember?

15        A    Nah, I don't remember that.

16        Q    So approximately you don't remember eight

17   days later talking to the police?

18        A    I can't remember.

19        Q    Counsel showed you -- prosecutor showed

20   you some photographs and some markings that she

21   asked you if you made or not and I believe you said

22   you didn't remember but you did say something did

23   the police tell you who to identify?

24        A    Well, they said that they knew who it was

                                                    44

1    and they had already said that they had David and

2    they said his real name, I guess, it was his real

3    name and they said they just need me to say that

4    these is them or something I guess so.

5        Q    So that's -- you remember the police

6    telling you that they already had David was it

7    Anthony Kuri Rowdy?

8        A    Yes, I believe.

9        Q    So when you looked at the photographs,

10   that the reason that you picked those two persons

11   Out?

12       A    They said that they -- if I was to say

13   that it was them then that they was going to give

14   Tony Fernandez money for being a victim of a crime.

15   So they told me to really just help Tony out.

16       Q    So you were helping your friend out, Tony,

17   is that your testimony?

18       A    Basically.

19       Q    So when you testified in the grand jury as

20   to what you allegedly saw that night that wasn't

21   true, is that right?

22       A    I guess it's correct.

23       Q    And is it your testimony today in front of

24   this judge that you said that in the grand jury

25 (illegible)

45

1   under oath because you were trying to help out your

2   friend Tony?

3       A    Yes, sir.

4       Q    Do you remember the name of the police

5   officer that told you to say this?

6       A    Nah, I can't remember.

7            MR. KREJCI:  Just a brief moment, Judge.

8   Judge, I have nothing further.  I tender.

9            THE COURT:  Ms. Herigodt, are you going to

10  adopt the questions of Mr. Krejci and asks

11  additional questions?

12           MS. HERIGODT:  I will adopt and I will ask

13  additional questions as well.

14           THE COURT:  Thank you.

15           MS. HERIGODT:  Thank you.

16                    **CROSS-EXAMINATION**

17  BY MS. HERIGODT:

18       Q   And, Mr. Russell, you're a Conservative

19  Vice Lord, isn't that correct?

20       A   No, ma'am.

21       Q   That's not correct.

22           Well, you have a conviction for aggravated

23  battery of a police officer, isn't that correct?

24       A   Yes, ma'am.

                                        46

1      Q    And when you were -- during that

2  aggravated battery of a police officer, you were

3  actually yelling that you were a Vice Lord, isn't

4  that correct?

5           MS. MURTAUGH:  Objection.

6           THE COURT:  Sustained.  It's for

7  impeachment purposes only.  I'm not getting into the

8  facts of his arrest.  Sustained.  Move on.

9  BY MS. HERIGODT:

10     Q    Did you tell a police officer did you

11  admit to being a Conservative Vice Lord at the time

12  of your arrest?

13     A    No.  I never committed to being anything.

14  Nah, I didn't.

15     Q    Now, you know David Gomez, is that

16  correct?

17     A    Yes, ma'am.

18     Q    You know Anthony Kuri, is that correct?

19     A    Yes, ma'am.

20     Q    And you know that Latino neighborhood, is

21  that correct?

22     A    Yes, ma'am.

23     Q    And you knew them to be Spanish Cobras, is

24  that correct?

47

RFC 003163

1      A      Yes, ma'am?

2      Q      Now, before the shooting happened, you

3  were riding around in Tony's van, is that correct?

4      A      Yes.

5      Q      A fight broke out, isn't that correct?

6      A      I don't remember that.

7      Q      A fight broke out between the Latin Kings,

8  isn't that correct?

9      A      Nah, I don't remember.

10      Q      And members of the Spanish Cobras, isn't

11  that correct?

12      A      I don't remember.

13      Q      Chino and Funk, do you remember that?

14      A      Do not.

15      Q      You were with Tony Fernandez, isn't that

16  correct early that evening, isn't that correct, on

17  the 23?

18      A      Yes, ma'am.

19      Q      Tony Fernandez' brother, Ricky, was in the

20  van as well, is that correct?

21      A      As far as I can remember I believe so, I

22  think.

23      Q      And other members of the Latin Kings were

24  in the van too, is that correct?

48

RFC 003164

1     A    I think so.  I don't remember.

2     Q    And Tony was a Latin King.

3         THE COURT:  Would you please let him

4  finish his answer.  I have to write it down.

5         MS. HERIGODT:  I'm sorry, Judge.

6  BY THE WITNESS:

7     A    I said I can't remember.  I don't know.

8  BY MS. HERIGODT:

9     Q    Tony it was a Latin King?

10    A    Yes.  I believe so yes.

11    Q    You were drinking that night with Tony and

12  his friends, is that correct?

13    A    I don't remember all that.  I don't

14  remember.

