IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ANTHONY KURI,                          )
(a/k/a Ramsey Qurash),                 )
                                       )
          Plaintiff,                   )
                                       )
   vs.                                 ) Case No. 1:13-1654
                                       )
THE CITY OF CHICAGO, DETECTIVES    )
SZWEDO, VALKNER, FOLINO,               )
McDERMOTT, KOLMAN, CORDARO,        )
FIGUEROA-MITCHELL, OFFICERS LOPEZ,)
SANCHEZ, and AS-YET UNKNOWN        )
CHICAGO POLICE DEPARTMENT MEMBERS,)
                                       )
          Defendants.                  )


        The deposition of DETECTIVE JOHN FOLINO, JR.,

taken before BETH SKLAR, Certified Shorthand Reporter

and Registered Professional Reporter, pursuant to the

provisions of the Illinois Code of Civil Procedure and

the Rules of the Supreme Court thereof pertaining to the

taking of depositions for the purpose of discovery at

Loevy & Loevy, 311 North Aberdeen Street, Chicago,

Illinois 60607, commencing at 10:03 a.m. on the 16th day

of March, 2015.


**Exhibit 14**

Page 46

Q. So the both of you who, I guess, provided the information which then was memorialized in this report?

A. That is correct, sir.

Q. So Officer or Detective Kolman was not involved in this one?

A. He was not.

Q. And it looks like the narrative on this one is on pages 8, 9 and 10, so if you want to quickly take a look at that.

A. I have it started on page 7, but I noted --

Q. Oh, is it 7? I'm sorry.

A. I'm on page 8 now for you.

Q. Okay. If you just wouldn't mind reviewing 8, 9 and 10, and then I'll ask you some questions.

A. Sure.

Eight, nine and ten are complete.

Q. So it says -- it looks like on August 1st, looking at page 8, August 1st at 2055 hours, you and Detective McDermott met with Mr. Fernandez; is that correct?

A. That is correct.

Q. And it says that you presented Mr. Fernandez with a series of data warehouse photographs. Do you see that?

Page 47

A.   Yes, sir.

Q.   And what are data warehouse photographs?

A.   Basically what it is, it's an IR image computer-generated, so data warehouse is the -- I hate to say it -- the warehouse that stores the data on the computer system, and that's probably the best way.  So you go in, access the CPD databank and pull out different images, place them into, you know, the format for a photo array and print.

Q.   And at the time that you -- strike that.

So did you -- you had that -- those photographs -- strike that too.

When did you gather those photographs?

A.   It would be on the 1st of August, 2009, just prior to 2055 hours.

Q.   Okay.  And how did you go about choosing photographs for purposes of showing them to Mr. Fernandez?

A.   The way it works is, if we are, you know, at this time focusing on a particular gang, we can pull up pictures from that gang, the computer then will conduct its own internal search looking for anyone with similar demographics:  Approximate height and weight, approximately, you know, skin tone, if we want tattoos

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ANTHONY KURI,                          )
(a/k/a Ramsey Qurash),                 )
                                       )
          Plaintiff,                   )
                                       )
  vs.                                  ) Case No. 1:13-1654
                                       )
THE CITY OF CHICAGO, DETECTIVES    )
SZWEDO, VALKNER, FOLINO,            )
McDERMOTT, KOLMAN, CORDARO,         )
FIGUEROA-MITCHELL, OFFICERS LOPEZ,)
SANCHEZ, and AS-YET UNKNOWN         )
CHICAGO POLICE DEPARTMENT MEMBERS,)
                                       )
          Defendants.                  )


          The deposition of DETECTIVE JOHN FOLINO, JR.,

taken before BETH SKLAR, Certified Shorthand Reporter

and Registered Professional Reporter, pursuant to the

provisions of the Illinois Code of Civil Procedure and

the Rules of the Supreme Court thereof pertaining to the

taking of depositions for the purpose of discovery at

Loevy & Loevy, 311 North Aberdeen Street, Chicago,

Illinois 60607, commencing at 10:03 a.m. on the 16th day

of March, 2015.

Page 46

Q. So the both of you who, I guess, provided the information which then was memorialized in this report?

A. That is correct, sir.

Q. So Officer or Detective Kolman was not involved in this one?

A. He was not.

Q. And it looks like the narrative on this one is on pages 8, 9 and 10, so if you want to quickly take a look at that.

A. I have it started on page 7, but I noted --

Q. Oh, is it 7? I'm sorry.

A. I'm on page 8 now for you.

Q. Okay. If you just wouldn't mind reviewing 8, 9 and 10, and then I'll ask you some questions.

A. Sure.

Eight, nine and ten are complete.

