IN RE:    JOHN DOE INVESTIGATION

GJ# AUG 245

BEFORE THE GRAND JURY OF COOK COUNTY

AUGUST, 2009

REPORT OF GRAND JURY PROCEEDINGS
on the 18th day of August, 2009, at the
Cook County Criminal Courts Building, 2600
South California Avenue, Chicago, Illinois
60608.

PRESENT:
HONORABLE ANITA ALVAREZ,
State's Attorney of Cook County, Illinois, by:
MS. KRISTA PETERSON:
appeared on behalf of the People
of the State of Illinois

WITNESS:

TONY FERNANDEZ

REPORTED BY:
HELEN M. HACKNEY
CERTIFIED SHORTHAND REPORTER
2650 SOUTH CALIFORNIA AVENUE
CHICAGO, ILLINOIS 60608
ILLINOIS CSR LICENSE NO. 084-001452

RFC 002969

THE FOREPERSON: Would you raise your right hand?

(Witness duly sworn.)

MS. PETERSON: I'm Assistant State's Attorney Krista Peterson of the Homicide Sex Unit. I'm appearing today on Grand Jury Number August 245, which is a John Doe investigation relating to the homicide of Gaurav Patel, which occurred on July 24th, 2009. We are not seeking an indictment at this time. The RD Number is HR 445323.

The Grand Jury does have the right to subpoena and question any person against whom the State's Attorney is seeking a Bill of Indictment, or any other person, and to obtain and examine any documents or transcripts relevant to the matter being prosecuted by the State's Attorney.

At this time I ask leave to call Tony Fernandez.

TONY FERNANDEZ, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY: MS. PETERSON:

Q. Tony, have you been sworn to tell the truth?

A. Yes, ma'am.

Q. Okay. You will have to keep your voice loud,

RFC 002970

okay?

A. Yes.

Q. All right. Tony, what is your full name?

A. Tony Fernandez.

Q. How old are you?

A. I'm 23.

Q. What is your date of birth?

A. March 9, '86.

Q. Were you born in Chicago?

A. Yes.

Q. Have you lived here your whole life?

A. Yes.

Q. Where do you live right now?

A. I am staying at a friend's house.

Q. And, what street is that located on?

A. It's Hamilton and Arthur.

Q. Okay. And, on July 24th, 2009, where were you living on that day?

A. Staying by my uncle's house, 4630 North Harding.

Q. Okay. Do you know someone whose name is Gaurav Patel?

A. Yes.

Q. Okay. Did you call him by another name?

A. (Nodding head.)

RFC 002971

Q. What name?

A. I called Habib.

Q. Habib?

A. Yes.

Q. Where did you meet him?

A. I met him at Computer Cafe.

Q. The Computer Cafe?

A. (Nodding head)

Q. Did he work there?

A. Yes.

Q. Okay. And, was that a couple months ago that you met him?

A. Yeah.

Q. Okay. Did you and he become friends?

A. Friends.

Q. Okay. Do you know someone by the name of Zae Russell?

A. Yes.

Q. And, how long have you known Zae?

A. Like ten years.

Q. Did you go to school with him?

A. We went to the same high school.

Q. Okay. What high school was that?

A. Roosevelt High School.

RFC 002972

Q.   Are you friends with Zae?

A.   Yes.

Q.   Okay.  On July 24th, 2009, were you hanging out with Zae and Habib?

A.   Yes.

Q.   Okay.  At some point did you decide to take Zae home?

A.   I did.

Q.   Okay.  And, what car, whose car were you driving in?

A.   We were in my van.

Q.   Your van?

A.   (Nodding head).

Q.   Who was driving?

A.   Patel.

Q.   Okay.  And, that's the person you said you call Habib?

A.   Habib.

Q.   And, where were you and Zae seated?

A.   I'm in the back.

Q.   In the back of the van?

A.   Back of the van.

Q.   Was anyone in the front passenger seat?

A.   No.

RFC 002973

Q.    When you got to Zae's house did Patel pull up in front of the house?

A.    Yes.

Q.    Okay.  And, is that at 4628 North Central Park?

A.    Correct.

Q.    What happened when Patel pulled the van over in front of Zae's house?

A.    We got -- we were getting shot at.

Q.    I'm sorry?

A.    We were getting shot at.

Q.    You were getting shot at?

A.    (Nodding head).

Q.    Did you see who was shooting at you?

A.    Yes.

Q.    Was there one person shooting or more than one?

A.    It was one.

Q.    Okay.  Was anyone with the person who was shooting at you?

A.    Yes.

Q.    Okay.  Did those -- when you first saw those two people was it just one person was the shooter?

A.    One person.

Q.    When you first saw those two people were they walking?

RFC 002974

A.    They had a bike, but I seen him when he was walking.  I was getting shot at when he was walking.

Q.    Okay.

A.    No, ma'am.  He was not on a bike, and he was just walking.  He jumped off the bike.

THE COURT REPORTER:  I can't hear what you're saying.

