**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTHONY KURI (a.k.a. Ramsey Qurash), | ) |
| Plaintiff, | ) |
| | ) Case No. 13 C 1653 |
| v. | ) |
| CITY OF CHICAGO, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On March 12, 2013, Plaintiff Anthony Kuri filed a First Amended Complaint alleging violations of his constitutional rights, along with supplemental state law claims, against Defendants City of Chicago and individual Chicago Police Officers.[1] After the parties conducted fact discovery and briefed the individual Defendant Officers' motion for summary judgment, the Executive Committee for the Northern District of Illinois reassigned this lawsuit to the Court on October 16, 2017. Before the Court is Defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56(a).

For the following reasons, the Court grants in part and denies in part Defendants' motion. The Court grants Defendants' motion in relation to Defendant Officers Thomas Kolman, Noe Sanchez, and Carmen Lopez due to their lack of involvement in the alleged constitutional violations and malicious prosecution. Otherwise, the Court denies the remainder of Defendants'

---

[1] On November 24, 2014, the court granted Defendant City of Chicago's unopposed motion to bifurcate the *Monell* claims and stay *Monell* discovery. (R. 86.) Also, Plaintiff voluntarily dismisses individual police officers Robert Cordaro, Tina Figueroa-Mitchell, Frank Szwedo, and John Valkner. (R. 187, Pl.'s Resp. Brief, at 39.) The Court hereby dismisses these Defendants from this lawsuit.

summary judgment motion. As such, the remaining individual Defendant Officers in this lawsuit are Defendant Officers John Folino, Jr. and Timothy McDermott.

## BACKGROUND

Plaintiff Anthony Kuri's present lawsuit stems from his arrest and prosecution for a shooting that occurred in July 2009 on the 4600 block of North Central Park Avenue in Chicago, Illinois. More specifically, just before midnight on July 23, 2009, a group of friends in their teens and twenties – some of whom were Latin Kings – were driving around in Tony Fernandez's mini-van. (R. 169, Defs.' Rule 56.1 Stmt. Facts ¶ 4; R. 181, Pl.'s Rule 56.1 Stmt. Facts ¶¶ 2, 3.)[2] In the early hours of July 24, 2009, the driver of the mini-van, Guarav Patel, drove the vehicle to the 4600 block of North Central Park Avenue to drop off passenger Zay Russell at his home. (Defs.' Stmt. Facts ¶ 5.) At that time, there were only three individuals left in the mini-van, namely, Patel, Russell, and Fernandez. (*Id*. ¶¶ 5, 8; Pl.'s Stmt. Facts ¶ 25.) As Russell began to exit the mini-van, someone started shooting at the vehicle hitting Patel in the neck and Fernandez in the leg. (Defs.' Stmt. Facts ¶ 6; Pl.'s Stmt. Facts ¶¶ 6, 7.) Fernandez then took control of the mini-van and drove to Wilson Avenue, after which he and Russell got out and summoned help. (Defs.' Stmt. Facts ¶ 7, Pl.'s Stmt. Facts ¶¶ 7, 8.) An ambulance took Patel and Fernandez to Illinois Masonic Hospital where Patel was pronounced dead. (Defs.' Stmt. Facts ¶ 8; Pl.'s Stmt. Facts ¶ 8.) Both Fernandez and Russell survived the shooting. (Defs.' Stmt. Facts ¶ 8.)

Chicago police detectives processed the crime scene where they found a Huffy brand bicycle. (Pl.'s Stmt. Facts ¶ 20.) The bicycle was processed for fingerprints and DNA testing,

---

[2] The Court considered Defendants' Northern District of Illinois Local Rule 56.1 arguments within the context of each challenged fact.

which excluded Plaintiff as having contributed to the DNA on the bike. (*Id.* ¶¶ 20, 49.) It is undisputed that no forensic evidence collected at the crime scene implicated Plaintiff in any respect. (*Id*. ¶ 49.)

