IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 1653 |
| | ) | |
| v. | ) | Honorable Edmond E. Chang |
| | ) | |
| THE CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

**PLAINTIFF'S REPLIES TO DEFENDANTS' RESPONSES
TO PLAINTIFF'S MOTIONS *IN LIMINE***

Now Comes Plaintiff, ANTHONY KURI, by and through his attorneys, LOEVY &

LOEVY, and replies to Defendants' responses to Plaintiff's motions *in limine* [Dkts. 222-233] as

follows:

**I.       Motion *in Limine* No. 3 to bar Judge Sheehan's Testimony**

Defendants apparently feel strongly about this motion, leading off their response with 9

pages of argument, but this one is not even a close call.  The criminal trial judge, Judge Sheehan,

has nothing admissible to offer the jury.  He was not disclosed as an expert witness, but even if

he had been, his personal (or even professional) opinion about probable cause are not properly

part of this trial.

**Judge Sheehan's Opinions Remain Inadmissible**

As Plaintiff explained at some length in responding to the summary judgment motion, at

the Plaintiff's criminal trial, Fernandez and Russell caused the Assistant State's Attorney much

frustration by refusing to regurgitate the Defendant Officers' version of the murder.  No longer

boys (three-plus years had passed since their original police interactions) these young men

refused to go along with a story they knew was untruthful.   Based on nothing but his own biases

and preconceptions, Judge Sheehan (himself a former ASA) reached the conclusion that Fernandez and Russell's decision to tell the truth was a "highjack[ing]" of the judicial system. In forming that opinion, Judge Sheehan ignored the fact that Fernandez and Russell did not implicate Plaintiff when first questioned by the police, and only did so later, after the police manipulated them by threatening them and feeding them the incriminating facts. And they told Judge Sheehan as much.

The point is, Judge Sheehan has no personal knowledge about the shooting, and he will never know if these witnesses' original accounts were truthful, or whether they were instead telling the truth after the Defendant Officers managed to get them to change their stories. That is why Judge Sheehan's personal opinion is hearsay, and has no place at this trial.

Defendants disavow any hearsay purpose, claiming they are merely offering Judge Sheehan's commentary to explain how he arrived at his verdict, and what he considered when he "assessed the reasonableness of their testimony." That argument is a nonstarter. The only relevant fact for purposes of this trial and Plaintiff's claims is that Plaintiff was acquitted. As Judge Gottschall concluded in connection with an early motion, the fact of the acquittal is what is relevant to that element of a malicious prosecution claim, not the underlying thought process that went into it. Dkt. 57 (Memorandum Opinion & Order, Judge Gottschall) at 13-14; *see also* Dkt. 203 (Memorandum Opinion & Order, Judge St. Eve) at 16-17.

To illustrate why this is so, perhaps it would be even easier to see this point if the factfinder at this criminal trial was a jury rather than a judge. Under those circumstances, no one would seriously contend that either side could put jurors on the witness stand at a Section 1983 trial to talk about why they reached their verdict. To take an even more obvious example, in a case where a jury acquits a malicious prosecution plaintiff, the Court obviously would not permit

that plaintiff to call the trial judge, much less members of the criminal jury, to testify that certain witnesses were not credible. The converse ruling sought by the Defendants here is equally ridiculous. The verdict itself is what has legal significance, not the surrounding commentary.

Defendants cite no cases supporting their position, something they try excuse by claiming that the issue has never come up. To the contrary, the surrounding malicious prosecution law is not at all unsettled. It has long been established that an acquittal satisfies the indicative of innocence element. *See Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001). Unless and until the Illinois courts put a new limiting qualifier on those holdings – i.e., that only certain acquittals qualify, namely, those where the factfinder's associated commentary is also indicative of innocence – there is no basis in the law to get past the fact of the acquittal.

Defendants next argue that "even if the court finds Judge Sheehan's testimony" about who was lying are not genuinely relevant to the first element of malicious prosecution, they would "still be admissible for the purpose of assessing whether or not there was probable cause for the criminal proceedings and the element of malice." Dkt. 250 (Defendant Officers' Responses to Plaintiff's Motions *in Limine*) at 5-6. The argument assumes its own conclusion. While there is no dispute that probable cause and malice are legitimately at issue, there is no conceivable way that Judge Sheehan's take on the witnesses is in any way relevant to those inquiries. As is true in other cases, Defendants are going to have to prove the existence of probable cause by some means other than the trial judge's *ex post dicta* about everyone's credibility. In addition being unsupported, Defendants' argument is not even logical: what happened at trial is not relevant to whether the officers had probable cause to pursue charges or

continue the prosecution.[1]

Defendants' next argument that Judge Sheehan's views are supposedly relevant to due process materiality makes no sense. When Russell and Fernandez told the truth at the criminal trial, Plaintiff was acquitted. Had the witnesses told the police version (that Plaintiff was guilty) then he would have been convicted. Judge Sheehan's belief about why they did what they did is neither here nor there.

