Exhibit A

10:55AM 1    A.   Yes.

10:55AM 2    Q.   You were using words and talking with them, weren't you?

10:55AM 3    A.   Well, you got to be more clearly about it because

10:55AM 4    talking mean that you go voluntarily talk, you know?

10:55AM 5    Q.   Okay.

10:55AM 6         So in August of 2009, that's the first time that

10:55AM 7    you were at a police station and you were asked questions

10:55AM 8    about the Patel homicide, correct?

10:55AM 9    A.   It was like August 4th or August 5th.

10:55AM 10   Q.   Okay.

10:55AM 11        And if the police reports say August 5th, you

10:55AM 12   wouldn't dispute that, right?

10:55AM 13   A.   Right.

10:55AM 14   Q.   Okay.

10:55AM 15        So on August 5th was the first time that you had

10:55AM 16   any interaction with police about the Patel homicide, right?

10:55AM 17   A.   Right.

10:55AM 18   Q.   Okay.

10:55AM 19        And at that time, they asked you if you knew David

10:55AM 20   Gomez, right?

10:55AM 21   A.   Right.

10:55AM 22   Q.   And you told them no, right?

10:55AM 23   A.   Yes.

10:55AM 24   Q.   And they showed you a picture of David Gomez, right?

10:55AM 25   A.   Yes.

Q.   And you told them you didn't know who he was.

A.   Yes.

Q.   Okay.  And then a little later, you actually said you did know who David Gomez was, right?

A.   Right.

Q.   Okay.  You told us this morning it was because you were scared; that's why you first denied it, right?

A.   Well, no, because he was trying-- they were saying that he implicated me in the murder, and I was saying that I had nothing to do with it.  So I'm not going to say that I know this guy.

Q.   Okay.  But eventually on August 5th, during that interaction with the police, when they were asking you questions about the homicide --

A.   Yes, I told them that I didn't know him.

Q.   And then you told them you did?

A.   Right.

Q.   Okay.

     Then in September, when you got arrested for the murder, you again told them you didn't know David Gomez, right?

A.   Excuse me?

Q.   In September of 2009 --

A.   The second time they picked me up?

Q.   Correct.

| | | |
|---|---|---|
| 11:16AM | 1 | form. |
| 11:16AM | 2 | Do you recall that happening on August 5th? |
| 11:16AM | 3 | A. It could have. |
| 11:16AM | 4 | Q. Okay. |
| 11:16AM | 5 | When you left and you went back to Tony's house, |
| 11:16AM | 6 | did you spend the night at Tony's house that night? |
| 11:16AM | 7 | A. When they let me go? |
| 11:17AM | 8 | Q. Yeah. |
| 11:17AM | 9 | A. Yeah. |
| 11:17AM | 10 | Q. Did you talk to him about the fact that the police had |
| 11:17AM | 11 | picked you up? |
| 11:17AM | 12 | A. When I saw him, I told him that they was questioning me |
| 11:17AM | 13 | about a murder. I don't know anything about it. That's all |
| 11:17AM | 14 | I said. |
| 11:17AM | 15 | Q. And did you ask him if he remembered where you were on |
| 11:17AM | 16 | July 23rd or July 24th? |
| 11:17AM | 17 | A. When I went back? |
| 11:17AM | 18 | Q. Yeah, when you talked to Tony. |
| 11:17AM | 19 | A. No, no. |
| 11:17AM | 20 | Q. No? |
| 11:17AM | 21 | A. No. |
| 11:17AM | 22 | Q. Did you ever talk to your brother about the fact that |
| 11:17AM | 23 | you had been picked up for this murder? |
| 11:17AM | 24 | A. Not that I recall. |
| 11:17AM | 25 | Q. And shortly after you left the police station, after you |

| | | |
|---|---|---|
| 11:17AM | 1 | talked to them on August 5th, you left, right, the City of |
| 11:17AM | 2 | Chicago, and you went to Rochelle? |
| 11:17AM | 3 | A.    Excuse me? |
| 11:17AM | 4 | Q.    Shortly after you left the police station on August 5th, |
| 11:17AM | 5 | 2009, after the police talked to you -- |
| 11:17AM | 6 | A.    Except I didn't leave August 5th. |
| 11:18AM | 7 | Q.    Okay. |
| 11:18AM | 8 |         So shortly after you left the police station in |
| 11:18AM | 9 | August of 2009, you left Chicago, the City of Chicago, and |
| 11:18AM | 10 | you went to Rochelle, correct? |
| 11:18AM | 11 | A.    Not right away. |
| 11:18AM | 12 | Q.    Within a week or so, right? |
| 11:18AM | 13 | A.    Yep. |
| 11:18AM | 14 | Q.    Right? |
| 11:18AM | 15 | A.    Yes. |
| 11:18AM | 16 | Q.    And you went because you didn't want to get picked up |
| 11:18AM | 17 | again for this murder, right? |
| 11:18AM | 18 | A.    I mean, while I was telling them -- so I told them like |
| 11:18AM | 19 | a hundred times that I had nothing to do with it.  So, you |
| 11:18AM | 20 | know.  And they're telling me, no, people identified you, |
| 11:18AM | 21 | and, you know, that the witnesses weren't ready at the time, |
| 11:18AM | 22 | so this means so now, like, I want to get away from what's |
| 11:18AM | 23 | going on.  I was thinking maybe this will go away, stuff like |
| 11:18AM | 24 | that. |
| 11:18AM | 25 | Q.    So you went out to Rochelle? |

```
 1   correct?
 2   A.   Originally?
 3   Q.   Yes.
 4   A.   What do you mean?
 5            MR. LOEVY:  If we could play 16 through 18, Lines
 6   17 through 1.
 7            THE COURT:  Don't play it yet, please.
 8            Page 16, Line --
 9            MR. LOEVY:  18, 17 through 1.
10            MS. ROSEN:  Page 16, Line 18?
11            MR. LOEVY:  16 through 17, Line 1.
12            THE COURT:  Any objection?
13            MS. ROSEN:  No objection.
14            MR. LOEVY:  All right.  You can play it, Val.
15         (Said audiotape was played in open court.)
16   BY MR. LOEVY:
17   Q.   Was that your testimony?
18   A.   Yes, it was.
19   Q.   All right.  When the police -- prior to showing you
20   photographs, they told you that they knew -- that they
21   thought they knew who shot you; isn't that true?
22   A.   No.
23   Q.   Do you remember testifying at the criminal trial?
24            MR. LOEVY:  This is Page 30, Lines 8 through 14.
25            What's the exhibit number for the criminal trial?
```

```
 1              MS. ROSEN:  What's the page again?

 2              MS. GOODWIN:  Defendant's 42A.

 3              MR. LOEVY:  Defendant's 42A.  It's page 30, Lines 8

 4     through 14.

 5              May I proceed, your Honor?

 6              THE COURT:  Let's have a sidebar.

 7         (The following proceedings were had at sidebar:)

 8              THE COURT:  I do not have 42A, and under the

 9     exhibit numbering convention, there should be no such thing

10     as 42A.

11              Having said that --

12              MS. ROSEN:  Because of that 42A problem, it is now

13     78.

14              THE COURT:  Defense 78?

15              MS. ROSEN:  Yeah, because -- yes, because of that.

16              THE COURT:  Are you on the same --

17              MR. LOEVY:  Is it the same numbering?

18              Do we have an extra copy for the Judge?

19              THE COURT:  Well, if it's Defense 78, then I will

20     be able to pull it up.

21              All right.  Thank you.

22              MR. LOEVY:  Thank you.

23         (End of sidebar proceedings.)

24              THE COURT:  One minute.

25         (Brief pause.)
```

```
 1              MR. LOEVY:  May I proceed, your Honor?
 2              THE COURT:  One second.
 3         (Brief pause.)
 4              THE COURT:  Is there any objection?
 5              MS. ROSEN:  I have actually lost the question.
 6              MR. LOEVY:  Page 30, Lines 8 through 14.
 7              MS. ROSEN:  No objection.
 8    BY MR. LOEVY:
 9    Q.   Do you remember being asked these questions and giving
10    these answers under oath:
11              "After you signed it, you looked at some photo
12    arrays?"
13              And you said, "Yes, I believe."
14              And then the question was, "Did you make any
15    identification in those photo arrays?"
16              "A.  No.  The police officer already told me who
17    they were."
18              Did you give those answers under oath.
19    A.   Where at?
20    Q.   At the criminal trial.
21    A.   At the criminal trial?
22    Q.   Yes.
23    A.   You said, did I answer those questions?
24    Q.   Yeah.  I'm reading from the transcript.
25              Do you acknowledge that you gave that testimony
```