15    Q    Let me show you and what I'm marking as

16  Defense's Exhibit No. 8.

17        THE COURT:  That's Defense Kuri No. 8,

18  correct?

19        MS. HERIGODT:  Thank you, Judge.

20        THE COURT:  You may approach the witness,

21  Ms. Herigodt.

22        MS. HERIGODT:  Thank you.

23        THE COURT:  Sir, sit up.

24        THE WITNESS:  All right.

RFC 003165

1  BY MS. HERIGODT:

2      Q    Mr. Russell, I'm showing you what I've

3  marked as Defense's Exhibit No. 8 for

4  identification, can you tell me what's in this

5  picture, sir?

6      A    It's a picture of a car.

7      Q    Is it Tony's van?

8      A    Yes.

9      Q    And you said you were sitting in the rear

10  seat of that van, is that correct?

11     A    Yes, ma'am.

12     Q    There were actually three rows of seats in

13  the van, is that correct?

14     A    Yes, ma'am.

15     Q    There was the front seat, correct?

16     A    Yes, ma'am.

17     Q    Middle seat, is that correct?

18     A    Yes, ma'am.

19     Q    And a third row of seats, correct?

20     A    Correct.

21     Q    And you were in that third row of seats,

22  is that correct?

23     A    Correct.

24     Q    You were on the driver's side in that

50

RFC 003166

1    third row of seats, is that correct?

2        A    Correct.

3        Q    And were you drinking from that bottle of

4    Vodka that's in that seat pocket there, third row

5    seat pocket?

6        A    I don't remember.

7            MS. MURTAUGH:  Objection.  Assumes facts

8    not in evidence.

9            THE COURT:  Well, it does assume a fact.

10   I don't know what in that bottle.  Sustained.

11   BY MS. HERIGODT:

12       Q    Do you see in Defense Kuri, Defendant Kuri

13   Exhibit Number 8 a bottle in a seat pocket?

14       A    Yes, I see a bottle.

15       Q    Can you tell what kind of bottle that is?

16       A    It's a Grey Goose bottle.

17       Q    And you can tell it's a Grey Goose bottle

18   because it's got a logo on it, right?

19       A    Yes, ma'am.

20       Q    Does that refresh your recollection as to

21   whether or not you were drinking that night?

22       A    I don't remember.  It could have been

23   there for days.

24       Q    Okay.  Now the van that were in had tinted

51

1    windows, isn't that correct?

2         A    Yes, ma'am.

3         Q    Showing you what I'm marking as Defense

4    Kuri No. 9.  Can you identify that photo?

5         A    Yes.  It's a van with a hole in the

6    window.

7         Q    Now, is that the van that you were in on

8    July 24?

9         A    It looks like it.

10        Q    And that was Tony's van, isn't that

11   correct?

12        A    Looks like it.

13        Q    And that picture shows that the windows of

14   the van are tinted, isn't that correct?

15        A    Yes, ma'am.

16        Q    Now, the window next to the middle seat on

17   the passenger's side is broken, isn't that correct?

18        A    Yes, ma'am.

19        Q    A big hole in it, is that correct?

20        A    Yes, ma'am.

21        Q    And then the window next to the rear seat

22   of the van is not broken, isn't that correct?

23        A    Say that again.

24        Q    The window next to the rear seat of the

52

1    van on the passenger's side is not broken?

2         A    Correct.

3         Q    Do the pictures that I've showed you,

4    Defendant Kuri's No. 8 and No. 9, truly showed the

5    van that you were in on the 24?

6         A    Looks like it.  But I'm not sure it's a

7    van but it looks like it.

8         Q    Now, you said that since you've been down

9    to the penitentiary, you've been having memory

10   problems, is that correct?

11        A    Correct.

12        Q    And why is that?

13        A    Because I was doing like some illegal

14   stuff in there.

15        Q    You were doing illegal drugs in the

16   penitentiary?

17        A    Yes, ma'am.

18        Q    And those what drugs were those?

19        A    We were making wine, and we were taking --

20   well, I was taking other people's prescription and

21   doing some stuff just to get certain stuff off my

22   mind.

23        Q    Okay.  What was the result of you doing

24   that?

53

1            MS. MURTAUGH: Objection.

2            THE COURT: Overruled.

3  BY THE WITNESS:

4     A   It will keep me off thinking about other

5  stuff and it will put me to sleep I can sleep my

6  time away really.

7  BY MS. HERIGODT:

8     Q   Okay. Did those substances that you took

9  affect your memory, is that what you were telling

10  us?

11     A   A little bit.

12     Q   Now, you remember being in that van, isn't

13  that correct?

14     A   Yeah.

15     Q   And you remember your friends being shot,

16  isn't that correct?

17     A   Yeah, I remember certain pieces of that

18  correct.