Q. So it says -- it looks like on August 1st, looking at page 8, August 1st at 2055 hours, you and Detective McDermott met with Mr. Fernandez; is that correct?

A. That is correct.

Q. And it says that you presented Mr. Fernandez with a series of data warehouse photographs. Do you see that?

Page 63

which he should be.

Q.   And then did Mr. Wilson -- I don't have copies of this, but did Mr. Wilson file a civil lawsuit against yourself and other Chicago police officers?

A.   Yes, sir.

Q.   And do you recall:  Did you give a deposition in connection with that lawsuit?

A.   I cannot recall.

Q.   Was that -- is this -- the Mr. Wilson lawsuit, is that the one that you mentioned earlier where you were deposed?

A.   It is not.  The earlier one was an officer-involved shooting.  I just did not recall that one.

Q.   Okay.  And was Mr. Wilson's, that was not an officer-involved shooting?

A.   It was specifically a homicide investigation.

Q.   And do you know how this lawsuit was resolved, "this lawsuit" being the Mr. Wilson lawsuit?

A.   I vaguely recall the city settling I believe for -- I can't recall what dollar amount, but providing Wilson or the attorney some sort of settlement.

Q.   And were you involved in the investigation of the murder which Mr. Wilson was I guess accused of, for

Page 86

At the meeting with Mr. Fernandez, who else was present? I should be more specific. The meeting with yourself and the State's Attorney and Mr. Fernandez, was anyone else present at that meeting?

A. I would say between my partner, Detective McDermott, and I were present at some point in the interview.

Q. Was Mr. -- did the meeting with Mr. Fernandez take place at the same time as the meeting with Mr. Rusell?

A. It would be very difficult for me to be at two places at one time, so no.

Q. So that's my next question. Did the meeting with the State's Attorney -- was there one meeting where you were present, perhaps your partner was present, and both Fernandez and Rusell were present?

A. No. There would never be a meeting with Fernandez and Rusell present with the State's Attorneys.

Q. So the meetings with the State's Attorney and those two individuals occurred separately?

A. That is correct.

Q. And do you know if you took Mr. Rusell to that meeting with the State's Attorney?

A. I cannot recall.

Page 87

Q.   If you picked up Mr. Rusell to go to that meeting with the State's Attorney, would that be memorialized somewhere?

A.   The meeting itself memorialized?

Q.   The fact that you were the one who took him to the meeting, if that in fact happened.

A.   I really don't have an answer for you.  I mean, each case is different.  I may have written it down, I may not have.  You pick people up, you don't pick them up.  If they need a ride, you give them a ride.  That's about the best way to sum it up.

Q.   And how about the same question, just to get it on the record, with respect to Mr. Fernandez?  If you in fact did pick up Mr. Fernandez to take him to the meeting with the State's Attorney, would the fact that you picked him up be memorialized in a report somewhere?

A.   Each case is different, and I'm not sure if it was in this one or not.

Q.   Prior -- you testified at the criminal trial of Mr. -- Messrs. Kuri and Gomez; is that correct?

A.   Yes, sir.  I did.

Q.   And did you meet with the State's Attorney prior to testifying at the trial?

A.   Yes, sir.

Page 92

Q.   Did you ask Mr. Wachaa if he knew Mr. Patel?

A.   I don't know specifically if I asked that question or if he was just familiar with the murder, if he heard anything that occurred with the murder on Central Park.

Q.   And did you ask Mr. Wachaa if he knew Mr. Rusell?

A.   At some point Mr. Rusell -- Mr. Rusell's name came up because Abdul Wachaa assisted us with speaking with him.

Q.   And did you ask Mr. Wachaa if he knew Mr. Fernandez?

A.   I can't recall.

Q.   When you met with Mr. Rusell the first time, had you ever heard the name Rowdy before?

A.   I have not.

Q.   And when you met with Mr. Rusell the first time, had you heard the name Little David before?

A.   I had not.

Q.   So the first time that you heard those names was during your meeting with Mr. Rusell on August 2, 2009?

A.   I believe that is correct.

Q.   And did you tell Mr. Wachaa to contact

Page 93

Mr. Rusell regarding the Patel murder?