Q.    Tony, you have got to keep your voice up, okay? She has got to type what you're saying.  You got to speak loud enough so that she can hear what you're saying, okay?

A.    (No response)

Q.    All right?

A.    Yeah, yeah, yeah.

Q.    When you first saw the two people were they walking, or were they on a bike?

A.    Walking.

Q.    Okay.  Did you ever see them on a bike?

A.    No.

Q.    Okay.  When they were walking where did they walk to?

A.    They were walking towards the front of my -- Zae's crib -- house.

Q.    Okay.  And, that was where the van was parked in front of?

A.    Yeah.

Q. All right. Did Zae go try to get out of the van?

A. Right.

Q. And, when Zae tried to get out of the van what happened?

A. The other guy recognized him.

Q. Okay. When you say the other guy, who are you talking about?

A. I don't know his name.

Q. Okay.

A. The shooter.

Q. The shooter?

A. Yeah.

Q. And, how did you know? What made you think that he recognized Zae?

A. Because he started going in that book bag.

Q. He started going in his book bag?

A. Reaching in his little bag, yeah.

Q. Okay. And, did you see what the shooter got out of the bag?

A. No.

Q. I'm sorry?

A. No, nope.

Q. Okay. What happened next?

RFC 002976

A.    Hey, my voice yelling, "Go, go, go.  Get out of here".

Q.    Who was yelling?

A.    Zae.

Q.    Why was Zae yelling that?

A.    Because he noticed that something was wrong.

Q.    What happened then?

A.    I started hearing gunshots and my ears started ringing, and they were like almost bullets like passing me.

Q.    You saw bullets going past you?

A.    Yeah.

Q.    You were still in the van, right?

A.    Yes.

Q.    Did Zae ever get out of the van?

A.    No.

Q.    Did you see who was shooting the bullets that were going past you?

A.    Well, it was obvious because he was running up to us, came reaching, and I saw a gun.  All of a sudden I just heard ... it ain't like he -- almost like loaded already.

THE COURT REPORTER:  I can't hear you.

Q.    Tony, you have got to talk louder, okay?  What

RFC 002977

was loaded?

A.   The gun.

Q.   Okay.

A.   And, after that he just started shooting at us.

Q.   So, you saw him get a gun out of the bag and start shooting at you?

A.   Right.

Q.   Okay.  And, when that happened when you were seeing the bullets what did you say?

A.   I kept saying, "Leave, leave.  Let's get out of here.  Get out of here, you know"?

Q.   Okay.

A.   And, my boy, he couldn't move.

Q.   Now, when you say my boy, who are you talking about?

A.   Patel.

Q.   And, he couldn't move what?

A.   'Cause I didn't really know.  I figured then he was shot.  He had to have been shot.  I didn't know.

Q.   Okay.

A.   He just -- I can't move.  He just said, "I can't move.  I can't move.  I can't breathe."

Q.   Okay.  And, so what did you do once Patel said that he couldn't move?

RFC 002978

A.    Stood in front of the house not moving.  And, I -- he was like, "I can't move.  I can't move.  I can't go."  And, that's when I jumped up, got him off of my seat, and I got into the driver's -- almost jumped on my head like ....

Q.    I didn't hear the end of that.

A.    I jumped up to the driver seat and I took over.

Q.    You drove away?

A.    I think when I got up that's when I think he got me with the last shot in my leg.

Q.    So you were shot?

A.    Yes.

Q.    Where were you shot?

A.    Right here.

Q.    You're pointing to your right leg?

A.    Right leg, yeah.

Q.    And, right now you have that leg in a brace, right?

A.    (Nodding head).

Q.    Is that from being shot?

A.    From being shot.

Q.    Were you able to drive the van away?

A.    Yes.

Q.    Okay.  And, did you drive to Wilson to get help?

A. Right.

Q. Okay. And, then did you go by ambulance to Illinois Masonic Hospital?

A. Then, well, I passed out like two times. Then my boys had called the ambulance, and they say they took 30 minutes for the ambulance to get there. I woke up. It was only like two or three minutes for me, and they carried me to the ambulance, and I was in the hospital.