On either July 24 or 25, 2009, Defendant Detectives Timothy McDermott and John Folino were assigned to investigate the shooting. (*Id*. ¶ 13.) Initially, they reviewed the paperwork of the shooting, including General Progress Reports ("GPRs") and other case reports. (*Id*.) According to the July 24 GPR (and August 4 Supplementary Report), on the night of the shooting, Russell told Defendants McDermott and Folino that he had been driving around in a van with Fernandez, Patel, and two Latin Kings. (Pl.'s Stmt. Facts ¶ 14.) Russell further stated that about a half an hour before the shooting, two Spanish Cobra gang members, nicknamed Chino and Funk, tried to start a fight with the individuals in the mini-van. (*Id*.) The police reports further indicate that after the shooting, Russell told the police officers that two unknown male Hispanics riding bikes approached the mini-van and yelled "King Killer." (*Id*. ¶ 15.) The August 4, 2009 Supplemental Report about Russell's initial interview stated that "Russell may be able to recognize the offenders in the future," but he "could not add any additional information at this time." (*Id*. ¶ 27.) There is also evidence in the record that Russell knew Plaintiff since they were young and that Fernandez "knew of" Plaintiff prior to the shooting. (*Id*. ¶ 11.) Both Russell and Fernandez saw the shooter on July 24, 2009 and initially told the police that they did not know who the shooter was. (*Id*. ¶ 9.)

Meanwhile, Defendant Officers McDermott and Folino gathered information indicating that Spanish Cobras were a problem in the area of the shooting, and, in an attempt to identify the perpetrators, the detectives generated photo arrays to show witnesses. (Defs.' Stmt. Facts ¶ 13.) On August 1, 2009, Defendants McDermott and Folino went to the hospital to interview

3

Fernandez. (Defs.' Stmt. Facts ¶ 14; Pl.'s Stmt. Facts ¶ 17.) At that time, Defendant Officers brought photo arrays of Spanish Cobra gang members, after which Fernandez told the officers that the offenders were not in the photo arrays. (Defs.' Stmt. Facts ¶ 14; Pl.'s Stmt. Facts ¶ 17.) According to police reports, Fernandez told the detectives that he would be able to identify the two offenders and that he was willing to cooperate with the investigation. (Defs.' Stmt. Facts. ¶ 14; Pl.'s Stmt. Facts ¶¶ 17, 27, 29.)

On August 2, 2009, Defendants McDermott and Folino went to Russell's home to re-interview him about the shooting. (Defs.' Stmt. Facts ¶ 15.) Defendants maintain that Russell told them "Little David" and "Rowdy" were the offenders. (*Id*.) Defendant Officers then learned that "Little David" was David Gomez and "Rowdy" was Plaintiff Anthony Kuri. (*Id*. ¶ 16.) According to Russell's testimony at Plaintiff's criminal trial, however, when Defendant Detectives were interviewing him, the detectives told him they already knew who committed the crime. (Pl.'s Stmt. Facts ¶¶ 34, 35.)[3] Russell further testified that he picked out Gomez and Kuri from photo arrays because the officers said "if I was to say that it was them then that they was going to give Tony Fernandez money for being a victim of a crime. So they told me to really just help Tony out." (*Id*. ¶¶ 34, 35; R. 182-3, Russell Trial Tr., at 45; Defs.' Stmt. Facts ¶ 48.) Also at Plaintiff's criminal trial, Russell testified that he did not make an identification of the offenders from the photo arrays because the "police officer already told me who they were." (Russell Trial Tr., at 30.)

---

[3] Despite Defendants' argument to the contrary, Russell's and Fernandez's testimony at Plaintiff's criminal trial is not hearsay because if they are called to testify at trial in this lawsuit, there earlier sworn statements would be admissible as prior statements by a witness. *See* Fed.R.Evid. 801(d)(1)(B); *Whitlock v. Brueggemann*, 682 F.3d 567, 575 (7th Cir. 2012); *see, e.g., Hampton v. City of Chicago,* No. 12-CV-5650, 2017 WL 2985743, at *15 (N.D. Ill. July 13, 2017). In fact, Defendants also cite Russell's testimony, as well as other witness testimony from the 2012 trial, in their Rule 56.1 Statement of Facts. (Def. Stmt. Facts ¶¶ 7-9, 12, 14, 15, 17, 34.)

4

Officers McDermott and Folino returned to the hospital to interview Fernandez on August 2, 2009. (Defs.' Stmt. Facts ¶ 17.) Defendants maintain that at that time Fernandez picked Kuri from a photo array as being involved in the shooting. (*Id.*) At Kuri's criminal trial, however, Fernandez testified that he did not tell the police that Kuri was at the scene of the shooting. (Pl.'s Stmt. Facts ¶ 40.) In addition, Fernandez testified at his deposition in this lawsuit that the Defendant Officers showed him photographs of Kuri and Gomez and that these photos were already circled. (*Id.*; R. 182-2, Fernandez Dep., at 120-21.)