The point that Defendants seem to be stretching so hard to elicit, repeated several times throughout their Response, is Judge Sheehan's statement that the acquittal was supposedly the result of "gangbanger" malfeasance. According to Defendants, Judge Sheehan "was an eyewitness and has first-hand knowledge of the proceedings," and "after assessing the evidence presented and credibility of the witnesses," he determined that Russell and Fernandez's trial testimony was the result of gang influence." *Id*. at 7.

That may be Judge Sheehan's personal opinion, but even it has no place at this trial. The prosecution witnesses in question were not fellow gang members of the Plaintiff, and there was thus no "gang-motive" to protect him. While it is true that these witnesses were associated with gangs, that fact does not bear on whether the Defendants did or did not do what they are accused of doing. Defendants would be outraged if Plaintiff argued that his wrongful prosecution was part of some larger pattern of "corrupt CPD cops" – indeed, Defendants themselves have moved to bar any attempts to malign them with inflammatory association with broader CPD criminality. The rule should be enforced both ways. The jury should decide if these Defendants violated this

---

[1] Without citation, Defendants suggest that Judge Sheehan's denial of a directed verdict is proof that there was probable cause for the underlying arrest and prosecution. There are no cites for that proposition, and it is not a recognized principle of law. Nor is it logical. It could both be true that a directed verdict is denied based on what happens at trial, yet there was no probable cause at the time charges were brought.

Plaintiff's due process rights without references to "gangbanger" malfeasance *or* CPD corruption more generally.

Nor is Judge Sheehan's opinion based in anything but speculation and conjecture. At Kuri's trial, Russell was asked on the stand whether he made any identification from the photo arrays. When he answered "N[o], the police officer already told me who they were," Judge Sheehan interceded and admonished Russell "not to volunteer information." Dkt. 181 (Plaintiff's L.R. 56.1(b)(3)(C) Statement of Facts) at ¶ 65. Then when Russell was later confronted with his Grand Jury statement wherein he implicated Kuri, Russell started to explain: "The police officer–" but Judge Sheehan interrupted him again and instructed him to "just answer the question." *Id.*

It is after this second admonishment that Russell began answering "I don't remember" to the State's questions. *Id.* With the judge having made clear that Russell was not going to be free to explain himself about how the identifications were really made, Russell – no doubt disgusted by the farce of a process in which he was being asked by the State to regurgitate his police-fabricated statement – gave up and began asserting lack of memory. *Id.*

Judge Sheehan found these answers insulting to the judicial process, and Defendants' prior summary judgment motion was premised improperly based on the assumption that they and Judge Sheehan get to decide what was going on here. Judge St. Eve rejected that argument, and it should not be revived for trial. Back when he was a teenager, the police cheated and told Russell who to pick out; years later when he was more mature and wanted to explain what had happened, the Judge quite clearly did not want to hear anything about it. That Russell apparently quit respecting the process (and continues to this day to want nothing to do with it) by no means

proves that he is lying about Kuri's innocence or that "gangbanger-ism" was the source of the problem, notwithstanding Judge Sheehan's personal beliefs.

Defendants suggest that cross-examination should suffice to salvage this otherwise inadmissible testimony. But what exactly would that cross-examination look like? Would Plaintiff be allowed to meet Judge Sheehan's opinion about "gangbanger" influence by cross-examining him with questions about Defendant McDermott's Special Operations (SOS) corruption as being an alternative source of the improper "influence" on these witnesses? As stated, this is not admissible testimony – either way.

### Judge Sheehan Should Be Barred Entirely

Defendants argue that Plaintiff only sought to bar Judge Sheehan's testimony about his ruling, not a blanket prohibition against Judge Sheehan as a witness. However, the only arguable basis for Judge Sheehan to take the witness stand at this trial, and the only rationale offered by the Defendants, is to explain his views about the trial witnesses and the reasoning behind his verdict. Once that testimony is disallowed, there is no reason left for Judge Sheehan to take the stand. His testimony should be barred.[2]

### II. Motion *in Limine* No. 6 to Bar References to Prior Arrests, Conviction, and Bad Acts

Defendants' half-hearted opposition to this motion should be rejected. While they are correct that such evidence would be admissible if the Court determines that Plaintiff opens the door, the law requires exclusion and the Court should grant this Motion.

---

[2] That is not to say that Defendants should be barred from eliciting what happened at the criminal trial, which is relevant to the due process claim. In Plaintiff's counsel's experience (having tried close to a dozen Section 1983 wrongful prosecution cases) the usual way to elicit that testimony is through either criminal defense attorneys or the prosecutors. Plaintiff's counsel has never been part of a Section 1983 trial where a criminal trial judge was a witness.

6

### A.      Prior Convictions

This motion continues to be governed by Federal Rule of Evidence 609 and its familiar prohibition against convictions more than ten years old.  At bottom, convictions for completely unrelated crimes are not particularly relevant to the question of whether these Defendants violated Plaintiff's rights in this case, and while the drafters of the Federal Rules determined that such convictions can be used to impeach credibility, those drafters made the decision to exclude convictions older than ten years.