1    under oath?

2    A.    Yeah.  Yeah.

3    Q.    And did the police tell you whose photo to pick out?

4    A.    No, they didn't.

5           MR. LOEVY:  All right.  This is Page 44, Line 17

6    through 45, Line 16.  Same transcript.

7           THE COURT:  Any objection?

8           MS. ROSEN:  No objection.

9           THE COURT:  All right.  Go ahead.

10   BY MR. LOEVY:

11   Q.    "Counsel showed you -- prosecutor showed you some

12   photographs and some markings that she asked you if you made

13   or not.  And I believe you said you didn't remember, but you

14   did say something -- did the police tell you who to identify?

15          "A.  Well, they said that they knew who it was.

16   And they already said that they had David, and they said his

17   real name, I guess.  It was his real name.  And they said

18   they just needed me to say that these is them or something,

19   so I guess so.

20          "Q.  So that's where you remember the police

21   telling you that they already had David.  Was it Anthony

22   Kuri, Rowdy?

23          "A.  Yes, I believe.

24          "Q.  So when you looked at the photographs, that's

25   the reason you picked out -- those two persons out?"

1    And you said, "They said that they -- if I was
2  gonna say that it was them, then they were gonna give Tony
3  Fernandez money for being a victim of a crime.  So they told
4  me, really, just to help Tony out."
5    "So your testimony was helping out a friend, Tony?
6  Is that your testimony?
7    "A.  Basically."
8    Did you give those answers at trial?
9  A.  Yeah, I did give those answers at trial.
10  Q.  Did they tell you that they were going to give Tony some
11  money?
12  A.  No, they didn't.
13  Q.  Are you on probation right now, sir?
14  A.  I'm on parole.
15  Q.  You are on parole.
16    How often do you have to check in for that?
17  A.  Every week.
18  Q.  All right.  Is there -- you have to get discharged from
19  parole, correct?
20  A.  Yes.
21  Q.  Do you have any concern about testifying in this case?
22  A.  No.  No, I don't.
23  Q.  All right.  Who was Abdul Wachaa?
24  A.  A friend.
25  Q.  All right.  Do you remember being asked this question

1    A.    We was just driving around.  Just driving around.

2    Q.    Maybe doing a little drinking probably?

3    A.    Yes, we was.

4    Q.    Maybe even smoking a little marijuana probably?

5    A.    Yeah.

6    Q.    All right.  And then you got to your house, and you guys

7    were sort of hanging out?

8    A.    When we got to my house?

9    Q.    Yeah.

10   A.    No, we never got a chance to go inside my house.  We

11   just pulled up in the front.

12   Q.    All right.

13   A.    As we was pulling up, a bicycle was pulling up at the

14   same time.  So, like, we met in front of my house at the same

15   time.

16   Q.    All right.  So you did see a bicycle?

17   A.    Yes, I did.

18   Q.    Was Rowdy or Gomez on the bicycle?

19   A.    Not Rowdy, no.

20   Q.    All right.  Did the police feel like they were trying to

21   come back multiple times?

22         MS. ROSEN:  Objection to the form.

23   BY MR. LOEVY:

24   Q.    Did the police come back multiple times?

25   A.    Yes, they did.

1    Q.   Do you remember on August 3rd getting into trouble,

2    criminal trouble?

3    A.   August 3rd?

4    Q.   Yeah.  So this is about a week after the murder.

5    A.   I don't know.  Maybe.

6    Q.   A battery with Abdul Wachaa?  Something about a fire

7    extinguisher.  Coming back to you?

8            Do you remember getting arrested?

9    A.   No, I don't remember that.

10   Q.   Did the police talk to you at all about pending criminal

11   charges when they were coming back in front of you?

12   A.   No.

13   Q.   Do you know what happened in those charges?

14   A.   No, I do not.  I don't even remember that case,

15   actually.

16   Q.   All right.  At some point did you pick the photograph

17   that the police were showing you?