19     Q   Now, when you were in that van at the time

20  of the shooting, where were you?

21     A   I told you I was in the third row.

22     Q   Did you ever leave that third row?

23     A   I don't remember.

24     Q   You don't remember ever leaving the third

RFC 003170

1    row, is that correct?

2         A    Nah.

3         Q    Do you remember ever opening the door to

4    the van?

5         A    Nah.

6         Q    Do you remember ever shutting that door to

7    the van after opening it seconds before?

8         A    No.

9         Q    Now, Tony Fernandez was a good friend of

10   yours, is that correct?

11        A    Yes, ma'am.

12        Q    I think here you said that you've known

13   him five years but in the past you've said that

14   you've known him ten years, is that correct?

15             MS. MURTAUGH:  Objection.

16             THE COURT:  What's the basis of that, do

17   you have some documents?

18             MS. HERIGODT:  Yes.

19             THE COURT:  What do you mean in the past

20   he said that.  What does that mean?  If you want to

21   you challenge him on an ancillary matter like that,

22   Ms. Herigodt --

23             MS. HERIGODT:  I'll move on, Judge.

24

                                              55

1   BY MS. HERIGODT:

2       Q   You were still on the on the scene when

3   you police got there, is that correct?

4       A   Yes, I believe so.

5       Q   And at some point the police put you under

6   arrest, is that what you are telling us?

7       A   Yes, ma'am.

8       Q   And that night you talked to the police,

9   isn't that correct?

10      A   Yes, ma'am.

11          THE COURT:  I assume the date is the date

12  of the incident.

13          MS. HERIGODT:  Yes.

14          THE COURT:  Okay.

15  BY MS. HERIGODT:

16      Q   And the person that you talked to on the

17  July 24, 2009 was a detective by the name of Swedo,

18  do you remember that?

19      A   No, I don't remember that.

20      Q   And what you told Detective Swedo was that

21  you only heard five gunshots, isn't that correct?

22          MS. MURTAUGH:  Objection.

23          THE COURT:  Sustained.  He said he doesn't

24  remember talking to Swedo so he can't testify to

56

1    what he told him.

2          MS. HERIGODT:  Judge, I think I can try to

3    refresh his recollection by actually.

4          THE COURT:  Actually what?

5          MS. HERIGODT:  Presenting the actual

6    information that he gave to Detective Swedo.

7          THE COURT:  You asked the question in an

8    imprecised manner when you said do you remember

9    talking to Swedo.  Once he said no, you're finished

10   with further questions because he doesn't remember

11   speaking to him so when you then asked him if he

12   said this, this, and this, it's improper.  Move on.

13         MS. HERIGODT:  May I have a moment?

14         THE COURT:  Take your time.

15         MS. HERIGODT:  I have no further

16   questions.

17         THE COURT:  Any redirect based on cross,

18   Ms. Murtaugh?

19         MS. MURTAUGH:  No.

20         THE COURT:  All right.  Mr. Sheriff, you

21   may escort the witness.

22         State, how do you wish to proceed at this

23   time?

24         MS. MURTAUGH:  I talked to Mr. Krejci --

                                                57

RFC 003173

1   we do have stipulation but --

2           THE COURT:  Do those need to be worked

3   out?

4           MS. MURTAUGH:  Right.  And then there's

5   other witnesses that I need to call so I think we

6   can get it done on the next date.

7           THE COURT:  Based on his testimony if you

8   are not certain about the stipulations, and we are

9   going to go to another date anyway to finish the

10  State's case, why don't you get your stipulations

11  together so they're precise and you can discuss with

12  counsel and you can put those in on the next court

13  date.

14          Why don't you talk to Ms. Herigodt and Mr.

15  Krejci about the next court date and we can perhaps

16  move this case along.

17          What day is that?

18          MS. MURTAUGH:  June 7.

19          THE COURT:  Trial commenced and continued

20  June 7.  The ACC will be continued on that day on

21  Mr. Russell.  No bail to stand.  June 7.

22              (WHEREUPON, the above-entitled cause

23              was concluded.)

24

58

RFC 003174

```
 1          STATE OF ILLINOIS    )
                                 ) SS
 2          COUNTY OF COOK       )

 3

 4     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 5        CRIMINAL DEPARTMENT/CRIMINAL DIVISION

 6

 7              I, Gail Duff, an Official Court

 8   Reporter for the Circuit Court of Cook County,

 9   Criminal Department, do hereby certify that I

10   reported in shorthand the proceedings had at the

11   hearing of the above-entitled cause; that I

12   thereafter caused the foregoing to be transcribed

13   into typewriting, which I hereby certify to be a

14   true and correct transcript of the proceedings.

15

16          _____

17          Official Court Reporter

18              084-003875

19   Dated this 4th

20   of June 2012.

21

22

23

24
```

59

RFC 003175