A.   At some point in the investigation I asked him to see if he can talk with Mr. Rusell to, you know, persuade him to cooperate with the police in this investigation and do it for the victim's family.

Q.   And did you tell Mr. Wachaa anything regarding the -- any details regarding the investigation?

A.   I did not.

Q.   Did you tell Mr. Wachaa how many suspects were involved?

A.   I did not.

Q.   Did you tell Mr. Wachaa anything regarding a bicycle being involved in the murder?

A.   I did not.

Q.   And is Mr. Wachaa a gang member?  Well, was he at the time I should say.

MS. BENJAMIN:  Objection.  Foundation.

BY MR. FELDMAN:

Q.   To your knowledge.

A.   I can't recall if he was.

Q.   After Mr. Rusell identified Rowdy and Little David in the photo spreads which you had prepared, did you have any later contact with Mr. Wachaa regarding the Patel murder?

Page 94

A.   I believe I did.

Q.   And what happened there?

A.   I believe Mr. Wachaa provided transportation to Mr. Rusell to go down to the Grand Jury, and I had to be present at the Grand Jury so I believe that was the next contact that I recall.

Q.   So you saw -- it's your recollection you saw Mr. Wachaa at the location where the Grand Jury was convened?

A.   That is correct.

Q.   Did you talk to him there?

A.   Yes, I did.

Q.   And what did you talk about?

A.   I believe I said something as, "Thank you for providing transportation to Mr. Rusell to get down to the Grand Jury today."

Q.   But he told you or Mr. Wachaa told you that he had driven Mr. Rusell there?

A.   He did.  It may have even been requested by me.  He may have needed a ride.  I just -- I can't specifically recall, but I do recall the transportation being provided.  I just remember Mr. Wachaa had a van at the time.

Q.   You said that you may have requested him; is

Page 95

that correct?

A. That is correct.

Q. So you may have requested that Mr. Wachaa give Mr. Rusell a ride to the Grand Jury?

A. Correct.

Q. And so how did you reach him? How did reach Mr. Wachaa to arrange that?

A. I'm guessing, but I believe by phone.

Q. And do you recall if you documented Mr. Wachaa's part in the investigation in any of your reports?

MS. BENJAMIN: Object to form.

THE WITNESS: I don't recall.

BY MR. FELDMAN:

Q. Now, you've said that you've -- Mr. Wachaa has been of some help in subsequent investigations; is that correct?

A. Again, I remember -- I was telling you that I just can't recall if I assisted him prior to that one, but prior to today's date he's been involved in several investigations that I have had some role in.

Q. And you said Mr. Wachaa at some point was the victim of a shooting or an attempted shooting?

A. Well, they fired at him. They just missed

him.

Q.   So he wasn't injured?

A.   He was not physically injured.

Q.   Yes.

And do you recall or can you tell me what other cases in which Mr. Wachaa has helped your investigation?

A.   They are confidential Organized Crime Division investigations.

Q.   And so that's things that are currently ongoing?

A.   That is correct.

Q.   Apart from any current investigations -- excuse me -- current organized crime investigations, has Mr. Wachaa provided help to you in any investigations following the Patel homicide?

A.   Yes, sir.

Q.   And what investigations are those?

A.   Specifically the one where he was shot at.

Q.   Apart from the one that he was shot at and the ones which are currently ongoing, has Mr. Wachaa provided assistance to you in any other investigations?

A.   Nothing else that I can recall.

Q.   Why don't we take a few minutes here, if

Page 99

got in touch with Mr. Wachaa, you -- you instructed him to contact Mr. Rusell to see if he could get Mr. Rusell to cooperate in the investigation?

A. That's a fair response.

Q. Well, how would you say it?

A. Just asked him that, in so many words, "Get in and do the right thing."

Q. And that conversation with Mr. Wachaa took place prior to you meeting Zay Rusell on August 2, 2009?

MS. BENJAMIN: Could you read back that question?

(A portion of the record was read by the reporter.)

THE WITNESS: No, it did not.

BY MR. FELDMAN:

Q. So you had already met with Zay Rusell as of the time that you first had contact with Mr. Wachaa?

A. That is correct.

Q. And at that first meeting with Mr. Rusell he gave you the names of Rowdy and Little David?

A. That is correct.

Q. And did you physically meet with Mr. Wachaa during the course of the Patel investigation apart from the time where you said you saw him at the Grand Jury