Q. Okay. And, you got out of the hospital on August 10th, right?

A. Right.

Q. That was a Monday?

A. Monday.

Q. Okay. While you were in the hospital did a state's attorney by the name of Ashley Moore and some Chicago Police officers come to talk to you?

A. Yes.

Q. Okay. And, did they show you a photo array?

A. Right. Correct.

Q. Did you recognize the person who shot at you in the photo array?

A. Yes, I did.

Q. Did you tell or point out that person to the state's attorney and the police?

RFC 002980

A. Correct.

Q. Okay. And, that was on August 2nd, 2009, they came to the hospital, correct?

A. Correct.

Q. All right. Did anyone tell you who to pick out of the photo array?

A. No.

Q. When you talked to the state's attorney and the police in the hospital did you tell them the same things you're telling the Grand Jury now?

A. Right. Yes, ma'am.

Q. Okay. And, when you spoke with them in the hospital were you on some medication for pain?

A. I was.

Q. Okay. Was it affecting your ability to remember what happened?

A. Nope.

Q. Okay, and today are you taking some medicine as well?

A. I am.

Q. What type of medicine are you taking today?

A. I'm taking pain killers.

Q. Okay. That was what the doctors at the hospital prescribed for you?

A. Prescribed.

Q. Is it called Norco?

A. Norco.

Q. And, is that affecting your ability to remember this incident?

A. No.

Q. Okay. Now, the state's attorney and the police that came to the hospital, did they treat you okay?

A. Yeah.

Q. Did they threaten you or promise you anything to get you to talk to them?

A. No.

Q. And, when you came to this building today to talk to me, did anyone force you or threaten you to come to this building?

A. No.

Q. Did anyone force you or threaten you to talk to me?

A. No.

Q. And, you told me the same things that you're telling the Grand Jury right now, correct?

A. Correct.

Q. Is what you're telling the Grand Jury the truth, Tony?

RFC 002982

A.    Yeah.

Q.    Okay.  Other than the medication that you're taking are you under the influence of any other drugs or alcohol today?

A.    No.

Q.    You had some misdemeanor cases; a criminal trespassing and disorderly conduct, in Branch 23, right?

A.    Right.

Q.    Those were dropped on August 14th?

A.    Right.

Q.    Did anyone promise you anything about those cases in order to get you to cooperate in this case?

A.    No.

Q.    Tony, I'm showing you what's marked Grand Jury Exhibit Number One.  Do you recognize the person in that picture?

A.    Yes.

Q.    Who is this?

A.    My friend, Zae.

Q.    Okay.  Can you sign your name on Grand Jury Exhibit Number One?

                    (Indicating

            This is Grand Jury Exhibit Number Two.  Do you recognize the person in that picture?

A.    Yes.

Q.    Who is that?

A.    Accomplist.

Q.    When you say accomplist, what do you mean by that?

A.    Partner in crime.

Q.    Okay.   Was he with the person that shot at you?

A.    Yes.

Q.    Okay.   Can you sign your name on Grand Jury Exhibit Number Two?

(Indicating)

Q.    I'm showing you what's been marked as Grand Jury Exhibit Number Three.   Do you recognize the person in that picture?

A.    Um-humm.

Q.    You have to answer out loud.

A.    Yes.

Q.    Okay.   And, who is that person?

A.    Shooter.

Q.    That's the person who shot at you?

A.    Um-humm.   Yes, ma'am.

Q.    Please sign your name on Grand Jury Exhibit Number Three.

(Indicating).

RFC 002984

I have no further questions for Tony.  Do any members of the Grand Jury have any questions for him?

(No response)

(Witness excused.)

(Investigation continues)

RFC 002985

STATE OF ILLINOIS)
                  ) SS:
COUNTY OF C O O K)


          I, HELEN M. HACKNEY, a licensed Shorthand Court Reporter in the State of Illinois, do hereby certify that I reported in shorthand the hearing of the aforementioned cause before the Grand Jury of Cook County, Illinois; that I thereafter caused the foregoing to be transcribed into typewriting, which I hereby certify to be a true and accurate transcript of the proceedings had.

                         _____

                         Helen M. Hackney
                         Certified Shorthand Reporter
                         License No. 084-001452

RFC 002986