According to a handwritten police report that was later entered into the CPD system on August 3, 2009, Chicago police officers received information from an individual in custody named Abdul Wachaa. (Defs.' Stmt. ¶ 19.) The handwritten report indicated that Wachaa told police Russell had called him after the shooting and told him that Kuri and Gomez were the offenders involved in the shooting. (*Id.*; Pl.'s Stmt. Facts ¶ 32.) Wachaa's "tip" was memorialized as follows:

> Offender [Wachaa] related 20 minutes before he arrived on scene he was on the cell phone with Zay Russell who was yelling and scared and told offender, Abdul, Abdul [Wachaa], Joe these niggas are trying to kill me, Lil David [Gomez] and Rowdy [Kuri] are in front of my house. They killed Indian Dude [Patel], and they shot TC [Fernandez] and dude in the neck three times, Rowdy was on the bike and Lil David was on the pegs, and Lil David jumped off the pegs and started shooting." Offender [Wachaa] further related that he heard Zay Russell yelling at Indian Dude drive off or I'm going to slap you.

(Pl.'s Stmt. Facts ¶ 32.) At his deposition in this lawsuit, Defendant Folino testified that when he later interviewed Wachaa, he learned that the information Wachaa had provided was not firsthand information, but information Wachaa had heard on the street. (*Id.* ¶ 51; 182-14, Folino Dep., at 96; Defs.' Stmt. Facts ¶ 24.) There was no indication in any police report that Defendants corroborated Wachaa's story. (Pl.'s Stmt. Facts ¶ 47; Defs.' Stmt. Facts ¶ 24.)

5

After August 3, 2009, Defendants McDermott and Folino issued investigative alerts for both Kuri and Gomez, and, on August 5, 2009, Chicago police arrested Kuri. (Defs.' Stmt. Facts ¶ 21; Pl.'s Stmt. Facts ¶ 52.) Defendants McDermott and Folino then interviewed Kuri at which time he denied knowledge or involvement in the shooting. (Defs.' Stmt. Facts ¶ 21; Pl.'s Stmt. Facts ¶ 52.) Also on August 5, 2009, Kuri voluntarily took a polygraph test. (Defs.' Stmt. Facts ¶ 22; Pl.'s Stmt. Facts ¶ 53.) The police officer who administered the polygraph test stated at her deposition that Kuri was not deceptive when answering certain questions, but that the test indicated Kuri was deceptive when answering question number 5. (Defs.' Stmt. Facts ¶ 22; Pl.'s Stmt. Facts ¶ 53; R. 169-2, Figueroa-Mitchell Dep, at 47; R. 182-32, Figueroa-Mitchell Dep., at 100-01.) Question number 5 asked – "Did you ride a bike to that van that the Indian kid was sitting in?" (Figueroa-Mitchell Dep, at 75.)

After Kuri completed the polygraph examination on August 5, 2009, the police officers allowed him to go home. (Pl.'s Stmt. Facts ¶ 54.) On August 8, 2009, Russell went to the police station and viewed a lineup, after which he gave a statement implicating Kuri and Gomez. (Defs.' Stmt. Facts ¶ 26.) On September 11, 2009, Kuri was charged with First Degree Murder based on an accountability theory. (Pl.'s Stmt. Facts ¶ 55; Defs.' Stmt. Facts ¶ 31.) On September 25, 2009, Defendant Folino testified in front of the grand jury that eyewitnesses in this case told the police that (1) Kuri was riding a bike and Gomez was riding on the back pegs of the bike; and (2) when Kuri stopped, Gomez pointed a gun and fired at the mini-van. (Pl.'s Stmt. Facts ¶ 56; R. 182-26, Grand Jury Tr., at 5-6.) Evidence in the record, however, shows that the Huffy bike recovered from the scene of the shooting did not have back pegs. (Pl.'s Stmt. Facts ¶ 48.)