There is no dispute that two of Plaintiff's convictions fail test.  Defendants do not seriously contend otherwise.

Citing *Sanchez v. City of Chicago,* 700 F.3d 919, 930–33 (7th Cir. 2012), Defendants to get around the prohibition against older prior convictions and/or incarceration by arguing it can be relevant to physical and emotional distress.  The Sanchez case does not support that proposition at all.  In *Sanchez,* a plaintiff sought compensatory damages for a single day encounter during which he was allegedly stopped and briefly detained without justification. Judge Darrah permitted the defendants to elicit that the Sanchez had been arrested on "several occasions" (and nothing further, even though his arrest history was actually "lengthy," with more than 30 arrests) after "Sanchez testified that he had become afraid of the police, that he had nightmares about them, that he did not trust them, and became nervous when he saw them." *Id*. at 931 ("In the court's view, that testimony gave rise to an inaccurate impression that Sanchez had no real prior experience with law enforcement officials…").

That is a far cry from this case.  Here, Plaintiff spent more than three years in prison.  He did not suffer any less during those three years just because he had previously been convicted.

The law does not permit Rule 609 to be circumvented just because the Plaintiff seeks damages, and Defendants cite no cases suggesting otherwise.

Defendants other argument is that his older prior convictions in other cases for burglary and a minor drug case somehow rebut the proposition that the Defendant Officers in this case were "out to get him" and that he was "arbitrarily framed" for this murder. Dkt. 250 at 21. Defendants never actually explain why the former rebuts the latter, and in fact no such argument could made without resort to a prohibited propensity inference, and an unduly attenuated one at that. The case law cited in Plaintiff's original motion should control. E.g., *THK America, Inc. v. NSK, Ltd.,* 917 F. Supp. 563, 570 (N.D. Ill. 1996) ("Congress intended that convictions over ten years old be admitted very rarely and only in exceptional circumstances").

That leaves Plaintiff's lone conviction within the past ten years, the 2014 conviction arising out of the incident where he allegedly tossed a pill bottle on the ground containing what turned out to be anxiety medication. Plaintiff's motion made a Rule 403 argument, asking the Court to invoke its discretion to exclude it, pointing out that possession of controlled substances do not involve dishonesty of false statement. *See Jones v. Sheahan,* 2003 WL 21654279 at *5 (N.D.Ill. July 14, 2003); *Coles v. City of Chicago*, 2005 WL 1785326 at *1 (N.D. Ill. July 22, 2005).

For reasons unstated, the Defendants' Response completely ignores these arguments. It makes no reference to the 2014 conviction whatsoever, much less any attempt to explain why Rule 403 balancing would not tip in favor of exclusion. With Defendants having forfeited any arguments specific to the 2014 conviction, the Court should grant this motion.[3]

---

[3] The same is true of Plaintiff's misdemeanors, one of which was for riding his bike on a sidewalk. Plaintiff's motion showed that the law does not permit references to misdemeanor convictions, and Defendants failed to make any specific arguments why any particular conviction would be admissible. The motion should be granted in that respect as well.

**B.      Prior Arrests and Misdemeanor Convictions**

Faced with the overwhelming weight of authority holding that prior arrests are inadmissible, Defendants do not seriously contend otherwise.  They fail to identify any particular arrest for which an exception should be made (with the exception of Motion *in Limine* No. 10, discussed below).  The argument that a prior arrest has any marginal probative value on the emotional distress associated with three years in prison is not one that can seriously be maintained, and (with *Sanchez* having been distinguished) Defendants cite no authority suggesting otherwise.

Defendants also argue that if Plaintiff opens the door, as the *Sanchez* plaintiff did, by implying total inexperience with the legal system, then the Court should revisit the issue outside the presence of the jury.  Plaintiff agrees.  But unless and until the Court determines that a door has been opened (which Plaintiff will avoid by staying away, for example, from the testimony that troubles the Defendants about Plaintiff having been constantly "harassed" by the police), then a prior arrest is nothing but a prior bad act, and an unproven one at that.  Exclusion is justified under all of the authority cited in Plaintiff's original motion.  *E.g., See Dyson v. Szarzynski*, 2014 WL 7205591, at *6 (N.D. Ill. Dec. 18, 2014) ("However, the risk of unfair prejudice to Dyson is considerable if prior arrest evidence is admitted without the door being opened first. For these reasons, Dyson's motion No. 5 is granted with respect to prior arrests."); *Mowrey v. City of Fort Wayne*, 2013 WL 6512664, at *2 (N.D. Ind. Dec. 12, 2013) ("Prior arrests that did not lead to a conviction are usually inadmissible under Rule 403's balancing test and Rule 404(b)'s bar against character evidence."); *Gregory v. Oliver*, Case No. 00 C 5984, 2003 WL 1860270, at *1 (N.D. Ill. Apr.  9, 2003) ("Arrests that have not led to convictions are classic candidates for exclusion under [FRE] 404(b)").