18            MS. ROSEN:  I object to the form.

19            THE COURT:  Sustained.

20   BY MR. LOEVY:

21   Q.   At some point did you make an identification?

22   A.   Yes, I did.

23   Q.   We have already covered it, but you testified at the

24   criminal trial that the police told you they knew who did it,

25   and told you who to pick out.

```
 1            That's what you testified at the criminal trial,
 2   correct?
 3            MS. ROSEN:  I object to the form.
 4   BY THE WITNESS:
 5   A.   Yes, that's what I testified.
 6            THE COURT:  Overruled.
 7   BY MR. LOEVY:
 8   Q.   All right.  Do you have any concern about testifying
 9   against the police at this trial?
10   A.   No.
11   Q.   Are you concerned about being accused of perjury?
12   A.   No.
13   Q.   You have given different accounts on different
14   occasions, correct?
15   A.   I guess.  I don't know.
16   Q.   Well, you gave --
17   A.   At that video from jail, I told him I wasn't comfortable
18   doing that in jail, that I was on medication at the time, in
19   jail.  I told him I didn't want to do that.  We can do it
20   when I get out.  But he still wanted -- I was on heavy
21   medication.  I'm still on medication for bipolar and
22   schizophrenic.
23   Q.   Now, you did give a video statement.
24            Do you remember a video statement to the State's
25   Attorneys?
```

1   A.   When?

2   Q.   Back in August 2009.

3   A.   At the trial, the criminal trial?

4   Q.   Before the criminal trial.

5            When the police got your identification, do you

6   remember putting it on video for them?

7   A.   Yeah, I believe so.

8   Q.   And do you remember going to the grand jury and

9   repeating it at the grand jury?

10  A.   Yes.

11  Q.   Did you want to go to the grand jury?

12  A.   No, I didn't.

13  Q.   How did the police get you to go there?

14  A.   They came to my house.

15  Q.   Tell me what happened.

16  A.   And when they came to my house, I told them, I didn't

17  want anything to do with it, that I didn't want to go.  They

18  tried grabbing me, and I was holding on to the gate, saying I

19  didn't want to go.  And they just kept forcing me.  So I just

20  went anyway.

21  Q.   What were you doing at the time they pulled up?

22  A.   I was cutting the grass in front of the house.

23  Q.   All right.  How about when it came time for the criminal

24  trial?  Did you want to go to the criminal trial?

25  A.   No, I didn't.

1    said, point out the person who was on the bike, and you said

2    it was not anybody in court, correct?

3    A.   Yes, that's what I said.

4    Q.   And you testified truthfully at the criminal trial; did

5    you not?

6    A.   At the criminal trial?

7    Q.   Yes.  I guess that's a lot of testimony.  It's hard to

8    encapsulate.

9    A.   I can't remember.

10   Q.   But prior to the police showing you the photograph of

11   Ramsey, they told you they thought they knew who shot you,

12   correct?

13   A.   Yeah.

14   Q.   And they told you who to pick, didn't they?

15   A.   Yeah.

16   Q.   Now, when you tried to say that at the criminal trial,

17   the judge didn't want to hear it, did he?

18            MS. ROSEN:  Objection, Judge.

19            THE COURT:  Sustained.

20   BY THE WITNESS:

21   A.   Can you repeat that again?

22            THE COURT:  It's all right.  You don't have to

23   answer it.

24   BY MR. LOEVY:

25   Q.   You have testified about this interaction a number of

1    Q.   And Mr. Fernandez was sitting in the second row of the

2    van; is that correct?

3    A.   Correct.

4    Q.   And you were in the third row of the van, correct?

5    A.   Yes.

6    Q.   And shortly before the shooting, isn't it true that you

7    noticed through the van windows that two people were riding

8    on a bike at the corner, and as they got closer, you noticed

9    the bicycle and the occupants of the bicycle, correct?

10   A.   Correct.

11            MR. LOEVY:  Objection.  Leading, your Honor.

12            THE COURT:  Overruled.

13   BY MS. ROSEN:

14   Q.   Yes?

15   A.   That's correct.

16   Q.   And isn't it true that you told Mr. Patel and

17   Mr. Fernandez, "Watch these niggas," shortly before -- or

18   shortly after the individuals jumped off the bike?

19   A.   Yes.

20   Q.   So you shouted out a warning to Mr. Fernandez; is that

21   correct?

22   A.   That's correct.

23   Q.   And Mr. Patel, correct?

24   A.   That's correct.

25   Q.   And why did you do that?

 1   A.   Why did I do that?  Because they looked suspicious with
 2   hoods on and stuff.
 3   Q.   Okay.  Is it correct to say that at -- well, I will move
 4   on for a second.
 5         Now, when you saw the individuals, did you
 6   recognize them?
 7   A.   Yes.
 8   Q.   And shortly after -- did you recognize them by name?
 9   A.   Yes.
10   Q.   So you knew who they were, correct?
11   A.   Correct.
12   Q.   And they were Spanish Cobras?
13   A.   Correct.
14   Q.   Okay.  Now, eventually you spoke to the police; is that
15   correct?
16   A.   That's correct.
17   Q.   And when you spoke to the police, did you tell them that
18   the people that you saw on the bike were Mr. Gomez and
19   Mr. Kuri?
20   A.   That's what I said.  That's correct.
21   Q.   Okay.  And when you said that to the police, did you
22   tell them -- did you use their nicknames?
23   A.   Yes, I did.
24   Q.   And did you use Rowdy?
25   A.   Yes, I did.

1    Q.   And you knew that to be Mr. Kuri's nickname from the

2    street, correct?

3    A.   Yes.  Correct.

4            THE COURT:  Let's have a sidebar.

5        (The following proceedings were had at sidebar:)

6            THE COURT:  Okay.  A little less leading.  I gave

7    both of you some leeway early on because he was extremely

8    resistant.  And now he is 100 percent compliant.  So I'm not

9    sure what is going on, but you -- so less leading and -- so,

10   for example, how did you refer to him?

11           MS. ROSEN:  Okay.

12           THE COURT:  And if he starts going sideways again,

13   then I will let you lead again.  But right now he is just in

14   whatever-you-say mode.  All right?

15           MS. ROSEN:  Okay.  Thank you.

16       (End of sidebar proceedings.)

17           THE COURT:  All right.  We will get resituated.

18       (Brief pause.)

19           THE COURT:  All right.  Go ahead.

20           MS. ROSEN:  Thank you.

21   BY MS. ROSEN:

22   Q.   What are the nicknames that you gave -- what are the

23   nicknames of the people that you recognized on the bike?