6

Further, Fernandez testified in front of the grand jury stating that he identified both Gomez and Kuri from photo arrays. (Defs.' Stmt. Facts ¶¶ 55, 56.) Moreover, although Russell also testified in the grand jury that he identified Gomez and Kuri from photo arrays, at the 2012 criminal trial, Russell stated that he lied to the grand jury to help Fernandez get money for being the victim of a crime. (Defs.' Stmt. Facts ¶¶ 43, 49.) On October 2, 2009, a grand jury indictment charged Gomez and Kuri with First Degree Murder. (Defs.' Stmt. Facts ¶ 32.) Police then took Kuri into custody, after which he was detained at the Cook County Jail for approximately three years before his criminal trial in the Circuit Court of Cook County. (Pl.'s Stmt. Facts ¶ 57.)

A Circuit Court of Cook County Judge held a bench trial on three separate dates between March and June 2012. (*Id.* ¶ 58; Defs.' Stmt. Facts ¶ 34.) Defendant Folino testified at the criminal trial that Russell provided the detectives the nicknames for Gomez and Kuri and that both Russell and Fernandez picked Gomez and Kuri out of photo arrays. (Pl.'s Stmt. Facts ¶ 59.) On the other hand, both Russell and Fernandez disputed that they made positive identifications of Gomez and Kuri. (*Id.* ¶¶ 60, 61.) The trial judge acquitted Gomez and Kuri on all counts and then ordered Kuri released from custody. (Pl.'s Stmt. Facts ¶¶ 63, 64; Defs.' Stmt. Facts ¶ 74.)

**LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment

motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson*, 477 U.S. at 255 (quotation omitted). "To survive summary judgment, the nonmoving party must show evidence sufficient to establish every element that is essential to its claim and for which it will bear the burden of proof at trial." *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 591 (7th Cir. 2016) (citations omitted).

## ANALYSIS

### I. Due Process Fabricated Evidence Claim

Defendants argue that because the court dismissed Plaintiff's fabricated evidence claim on January 10, 2014 – concluding that the claim was not cognizable under then current Seventh Circuit law – Plaintiff cannot bring any such claim despite significant changes in Seventh Circuit precedent. The Court disagrees because "Rule 54(b) provides that non-final orders may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities," *Galvan v. Norberg,* 678 F.3d 581, 587 (7th Cir. 2012), and Seventh Circuit case law in relation to fabricated evidence claims has significantly evolved over the last three years.[4] In 2016, for example, the Seventh Circuit unequivocally explained that "[a]llegations of evidence fabrication may state a colorable due-process claim in the wake of our decisions in

---

[4] Because the Court has yet to set a trial date, Defendants are not prejudiced by the reinstatement of Plaintiff's fabricated evidence claim, especially because the parties have conducted extensive fact discovery regarding Plaintiff's due process fair trial rights.

8

*Whitlock* and *Fields II*." Bianchi v. McQueen, 818 F.3d 309, 319 (7th Cir. 2016); *see also Avery v. City of Milwaukee,* 847 F.3d 433, 439 (7th Cir. 2017) (relevant inquiry is "whether the officers 'created evidence that *they knew to be false*.'") (quotation omitted) (emphasis in original). To clarify, "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way." *Saunders-El v. Rohde*, 778 F.3d 556, 560 (7th Cir. 2015) (quoting *Whitlock v. Brueggemann,* 682 F.3d 567, 580 (7th Cir. 2012)); *see also Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) (*Fields II*).

Because Kuri was acquitted after his bench trial, he seeks damages based on the approximately three years he spent as a pretrial detainee at the Cook County Jail. As the *Bianchi* decision instructs "an act of evidence fabrication doesn't implicate due process rights *unless* the fabricated evidence 'is later used to deprive the [criminal] defendant of her liberty in some way.'" *Id*. at 319 (emphasis in original) (quoting *Whitlock,* 682 F.3d at 580). Thus, if a § 1983 plaintiff is released on bond following his arrest and then acquitted at trial, the fabricated evidence did not deprive the plaintiff of his liberty interest because he was neither detained nor incarcerated. *See Cairel v. Alderden,* 821 F.3d 823, 831 (7th Cir. 2016); *Saunders-El,* 778 F.3d at 561. On the other hand, in *Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012), the Seventh Circuit "endorsed the proposition that a due process claim will lie where a plaintiff spent months in pretrial custody after bail was revoked on account of fabricated evidence." *Myvett v. Chicago Police Detective Edward Heerdt,* 232 F. Supp. 3d 1005, 1017 (N.D. Ill. 2017). Based on *Alexander*, the *Myvett* court concluded "the accused does not need to be tried and convicted for a deprivation to occur, something short of a conviction – such as pretrial detention – is sufficient." *Id.* at 1019. Seventh Circuit precedent supports the *Myvett* court's conclusion. In particular, the