9

**III.     Motion *in Limine* No. 9 to Bar Allegations of Misconduct In Jail**

The actions at issue here are most accurately characterized as prior bad acts.  While in jail, Plaintiff allegedly did things that broke the rules.  Under any reasonable analysis, these prior bad acts have no bearing on the issues to be decided by the jury: they certainly do not relate to the liability inquiry as to whether the Defendants violated Plaintiff's rights, and Defendants do suggest they relate to damages, because they do not.  (If anything, Plaintiff's frustration and punishment exacerbate the damages).

There is a good reason why the law bars prior bad act evidence.  Just as the Defendants have moved to bar the jury from hearing about CR files documenting other misconduct they allegedly committed on other occasions, Plaintiff too is entitled to his claims adjudicated without being unfairly judged for his bad actions on other occasions.

Defendants do not address the *Gomez* line of cases cited in Plaintiff's motion, nor attempt to invoke any exception to Rule 404(b) which could justify admission.  Instead, the arguments that they do make are too weak to be taken seriously.

Primarily, they suggest that his possession of a "gang letter" proves that witnesses must have been intimidated.  It is unclear what a "gang letter" is, but presumably one of Plaintiff's friends must have written him a letter, and that friend must have been in a gang.  Despite the implication, Defendants do not actually claim that the letter had anything to do with witness intimidation.  Instead, the chain of inferences they seek to invoke is apparently that because Plaintiff had a friend in a gang who sent him a letter, then it is therefore a reasonable conclusion that witnesses were intimidated.  That is an absurd stretch, and the fact that it is Defendants' lead off and best argument is telling.

10

Defendants also argue that they should be able to rebut any testimony by Plaintiff that he was a model prisoner, and that makes sense. Should Plaintiff give the jury that impression, Defendants should obviously be free to raise an open door contention outside the jury's presence.

The only reason for any pause is Plaintiff's refusal to go to protective custody undercuts his anticipated contention that he (and everyone else) lived in near-constant fear of violence at the jail. The fact that he refused protective custody does not prove that he was "not scared of other detainees," Dkt. 250 at 36, but Plaintiff appreciates that his refusal to go to protective custody is probably fair game on that issue. (If Defendants do go there, it is expected that Plaintiff will explain protective custody is actually a very dangerous place in the Jail.)

With that exception, Plaintiff's motion to bar references to prison discipline should be granted.

**IV. Motion *in Limine* No. 8 to Exclude References to Gangs**

The Court is now considering this issue on parallel tracks, as Plaintiff has already responded to Defendants' motion *in limine* no. 2 seeking leave to admit gang evidence. To avoid redundancy, Plaintiff will not repeat those arguments here, but to summarize, Plaintiff's position remains that (a) there is absolutely no reason this story cannot be told without referencing a subject as inflammatory as street gangs, but (b) if the Court does permit some limited references to gangs, those references should be tightly controlled and limited to basics such as each witnesses' affiliation with which group, and perhaps some very brief introduction of the nature of crime, but must definitely not include the broader types of "gang-members-sometimes-intimidate-witnesses" generalizations proposed here.

Regarding the first argument, this trial could absolutely proceed fairly without any references to gangs at all. For all Defendants' arguments about why they suspected a Spanish

Cobra was involved, their story fundamentally is that they arrested and sought charges against Plaintiff because the witnesses supposedly told them that Plaintiff committed the crime. It does not matter if Plaintiff is a Spanish Cobra or a French Opossum. In Defendants' telling, the witnesses knew Plaintiff, and said he did it, which is why they did what they did. The issue of "how Plaintiff became a suspect," Dkt. 250 at 27, or an alleged recent conflict between the gangs, does not require any resort to gang testimony. World War III might have been raging between the gangs, but the Defendants arrested Plaintiff because that is who they were told who did it. Under those circumstances, invoking a gang war only inflames unnecessarily.

Similarly unavailing is Defendants' suggestion that they need to explain why the tactical officers were involved. *Id.* The jury could easily be told that tactical officers were more familiar with the boys in the neighborhood without invoking the prejudicial specter of street gangs. Likewise, Defendants arguments that they need to impeach credibility, *Id.* at 32, only illustrates further how they intend to use the gang evidence for improper purposes.

Indeed, if anything, the fact that witnesses were in a different gang from Plaintiff is helpful to Plaintiff, not the Defendants. Under many circumstances, Defendants would be arguing they should be permitted to show bias by eliciting that the witnesses and the plaintiff were not just friendly, but in the same gang. Here, the evidence Defendants are so eager to introduce shows that Russell and Fernandez have no motive to testify favorably to Plaintiff that they were manipulated. And the truth remains, they want nothing to do with this case.