24           I'm sorry.  Let me withdraw that question.

25           What are the nicknames of the people that you told

1    police were riding on the bike?

2    A.   Rowdy and David.

3    Q.   And is that Little David?  Is he referred to as

4    Little David?

5    A.   Yes.

6    Q.   Or Little C?

7    A.   Yes.

8    Q.   Okay.  And when you told -- after you told the police

9    those names, did they show you some photographs?

10   A.   Yes, they did.

11   Q.   Okay.  And when you reviewed those photographs -- prior

12   to reviewing those photographs, did they give you a piece of

13   paper and a form to have you sign-off on the -- that you were

14   willing to view the photographs?

15   A.   Yes.

16        MS. ROSEN:  We would like to use Defendants'

17   Exhibit 112.  That's been marked for identification.

18        THE COURT:  Are you moving it in or just to show

19   the witness?

20        MS. ROSEN:  Actually, I would like to move it into

21   evidence.

22        MR. LOEVY:  The photo array?

23        MS. ROSEN:  The photo array, yes.

24        MR. LOEVY:  No objection, your Honor.

25        THE COURT:  All right.  Defense 112.  It's allowed.

```
 1              (Said exhibit was received in evidence.)
 2              MS. ROSEN:  If we can go to CCSAO 2749.
 3    BY MS. ROSEN:
 4    Q.   Can you see on the screen there, that form?
 5    A.   Yes, I see it.
 6    Q.   Okay.  And you see at the bottom there, there is your
 7    signature, right?
 8    A.   Yes.
 9    Q.   And you signed that, right?
10    A.   Yes.  Correct.
11    Q.   Okay.  And do you recall the police officers were at
12    your home at the time, and they asked you to sign this,
13    correct?
14    A.   Yes.
15    Q.   And they explained to you, as it says on the form, that
16    you understand that the suspect may or may not be in the
17    photo spread, correct?
18    A.   Yes.
19    Q.   And you understood that.  Did you understand that?
20    A.   Yes.
21    Q.   And they also explained to you that you are not required
22    to make an identification.
23              Did they tell you that?
24    A.   Yes.
25    Q.   And did they also read you or inform you of the third
```

1    line, which indicates that you are not to assume that the

2    person administering the photo spread, the person showing you

3    the photos, knows which person is the subject?

4              Did they explain that to you?

5    A.   I can't remember, but I'd say yeah.  I can't remember.

6    Q.   Okay.  But in any event, you read it and you signed the

7    document, right?

8    A.   Yes.

9    Q.   Okay.  And then if we go to the next page, which is

10   CCSAO 2750, is that the photographs -- one of the groups of

11   photographs they showed you?

12   A.   Yes.

13   Q.   And did you circle the photo in the middle on the top

14   line?

15   A.   Yes.

16   Q.   And did you write the name "Rowdy" underneath it?

17   A.   Yes.  Yeah.

18   Q.   Okay.  And is that your signature at the top, "Zay

19   Russell"?

20   A.   Yes.

21   Q.   And did you actually write "August 2nd, 2009, 9:45

22   p.m."?

23   A.   No.

24   Q.   You didn't.  Okay.

25              And then, if we go to -- they showed you another

1   group of photographs, correct, that same night?

2   A.   I can't remember.

3   Q.   Perhaps if you take a look at CCSAO 2752, is that

4   your --

5        MR. LOEVY:  Your Honor, I thought we were going to

6   use the same procedure for refreshing recollection.

7        MS. ROSEN:  Well, I thought this was already in.

8   Sorry.

9        MR. LOEVY:  Either way, your Honor.

10       THE COURT:  Okay.  Just ask him if it would help

11  him remember.

12  BY MS. ROSEN:

13  Q.   If you take a look at these photographs, does that

14  refresh your recollection that you also viewed some

15  photographs that night -- additional photographs?

16  A.   Yes.

17  Q.   Okay.  Is that your signature at the top there, "Zay

18  Russell"?

19  A.   Yes.

20  Q.   And did you write -- did you put the circle around the

21  photograph in the top left corner?

22  A.   Yes.

23  Q.   And did you write "Little C/David"?

24  A.   Yes.

25  Q.   Okay.  Now, after you made those photo identifications,

1    a few days or a week later were you interviewed at the police

2    station?

3    A.    Yes, I believe so.

4    Q.    And did you meet with an Assistant State's Attorney?

5    A.    Yes.

6    Q.    Okay.  And at that time did you also view a lineup with

7    Mr. Gomez?

8    A.    Yes.

9    Q.    And did you identify Mr. Gomez from the lineup?

10   A.    Yes.

11   Q.    And then when you met with the Assistant State's

12   Attorney, was there a period of time that you met with her

13   with a detective present?

14           Do you remember?

15   A.    I can't remember.

16   Q.    Okay.  Do you remember speaking with her alone and her

17   having a conversation with you about what you saw and what

18   you observed?

19   A.    Yes.

20   Q.    And do you remember her asking you specifically whether

21   or not the police had done anything to influence your

22   identification?

23   A.    I can't remember everything that was said, but -- I

24   don't know.

25   Q.    Okay.  But in any event, after that she explained to you

1    that she would like to memorialize or have your statement

2    recorded in some way.

3              Do you remember that?

4    A.   Yes.

5    Q.   And did she explain to you that you could do it either a

6    handwritten statement or you could be video-recorded at the

7    police station?

8              Do you remember that?

9    A.   No, I don't remember if she said that.  I can't

10   remember.

11   Q.   Okay.  But in any event, your statement was ultimately

12   video-recorded, right?

13   A.   Yes.

14   Q.   Okay.  Have you had an opportunity to see that videotape

15   ever?

16   A.   Yeah, I've seen it.

17   Q.   Okay.  And when you reviewed it, did it seem that it

18   recorded all the words that you said accurately?

19   A.   Yes, it did.

20   Q.   Okay.  And at that point, when you gave that

21   video-recorded statement, you told the Assistant State's

22   Attorney what happened to you that night; isn't that right?

23   A.   Yes.

24   Q.   Okay.  You told her the circumstances of the shooting,

25   correct?