9

*Armstrong* decision teaches "[t]hough the most common liberty deprivation cases are based on post-trial incarceration after a wrongful conviction, the essential elements of this constitutional claim are more general and not limited to wrongful convictions." 786 F.3d at 551. In *Fields II,* the court concluded that "the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him." 740 F.3d at 1112; *see also Sumling v. Vill. of E. Dundee,* No. 14 C 3794, 2015 WL 5545294, at *3 (N.D. Ill. Sept. 18, 2015) ("The Seventh Circuit has held that due process claims encompass both pretrial and post-trial deprivations of liberty") (citing *Armstrong*, 786 F.3d at 531-32).

Here, Kuri's theory of liability is that Defendant Officers fabricated and falsified evidence by affirmatively telling the two eyewitnesses, Russell and Fernandez, who they should identify as the perpetrators of the shooting. Viewing the evidence and all reasonable inferences in Kuri's favor – as the Court is required to do at this procedural posture – he has presented evidence raising triable issues of material fact that Defendant Officers convinced Russell to implicate Kuri. Evidence indicates that Russell could not identify the shooter when police officers initially interviewed him and that he had known Kuri since they were young. Yet, at the follow-up interview on August 2, 2009, Defendant Officers maintain that Russell implicated Kuri, even though Russell later testified that he did not make an identification of Kuri or Gomez because "the police officer already told me who they were." As to Fernandez, at his initial interview at the hospital, he told the officers that the offenders were not in the photo arrays they showed him. When the detectives returned to the hospital the next day, the officers contend that Fernandez identified Kuri from a photo array – yet Fernandez later testified that the detectives showed him photo arrays where Kuri's and Gomez's photographs had already been circled.

Moreover, Defendants' version of facts, including Detective Folino's grand jury testimony that Kuri was riding a bike and Gomez was riding on the back pegs of the bike before the shooting, was similar to the facts that the informant Wachaa provided, but it is undisputed that Defendants were unable to corroborate Wachaa's tip. Rather, Defendant Detectives later found out that Wachaa had not talked to Russell after the shooting and that Wachaa had heard this information on the street.

Defendants, on the other hand, point to Russell's and Fernandez's numerous inconsistent statements made through the course of the investigation, to the grand jury, and at Kuri's criminal trial in support of their motion. Not only are these inconsistencies part of Kuri's theory of liability, but Defendants are suggesting that the Court make credibility determinations, which is not the Court's role at summary judgment. *Estate of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017) ("district court's obligation at summary judgment to consider the evidence in the light most favorable to [plaintiff] and to refrain from making credibility determinations"). Weighing Russell's and Fernandez's credibility will be a question for the jury. *Baines v. Walgreen Co.*, 863 F.3d 656, 663 (7th Cir. 2017).

Accordingly, Kuri has presented sufficient evidence raising material issues of fact for trial that Defendant Officers fabricated evidence that caused the deprivation of his due process liberty interest, namely, the three years of pretrial detention at the Cook County Jail. The Court therefore denies Defendants' summary judgment motion in this respect.

## II. Due Process Brady Claim

Next, Kuri alleges that Defendant Officers violated his Fourteenth Amendment due process rights to a fair trial by deliberately withholding exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Saunders-El,* 778

11

F.3d at 561 ("A criminal defendant's *Brady* right is one that 'the Constitution provides as part of its basic 'fair trial' guarantee.'") (quotation omitted). The *Brady* duty to disclose applies to police officers. *See Youngblood v. W. Virginia*, 547 U.S. 867, 869-70, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (per curiam). "To prevail on a *Brady* claim for an officer's failure to disclose evidence, a plaintiff must show that (1) the evidence was favorable to him; (2) the officer concealed the evidence; and (3) the concealment prejudiced him." *Gill v. City of Milwaukee,* 850 F.3d 335, 343 (7th Cir. 2017). "Prejudice requires proof that the failure to disclose caused a deprivation of the accused's liberty." *Id*. (quoting *Cairel*, 821 F.3d at 832).