Unable to support gang references on that more conventional basis, Defendants seek to reverse things and argue that they should be able to prove that the fact that the witnesses were in different gangs means they should be able to prove that rival gangs pressure each other not to testify against each other. This is a novel argument in Plaintiff's counsel's experience, and not

12

one the Defendants support with any actual evidence – either for the general proposition or that there was any actual pressure in this case.

The fact is, Defendants have now filed a number of briefs in connection with these motions *in limine* and yet they have conspicuously failed to point this Court to any actual testimony that there really was gang intimidation in this case, or that any witness was in fact pressured. Nothing. The burden was certainly on the Defendants to show why such an inflammatory subject should be permitted, and their inability and unwillingness to put any such testimony before the Court is critically telling. They want this Court to allow gang evidence based on their say-so that the record supports the inferences they want the jury to draw. If that were so, they presumably would have pointed the Court to an actual basis for making such a determination.

Instead, they argue generally that witnesses were in fact actually pressured by gangs. The only evidence in the record is the exact opposite. Russell was unequivocal that he was not intimidated by any rival gang members. *See* Ex. 1 (Russell Dep. Trans.) at 73:8-10. Because this was never any such issue during the entire criminal trial or any other time until now, Fernandez was not even asked any such questions by defense counsel. The record is totally devoid of support of evidence that would permit the argument Defendants now seek to make. They literally have nothing other than speculation and conjecture. And this would be speculation and conjecture of the worst kind. There is no way Plaintiff could get a fair trial on the important claims in this case if the Defendants were permitted to suggest that perhaps gang members

13

pressured people to change their testimony.[4]

Without any citations, Defendants also continue to greatly exaggerate the notion that a bunch of Spanish Cobras showed up at the criminal trial to intimidate witnesses. Gomez testified only that his family showed up to support him, including his brothers and sisters, as well as some friends, who happened to be in his gang (not coincidentally, since they were his buddies). Ex. 2 (Gomez Dep. Trans.) at 92:1-93:6. As it turns out, Fernandez and Russell, who are not Spanish Cobras, did not even know that anyone in the courtroom was a Spanish Cobra. Ex. 1 (Russell Dep. Trans.) at 73:8-10; Ex. 3 (Fernandez Dep. Trans) at 261:20-262:1. That aside, the real point is that there was no suggestion by Gomez, Fernandez, Russell, or anyone else that Gomez's friends "gang intimidated" or so much as even tried to intimidate any witness in the case. Which is why Defendants have consistently offered no citations to the record to support this argument.

The other important point is that such a ruling would have to go both ways. If the Defendants were permitted to suggest that people in a gang pressure people in other gangs to change their testimony, then Plaintiff must be permitted to elicit testimony that police officers in McDermott's Special Operations Section (SOS) group pressured witnesses to tell their stories too. McDermott's former SOS partner, Jerome Finnegan, for example, pleaded guilty to a murder-for-hire plot after conspiring with a fellow indicted cop about killing another officer who had provided information against them. *See* Dkt. 249-2 (Chicago Tribune Article dated September 27, 2007).

---

[4] It is also worth noting that this is not even the conventional situation where a member of a gang is allegedly pressured by people in his own gang not to "rat out" one of their own. The people who the Defendants are trying to claim pressured the witnesses in this case were not in the same gang as those witnesses, and even under Defendants' telling, they were therefore not trying to get the witnesses to avoid violating a gang "code" by implicating someone in their own gang.

Defendants would be beside themselves if Plaintiff were allowed to point out that people in the Defendants' group sometimes go around pressuring and threatening witnesses with death based on their anticipated testimony. Yet that is exactly what they propose to introduce here, namely, testimony that sometimes people in gangs pressure other people in other gangs to change their testimony or face consequences. Defendants cite no cases permitting that sort of testimony, and it should be excluded, particularly given Defendants' inability to make a record in support.

Defendants continue to argue that references to evidence of gang corruption are of a completely different character than evidence of police corruption. That argument, however, somewhat depends on your point of view. If you are a police officer, the comparison is beyond absurd. If you are a plaintiff's civil rights lawyer who see a consistent stream of police officers acting lawlessly, then the comparison makes perfect sense. Both groups have self-protective biases and codes of silence, and make efforts to cover for each other even when the law is broken.

To be clear, Plaintiff is not arguing that the CPD is a criminal street gang. Rather, Plaintiff is arguing that if the Defendants are going to be permitted to elicit alleged "group characteristics" of gang members in order to prove that those individuals acted in conformity therewith on this occasion, then the same analysis should permit evidence that other police officers sometimes lie for one another and pressure witnesses.

As is hopefully obvious, Plaintiff does not believe either side should be permitted to go down this road. Neither Russell nor Fernandez has ever suggested they were pressured by gang members, and Defendants cite the Court no evidence establishing otherwise. Defendants should not be able to invoke prejudicial stereotypes for precisely the same reason they themselves have

15

moved to bar the converse arguments and innuendo as applied to police officers. In Plaintiff's counsels' experience, some judges in this District have excluded gang evidence even where it is part of the underlying fact pattern, e.g., Judge Grady in *Johnson v. Guevara. See* Ex. 5 (Excerpt of J. Johnson Proceeding) at 179-181. Other judges in this District have permitted some references to gangs, but only to the extent directly probative to an issue at trial, such as which gang shot which gang, and definitely not for purposes of making extraordinarily prejudicial arguments such as "gang members pressure one another to lie."