1  A.   I don't even remember how she looked.  I don't know.  I
2  don't know what we talked about.
3  Q.   Okay.  Do you recall telling the investigator in May --
4  on May 19th of 2011, that it was Rowdy pedaling and Little D
5  riding the rear pegs of the bike?
6  A.   Yes.
7  Q.   Did you also tell the investigator that you were worried
8  about what TC had to say?
9  A.   No, I don't remember that.  I don't know.
10  Q.   Do you recall telling the investigator that you were
11  worried about testifying?
12  A.   Yeah, I guess.  I don't know.
13  Q.   By the time it got to Mr. Kuri and Mr. Gomez's criminal
14  trial, you had got to the point where you didn't want to
15  participate anymore, correct?
16  A.   Correct.
17  Q.   And you had actually been subpoenaed to testify,
18  correct?
19  A.   Yes.
20  Q.   And you understood that a subpoena is a court order,
21  right?
22  A.   Yes.
23  Q.   But you didn't want to testify, so you disregarded it,
24  correct?
25  A.   Yes.

1          Didn't you tell Ms. Rosen that, when she was asking

2     you questions a second ago, that the shooting happened.  The

3     police rolled up, and you knew who killed you -- or shot you,

4     and you told the police?

5     A.    Yes.

6     Q.    You told Ms. Rosen that?

7     A.    Yes.

8     Q.    When you were -- you said, yes, basically to just about

9     every question she asked you, didn't you?

10    A.    Yes.

11    Q.    Then, when you were taking questions from me, you also

12    said the police told you who to say and that they told you

13    they had done their job and that you hadn't seen Rowdy and

14    Gomez on the bike, right?

15          MS. ROSEN:  I object to that as compound and form.

16    BY THE WITNESS:

17    A.    That's what I told them.

18          THE COURT:  Overruled.

19    BY MR. LOEVY:

20    Q.    Are you trying to get out of here as fast as you can?

21    A.    No.  I mean, you talked to me.  You told me to tell the

22    truth, so I'm telling the truth.

23    Q.    That's right.

24          And you and I met today, correct?

25    A.    Yes.

11:30AM 1    Now the -- there's plenty of times on the video

11:30AM 2    where you're not seen with him and you're not in the room

11:30AM 3    with him, right?

11:30AM 4    A.   That is correct, ma'am.

11:30AM 5    Q.   Okay.

11:30AM 6    What are you doing when you're not interviewing

11:30AM 7    him?

11:30AM 8    A.   I could be -- I mean, I went home at some point.  I

11:30AM 9    could have went out and grabbed something to eat.

11:30AM 10    I probably was working on the investigation,

11:30AM 11    attempting to locate our witnesses for physical lineups,

11:30AM 12    typing, getting the reports together, reviewing different

11:30AM 13    documents, just trying to compile this, along with reaching

11:31AM 14    out to the State's Attorney's Office, that's another part of

11:31AM 15    the investigation, to update them on the status and where

11:31AM 16    we're at in the investigation.

11:31AM 17    Q.   Okay.

11:31AM 18    So during your interviews with Mr. Kuri, I think a

11:31AM 19    couple hours after he had first been brought in, he gave you

11:31AM 20    some alibi witnesses; is that right?

11:31AM 21    A.   That is correct, ma'am.

11:31AM 22    Q.   Okay.  And what is an alibi?

11:31AM 23    A.   An alibi is a reason that you weren't at the specific

11:31AM 24    location that is being requested.

11:31AM 25    So, for example, you know, where were you at this

11:31AM 1    date and time and location?  And, you know, I believe you

11:31AM 2    were at this location.

11:31AM 3          The individual could say, I was at another

11:31AM 4    location, speaking or living with or visiting so-and-so.

11:31AM 5          So it's our responsibility to then go and try to

11:31AM 6    verify that information, speak to those other people to see,

11:31AM 7    is this individual we're talking to is he -- is this

11:31AM 8    accurate?  Is that an actual alibi?  Or is the individual

11:31AM 9    lying to you and it's not an alibi.

11:32AM 10   Q.   Okay.

11:32AM 11         And there were actually several people that are

11:32AM 12   listed in your report as different individuals you went and

11:32AM 13   spoke to on behalf of Mr. Kuri; is that right?

11:32AM 14   A.   Several addresses and information that Mr. Kuri

11:32AM 15   provided, yes.  Went specifically to their residences,

11:32AM 16   knocking on doors, speaking with them, to verify information,

11:32AM 17   specific alibis that Mr. Kuri provided.

11:32AM 18   Q.   Okay.

11:32AM 19         And when you are investigating an alibi, you are

11:32AM 20   potentially generating helpful information for Mr. Kuri; is

11:32AM 21   that right?

11:32AM 22   A.   Absolutely.  You're giving him the benefit of the doubt.

11:32AM 23   He's saying he was somewhere else.  I want to speak to that

11:32AM 24   person.  I want to verify if this is true or not.

11:32AM 25   Q.   Okay.

| | |
|---|---|
| 11:32AM | 1 |
| 11:32AM | 2 |
| 11:32AM | 3 |

And when -- do you recall from August 5th Mr. Kuri had given you an address on Tripp, 1935 North Tripp?

A.   I do recall that address, ma'am.

Q.   All right.

And were you -- you weren't able to interview anyone with regard to that address back on August 5th, but you were on August 9th.

Do you remember that?

A.   I believe it was September 9th.

Q.   I'm sorry, September 9th.

A.   Yeah, so August 5th, we were unsuccessful.  September 9th we were successful in locating and speaking with some individuals.

Q.   Okay.

And I'm going to show you Defense Exhibit 128.

THE COURT:  All right.  Any objection to 128?

MR. LOEVY:  Just hearsay, Your Honor.

No objection, no objection.

THE COURT:  All right.

It's allowed.

MS. BENJAMIN:  Thank you.