In their summary judgment motion, Defendants argue that Kuri's acquittal precludes his *Brady* claim. Defendants' argument contradicts established Seventh Circuit case law because "the key to a civil *Brady* claim is not a conviction or acquittal but a deprivation of liberty." *Cairel,* 821 F.3d at 833. Accordingly, under circumstances "where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction." *Id*.; *see also Armstrong*, 786 F.3d at 553 (*Brady* claim actionable if "the plaintiff shows 'that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment.'") (quoting *Mosley v. City of Chicago,* 614 F.3d 391, 397 (7th Cir. 2010)); *see, e.g., Fields v. City of Chicago*, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017) ("Unlike a defendant who is released after his arrest and is later acquitted, Fields was deprived of his liberty; he was held in custody from 1984 through 2003.").

In his response brief, Kuri asserts that Defendant Officers failed to disclose exculpatory evidence, namely, that they knowingly manipulated and fabricated the eyewitnesses' statements. *See Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (police officers' "liability is under the due process clause because they concealed exculpatory evidence – the details of how they induced the witnesses to finger" the criminal defendant). As discussed directly above, construing the facts and all reasonable inferences in Kuri's favor, he has presented evidence that Defendant Officers fabricated evidence causing the deprivation of his due process liberty interest. Moreover, outside of Fernandez's and Russell's eyewitness accounts, there was no other evidence, physical or otherwise, implicating Kuri in the shooting except Wachaa's unsubstantiated "tip." Furthermore, the Court can draw a reasonable inference from the evidence in the record, including Defendant Folino's testimony in front of the grand jury, that the prosecutors relied upon Defendant Officers' version of the facts when deciding to prosecute Kuri for the July 24, 2009 shooting. In sum, Kuri has presented sufficient evidence creating genuine issues of material fact for trial that Defendant Officers concealed evidence that Fernandez and Russell did not identify Kuri without the alleged manipulation and that this concealment prejudiced Kuri because he was detained at the Cook County Jail for approximately three years before his trial. *See Cairel,* 821 F.3d at 832 ("Prejudice requires proof that the failure to disclose caused a deprivation of the accused's liberty").

Nevertheless, Defendant Officers argue that Kuri cannot maintain his *Brady* claim because Kuri knew Russell and Fernandez could not identify him prior to his criminal trial. Defendants Officers' argument is without merit because even if Kuri knew that Russell's and Fernandez's identifications were false, there is no indication from the record that Kuri knew that the Defendant Officers used "pressure tactics and inducements" to obtain these false statements.

13

*See Avery,* 847 F.3d at 443. Defendant Officers also contend that Kuri made use of the alleged exculpatory evidence at his criminal trial because Russell testified that the police promised to give Fernandez money for being a crime victim in exchange for Russell's identification of Kuri. Although Russell testified as such at the criminal trial, Kuri's theory of liability is not based on this one factor, but rather concerns Defendant Officers' alleged manipulation and fabrication of the eyewitness identifications and Defendant Officers' failure to inform the prosecution as such. Therefore, the Court denies this aspect of Defendants' summary judgment motion.

**III.   Malicious Prosecution Claims**

Kuri brings malicious prosecution claims under both Illinois tort law and the Fourth Amendment. To establish the tort of malicious prosecution under Illinois law, a plaintiff must show the following elements: "(1) commencement or continuation of an original proceeding; (2) termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause; (4) malice; and (5) damages." *Cairel,* 821 F.3d at 834; *see also Swick v. Liautaud,* 169 Ill.2d 504, 215 Ill.Dec. 98, 662 N.E.2d 1238, 1242 (1996). "The failure to establish any one element bars recovery." *Cairel,* 821 F.3d at 834. Likewise, to bring a claim of malicious prosecution under the Fourth Amendment per *Manuel v. City of Joliet, Ill.,* 137 S.Ct. 911 (2017), courts have set forth the following elements: "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Hernandez-Cuevas v. Taylor,* 723 F.3d 91, 101 (1st Cir. 2013) (citation omitted); *Blocker v. City of Chicago,* No. 17 CV 00055, 2017 WL 3278323, at *4 (N.D. Ill. Aug. 2, 2017) ("prolonged pretrial detention without probable cause (including a judicial finding of probable cause based solely on false evidence supplied by police officers), violates the Fourth Amendment.").