## Any Gang Evidence, If Admitted, Should Be Limited

Finally, to the extent the Court does decide to allow certain references to gangs for limited purposes, that evidence should be carefully restricted. Plaintiff has cited (and will not repeat here) a pile of cases expressing concern that gang evidence is so unfairly prejudicial that it risks high-jacking a trial. In fact, reading the rest of the *Sanchez* case relied upon by the Defendants and discussed above, the Seventh Circuit discussed Judge Darrah's decision to exclude *all references* to plaintiff's gang membership as being too prejudicial to justify its admission, notwithstanding some arguable probative value in explaining what the police defendants were doing. *Sanchez v. City of Chicago,* 700 F.3d 919, 932 (7th Cir. 2012).

If the Court nonetheless decides not to bar gang evidence categorically, it should be limited to: (a) the respective affiliations of the witnesses in the case and the victim; (b) very limited background about the shooting, including that the victim was believed to have been shot by someone in Plaintiff's gang.

The fact that the shooting was allegedly in retaliation for a prior shooting is not particularly relevant, given that the police did not "solve" this crime in the usual sense, but rather arrested the person who the witnesses supposedly told them committed the crime. Weighed

16

against that minimal probative value, the inflammatory nature of retaliatory gang shootings is precisely the sort of unfair prejudice that is best (and easily) avoided. *See Anderson v. City of Chicago*, No. 09 C 2311, 2010 WL 4811937, at *1 (N.D.Ill. Nov. 19, 2010) ("[T]he Seventh Circuit has repeatedly warned that evidence of a party's gang membership is highly prejudicial, especially when the gang evidence is not relevant to a central issue in a case.") (citing *Brown v. City of Chicago,* 599 F.3d 772, 775–75 (7th Cir. 2010)).

Finally, and most importantly, the Court should definitely bar the Defendants from referencing or eliciting suggestions that gang members pressure or intimidate witnesses, or that they pressured or intimidated witnesses in this case. As explained at length above, there is no such evidence in this case, and this extremely prejudicial testimony or suggestion has no place in this trial. Should the Court hold otherwise, Plaintiff should be able to elicit suggestions that police officers do the same thing in order to protect their own, including police officers who, according to public records discussed in prior filings, worked with and got into trouble alongside Defendant McDermott.

## V.     Motion *in Limine* No. 5 to Bar Commendations and Awards

When the dust settles, both sides want to bar unrelated prior bad acts, whether those be arrests, misdemeanors, or CR allegations of police misconduct. Both sides are relying on the same legal principles to bar the reciprocal evidence. *See* Dkt. 250 at 16-17 (arguing that Plaintiff seeks to bar commendations/awards while "nevertheless seeking to introduce evidence of unrelated complaints, lawsuits, disciplinary proceedings [etc.]… collectively referred to here as 'unrelated bad act evidence.'").

If the Court decides to bar all of the prior bad act evidence, then presumably no police witness would be permitted to hold themselves out as decorated police officers. Should they

attempt to do so (and it is not clear these officers won any awards or commendations), Plaintiff would ask the Court outside the presence of the jury to permit questioning about the encounters during which the Defendants allegedly conducted themselves in a less than exemplary manner.

**VI.     Motion *in Limine* No. 7 To Bar Contact Cards Associated With Prior Arrests**

For the same reason that gang references should be excluded or appropriately limited, the Court should reject Defendants' attempted reliance on certain "contact cards" that were created in connection with prior stops of Plaintiff.

Taking a step back, the contact cards are essentially police reports in a different form. They are created entirely by police officers without input from or review by the people who are the subjects of the card. Moreover, they are police reports for incidents that do not even arise to the level of an arrest, much less a conviction.

If Defendants were seeking to introduce into evidence police reports from unrelated arrests, the evidentiary question would be easy. If a party (*i.e.,* Plaintiff) allegedly made a statement on another occasion that was deemed truly relevant to the issues in the case, then that statement would be a fair subject of testimony, but the underlying report documenting the statement would not be admissible to prove the truth of the matter asserted.

That latter purpose is exactly the use proposed by Defendants' response to this motion in limine. They claim that these contact cards from unrelated events should be admitted to "rebut Plaintiff's claim that he was arbitrarily framed," and for "impeachment and motive," and to "impeach[] Plaintiff's timeline of events." Dkt. 250 at 22-23. Those arguments have no merit. A police report – even if renamed a "contact card" – can legitimately do none of those things.