BY MS. BENJAMIN

Q.   So this is another GPR that you prepared, and this is in relation to your interview with Ms. Luis, Teresa Luis?

A.   That's correct, ma'am.

| | | |
|---|---|---|
| 11:33AM | 1 | Q. Okay. |
| 11:33AM | 2 | And the address is 1935 North Tripp? |
| 11:33AM | 3 | A. Specifically, the first floor, yes, ma'am. |
| 11:34AM | 4 | Q. Okay. |
| 11:34AM | 5 | And can you tell what time you met with her from |
| 11:34AM | 6 | this report, or this progress report? |
| 11:34AM | 7 | A. 0730 hours, which is 7:30 a.m. |
| 11:34AM | 8 | Q. Okay. |
| 11:34AM | 9 | And what information -- when you first met with |
| 11:34AM | 10 | her, did you show her a photograph? |
| 11:34AM | 11 | A. Yes, I did. |
| 11:34AM | 12 | Q. And is it your understanding that you were showing her a |
| 11:34AM | 13 | photograph, a recent photograph, taken in July of 2009, of |
| 11:34AM | 14 | Mr. Kuri? |
| 11:34AM | 15 | A. That is correct, ma'am. |
| 11:34AM | 16 | Q. Okay. |
| 11:34AM | 17 | And I'm going to show you a copy of that |
| 11:34AM | 18 | photograph. This is Defendant's Exhibit 120. |
| 11:34AM | 19 | THE COURT: All right. It's allowed based on our |
| 11:34AM | 20 | sidebars. |
| 11:34AM | 21 | BY MS. BENJAMIN: |
| 11:34AM | 22 | Q. Is that the photograph that you showed Ms. Luis on March |
| 11:35AM | 23 | 9th, 2009? |
| 11:35AM | 24 | A. September 9th, 2009? Yes, ma'am. |
| 11:35AM | 25 | Q. I'm sorry. I'm seeing "3" on your report. |

11:35AM  1      And this, there's a back side to this, and

11:35AM  2   actually, I have the original here with me, so I'm going to

11:35AM  3   swap that out.

11:35AM  4      This would have been a document you would have

11:35AM  5   maintained in your file, is that right?

11:35AM  6   A.   Yes, ma'am.

11:35AM  7   Q.   And we have copies of it as an exhibit, but the original

11:35AM  8   was a color photo, correct?

11:35AM  9   A.   I --

11:35AM  10      MR. LOEVY:  Objection, leading, Your Honor.

11:35AM  11      THE COURT:  Yes, sustained.

11:35AM  12      MS. BENJAMIN:  Okay.

11:35AM  13   BY MS. BENJAMIN:

11:35AM  14   Q.   You had access to a color printer at Area 5, correct?

11:35AM  15      MR. LOEVY:  Objection, leading.

11:35AM  16   BY MS. BENJAMIN:

11:35AM  17   Q.   Do you have access to a color printer at Area 5?

11:35AM  18      THE COURT:  All right.  Go ahead.

11:35AM  19   BY THE WITNESS:

11:35AM  20   A.   Access, correct.  But always functioning, not correct.

11:35AM  21   BY MS. BENJAMIN:

11:35AM  22   Q.   Okay.

11:35AM  23      THE COURT:  All right.  Just for the record, it's

11:35AM  24   Defense 210.  I think you might have said 120.  So Defense

11:35AM  25   210 is in, based on the sidebar discussion.

```
11:36AM   1         MS. BENJAMIN:  I'm sorry.  All right.
11:36AM   2    BY MS. BENJAMIN:
11:36AM   3    Q.   And I'd like to now show you the original from your file
11:36AM   4    of this photograph since this is a photocopy.
11:36AM   5    A.   Sure.
11:36AM   6    Q.   All right.
11:36AM   7         MR. LOEVY:  Your Honor, can I just see a copy of
11:36AM   8    it?
11:36AM   9         THE COURT:  Yes.
11:36AM  10         MR. LOEVY:  Was that in the file?
11:36AM  11         MS. BENJAMIN:  Uh-huh.
11:36AM  12         MR. LOEVY:  Okay.  If it was in the file, we accept
11:36AM  13    that.
11:36AM  14         MS. BENJAMIN:  Yes.
11:36AM  15         It's the same.
11:36AM  16         MR. LOEVY:  I know it's the same photo.  I
11:36AM  17    didn't -- the color photo, I didn't understand the color
11:36AM  18    photo was in the file.
11:36AM  19         MS. BENJAMIN:  Okay.
11:36AM  20         THE COURT:  Well, let's have a quick sidebar.
11:36AM  21         MR. LOEVY:  It doesn't really matter.
11:36AM  22         THE COURT:  I'm sorry?
11:36AM  23       (Proceedings heard at sidebar:)
11:36AM  24         MR. LOEVY:  We don't know where the representation
11:36AM  25    is coming from that there was a color photo in the file.
```

11:36AM 1    MS. ROSEN:  He knows the file.  It's here, and

11:36AM 2    it's --

11:36AM 3         MR. LOEVY:  If they're telling me that's the photo

11:36AM 4    from the file?

11:36AM 5         MS. BENJAMIN:  Oh, it is.

11:36AM 6         MS. ROSEN:  Yes.

11:36AM 7         MR. LOEVY:  Then I accept it.

11:36AM 8         THE COURT:  Yeah, I think you could also accept it

11:36AM 9    because it's got coffee stains and pen marks that are

10    original.

11         (Laughter.)

12         MS. BENJAMIN:  And there's a note on the back.

13         THE COURT:  All right.

14         (Proceedings heard in open court:)

11:37AM 15        THE COURT:  All right.  You can go ahead and show

11:37AM 16   the original of 210.

11:37AM 17        MS. BENJAMIN:  Thank you.

11:37AM 18   BY MS. BENJAMIN:

11:37AM 19   Q.  All right.

11:37AM 20        And this photograph was first shown to Ms. Luis in

11:37AM 21   order to determine if she -- if you and her were talking

11:37AM 22   about the same person; is that right?

11:37AM 23   A.  That is correct.

11:37AM 24   Q.  Okay.

11:37AM 25        And when you met with her -- I'm going to show you

11:37AM 1    the back side of this document.

11:37AM 2        She lived on North Tripp, correct?

11:37AM 3    A.   Yeah, it looks -- that's correct, ma'am.

11:37AM 4    Q.   Okay.

11:37AM 5        So you just jotted down on the back of this

11:37AM 6    photograph where you showed it to her, correct?

11:37AM 7    A.   That is correct.  It just looks like the numbers might

11:37AM 8    be transposed a little bit, but it's just a quick note.  That

11:37AM 9    is correct.

11:37AM 10   Q.   All right.  Thank you.

11:37AM 11       And did she say -- what did she say to you when she

11:38AM 12   saw the photograph?

11:38AM 13   A.   She said she recognized him as Rowdy, as Anthony Kuri.

11:38AM 14   Q.   Okay.

11:38AM 15       Is that your writing here on the right-hand side

11:38AM 16   (indicating)?