14

Defendants first argue that Kuri has failed to present evidence of the absence of probable cause. In the context of malicious prosecution claims, Illinois courts define probable cause as "a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Cairel,* 821 F.3d at 834 (citation omitted). "For purposes of a malicious prosecution claim, the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest." *Holland v. City of Chicago,* 643 F.3d 248, 254 (7th Cir. 2011). If there is a disagreement about the relevant facts supporting probable cause, courts "adopt[ ] the plaintiff's version of the disputed facts for which there is some support in the record." *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001) (internal quotation marks omitted); *see also Jimenez v. City of Chicago,* 830 F. Supp. 2d 432, 450 (N.D. Ill. 2011).

In their motion, Defendant Officers assert that Russell's statement to the grand jury, along with his videotaped statement made to the Cook County Assistant State's Attorney, conclusively establishes probable cause. In response, Kuri contends that Defendants cannot manufacture their own probable cause by fabricating evidence and manipulating eyewitnesses to implicate him in the shooting. The Court agrees. *See Myvett,* 232 F. Supp. 3d at 1027 (fabricated witness statements insufficient to establish probable cause); *Ruiz-Cortez v. City of Chicago,* No. 11 C 1420, 2016 WL 6270768, at *21 (N.D. Ill. Oct. 26, 2016) (police cannot "defeat a malicious prosecution claim" at summary judgment if there is a "genuine dispute of material fact as to whether [police] fabricated evidence or withheld *Brady* materials after the arrest"); *Fields v. City of Chicago,* No. 10 C 1168, 2014 WL 477394, at *13 (N.D. Ill. Feb. 6, 2014) ("the presence (again, the Court stresses, not yet proven) of deliberately fabricated

15

statements by witnesses would be sufficient to permit a reasonable jury to conclude there was no probable cause").

Nonetheless, Defendants point to other evidence in the record to support their argument that probable cause existed to prosecute Kuri for murder, such as Kuri's polygraph test results – even though under Illinois law "polygraph examinations may not be utilized in a determination of probable cause." *Lyons v. Vill. of Woodridge*, No. 08 C 5063, 2011 WL 2292299, at *10 (N.D. Ill. June 8, 2011) (quoting *People v. Allen,* 620 N.E.2d 1105, 1114 (1st Dist. 1993)); *see also People v. Taylor*, 101 Ill. 2d 377, 391 (1984) ("Lie detector tests are inadmissible in Illinois to prove either guilt or innocence"). In any event, evidence in the record indicates that many of Kuri's answers during his polygraph testing were not deceptive, calling into question Defendants' argument in the first instance. Likewise, Defendants' reliance on the Wachaa tip to establish probable cause fares no better because it is undisputed that Wachaa did not have firsthand knowledge of the shooting, but rather told police information that he had heard on the street. Last, Defendants assert that Kuri's alibi witnesses denied they were with him at the time of the shooting. This fact is hotly contested, and at this stage of the proceedings, the Court must view the facts in Kuri's favor. Further, as discussed above, Defendant Officers' arguments concerning Russell's credibility are best left for the jury. Thus, Kuri has set forth sufficient evidence establishing a triable issue in relation to the absence of probable cause.

Next, Defendant Officers argue that Kuri's acquittal is not indicative of his innocence based on what the Circuit Court Judge said at the end of Kuri's criminal bench trial. In other words, although the Seventh Circuit has held that "an acquittal is clearly sufficient to show favorable termination," *see Logan,* 246 F.3d at 926, Defendant Officers contend that the Court should look to the reasoning behind the acquittal – relying on a seminal Illinois malicious

prosecution case where the prosecution was nolle prossed.[5] *See Swick,* 169 Ill.2d at 513-14 ("Only when a plaintiff establishes that the nolle prosequi was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof. The circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution."). Defendants, however, fail to cite legal authority for the proposition that after an acquittal, the factfinder in a malicious prosecution case may also consider the judge's or jury's opinions or mental impressions concerning the evidence and witness veracity. Indeed, the Court could find none. If anything, federal law lends guidance in the opposite direction, namely, the "law neither requires juries to state reasons for their verdicts nor permits courts to inquire into the reasoning process of the jurors for the purpose of impeaching their verdict." *Outboard Marine Corp. v. Babcock Indus., Inc.,* 106 F.3d 182, 186 (7th Cir. 1997) (citing Fed.R.Evid. 606(b)). Construing the facts and all reasonable inferences in Kuri's favor, his acquittal shows that the criminal proceedings were terminated in his favor. The Court thus denies Defendants' summary judgment motion in relation to Kuri's malicious prosecution claims.