More specifically, Defendants point to a card that supposedly proves that Plaintiff was "crying next to a memorial for a fellow gang member." *Id.* at 24. The threshold question must be

18

whether the underlying subject matter is even admissible in this wrongful imprisonment trial, and as argued in support of the prior motion *in limine,* it plainly is not. No police officer should be permitted to testify that on an unrelated occasion, Plaintiff once was found crying over a friend who was in a gang. Any marginal probative value is so miniscule as to be virtually non-existent. But even if it were relevant, the contact card is not admissible for establishing that it occurred.

In sum, Defendants have failed to justify the introduction of any contact cards, and, just as important, they have failed to suggest any relevant basis even to reference the underlying events described in contact cards. After all, Defendants essentially concede, as they must, that prior unrelated arrests are irrelevant and inadmissible as a general matter. Thus, if Plaintiff had been arrested for the events described in the contact cards, exclusion would be an obvious call. The evidentiary result should not change just because the encounters leading to the contact cards did not rise to allegations of prior bad acts sufficient to justify an arrest. References should thus be excluded unless and until the Defendants satisfy the Court outside the presence of the jury that the subject matter is relevant and admissible.

### VII. Motion *in Limine* No. 10 to Bar Statement Allegedly Made By Plaintiff During his March 2013 Arrest

Both sides having weighed in on this issue, what Defendants have failed to establish is that the statement is actually relevant to anything at trial. Even assuming for the sake of argument that everything went down exactly as Defendants describe and Plaintiff blurted out this incriminating statement, such evidence has no bearing on any claim or defense in this case. Because it occurred many years after the fact, it does not bear on probable cause or the alleged

due process violations, nor does it affect damages. It is thus the proverbial "side trial" – apparently involving six police officers – that will swallow the trial itself.[5]

Moreover, should the Court decide to permit testimony that Plaintiff made this statement, that by no means justifies the full extent of the evidence Defendants provided the Court as "background" for the encounter. The fact that the police allegedly responded to a call from a family leaving church who say that individuals yelled gang slogans at them and pretended to have weapons is plainly out of bounds. There is also no reason to elicit the fact that the church goers allegedly identified Plaintiff as a perpetrator before Plaintiff made the disputed statement.

Instead, if the Court decides that Plaintiff's statement is going to be part of this trial, Defendants should be permitted to elicit that Plaintiff was picked up and arrested for a misdemeanor. *See* Ex. 6 (Criminal History Report). While a misdemeanor arrest would not ordinarily be admissible, Plaintiff concedes that if the Court allows the associated purported murder confession to come in, there will need to be some context. Calling the arrest what it was, an arrest for a misdemeanor, accomplishes everything probative without the unnecessarily and unfairly prejudicial extraneous details. (The docket record attached to the Defendants' Response suggests the charge was "assault" on a peace officer, 720 ILCS 5/12-2-B-7, so one of arresting officers must have charged Plaintiff with insulting or provocative language toward him.)

---

[5] Without citation to Plaintiff's motion, Defendants call out Plaintiff for supposedly representing that in between the incident at 8:50 p.m. and the time the Incident Report with the alleged statement was submitted just before 1:00 a.m., Officer McNichols spoke to Defendants Folino and McDermott. Dkt. 250 at 39 (calling this an unsupported statement intended to "deliberately mislead this Court"). It is the Defendants who are mistaken. What Plaintiff's motion actually said was that during this time period, McNichols "contacted the Violent Crimes Area North Detective Division and admits that he was told details about the Patel homicide." Dkt. 231 at 1 n.1. What Plaintiff's motion actually said, as opposed to what Defendants inaccurately claimed it said, is true. *See* Ex. 7 (McNichols Dep. Trans) at 29:5-32:21. Unlike Defendants' accusation, however, Plaintiff's counsel ascribes the Defendants' error to an innocent mistake rather than a deliberate attempt to mislead.

20

Defendants apparently want to take things another step further and also elicit that Plaintiff pled guilty to this misdemeanor. To the best of Plaintiff's understanding, their argument appears to be that Plaintiff allegedly confessed to murder in the context of saying he beat a case for a crime he did commit, so it is therefore somehow relevant that Plaintiff's irritation over being arrested was thus unjustified. If that sentence does not seem to make sense, that is because neither does Defendants' argument. What matters is that Plaintiff was arrested, and allegedly made the statement. Not whether Plaintiff later went on to plead guilty to the underlying charge.

**VIII. Plaintiff's Motion *in Limine* No. 4 to Bar Undisclosed or Improperly Disclosed Witnesses**

Despite beginning their response by emphasizing the importance of ASA Peterson and Inv. Bratton in the context of Zay Russell and Tony Fernandez's testimony, Defendants affirm that these two witnesses were never properly disclosed pursuant to Federal Rule 26(a) during the discovery period. That remains true even when the discovery period was twice extended, as Defendants point out in Dockets 164 and 167. Defendants' argument of their "less formal" disclosure does not hold weight as witnesses in discovery are either disclosed, or not; no witness is disclosed just by talking. However, if the Court does permit these two witnesses to testify, their testimony should be strictly limited to impeachment of statements made by Zay Russell and Tony Fernandez. Anything beyond impeachment testimony would be prejudicial to Plaintiff due to the clear non-disclosures and should therefore be barred pursuant to Federal Rule 37(c).