11:38AM 17   A.   That does not look like my writing.

11:38AM 18   Q.   Okay.

11:38AM 19       Now, going back to Defense Exhibit 128, after you

11:38AM 20   showed her that photograph, and she identified him, what did

11:38AM 21   you talk to her about?  Or what --

11:38AM 22   A.   Basically just asked her if she knew him.  She said she

11:38AM 23   knew him.  When was the last time she had any contact with

11:38AM 24   him, and it was months, months ago.

11:38AM 25       She said that she was helpful.  Sometimes he just

11:38AM 1    was looking for somewhere to stay, wanted some food, but she

11:38AM 2    really didn't want him staying at the house, she had some

11:38AM 3    young daughters, and she would provide food and --

11:38AM 4              MR. LOEVY:  Objection.

11:38AM 5              THE COURT:  I'm sorry?

11:38AM 6              MR. LOEVY:  We object to the hearsay and attempt to

11:38AM 7    prejudice.

11:39AM 8              THE COURT:  All right.  We need to take a sidebar.

11:39AM 9              MR. LOEVY:  All right.  We'll withdraw the

11:39AM 10   objection.  The report speaks for itself.  We'll withdraw the

11:39AM 11   objection.

11:39AM 12             THE COURT:  All right.

11:39AM 13   BY THE WITNESS:

11:39AM 14   A.   Should I continue?

11:39AM 15   BY MS. BENJAMIN:

11:39AM 16   Q.   I'll ask you another question.

11:39AM 17             You recorded whatever she had to say in your

11:39AM 18   general progress report, correct?

11:39AM 19   A.   That is correct.

11:39AM 20   Q.   Okay.

11:39AM 21             And if she had said something that said, yes,

11:39AM 22   Mr. Kuri was there with me, you would have recorded that in

11:39AM 23   your general progress report?

11:39AM 24   A.   Of course.

11:39AM 25   Q.   Okay.

11:39AM 1    And you did that with regard to your other

11:39AM 2    interviews with Nicole Campos and Chrystian Reyes?

11:39AM 3    A.   That is correct.

11:39AM 4    Q.   Okay.

11:39AM 5         And you showed them photos of Mr. Kuri

11:39AM 6    contemporaneously taken in or around July of 2009 as well to

11:39AM 7    make sure you were talking about the same person, or make

11:39AM 8    sure they understood who you were talking about?

11:39AM 9    A.   Yes.  Just to be clear, it wasn't like a photo array as

11:39AM 10   we discussed earlier.  It was just an individual photo.  Do

11:39AM 11   you know this guy?  And continue on with, how do you know

11:40AM 12   him?  When was the last time you saw him?  If that makes

11:40AM 13   sense.

11:40AM 14   Q.   Okay.

11:40AM 15        And did any of the alibi witnesses that you spoke

11:40AM 16   to -- could any of them say definitively that Mr. Kuri was

11:40AM 17   with them on the night of the Patel homicide?

11:40AM 18   A.   No, they could not.

11:40AM 19   Q.   Okay.

11:40AM 20        So none of Mr. Kuri's alibis checked out, according

11:40AM 21   to your investigation?

11:40AM 22   A.   That is correct, Ma'am.

11:40AM 23   Q.   Okay.

11:40AM 24        And you recorded all of that in your report that

11:40AM 25   you eventually prepared in relation to your work on August

02:04PM 1   Q.   Okay.

02:04PM 2        And did Mr. Russell indicate to you how it was that

02:04PM 3   he wanted to have his statement memorialized?

02:04PM 4   A.   He indicated that he would do it with the video-recorded

02:04PM 5   statement.

02:04PM 6   Q.   Okay.

02:04PM 7        And when you're having these discussions with

02:04PM 8   Mr. Russell, is there a certain place in the detective

02:05PM 9   division at Area 5 that you have this conversation at?

02:05PM 10  A.   So, we can have the oral conversation anywhere, in any

02:05PM 11  of the interview rooms; but at that time, there, I believe,

02:05PM 12  was at least one room that was connected electronically in

02:05PM 13  order to do the video-recorded statements.

02:05PM 14       Once he agreed to give a video-recorded statement,

02:05PM 15  we had to go to that room.

02:05PM 16       The video recording is snapped on prior to our

02:05PM 17  entry.  We walk into it.  Everybody decides where they want

02:05PM 18  to sit, and then we begin to record his statement.

02:05PM 19  Q.   Okay.

02:05PM 20       And the jury has seen videos of the -- an interview

02:05PM 21  room that Mr. Russell -- I mean Mr. Kuri was in at a later

02:05PM 22  point in time at Area 5.

02:05PM 23       Is that the same type of room that Mr. Russell

02:06PM 24  would have been in?

02:06PM 25  A.   Yes, I believe so.

| | | |
|---|---|---|
| 02:06PM | 1 | Q.   Okay. |
| 02:06PM | 2 | And the interview rooms at Area 5 are all similar |
| 02:06PM | 3 | in the way they look and -- |
| 02:06PM | 4 | A.   Yes. |
| 02:06PM | 5 | Q.   -- and how big they are -- |
| 02:06PM | 6 | A.   Yes. |
| 02:06PM | 7 | Q.   -- and the contents? |
| 02:06PM | 8 | A.   Correct. |
| 02:06PM | 9 | Q.   Okay. |
| 02:06PM | 10 | Do you recall what time it was approximately that |
| 02:06PM | 11 | you -- well, actually, let me back up a second. |
| 02:06PM | 12 | Before you did the video statement, you said you |
| 02:06PM | 13 | had a private conversation with Mr. Russell? |
| 02:06PM | 14 | A.   That's correct. |
| 02:06PM | 15 | Q.   At any point in time, and during that conversation, did |
| 02:06PM | 16 | Mr. Russell express any reluctance in cooperating with the |
| 02:06PM | 17 | investigation to you? |
| 02:06PM | 18 | A.   No. |
| 02:06PM | 19 | Q.   Okay. |
| 02:06PM | 20 | And during the course of that conversation, did |
| 02:06PM | 21 | Mr. Russell at any point in time indicate to you that his |
| 02:06PM | 22 | identifications of the individuals involved were as a result |
| 02:06PM | 23 | of detectives providing him the names of the individuals? |
| 02:06PM | 24 | MR. LOEVY:  Objection, foundation that question is |
| 02:06PM | 25 | asking, Your Honor. |

```
03:47PM   1   Q.   And on August 18th, 2009, you presented Zay Russell and
03:47PM   2   Tony Fernandez as witnesses to testify before the grand jury,
03:47PM   3   correct?
03:47PM   4   A.   Yes, I did.
03:47PM   5   Q.   And before you had them testify, did you meet with Zay
03:47PM   6   Russell to speak with him before he testified?
03:47PM   7   A.   Yes.
03:47PM   8   Q.   Where did you meet with him?
03:48PM   9   A.   In my office.
03:48PM  10   Q.   And was anybody else present when you met with him?
03:48PM  11   A.   Just me and Zay Russell.
03:48PM  12   Q.   Did you speak -- did you interview Mr. Russell?
03:48PM  13   A.   Yes, I did.
03:48PM  14   Q.   What did you interview him about?
03:48PM  15   A.   About the incident from July 24th, 2009.
03:48PM  16   Q.   Did you ask him to tell you what he was going to testify
03:48PM  17   about in his own words?
03:48PM  18   A.   Yes.
03:48PM  19   Q.   Did you ask him open-ended questions?  Meaning, tell me
03:48PM  20   what happened.  What happened next?  What happened after
03:48PM  21   that?
03:48PM  22   A.   Yes.
03:48PM  23   Q.   All right.  And did you take notes of this conversation?
03:48PM  24   A.   I did.
03:48PM  25   Q.   And did you also have a similar conversation with
```