**IV.     Conspiracy/Failure to Intervene/State Law Conspiracy**

Further, Defendants contend that Kuri's derivative claims for failure to intervene, § 1983 conspiracy, and state law conspiracy under Illinois tort law must fail because he has not established any underlying constitutional violations nor his state law malicious prosecution

---

[5] As the Supreme Court of Illinois explains "[t]he Latin term nolle prosequi means 'not to wish to prosecute.' … We have previously explained that a nolle prosequi is the formal entry of record by the State which denotes its unwillingness to prosecute a charge." *People v. Hughes,* 983 N.E.2d 439, 448, 368 Ill.Dec. 26 (Ill. 2012) (internal citations omitted).

claim. Because the Court concludes Kuri has presented evidence creating triable issues of fact supporting his § 1983 and malicious prosecution claims, Defendants' argument is premature.

**V.      Individual Involvement**

When bringing constitutional claims under 42 U.S.C. § 1983, individual liability requires personal involvement in the alleged constitutional violation. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017); *Minix v. Canarecci,* 597 F.3d 824, 833 (7th Cir. 2010). In other words, under § 1983, an individual is only liable for his or her own misconduct. *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Also, a "defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) (citation omitted).

First, Kuri asserts that Defendant Officer Thomas Kolman interviewed Russell on August 2, 2009, at which time Russell allegedly told the officers that "Little David" and "Rowdy" were the offenders and then picked them out of photo arrays. The evidence Kuri presents to establish Defendant Kolman's involvement does not indicate that he was present at that interview. Instead, the evidence Kuri relies upon shows that Defendants Folino and McDermott interviewed Russell on August 2 as memorialized by the August 14, 2009 Supplemental Report authored by Defendants Folino and McDermott. (Pl.'s Stmt. Facts ¶ 27, Ex. 12.) Kuri also points to Russell's 2012 trial testimony to support Defendant Kolman's involvement, but the testimony he highlights does not indicate that Defendant Kolman was one of the police detectives who interviewed him on August 2. (Pl.'s Stmt. Facts ¶ 35; R. 182-3, Ex. 3, Bench Trial Tr. at 44-45.) Although Defendant Kolman authored an October 7, 2009 Supplemental Report, Defendant Kolman's only action highlighted in that report was that he went to the hospital on August 8,

2009 to interview Fernandez, but was unable to do so at that time. (R. 182-27, Ex. 27, 10/7/09 Supp. Report.) In addition, Kuri relies upon the Felony Complaint that Defendant Officer Kolman signed for the proposition that Defendant Kolman persuaded the judge to find probable cause to detain him. (Pl.'s Stmt. Facts ¶ 55; R. 182-35, Ex. 35, Felony Complaint.) Examining the Felony Complaint and other evidence in the record in Kuri's favor, nothing indicates that Defendant Kolman "persuaded the judge to find probable cause" in a nefarious manner as Kuri suggests. In short, the evidence in the record does not support Kuri's contention that Defendant Kolman participated in the alleged wrongdoing underlying his claims, and thus the Court dismisses Defendant Kolman from this lawsuit.

Second, as to Defendant Officers Noe Sanchez and Carmen Lopez, Kuri argues that they had a role in creating the false Wachaa tip. After reviewing the parties' Rule 56.1 Statements and supporting evidence, there is no evidence in the record that Defendants Sanchez and Lopez did anything more than author the handwritten police report with information provided to them by Wachaa. (Pl.'s Stmt. Facts ¶ 30; Defs.' Stmt. Facts ¶ 19.) Because this evidence – viewed in Kuri's favor – does not show Defendants Sanchez and Lopez were involved in any wrongdoing, the Court dismisses Defendants Sanchez and Lopez from this lawsuit as well.

## CONCLUSION

The Court grants in part and denies in part Defendants' motion for summary judgment.

**Dated:** October 30, 2017

                                         **ENTERED**

                            *[signature]*

                            **AMY J. ST. EVE**
                            **United States District Court Judge**