The remainder of the witnesses[6] listed by the defense are even more problematic. As discussed thoroughly in Plaintiff's Motion *in Limine* No. 4, Defendants provided vague Rule 26(a) Disclosures for well over 60 witnesses. *See* Dkt. 225-1 (noting disclosures such as "on the scene of the shooting" or "knowledge of the prosecution of plaintiff."). In an attempt to keep

---

[6] With the exception of ASAs Murtaugh and Mojica, which Plaintiff withdraws from this motion.

21

these witnesses in play at trial, Defendants argue that because Plaintiff's counsel are experienced civil rights attorneys, they should know what the scope of testimony would be for an officer "on the scene of the shooting" or an ASA with "knowledge of the prosecution of Plaintiff." This argument is a non-starter. Rule 26(a) dictates that disclosures represent the knowledge of the witnesses specific to this case, in order to prepare for trial and cross-examination, not general knowledge of any police officer who may show up at any crime scene based on litigation in an unrelated matter. *See, e.g., Abbott v. Lockheed Martin Corp.*, 2014 WL 6613148, at *2 (N.D. Ill. Nov. 21, 2014) (finding the plaintiffs' ability to prepare for cross-examination "most important" for determining harmlessness).

Defendants further argue that just referring back to reports and criminal trial transcripts provide "clarity" regarding the testimony of these witnesses. Dkt. 250 at 13. That argument, too, lacks merit, and case law is clear that an attorney should not have to "slog through heaps of discovery materials" to supplement a vague witness disclosure. *See Norman v.CP Rail Systems,* No. 99 C 2823, 2000 WL 1700137 (N.D.Ill. Nov. 13, 2000).

Last, Defendants fail to adequately address Plaintiff's argument that counsel for defendants represented that certain witnesses (Szwed and Ribaudo; Golden, Blomstrand, Lohse, and Scott; and Olson) were duplicative of witness who were deposed during discovery. *See* Dkt. 225-2. It was not unreasonable, in a case that spanned more than 60 potential witnesses, for Plaintiff's counsel to rely on the representation of Defendants' counsel, who had the opportunity to discuss each witnesses' recollection and anticipated testimony (and presumably did so) and make the decision not to incur the cost of a deposition for officers who's testimony will be the same as another's. *See, e.g., Owens v. Ellison*, 2017 WL 1251694, at *2 (N.D. Ill. Mar. 31, 2017)

(non-disclosure not harmless because "[p]arties rely on these disclosures in deciding the written and oral discovery they wish to pursue").

Defendants now argue that they will not illicit duplicative information from these officers. But if they are not going to illicit information that is duplicative from what a deposed-witness will testify to, than the witnesses' Rule 26(a) Disclosures should have been supplemented with the additional information the witnesses is anticipated to provide. The Defendants cannot have it both ways. Either the witnesses' testimony is duplicative and should be barred under Rule 403, *see* Fed. R. Evid. 403 (barring relevant evidence on the basis of needlessly presenting cumulative evidence), or the witnesses will testify to new information that should have been properly disclosed and should be barred pursuant to Rule 37, *see* Fed. R. Civ. Pro. 37(c) (barring a witness if not properly disclosed under Rule 26(a)).  Were it otherwise, Plaintiff's attempts to depose the witnesses he legitimately anticipated facing at trial would be unfairly thwarted by swapping them out for undeposed and improperly disclosed substitutes.

As such, the following witnesses listed on Defendants' May Call should be barred from testifying at trial: Chicago Police Officers Golden, Lohse, Blomstrand, Scott, Olson, Zalinski, Szwed, Ribaudo, Patel, Ventura, Cmelka, Nestorowicz, and Pinzine; and, Assistant State's Attorneys, McMahon, Bailey, Gaudino, Moore, and McCarthy.  Alternatively, and to the extent that the Court entertains the Defendants' argument to leave the witnesses on Defendants' May Call List, and if Defendants indicate that they truly intend to call them, then Plaintiff respectfully requests leave to depose any such witnesses before trial.

### IX.      Motion *in Limine* No. 11 to Bar the Toy Gun

Plaintiff withdraws this motion.

23

Respectfully submitted,

/s/ Jon Loevy
*Attorney for Plaintiff*

Jon Loevy
Julie Goodwin
Joel Feldman
LOEVY & LOEVY
311 North Aberdeen St., 3rd Floor
Chicago, Illinois 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Jon Loevy, an attorney, hereby certify that on July 25, 2018, I caused the foregoing Plaintiff's Replies to Defendants' Responses to Plaintiff's Motions *in Limine* to be filed using the Court's CM/ECF system, which effected service on all counsel of record.

Respectfully submitted,

/s/ Jon Loevy
*Attorney for Plaintiff*

24