09:03AM 1    other documents, transporting witnesses to and from court,

09:03AM 2    and transporting medical records.

09:03AM 3              In relation to the criminal charges pending against

09:03AM 4    plaintiff, Investigator Ramsey interviewed Zay Russell for

09:03AM 5    plaintiff's criminal defense attorney Jean Harrigut

09:03AM 6    (phonetic).

09:03AM 7              Mr. Ramsey met with Russell on May 19, 2011 while

09:03AM 8    Russell was incarcerated at the Pontiac Correctional Center.

09:03AM 9              Mr. Ramsey would testify that prior to answering

09:03AM 10   any questions, Russell wanted to know what Tony Fernandez,

09:03AM 11   TC, said.  He would testify that Russell was worried about

09:03AM 12   what Fernandez had to say.  Ramsey would also testify that

09:03AM 13   Russell said that he was worried about testifying.

09:03AM 14             So stipulated by defendants.

09:03AM 15             THE COURT:  So stipulated?

09:03AM 16             MR. LOEVY:  So stipulated, Your Honor.

09:04AM 17             THE COURT:  All right.

09:04AM 18             MS. BENJAMIN:  The next is marked as Defendants'

09:04AM 19   Exhibit 240.

09:04AM 20             The parties stipulate that the transcript of Tony

09:04AM 21   Fernandez before the grand jury of Cook County on August

09:04AM 22   18th, 2009 was certified by Helen Hackney, a certified

09:04AM 23   shorthand reporter, to be a true and accurate transcript of

09:04AM 24   the proceedings.

09:04AM 25             The parties further stipulate that the transcript

09:04AM 1   of Tony Fernandez's testimony on March 8, 2012, at the

09:04AM 2   criminal trial of People of the State of Illinois versus

09:04AM 3   David Gomez and Anthony Kuri, No. 09 CR 19903 was certified

09:04AM 4   by Jamie T. Quinlan, official shorthand reporter for the

09:04AM 5   Circuit Court of Cook County, Criminal Division, to be a true

09:04AM 6   and accurate transcript of all the evidence heard.

09:04AM 7          So stipulated by defendants.

09:04AM 8          MR. LOEVY:  And so stipulated, Your Honor.

09:04AM 9          THE COURT:  All right.  Does the defense rest?

09:04AM 10         MS. ROSEN:  Subject to the admission of Defendants'

09:05AM 11  Exhibit 17 in its redacted form.

09:05AM 12         THE COURT:  Okay.  And we'll proceed with the Rule

09:05AM 13  50s as discussed yesterday.

09:05AM 14         Then anything else for the plaintiff?

09:05AM 15         MR. LOEVY:  Yes, Your Honor, and then it's the

09:05AM 16  final stipulation.

09:05AM 17         THE COURT:  Okay.

09:05AM 18         MR. LOEVY:  Can we put it on the ELMO?

09:05AM 19         THE COURT:  Yes.

09:05AM 20         MR. LOEVY:  Thank you.

09:05AM 21         Your Honor, the parties stipulate further as

09:05AM 22  follows:

09:05AM 23         Court records show that the plaintiff filed a

09:05AM 24  complaint in the above-captioned matter on March 4, 2013.

09:05AM 25  The summons to Defendant Folino was returned executed on

09:40AM  1          Why are they now lying and claiming, oh, that's a

09:40AM  2   typo, our sworn police report is wrong?  Because you saw it,

09:40AM  3   ladies and gentlemen, they pulled Rowdy's photograph on

09:40AM  4   August 1st, a day before they supposedly heard for the first

09:40AM  5   time -- I mean, it's so obvious.

09:40AM  6          They said, look, we talked to Mr. Russell.  He told

09:40AM  7   us these names of guys we'd never heard of on August 2nd.

09:41AM  8   That's what it says in their police report.  We say no.  The

09:41AM  9   guys are saying you came to us with the names.

09:41AM  10         Russell and Fernandez are saying, you came to us

09:41AM  11  with the names.  How is it that we can prove that they didn't

09:41AM  12  first say the names on August 2nd?  Because the police had

09:41AM  13  Rowdy as the suspect on August 1st.

09:41AM  14         And, you know, they can say, oh, I just remembered

09:41AM  15  my police report contains a typo, and my sworn police report

09:41AM  16  is wrong.  You know, there's a rule on trials:  The team

09:41AM  17  that's the typo team, that's the team that should lose.  They

09:41AM  18  want you to believe, don't believe my sworn papers, don't

09:41AM  19  believe what I wrote, don't believe what I submitted and

09:41AM  20  testified to, all wrong.

09:41AM  21         And by the way, they have no explanation for why

09:41AM  22  they remember it's a typo.  They don't recall why they

09:41AM  23  remember that they recalled it wrong.  They don't remember

09:41AM  24  July 31st, they don't remember July 30th, they just remember

09:41AM  25  it's wrong.  No, they don't just remember it's wrong.  They