PIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY KURI, | ) | |
| (a.k.a. Ramsey Qurash) | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-1653 |
| | ) | |
| v. | ) | Judge Edmond E. Change |
| | ) | |
| THE CITY OF CHICAGO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS'
<u>RULE 50 AND RULE 59 MOTIONS</u>**

## Table of Contents

Table of Authorities ........................................................................................... iii

**Introduction** ...................................................................................................... 1

**I.    Legal Standard** ......................................................................................... 1

**II.   Summary of the Factual Record at Trial** ............................................... 2

    The July 23, 2009 Murder ................................................................................. 2

    Plaintiff's Innocence ......................................................................................... 3

    Russell Makes no Mention of Kuri .................................................................... 4

    Fernandez Makes no Mention of Kuri ............................................................... 5

    Defendants' Involvement ................................................................................... 6

    The Fabricated Russell Identification ............................................................... 8

    The Fabricated Fernandez Identification .......................................................... 9

    The Smoking Gun ............................................................................................ 11

**III.  Legal Argument** ..................................................................................... 12

    **A.    The Jury's Verdict on the Fabrication Due Process Claim Was Not Against the Manifest Weight of the Evidence** ............................. 12

        1.   Plaintiff's Fabrication Claim Was Well Supported by the Factual Record ....... 13

        2.   Defendants' Argument That They Did Not "Know" The Identifications Were False Is Unpersuasive ........................................ 14

        3.   Defendants' Arguments About Witness Credibility Are Unavailing ............... 17

    **B.    The *Brady* Verdict Is Sufficiently Supported By The Record** ........... 22

        1.   The Trial Record Easily Supports The Jury's *Brady* Verdict ........... 23

          • The Eyewitnesses' Original Accounts ...................................... 23

- Other Exculpatory Details About The Fernandez Identification ..............25

- The Exculpatory Wachaa Details..................................................25

- Russell's Reluctance to Cooperate................................................26

- Other Investigatory Steps.........................................................27

- The Documents/Videos From Kuri's August 5 Arrest ........................28

- The Truth About How Kuri Got Implicated .................................30

2. The Fact That Kuri Was AcquittedDoes Not Defeat The Claim .....................30

**C.** **The Malicious Prosecution Verdict Is Sufficiently Supported By The Record**34

1. Probable Cause Is A Jury Question ..............................34

2. If The Jury Rejected Defendants' Version Of The Identifications, There Could Be No Probable Cause ......................................34

3. A Rational Jury Could Have Found An Absence Of Probable Cause On This Record ...............................................35

4. The Other Malicious Prosecution Elements ....................40

**D.** **The Jury's Verdict On Kuri's Derivative Claims Should Not Be Disturbed Either**........................................................41

**IV.** **The Verdict Against Defendant McDermott Was Not Against The Manifest Weight Of The Evidence** ....................................42

**V.** **There Was No Problem With Inconsistent Verdicts** ....................44

**A.** **Defendants Failed To Properly Preserve This Argument**................45

**B.** **The Jury's Verdicts Are Not Inconsistent** ........................45

**VI.** **The Jury's Damage Award Was Sufficiently Supported by the Evidence** ..........47

**A.** **Legal Standard**....................................................47

**B.** **The Jury's Award Here Was Roughly Comparable to Awards in Similar Cases**..................................................48

2

    C.      The Jury's Award Was Neither Monstrously Excessive Nor Lacking Any Rational Connection to the Record Evidence ........................................................ 53

    D.      The Record Evidence ............................................................................... 52

    E.      The Defendants Have Not Made The Required Showing that the Jury Acted Irrationally or that the Award is Monstrously Excessive ................................. 57

**CONCLUSION** ............................................................................................................ 58

# Table of Authorities

## Cases

*Adams v. City of Chicago*, 798 F.3d 539 (7th Cir. 2015) ...................................................48, 50, 57

*Aguirre v. City of Chicago, et al*, No. 2003-L-004065 (Ill. Cir. Ct. Feb. 17, 2006) ...................51

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013).............................................................35

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)..........................................................................31

*Ashe, et al. v. State of Connecticut* No. 23728, 2016 WL 2748380 (D.Conn. Jan. 15, 2016).......52

*Avery v. Milwaukee*, 847 F.3d 433 (7th Cir. 2017)................................................................ passim

*Ayers v. City of Cleveland*, 2013 WL 1965948 ..............................................................................49

*Baba-Ali v. State of New York*, 878 N.Y.S.2d 555 (Ct. Cl. 2009) .................................................51

*BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986)...............................................................................36

*Bogan v. Chicago,* 644 F.3d 563 (7th Cir. 2011)...............................................................................1

*Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ........................................................................19

*Cairel v. Alderden,* 821 F.3d 823 (7th Cir. 2016)...........................................................................31

*Carter v. Chicago Police Officers*,165 F.3d 1071 (7th Cir. 1998) ................................................45

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008) ........................................................................34

*Collier v. Chicago*, 2015 WL 50814408 (N.D. Ill. Aug. 26, 2015)................................................35

*Collins v. City of Chicago*, No. 2012-L-012389, 2013 WL 5771217( Ill. Cir. Ct. Sep. 24, 2013)50

*Cruz v. Cicero,* 275 F.3d 579 (7th Cir. 2001)....................................................................................1

*Calusinski v. Kruger,* 24 F.3d 931 (7th Cir. 1994) ...........................................................................1

*Deloughery v. City of Chicago*, 422 F.3d 611 (7th Cir. 2005) ................................................46, 53

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ...............................................................22, 48

*EEOC v. GKG, Inc.,* 39 F.3d 740 (7th Cir. 1994)........................................................................1, 24

*Egan v. City of Chicago*, 2012 WL 6963983 (N.D. Ill. Oct. 12, 2012)..........................................52

*Emmel v. Coca-Cola*, 95 F.3d 627, 633-34 (7th Cir. 1996)...........................................................24

*Fields v. City of Chicago*, 2015 WL 13578989 (N.D. Ill. Apr. 7, 2015) ...........................27, 49

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014).............................................................12, 15, 16

*Fleming v. Cnty. of Kane*, 898 F.2d 553 (7th Cir.1990) .................................................................48

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ........................................................................ passim

*Franks v. Delaware*, 438 U.S. 154 (1978)......................................................................................35

*Freeman v. Chicago Park Dist.*, 189 F.3d 613 (7th Cir.1999)........................................................46

*G.G. v. Grindle*, 665 F.3d 795 (7th Cir. 2011) ...............................................................................48

*Galvan v. Norberg*, 2011 WL 1898237 (N.D. Ill. May 18, 2011)............................................18, 19

*Giglio v. United States*, 405 U.S. 150 (1972) .................................................................................23

*Gorlikowski v. Tolbert*, 52 F.3d 1439 (7th Cir. 1995) ......................................................................2

*Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010 (7th Cir. 2016) ....................................................57

*Gristwood v. State of New York*, 2013 WL 1975649 (Ct. Cl. Apr. 4, 2013) ................................51

*Hammond v. Kunard*, 148 F.3d 692 (7th Cir. 1998).......................................................................35

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ....................................................................41

*Harvey v. Office of Banks*, 377 F.3d 698 (7th Cir. 2004) ..............................................................18

*Hendrickson v. Cooper,* 589 F.3d 887 (7th Cir. 2009) ...................................................................52

*Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322 (9th Cir. 1995)..........................45

*Irvin v. Kaczmaryn*, 913 F. Supp. 1190 (N.D. Ill. 1996) ...............................................................36

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) .............................................................48

*Johnson v. Guevara*, 2009 WL 1886888 (N.D. Ill. June 22, 2009)............................................48

*Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988)............................................................... passim

*Kadia v. Gonzales*, 501 F.3d 817 (7th Cir. 2007).................................................................19

*Koh v. Graf*, 307 F. Supp. 3d 827 (N.D.Ill. 2018) .................................................................16

*Kosmynka v. Polaris Indus.*, 462 F.3d 74 (2d Cir. 2006) ....................................................45

*Kuri v. City of Chicago*, 2017 WL 4882338 (N.D.Ill. Oct. 30, 2017) ...................14,30,32

*Kyles v. Whitley*, 514 U.S. 419 (1995).................................................................................31

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011)...............................................................35

*Logan v. Caterpillar*, 246 F.3d 912 (7th Cir. 2011) ..........................................................46

*Los Angeles v. Heller*, 475 U.S. 796 (1986) ...................................................................45,49

*Maher v. Chicago,* 547 F.3d 817 (7th Cir. 2008).................................................................2

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993)..........................................34

*Napue v. Illinois*, 360 U.S. 264 (1959) ...............................................................................23

*Newsome v. James*, 2000 WL 528475 (N.D. Ill. Apr. 26, 2000) ........................................18

*Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001)............................................................22

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003)......................................................34,49

*Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir. 1997) ....................................................45

*Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985) .....................................................................35

*Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841 (7th Cir. 1998) ...............................40

*Passanati v. Cook County,* 689 F.3d 655, 659 (7th Cir. 2013).............................................1

*Pearson v. Welborn*, 471 F.3d 732 (7th Cir. 2006)............................................................45

*Petty v. Chicago*, 754 F.3d 416, (7th Cir. 2014).......................................................... passim

*Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434 (7th Cir. 2010)..............................52,53

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002).............................................................41

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) ........................................................17

*Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir. 1981) .....................................41

*Richman v. Burgeson*, 2008 WL 2567132 (N.D. Ill. June 24, 2008) ..................................52

*Smith v. Cain*, 565 U.S. 73 (2012) .....................................................................................24

*Smith v. City of Evanston*, 631 N.E.2d 1269 (Ill. App. Ct. 1994).......................................53

*Smith v. City of Oakland*, 538 F.Supp.2d 1217 (N.D. Cal. 2008)..................................49,50

*Smith v. Northeastern Ill. Univ.*, 388 F.3d 559 (7th Cir. 2004) ........................................40

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ........................................36

*Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900 (7th Cir. 2006) ....................32

*Thomas v. Cook County*, 604 F.3d 293 (7th Cir. 2010).......................................................45

*Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058 (7th Cir. 2001) ..........52,56

*United States v. Agurs*, 427 U.S. 97 (1976).......................................................................23

*United States v. Arthur*, 582 F.3d 713 (7th Cir. 2009)......................................................18

*United States v. Dunkel*, 927 F.2d 955 (7th Cir. 1991)......................................................41

*United States v. Lucus*, 165 F.3d 33 (7th Cir. 1998)..........................................................32

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ............................................................................23

*White v. McKinley*, 605 F.3d 525 (10th Cir. 2010)............................................................49

*Whitlock v. Brueggeman*, 682 F.3d 567 (7th Cir. 2012).................................................. passim

**Rules**

Rule 50(b) .............................................................................................................. 1

Rule 59 ........................................................................................................... passim

**Introduction**

In seeking to overturn the jury's verdict, the Defendants are unable to identify a single error made by the Court during or prior to trial. Defendants are obviously unhappy with the jury's decision, but the Court at all times properly exercised its discretion, and the trial was fair to them.

Unable to point to any arguable errors, Defendants resort to challenging the sufficiency of the evidence. That is a heavy lift, to say the least. Given the Seventh Amendement and the role that jury verdicts play in our judicial system, post-trial relief on this ground is rarely appropriate, and this case does not even remotely warrant an exception.

## I.      Legal Standard

Pursuant to Rule 50(b), parties seeking judgment as a matter of law can prevail only if no rational jury could have found against them. *Bogan v. Chicago*, 644 F.3d 563, 572 (7th Cir. 2011). At this stage, the Court construes the evidence strictly in Kuri's favor, "does not make credibility determinations or weigh the evidence," and "disregard[s] all evidence favorable to the moving party that the jury [was] not required to believe." *Passanati v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2013). Such challenges face a "daunting task, given the deferential standard that applies to such reviews." *Cruz v. Cicero,* 275 F.3d 579, 586 (7th Cir. 2001).

As for their Rule 59 motion, Defendants' motion is atypical in that they are not arguing that the Court made erroneous rulings or that any new evidence has been discovered. To the extent Rule 59 is even a viable vehicle for a sufficiency of the evidence challenge, the road is steeply uphill because jury verdicts are accorded great deference. *Calusinski v. Kruger*, 24 F.3d 931, 936 (7th Cir. 1994). Courts are "obliged to leave the judgment undisturbed unless the moving party can show that no rational jury could have brought in a verdict against him." *EEOC v. GKG, Inc.*, 39 F.3d 740, 745 (7th Cir. 1994). The standard for reviewing a jury verdict is "not whether it was

against the weight of the evidence, but whether there is a reasonable basis in the record for the verdict." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1446 (7th Cir. 1995). The Seventh Circuit characterizes this as a "heavy burden." *Maher v. Chicago*, 547 F.3d 817, 824 (7th Cir. 2008).

## II.     Summary of the Factual Record at Trial

In July 2009, Anthony Kuri was a teenager living in the City of Chicago. Ex. A (Trial Tr.) at 231:23-25. Although he experienced a difficult childhood in various foster child settings, *id*. at 223:3-225:12, he was a hard worker and had a number of jobs, including caddying at the Evanston Country Club and working at Portillo's and Subway restaurants. *Id*. at 230:7-16.

### The July 23, 2009 Murder

In the late evening hours on July 23, 2009, a group of boys in their teens and early twenties were riding around Chicago's West Side in Tony Fernandez' family minivan. They had been drinking, smoking marijuana, and taking other drugs since early that afternoon. Dkt. 315 (Fernandez Tr.) at PageID #5255-5257; Ex. A (Trial Tr.) at 844:23-845:5.

Shortly before midnight, near the corner of Lawrence and Lawndale, the boys in the minivan got into an altercation with Reinaldo Nieves (nicknamed Funk) and someone named Chino, both members of a rival gang called the Spanish Cobras. Ex. A (Trial Tr.) at 470:13-471:8; 859:18-860:10. Thereafter, some of the people in the van got dropped off and, at about 12:30 a.m., the van arrived at Russell's house at 4628 North Central Park. *Id*. at 471:9-23.

Russell had "zoned out" in the back of the minivan and was sleeping at the time the vehicle stopped. Dkt. 315 at PageID #5259-5260. Fernandez was in the middle row, and Gaurav Patel was in the driver's seat. *Id*. at PageID #5257-5258.

Shortly after Patel parked at Russell's house, someone began shooting at the minivan from behind, shattering the back windows. When the shots started coming, Fernandez was blinded by

flying glass. *Id.* at PageID #5261. Patel was shot in the neck. Ex. A (Trial Tr.) at 830:19-831:2.

Russell ducked down and was not hit by any of the bullets. *Id.* at 830:12-13. Fernandez was shot in

the leg, but survived and managed to take control of the minivan from Patel and drive away. Dkt.

315 at PageID #5261-62. He drove the van to Wilson Avenue, got out and summoned help. *Id.*

Patel and Fernandez were taken by ambulance to Illinois Masonic Hospital, where Patel was

pronounced dead at 1:10 a.m. *Id.* at Page ID #5262, 5265; Ex. B (PL Trial Ex. 27) at 13.

There were good reasons to conclude that neither Fernandez nor Russell actually saw the

shooter(s) who ambushed them from behind the row of parked cars. *See e.g.* Dkt. 315 PageID

#5261 (Fernandez was blinded by flying glass); Ex. A (Trial Tr.) at 830:12-13 (Russell ducked

when he heard gunshots). Although he was inconsistent on the issue, Fernandez ultimately

admitted as much. Dkt. 315 PageID #5261-5262. Also, when first asked at the scene to describe

what had happened, Russell said he saw Latinos on bikes on the corner when they pulled up to

Russell's home, but did not claim to have seen anyone doing the shooting. Ex. A (Trial Tr.) at

471:22-473:25. He did not originally provide any substantive descriptions of the shooting or any

shooter(s), much less identify Kuri, who by all accounts he would have known by name. *Id.* Nor

did he originally claim the assailants were on a bike at the time of the shooting. *Id.*

### Plaintiff's Innocence

Whoever committed this terrible crime, it had nothing to do with Kuri. Kuri was not

present at the scene, had no knowledge of the events at issue, and did not participate in any respect.

He is completely innocent. Ex. A (Trial Tr.) at 316:2-317:15.

There was no dispute that at the time of the shooting, Kuri, Fernandez, and Russell (who all

grew up together in the same neighborhood) knew each other by name. *Id.* at 312:12-24. Russell

acknowledged that he has known Kuri – who he refers to by his nickname, Rowdy – since they

were both young boys, and that on occasion Russell would let Kuri stay at Russell's house when Kuri had no other play to stay. *Id*. at 312:19-21. Fernandez too knew Rowdy by name from being around the local school. Dkt. 315 at PageID #5251.

### Russell Makes No Mention of Kuri

At the scene, the responding detectives placed Russell (the only occupant of the van without a bullet hole in him) in handcuffs in the back of a police car, and proceeded to accuse him of having committed the shooting. Ex. A (Trial Tr.) at 831:18-832:8. Facing the possibility of wrongful murder charges as a teenager, and still unsure whether either victim was going to survive to tell what really happened, Russell would have had a strong incentive to identify the killers had he really known them. If he later tried to claim he knew the perpetrators the whole time but did not tell the police, that would surely have been too late to save himself. Plus, he would have been motivated to help the police to capture the killers before they had a chance to dispose of the evidence. Besides, the perpetrators had just murdered his friend and had tried to kill him as well, and Russell had no reason to protect the murderers.

Defendants' explanation for Russell's original failure to identify Kuri by name was that Russell supposedly felt the police had treated him poorly that night. According to Folino's subsequent police report, "Russell stated the night of this incident he did not like the way the police treated him and he refused to say anything regarding his observations for that night." Ex. C (PL's Trial Ex. 29) at 8. This was untrue. The police were professional with Russell and did not mistreat him in any way. Ex. A (Trial Tr.) at 476:8-19. In fact, according to Det. Szwedo's police report, Russell "cooperated with the preliminary investigators as well as the assigned investigators" and told Det. Szwedo everything that he remembered about the incident. According to Szwedo, Russell (who had just turned 19 years old at the time) was forthcoming with information and did

4

not hold back on any of the details he knew about. Ex. B (PL Trial Ex. 27) at 11-12; *see also* Ex. A (Trial Tr.) at 46414-21; 470:5-475:23.[1]

### Fernandez Makes No Mention of Kuri

On the night of the shooting, Fernandez was taken by ambulance from the scene to Illinois Masonic Hospital. Dkt. 315 at Page ID #5265. According to Defendant Folino's Supp Report dated August 14, Folino was able to interview Fernandez at the hospital on August 1 at 20:55 p.m. Ex. A (Trial Tr.) at 602; Ex. C (PL Trial Ex. 29) at 8. Folino showed Fernandez photo arrays with the two Spanish Cobras from the altercation earlier in the night, Chino and Funk (who Fernandez knew), but Fernandez indicated that these were not the people who shot him. Ex. A (Trial Tr.) at 609:20-25. According to Folino's report, however, Fernandez confirmed that "he would be able to identify the two offenders in this incident [who shot him] and was willing to cooperate with this investigation." *Id.*; Ex. C (PL Trial Ex. 29) at 8.

At no point on August 1 did Fernandez mention Kuri, who, as stated, he knew, and by name. Ex. A (Trial Tr.) at 610:1-5. At no time during his interviews with the police when he was initially interviewed did Fernandez give any indication that he had any reason to believe that Kuri

---

[1] According to Szwedo's July 24 General Progress Report (GPR) and subsequent August 4 Supplementary ("Supp") report, on the night of the shooting, Russell told the detectives that he had been driving around in a van with Fernandez, Patel, and two other Latin Kings. *See generally* Ex. A (Trial Tr.) at 470-475; Ex. B (PL Trial Ex. 27) at 11-12; Ex. D (PL Trial Ex. 48) at 11. Russell further related that a half-hour before the shooting, two Spanish Cobras nicknamed "Chino" and "Funk" tried to start a fight with those in the van. *Id.* Russell said he knew Funk from the neighborhood since he was young, and described Chino with long hair, wearing a Kangol hat and a black striped polo shirt. *Id.* Russell further relayed that Patel had returned to his house to drop him off, where he saw male Hispanics wearing white t-shirts with bikes on the corner, gang-banging. *Id.* Russell provided a description of these individuals, including short/shaved haircuts and white t-shirts, and specifically confirmed for the police that he might be able to recognize them in the future. *Id.* Russell then stated that during the shooting he yelled to Patel to drive away, but Patel told him he couldn't breathe, so Fernandez then jumped in the front and facilitated their escape. *Id.* Russell, in other words, most definitely did not refuse to say anything to the police that night or otherwise fail to cooperate.

(or Gomez) had anything to do with the crime. *Id.*

**Defendants' Involvement**

The investigation was assigned to Detectives Szwedo and Valkner. *Id.* at 456:3-14. No leads were developed, and the trail went cold. Even though the shooting happened on July 23, none of the substantive police reports were submitted in July 2009. *See e.g.* Ex B (PL Trial Ex. 27); Ex. C (PL Trial Ex. 29); Ex. D (PL Trial Ex. 48).

At some point, Defendants Detectives Folino and McDermott had multiple conversations about the Patel murder with an informant of his named Abdul Wachaa. Ex. A (Trial Tr.) at 1455:14-18. From time to time, Wachaa would get himself into criminal trouble and help himself out by assisting the police with their investigations. *Id.* at 533:4-6; Ex. F (PL Trial Ex. 276) (Stipulation Wachaa charges).[2]

There are no reports or notes (and thus no memorialized dates) concerning Folino's conversation with Wachaa about the Patel murder. Ex. A (Trial Tr.) at 549:2-15. There should be. Information about a murder is supposed to be memorialized for, among other reasons, *Brady* purposes, *Id.* at 445:16-447:24, although Folino tried to claim that the policies and practices of the CPD did not require that step. *Id.* at 545:23-546:2; 559:19-560:3.

According to Folino, Wachaa told him that Kuri and David Gomez rode up on a bike and committed the crime. *Id.* at 552:19-553:25. Wachaa at one point tried to claim that he had personal knowledge of Kuri's guilt, *i.e.*, that he was on the telephone with Russell during the shooting and

---

[2] At his deposition, Folino could not recall whether he and Wachaa had worked together in other cases prior to the Patel murder. Ex. A (Trial Tr.) at 539:13-22. At trial, however, Folino was extremely adamant that he now remembered (even without any written documentation whatsoever) that this case was the first time he ever interacted with Wachaa. *Id.* at 532:9-15; 537:20-24; 539:2-5.

was provided a contemporaneous description as it unfolded. *Id*. This was the version memorialized in a report taken by another police officer.[3] However, even Folino admitted that this account was not particularly plausible. *Id*. at 560:5-10. Indeed, Folino testified that Wachaa admitted to him that what was memorialized in the only existing police report was not actually true, and that Wachaa had heard that Kuri was involved not from Russell directly, but more of an "on the street" kind of thing. *Id*. at 556:8-15; 562:21-563:3.[4]

As stated, there are no reports or notes memorializing Folino's multiple conversations with Wachaa, so there is no way to date these interactions with certainty. However, Folino had previously admitted at his deposition that he was unable to recall if he spoke to Wachaa *before* speaking to Russell, and that Wachaa had helped him get in touch with Russell, who did not want to cooperate with them—testimony Folino vigorously tried to disavow at trial, albeit without any explanation for how he got it wrong at his deposition. *Id*. at 539:13-24.

In any event, Folino and McDermott paid a visit to Russell on August 2, more than a week

---

[3] That report states in relevant part:

> Offender [Wachaa] related twenty minutes before he arrived on scene he was on the cell phone with Zay Russell who was yelling and scared and told offender, "Abdul, Abdul [Wachaa], Joe these niggas are trying to kill me, Lil David [Gomez] and Rowdy [Kuri] are in front of my house. They killed Indian Dude, and they shot TC [Fernandez] and dude in the neck three times, Rowdy was on the bike and Lil David was on the pegs, and Lil David jumped off the pegs and started shooting." Offender [Wachaa] further related that he heard Zay Russell yelling at Indian Dude drive off or I'm going to slap you.

Ex. E (PL Trial Ex. 26). The beat officer who created this report (Lopez) had no independent memory of the event or anything specific that occurred during her shift, including how she came to be interacting with Wachaa about the subject, or why she—and not Folino— was the officer on the paper. Ex. A (Trial Tr.) at 1228:20-1229:1.

[4] The Defendants claimed that Wachaa received nothing of value for his cooperation, and that he was merely fulfilling his civic duty. Ex. A (Trial Tr.) at 534:2-8. The documents revealed, however, that Wachaa was arrested for an aggravated battery on August 3, and the charges against him were dismissed on September 24, the day before the true bill was returned against Kuri. Ex. F (PL Trial Ex. 276).

after the shooting. No one had any good explanation at trial for why they happened to be re-interviewing Russell, who had already been extensively interviewed by Szwedo, about a case that had not previously been assigned to them, and on which they had no prior involvement, if not because they were following up on Wachaa's tip about who the perpetrators supposedly were.

### The Fabricated Russell Identification

According to Russell, detectives came back to re-interview him in early August. *Id*. at 836:24-837:1 ("Q. And do you remember how many times the police came back to your house? A. Probably about three, four times maybe.").[5] Russell had no information beyond what he had originally told the police back in July, but these two detectives (now known from their report to be Folino and Kolman) told Russell that they now knew who committed the crime. *Id*. at 841:11-23. Specifically, these detectives told Russell that Gomez was the person who shot at him and that Gomez was with Kuri at the time of the crime. *Id.* Folino and Kolman further told Russell "they just need me to say" that Gomez and Kuri were the perpetrators. *Id.*

When the detectives proceeded to show Russell photos of Gomez and Kuri, they told Russell that if he identified the people who the police said had done it (Gomez and Kuri) then he would be helping out his injured friend, Fernandez. *Id*. at 841:24-842:9. Specifically the detectives told Russell that they already knew who did it, and that Fernandez would receive victim compensation money if Russell cooperated with the case against Gomez and Kuri. *Id.* According to Russell, Russell made the identifications of Gomez and Kuri from the photo arrays because the

---

[5] The exact date is unknown because there is no GPR report from Russell's interviews or his purported identification, nor did the Defendants create any contemporaneous Supp report. Ex. A (Trial Tr.) at 1050:10-1051:25; 1053:8-14. The first written record appears more than a week later, on August 14. *Id.*

police told Russell who the culprits were. *Id* at 854:10-13; 879:11-17.[6]

According to their after-the-fact Supp report dated August 14, this identification occurred on August 2. Ex. C (PL Trial Ex. 29) at 9. To be clear, the Defendants needed an explanation for why they put Kuri and Gomez' photos in the photo arrays for Russell and Fernandez to review. Unwilling to admit that they really got Kuri's name from Wachaa, the Defendants claim (according to their August 14 Supp report) that Russell supposedly came clean on August 2 and admitted that he knew the whole time that Gomez and Kuri (boys he knew "for a few years") were the ones who did it. *Id*. It was only at that point, according to the Defendants, that they showed Russell and Fernandez the Gomez/Kuri photo spreads. *Id*.

There were all kinds of problems with Defendants' story, the most obvious being the fact that neither Fernandez nor Russell had ever mentioned the killers names during their earlier interviews. *Id*. at 477:3-12; 520:15-17.

### The Fabricated Fernandez Identification

According to the August 14 Supp Report submitted by Folino and Kolman to the prosecutors to encourage Kuri's prosecution, Fernandez not only implicated Kuri, but did so in the manner that Wachaa and the Defendants believed the crime occurred. Specifically, the August 14 Supp report claims that Fernandez identified Kuri from a photospread as "the subject he observed riding a Huffy bicycle and as being in the company of another male Hispanic subject . . . standing on the pegs of that bicycle [when he] jumped off the bike and while armed with a handgun fired numerous gunshots [and] killed Gaurav Patel. . ." Ex. C (PL Trial Ex. 29) at 9.

---

[6] It turned out that Fernandez did receive $11,641.00 in victim compensation. *See* Ex. G (PL Trial Ex. 278) (Stipulation Victim Compensation); Dkt. 315 at PageID #5319. On the application form, one question was how he learned about the program, and he answered that the detectives told him about it. Ex. G (PL Trial Ex. 278).

9

None of that was true. Fernandez did not actually know who ambushed him in the van that night, and he never told the police that Kuri or Gomez were on the scene. Dkt. 315 at PageID #5296 ("And I don't even know who shot me."). Fernandez never saw anyone on any bicycle, and never told any detectives that he had, much less that he saw someone on bike pegs. *Id.* The fact is, Fernandez never saw Kuri that night and only picked Kuri's photo because the Defendants told him who to pick out, going so far as to show him two single photos of Kuri and Gomez before showing him the photo array, and then circled their pictures for him. *Id.* at PageID #5274.

Moreover, Defendants' reports decline to provide any explanation for why Fernandez had failed to identify Kuri at any point during his earlier, original interview. Fernandez had fully cooperated with the police investigation. For example, according to the July 24 GPR, he told Defendant Folino the names of his girlfriend, mother, and uncle, and provided the police with each of their home/cell numbers. Ex. D (PL Trial Ex. 48) at 1; Ex. A (Trial Tr.) at 822:6-13 ("This is information that [Fernandez] provided"). During his original interview on August 1, Fernandez had cooperated extensively, providing numerous details and descriptions of what happened that night, and had indicated a belief he could recognize the shooter if he saw him again. Ex. C (PL Trial Ex. 29) at 8. Yet he never mentioned Kuri. Ex. A (Trial Tr.) at 606:10-12; 1450:12-14.

Fernandez knew Kuri by the name of "Rowdy" from high school. Dkt. 315, PageID # 5251. It is undisputed Fernandez did not mention Kuri's involvement until the police came back with Kuri as their suspect. As with Russell, given that Kuri had supposedly been involved in a plot that almost killed Fernandez (and put him in the hospital for weeks), there was no apparent motive for Fernandez not to have given Kuri's name before the police came back to him upon identifying Kuri as their suspect. Defendants' police reports indicate no attempt to resolve that critical

10

problem, and they had no explanation at trial.[7]

### The Smoking Gun

At trial, the primary point of contention was whether the eyewitnesses revealed Kuri's name to the Defendants (as the Defendants claimed) or whether the Defendants provided Kuri's name to the eyewitnesses (as the eyewitnesses claimed). To be sure, if the Defendants merely received Kuri's name from Russell and thereafter procured the photo identifications, then they would be correct that they did nothing wrong. However, if the Defendants did feed Kuri's name to Fernandez and Russell (who did not otherwise know who shot at them) and persuaded them that the police had done their job and solved the crime, then the resulting "identifications" were fabrications and a fraud on the criminal justice system.

There was strong evidence at trial corroborating Fernandez and Russell's testimony that the latter was what really happened. Specifically, the police reports all document that the date on which Russell supposedly disclosed Kuri's name for the first time was August 2. Ex. C (PL Trial Ex. 29) at 8. By all accounts, the Defendants had never heard of Kuri, and had no reason to suspect his involvement prior to Russell doing so. Ex. A (Trial Tr.) at 616:21-617:1; Ex. C (PL Trial Ex. 29) at 9.

The problem for the Defendants is that the documents indicate that they ran Kuri's name and pulled his photograph *on August 1, the day before* Russell told them about Kuri. Ex. H (PL's Trial Ex. 64) at page 2. Indeed, there was no dispute at trial that Kuri's name and photo were

---

[7] According to this Supp report, Fernandez failed to identify Gomez at the time he identified Kuri. Ex. C (PL Trial Ex. 29) at 9-10. Folino apparently came back a day later and gave him a second try to identify Gomez, at which time Fernandez did so successfully. *Id.* Defendants' August 16 Supp report tries to explain away this problem by claiming Fernandez was too "tired" to look at the Gomez spread on the first day, but Folino's October 7, 2009 Supp report changes the excuse to "severe pain." *Id.*; Ex. K (Def. Trial Ex. 116) at 12. The discrepancy does not actually matter, however, because Fernandez specifically denied that *any of this* happened. Dkt. 315 at PageID # 5270-5271.

11

obtained on August 1. Ex. A (Trial Tr.) at 623:10-12; 624:4-10. Instead, Defendants tried to escape the trap by suggesting that the references in both of the two police reports—Folino's and Cordaro's—describing Russell's revelation of Kuri's name as having occurred on "August 2" were typographical errors.

Defendants admitted on the stand that there was no alternative reason for having pulled Kuri's photo on August 1 if in fact Russell did not say Kuri's name until August 2. Ex. A (Trial Tr.) at 626:23-627:6; 1453:10-12. In other words, Defendants conceded that they had no legitimate explanation for why they would have pulled Kuri's photo before Russell told him the name. Folino went "all in" on the typo explanation. *Id*. at 612:10-614:16; 623:5-629:10. That was so despite his having no actual explanation for why he belatedly recalls that the date reference in his sworn report is incorrect. *Id*. at 613:9-614:16.

## III.  Legal Argument

Neither of Defendants' post-trial motions have merit, and both should be denied.

### A.  The Jury's Verdict on the Fabrication Due Process Claim Was Not Against the Manifest Weight of the Evidence

Well-settled law provides a remedy for due process violations caused when detectives fabricate evidence against an accused. *Avery v. Milwaukee*, 847 F.3d 433, 438-39 (7th Cir. 2017), *cert. denied,* 137 S. Ct. 2249 (2017); *Whitlock v. Brueggeman*, 682 F.3d 567, 575 (7th Cir. 2012) (summary judgment unavailable in the face of evidence "that the police defendants violated [plaintiff's] right not to have police officers manufacture false evidence."). *See also Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him.").

### 1. Plaintiff's Fabrication Claim Was Well Supported By The Factual Record

It would be difficult to hypothesize a more classic example of the due process right at issue. If Plaintiff's evidence set forth above is credited, which of course it must be at this stage, the Defendants literally fabricated the only evidence used to convict Kuri. They affirmatively told the two eyewitnesses who they should identify. These eyewitnesses did not actually see the assailant(s) and had no independent personal knowledge about who committed the crime. They could not (and did not) identify Kuri and Gomez until the Defendants told them to do so. There was literally nothing else tying Kuri to the crime other than these bogus identifications.

What is more, the eyewitnesses also adopted the Defendants' fabricated theory of the case, right down to the "Huffy" brand bicycle that the Defendants knew (but Russell and Fernandez did not) had been recovered at the scene. As set forth above, Defendants' version of the crime tracks perfectly with the Wachaa "tip" story memorialized in the August 3 report regarding Gomez supposedly riding on Kuri's bike pegs. None of this was mentioned by Russell or Fernandez until Defendants heard about it from Wachaa. Then, after Russell and Fernandez abandoned their contemporaneous (bike-less) accounts and instead adopted the Defendants' Wachaa story in August, the Defendants learned that (a) Wachaa's tip turned out to be based on rumor "on the streets" rather than actual knowledge as originally claimed; (b) the Huffy bike had no pegs, making the account physically impossible; and (c) the DNA results excluded Kuri as being among the people who left their DNA on the bike's handlebars, and the various fingerprints on the bike were not Kuri's either.

In this light, there can be no serious dispute that the evidence on this claim was sufficient. *Whitlock,* 682 F.3d at 580 ("We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive

13

the defendant of [his] liberty in some way."); *Dominquez v. Hendley,* 545 F. 3d 585, 589 (7th Cir. 2008) ("There was and is no disputing that such conduct [including fabricating evidence] violates clearly established constitutional rights.").

### 2. Defendants' Argument That They Did Not "Know" The Identifications Were False Is Unpersuasive

Defendants concede, as they must, that Kuri suffered a deprivation of liberty caused by the allegedly fabricated eyewitnesses testimony. *See also Kuri v. City of Chicago,* 2017 WL 4882338, *4-*5 (N.D.Ill. Oct. 30, 2017) (St. Eve, *J.*) (explaining that Seventh Circuit law supports a fabrication claim where an acquitted criminal defendant is deprived of liberty prior to trial). Instead, Defendants challenge the entire premise that they manufactured evidence in a manner recognized as actionable. In so arguing, they try to squeeze this fact pattern into the line of cases where officers did not "know" that the coerced testimony was false. Defendants' argument fall short.

Most importantly, the Defendants have misconstrued the nature of what was fabricated. The evidence they fabricated here was not merely the identifications *per se,* but rather the false explanation about how those identifications came to be. Defendants' story—set forth in their police reports, adopted by the eyewitnesses, and then repeated to the prosecutors—was always that both eyewitnesses had affirmatively come forward with Kuri's name as a perpetrator riding a bike, and not the other way around. What was fabricated, in other words, was not that Fernandez and Russell made identifications of Kuri, which they obviously did, but the false impression that these witnesses made these identifications based on personal knowledge and observation, as opposed to having been fed those names and theory of the crime by the police. Given the evidence in the record, the jury was perfectly entitled to have concluded, as it did, that this very essential premise

14

of the identification story was fabricated and that the Defendants definitely knew it. *Avery v. Milwaukee*, 847 F.3d 433 (7th Cir. 2017); *Whitlock v. Brueggemann*, 682 F.3d 567, 572 (7th Cir. 2012); *Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014).[8]

The *Avery* case illustrates this point well. As in this case, the *Avery* jury found against detective defendants whose misconduct included, *inter alia,* obtaining incriminating statements from witnesses who suggested that Avery had committed a rape/murder. 847 F.3 at 435-37. The *Avery* detectives fed the witness details about the crime he would not have otherwise known, pressured him during multiple interactions, and eventually brought him around to their version of the crime (although, as in our case, the witness subsequently recanted the false account). *Id.*

After the jury found for Mr. Avery, Judge Randa took away the verdict, citing "mixed signals" from the Seventh Circuit about when a fabrication claim is actionable under the due process clause. On appeal, the *Avery* defendants tried to defend that decision, in part by relying upon the same *Petty v. Chicago*, 754 F.3d 416, 422-23 (7th Cir. 2014) argument that the Defendants rely upon in this case. *Id.* at 439-40.

The Seventh Circuit reversed, reinstating the jury's fabrication verdict. The Court distinguished *Petty* as standing for the proposition that "coercively interrogating" witnesses to say something that may well have been true does not necessarily violate due process. *Id.* at 439. The reason, according to Judge Sykes' opinion, is because if the accused is "[a]rmed with the *Brady* disclosure" of the coercive tactics, he "can impeach the coerced testimony by pointing to the

---

[8] Taken to its logical extension, imposing a requirment that investigators who fabricate false testimony by knowingly feeding witnesses their theory of the case must "actually know" that the resulting tainted identification is in fact false cannot work. Investigators were presumably not present at the scene of a given murder. They thus can never truly "know" that the person they are framing did or did not commit the crime; for all they know, a person the investigators are deliberately framing *even randomly* might turn out to have been guilty. Given their lack of personal knowledge, the investigators' ability to "know" that a tainted identification is actually incorrect is a meaningless test.

tactics the officers used to extract it, and the jury has a fair opportunity to find the truth." *Id.* The Court continued: "The same cannot be said for fabricated evidence." *Id.* ("Falsified evidence will never help a jury perform its essential truth-seeking function. That's why convictions based on deliberately falsified evidence will always violate the defendant's right to due process.").

In Plaintiff's view, any attempt to draw a meaningful distinction between coerced witness testimony, as in *Petty,* and manufactured false testimony, as in *Avery,* is arbitrary, if not impossible to apply consistently in practice. Fortunately, however, that is not an issue this Court need wrestle with here because this case falls comfortably on the side of fabrication as opposed to coercion. Fernandez and Russell were not coerced to give up the truth. The Defendants fed them a version of the shooting (apparently obtained from Wachaa) about which Fernandez and Russell had no personal basis to know if it was true. *Compare Koh v. Graf*, 307 F. Supp. 3d 827, 858 (N.D.Ill. 2018) ("The Seventh Circuit has drawn a distinction between coerced testimony (which may be true, even if coerced) and false or fabricated testimony. . .") (citing *Fields v. Wharrie*).[9]

Defendants' remaining argument is that Gomez was involved in the shooting, and Kuri's fabrication claim therefore fails. That, according to Defendants, is because "the fact that identifications of one of the offenders is admittedly accurate necessarily provides reason to believe the identifications of the other offender were accurate as well." R. 324 at 6.

---

[9] In the context of clear guidance from cases such as *Avery, Whitlock, and Fields*, the *Petty* decision is something of an outlier. For those interested in conspiracy theories, the lawyers who represented Mr. Petty (Hervas, Condon & Bersani) are ordinarily defense attorneys in Section 1983 cases, not plaintiff's attorneys. According to their website, *see* hcbattorneys.com, "[d]efending local governments and their officials in federal civil rights Section 1983 litigation is the heart of our pracice," and there is zero indication that they ever bring cases on behalf of people like Mr. Petty. Moreover, the *Petty* holding must be read against the backdrop that in litigating the *Petty* summary judgment motion, counsel apparently conceded every single one of the defendants' forty LR 56.1 statements of fact, and had the vast majority of their own statement stricken for failing to seek leave to file additional statements. *Petty v. City of Chicago*, 754 F.3d at 416, 418-20 (7th Cir. 2014).

Whatever the Latin phrase is for "that is really bad logic," it applies here in spades. The premise that Defendants fabricated Fernandez and Russell's identifications of Kuri is not undermined by the fact that Gomez may have been the shooter.

Besides, Defendant are sidestepping the facts that (a) Kuri's judicial admission about Gomez was not what they are claiming it is, and (b) they ultimately declined in any event to introduce any admission at trial. As for the former point, Kuri did not simply admit that Gomez shot the victims. Kuri admitted— based on the information available to him at the time he filed the complaint— that *Gomez acted alone* in shooting the victims. *See* R. 8, First Amd. Compl. at ¶¶ 8, 28, 34. Because that admission did not quite get the Defendants where they wanted to go, they never actually elected to inform the jury in any fashion what Kuri had pled or that he was bound to it. Ex. A (Trial Tr.) at 320:19-323:2; 1209:20-1211:8; 1432:3-5 (declining to reach an agreeable stipulation but nonetheless rejecting Court's offer for a jury instruction).

### 3. Defendants' Arguments About Witness Credibility Are Unavailing

Defendants' main contention is that the testimony supporting Plaintiff's claims was, in their view, not credible, and that the jury should have instead accepted Defendants' denials of misconduct. In support of that theory, Defendants rely on the fact that the eyewitnesses testified inconsistently at times and were impeached with their prior statements, including grand jury testimony and videotaped statements. According to Defendants, their resulting lack of credibility means that their trial testimony thus should have carried zero weight with the jury.

There are several obvious problems with that argument. For starters, post-trial motions are not vehicles for judges to substitute their own view of witness credibility for that of the jury. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51 (2000) (holding that "the court may not make credibility determinations or weigh the evidence."). This jury found these witnesses'

testimony sufficiently credible notwithstanding the impeachment; at this stage, it is not the Court's role to second-guess that determination. *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009) (courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations."); *Harvey v. Office of Banks*, 377 F.3d 698, 712 (7th Cir. 2004) ("[If there is] evidence from which the jury may reasonably infer that the proffered reasons are [or are] not truthful, the case turns on the credibility of the witnesses[, and courts] will not second-guess a jury on credibility issues."); *see also Newsome v. James*, 2000 WL 528475, at *2 (N.D. Ill. Apr. 26, 2000) ("Variations in the testimony of disinterested witnesses, as our court of appeals has noted, raise questions about credibility that must be answered by a jury, not by the Court.").[10]

In response, Defendants are basically contending that it was wholly irrational for any jury to have believed Fernandez and Russell under the circumstances. According to the Defendants, the eyewitnesses' testimony purportedly "goes against the laws of logic and common sense" because their contradictory accounts at variuos points in time necessarily "zero each other out." R. 324 at 3.

This argument finds no support in the law. *See Galvan v. Norberg*, 2011 WL 1898237, at *8 (N.D. Ill. May 18, 2011) (Chang, *J.*), *aff'd,* 678 F.3d 581 (7th Cir. 2012) (rejecting argument that jury's verdict was against the manifest weight of the evidence because the testimony of the officers was conflicting and inconsistent, both when measured against their own prior testimony or statements and against each other's testimony). Juries are perfectly entitled to accept some or all of a witnesses testimony, even if that testimony is impeached by prior inconsistent statements. The Court's jury instructions specifically permitted it. *See* Dkt. 300-1 at 11 ("If you decide that, before

---

[10] The Defendants may have forgotten that Plaintiff attempted to dismiss the jury demand on some of his claims shortly before trial, a move which would have freed the Court to make the very credibility determinations they now ask the Court to make. At the time, the Defendants countered by demanding that the jury make the credibility decisions in this case, and they cannot now escape the consequences of that election just because they do not like the jury's decision.

the trial, a witness made a statement not under oath, or acted in a manner that is inconsistent with his or her testimony here in court, you may consider the earlier statement or conduct only in deciding whether his or her testimony here in court was true and what weight to give to his testimony here in court."). There is simply no rule that a witness who testifies in a way that is materially different from the story he told on another occasion is insufficient to support a claim. *See Galvan*, 2011 WL 1898237, at *8 (denying motion for a new trial because "The jury heard all of the conflicting and inconsistent testimony, bad memories and impeachment and all, and then did precisely what it is called upon to do, which is make a credibility determination that was not manifestly outweighed by other evidence."); *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (noting that the judicial system could not function if it adopted the discredited doctrine that a witness who testifies incorrectly about one thing must be disbelieved on all things); *Branion v. Gramly*, 855 F.2d 1256 (7th Cir. 1988) ("Selective disbelief ... is an ordinary incident of trial[.]").[11]

Finally, to the extent that Defendants' Rule 59 motion asks the Court to find the eyewitnesses' descriptions of their misconduct less credible than Defendants' testimony that they did nothing wrong, that argument is unpersuasive on the merits. Even were the Court to accept Defendants' invitation to weigh the evidence for itself, the Defendants' relative credibility was hardly self-evident.

First, while it is true that Fernandez and Russell had once given videotaped and grand jury

---

[11] As they did at trial, Defendants take particular issue with Fernandez's testimony that the grand jury transcript must have been transcribed incorrectly if it reflected him fingering Kuri. Defendants are misunderstanding the situation. Fernandez was trying to make sense of the fact that in his memory, when it came time to testify, he told the truth about Kuri not being involved. He was partially correct. That is exactly what happened at Kuri's criminal trial. What Fernandez apparently forgot is that he testified differently at the earlier proceeding (which is not completely implausible given the human tendency to recall past events in a way that comports with one's view of oneself as a good person). In any event, this was an argument made to the jury to discredit Fernandez, but the jury did not accept it.

statements consistent with Defendants' theory before later recanting, a valid explanation for their
cooperation with the State was provided at trial. Defendants told Fernandez and Russell that the
police investigation determined that Kuri was involved in the attempt to kill them; even though
they had no direct knowledge, they had no reason at the time to doubt the police, who were also
offering access to financial compensation in connection with this cooperation. Also, Russell had
criminal charges pending against him at the time he gave his grand jury statement, and those
charges were inexplicably dropped the day after the grand jury returned a true bill against Kuri. Ex.
I (PL Trial Ex. 277) (Stipulation Russell charges). Indeed, the very fact that the Assistant State's
Attorneys felt obliged to "lock in" Fernandez and Russell with videotaped statements and then
testimony under penalty of perjury suggests at least some lack of confidence that these witnesses
would be telling the State's story when it came time for the criminal trial. Which was exactly what
happened. By then no longer teenagers, Fernandez and Russell were unwilling to pretend to have
witnessed something they did not.

Second, there was an absence of any motive for Fernandez and Russell to have testified at
the civil trial to anything other than the truth. The reality is, neither of them wanted anything to do
with this case. Fernandez had to be arrested on a warrant when he would not appear at his
deposition, and then refused to show up at trial. Dkt. 315 at PageID #5249-5250. Russell, who was
deposed in the County Jail whether he wanted to be or not, testified that he had no interest in
coming to court for trial but had no choice because of the subpoena. Ex. A (Trial Tr.) at
875:13-876:3. Neither man was friends with Kuri back when this all happened (actually, they were
in rival gangs, a reference that Defendants fought hard pretrial to be able to elicit) and they have
not spoken to one another or even seen each other at all since the day of the trial. Dkt. 315 at
PageID # 5251; Ex. A (Trial Tr.) at 876:14-18. And if Fernandez or Russell really had any reason

to believe that Kuri had tried to kill them, there was absolutely no motive to have lied for Kuri at deposition or trial.

Third, the independent evidence largely corroborated Fernandez and Russell over the Defendants. The Court must at this stage accept Kuri's testimony that he was innocent and not even present, which undermines Defendants' position that the identifications of him as being involved were untainted. The witness compensation documents, *see* Ex. G (PL Trial Ex. 278), also supported Fernandez and Russell's accounts, as does the critical police report putting Russell's August 2 disclosure of Kuri's name *after* the Defendants had already pulled Kuri's photo on August 1. Ex. C (PL Trial Ex. 29) at 8-9; Ex. H (PL Trial Ex. 64) at 2. The fact that Fernandez and Russell knew Kuri by name, yet declined to name him to anyone prior to Defendants' arrival on the scene, provides further independent support for crediting Fernandez and Russell's version over that of the Defendants. After all, this was not a case where the witnesses originally named Kuri than backed off; here it was actually the Defendants who "flipped" them away from their original story that did not involve Kuri at all.

Fourth, the jury was plainly entitled to consider all of the witnesses' credibility, including that of the Defendants. As the Court had the opportunity to observe, Folino was a terrible witness, whose obstreperous demeanor did him no favors. He also contradicted himself repeatedly on the stand. *E.g.*, Ex. A (Trial Tr.) at 1056:14-24; 560:5-10 (Folino denied previously admitting to the jury that Wachaa's story was facially implausible, even though he had earlier testified to exactly that); Ex. A (Trial Tr.) at 1080:2-14; 1087:25-1088:4 (same problem on the issue of whether Folino showed Fernandez a separate large photo of Kuri). Additionally, despite in all likelihood having no genuine independent recollection of these routine events at work nearly a decade ago, Folino (and the other primary police witnesses) memorized their reports and prior testimony like

21

actors learning their lines for a play, and then pretended to recall every detail as if it all happened yesterday. In stark contrast, Fernandez and Russell's accounts were raw and unrehearsed, and far more real and credible.

If anything, while both sides' witnesses contradicted themselves at times on important points, it was the Defendants whose inconsistencies and outright dishonesty was overwhelming. The Defendants lied to the prosecutors and the jury about many things, including, for example, that Kuri was not arrested on August 5 and remained free to leave; that Russell originally declined to name Kuri at the scene because he had refused to cooperate at all; that Folino did not show Fernandez the separate large photo of Kuri before the photospread; and that Fernandez failed to make the photo identification of Kuri after the Defendants read him the advisory on August 1 because he suddenly felt ill (as opposed to because he wanted Russell to do it first). Having themselves been caught in so many lies and implausible assertions, Defendants cannot legitimately ask the Court to overrule the jury's decision to believe the testimony of others over their own.[12]

## B. The *Brady* Verdict Is Sufficiently Supported By The Record

There is a well-established right to Section 1983 relief against police officers who withhold exculpatory or impeachment evidence that is material to a criminal case. *Whitlock v. Brueggemann*, 682 F.3d 567, 572 (7th Cir. 2012); *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir. 2001); *Jones v. Chicago*, 856 F.2d 985 (7th Cir. 1988). Applying that case law to this jury verdict, there was an amply sufficient evidentiary basis to support this kind of claim.

---

[12] Defendants also argue that Russell did not identify either Folino or McDermott as the officers with whom he interacted, R. 324 at 3, but it was hardly surprising that he did not recall them specifically so many years later. Moreover, it was undisputed based on the reports and their own testimony that Folino and McDermott were the officers who obtained the disputed identification. Ex. A (Trial Tr.) at 571:5-9; 1451:8-14; Ex. C (PL Trial Ex. 29).

### 1. The Trial Record Easily Supports The Jury's *Brady* Verdict

The Supreme Court recently reaffirmed that "[e]vidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972) and *Napue v. Illinois*, 360 U.S. 264, 271 (1959)) (internal quotations omitted). Moreover, materiality must be assessed by considering all suppressed or fabricated evidence together in the aggregate, and not piece-by-piece. *Wearry*, 136 S. Ct. at 1007. At the same time, whether evidence is material depends on the strength of other evidence used in the criminal case, so in cases where there is scant evidence of guilt, as was the case at Kuri's trial, it takes less for the suppressed or fabricated evidence to be deemed material. *United States v. Agurs*, 427 U.S. 97, 113 (1976).

In our case, the evidence at trial was more than sufficient to support the jury's determination that material evidence was suppressed. This includes the following.

### The Eyewitnesses' Original Accounts

The GPR notes from the Defendants' key interviews of Russell and Fernandez do not exist. The jury saw Folino's extremely detailed notetaking practices in the context of his investigation of Kuri's alibi witnesses, and was more than entitled to conclude that Folino was a scrupulous documenter of the who/what/where/when's that one would expect of a diligent homicide investigator. Ex. D (PL Trial Ex. 48). Folino's insistence that he took no notes and made no substantive reports about what he learned when he interviewed the key eyewitnesses in the case was completely ridiculous, particularly given that Fernandez had not previously been well enough to provide the earlier detectives any account of the events. Ex. A (Trial Tr.) at 600:12-17. Despite Folino's (implausible) insistence that the CPD's policies and practices did not require him to memorialize that kind of information, the jury was entitled to infer that he did write down what he

learned, but that information never made it to the criminal justice system.

Given that the criminal case against Kuri rested entirely, and rather precariously, on nothing but two "fingers"— the eyewitness accounts of Fernandez and Russell— it would have been imperative to memorialize those eyewitnesses' original accounts. Ex. A (Trial Tr.) at 602:19-24. *See Smith v. Cain,* 565 U.S. 73, 75 (2012) (finding that withheld witness impeachment evidence was sufficient to trigger "reasonable probability" of a different result because "Boatner's testimony was the only evidence linking Smith to the crime").

Defendants tried to deny that they ever asked Fernandez to describe the race or physical appearance of the assailant(s) prior to showing him Kuri's photo, or even to tell them what happened that night, much less whether Fernandez had actually seen anyone at all. Ex. A (Trial Tr.) at 607:12-608:4; 1036:13-18. In fact, Folino went so far as to insist that the City's policies and practices discouraged asking for descriptions prior to photo identifications. *Id.* at 608:1-7. All of the foregoing testimony was preposterous, and the jury did not have to accept it. *Emmel v. Coca-Cola*, 95 F.3d 627, 633-34 (7th Cir. 1996) ("Just because Coca-Cola articulated a non-discriminatory reason, the jury did not have to believe it."); *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994) ("The defendants are off base in arguing that. . . the jury had to accept [the testimony of their officers.] The jury may have thought them liars. It is the prerogative of a jury or other trier of fact to disbelieve. . . testimony.").[13]

At the end of the day, even though Plaintiff was not in the room and is thus unable to know with certainty what was said, what is known is that Fernandez and Russell (a) did not see who shot

---

[13] Defendants also failed to ask about and/or memorialize Fernandez' explanation for why he had previously failed to identify Kuri during their interaction the preceding day if in fact Kuri really was present at the scene. Ex. A (Trial Tr.) at 630:22:631:1. Also missing is any record about whether Russell was ever asked about that mid-shooting phone call from Wachaa (which he presumptively was) or if phone records were checked (which they presumptively were).

them, and, in any event, (b) did not see Kuri on any bike. That is certainly enough to infer that Defendants' missing notes/reports about what Fernandez and Russell told them would have been exculpatory, especially coupled with their testimony that they told the police both of those things. Ex. A (Trial Tr.) at 837:15-838:18; Dkt. 315 at PageID #5270-5271.[14]

**Other Exculpatory Details
About the Fernandez Identification**

The Defendants engaged in other undisclosed tactics that, had they been known, would have nullified the Fernandez identification of Kuri. For instance, they showed Fernandez a large photo of Kuri prior to the array procedure. Ex. A (Trial Tr.) at 1080:2-14. Folino did not deny that failing to disclose such a suggestive tactic would be problematic. *Id*. Instead, in one of his worst moments at trial, Folino tried to reverse himself and deny that he had admitted doing that, despite the jury having heard him do just that not ten minutes earlier. *Id*. at 1087:25-1088:4. The Defendants also persuaded Fernandez to tell their story by informing him (falsely) that Kuri had implicated him in the shooting.[15] None of this was disclosed in the Defendants' police reports, and none were known to the prosecutors. *See, e.g.*, Ex. B (PL Trial Ex. 27); Ex. C (PL Trial Ex. 29).

**The Exculpatory Wachaa Details**

Folino admitted that he spoke to Wachaa multiple times about the murder, and that Wachaa helped "bring around" Russell to the Defendants' theory of the case. Ex. A (Trial Tr.) at

---

[14] In that light, it would not change the analysis if Defendants were telling the truth about having failed to take notes or make reports. Either way, they suppressed information that would have nullified the prosecution of Kuri before it ever got off the ground.

[15] Rather than trying to get to the truth, the Defendants were going around telling everyone that they had better implicate someone before they got implicated themselves. To take another example, the Defendants told Kuri during the videotaped interrogation that Gomez was claiming he (Kuri) did it, and that notwithstanding his insistence that he had no knowledge of the crime, he could be a witness rather than a suspect if he agreed to implicate Gomez. Ex. A (Trial Tr.) at 239:21-240:17.

25

1060:18-20. However, all of the Defendants' police reports have been completely scrubbed of any and all references to Wachaa and his involvement in their case. *See, e.g.*, Ex. B (PL Trial Ex. 27); Ex. C (PL Trial Ex. 29); Ex. D (PL Trial Ex. 48). In that manner, the details about what Wachaa told Folino, when he told him, and why Wachaa believed his tip was or was not valid were all withheld from the prosecution and the criminal justice system. *Id.*

At a minimum, Folino acknowledged that he knew yet failed to disclose to anyone that Officer Lopez' police report regarding Wachaa was false, to wit, Wachaa did not really obtain personal knowledge about Kuri''s purported involvement from Russell during the shooting itself, despite having claimed otherwise. Also, whatever benefit Wachaa was promised (beyond "satisfaction") for implicating Kuri was undisclosed—the Defendants insist to this day that the dismissal of the pending criminal charges against Wachaa (and those against Russell for that matter) had nothing to do with their cooperation against Kuri. Ex. A (Trial Tr.) at 1075:2-7.[16]

### Russell's Reluctance to Cooperate

The prosecutor testified to have been operating under the assumption that Russell was coming forward by choice to vindicate a wrong, and she had no knowledge of any events the defendants failed to document. Ex. A (Trial Tr.) at 1554:12-16. When asked, Russell told the ASA that no one had threatened him or forced him to participate or made him any promises in exchange for his testimony. *Id.* at 853:12-14.

Unbeknownst to the State, Russell was actually anything but a willing witness. When the Defendants picked him up to bring him to court, they had to literally pull him off the fence at his

---

[16] Defendants argue that there "was no evidence that information Wachaa provided was untrue," R. 324 at 12, but that statement is itself untrue. Even Folino admitted that Wachaa's convenient claim to have actual knowledge (because he supposedly received a contemporaneous call from Russell right in the middle of the shooting) was hopelessly implausible and ultimately failed to check out. Ex. A (Trial Tr.) at 560:5-10.

family's home. *Id.* at 848:11-22. His tension between telling the truth on the one hand, and being accused of committing perjury on the other, was real (and continued to manifest through his testimony at our trial[17]).

### Other Investigatory Steps

On September 24, the day of the grand jury proceeding, a group of older GPR notes was submitted *en masse* to the supervisor. In response to questioning about whether the City's policies required timely submission as the GPRs were created (indeed, the whole point of why the GPR form was created was to redress to the "street file" problem[18]), Folino testified to his understanding that it was permissible to hold back the GPRs until the investigation closed in on the suspect. Ex. A (Trial Tr.) at 737:14-25. Similarly, the police witnesses all insisted that CPD policies and practices permitted them to leave their written "Supp" reports open (and thus edit-able) on the Department's computer system until detectives felt like submitting them. *Id.* at 594:16-595:18, 1485:16-21.

With only a very few exceptions (none of which involved the Defendants), no GPRs were submitted for supervisor signature and no police reports were entered as final into the system in all of July. Instead, Defendants' key reports in the case were not locked in as final until October 6 and

---

[17] At his deposition, Russell as much as admitted that his "memory might be different" if he were not testifying in a jumpsuit from Cook County Jail. Ex. A (Trial Tr.) at 878:13-17.

[18] Until a whistleblower disclosed their existence in the case of *Jones v. Chicago,* detectives maintained a parallel set of "street files" that were systematically withheld from the criminal justice system. 856 F.2d 985 (7th Cir. 1988) (""street files. . . were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files. As a result, the street files were not available to defense counsel even if they contained exculpatory material. We use the past tense because the practice was discontinued [in 1982] following a class-action [Palmer] suit (inspired by the disclosure, in the criminal trial of George Jones, of the existence of the street files) to enjoin the practice""). Two federal juries have recently found that the City's street files practice continued even after the City attempted to fix the problem by, inter alia, requiring detectives to take all notes on GPR forms that were all supposed to be produced in response to subpoenas. Ex. L (Memorandum Opinion and Order, *Fields v. City of Chicago et al.* Case No. 10 C 1168, Kennelly, *J.*); Ex. P (Judgment and Jury Instructions, *Rivera v. Guevara, et al.*, Case No. 12 C 4428, Gottschall, *J.*)

October 7, well after the events described therein, especially the eyewitness grand jury statements. See Ex. M (PL Trial Ex. 32); Ex. K (Def Trial Ex. 116); *see also* Ex. D (PL Trial Ex. 48).[19]

By then, the Defendants had decided that Kuri and Gomez were guilty. As was the custom in the bad old days of street files, all of the paperwork in this investigation is strikingly consistent with that hypothesis. There were no notes or reports disclosed to the criminal justice system suggesting that any other leads or alternative suspects were even investigated, much less credible. For example, there are no surviving GPR notes or reports reflecting any interview with Chino and Funk, the Spanish Cobras who got into the altercation with the occupants of Fernandez' minivan less than hour before it was ambushed. Defendants admit to knowing who Chino and Funk were, but claimed to have decided not to bother to even ask them if they knew anything relevant. It would not have been at all unreasonable for the jury to infer otherwise, *i.e.*, that the Defendants took, but were not turning over, notes that did not fit their theory of the case in a manner remininescent of the former, supposedly-forbidden street files practice.

### The Documents/Videos
### From Kuri's August 5 Arrest

Prior to the September 8-10 interrogation that was videotaped and partially shown to the jury, the Defendants originally picked up Kuri in Rochelle on August 5 and placed him in an identical interrogation room. On that date, Kuri testified that he remained in the room for a couple days, whereas Folino estimated it was more like 10 hours. Ex. A (Trial Tr.) at 236:5-10, 955:23-956:3.

---

[19] Judge Gottshall bifurcated the *Monell* claims early in this litigation, and there was no testimony developed during discovery or presented at trial that the City's policies and practices forbid this. At trial, Defendants took advantage of that, and testified that they do not. Plaintiff intends to move to un-bifurcate that claim, and it will be interesting to see if the City take a different position.

According to Defendants, during this initial August 5 interrogation, they made deliberate decisions to (a) not create an arrest report; (b) not read Kuri his rights; (c) not provide him with access to a lawyer; (d) not unlock the door to the room or otherwise communicate to Kuri that he was supposedly free to leave; (e) keep him for an extended time, despite the fact that it must have taken all of five minutes to elicit that he had no idea what they were talking about;[20] and (e) not videotape the questioning, notwithstanding their stated understanding that the rules and law unequivocally require recording of any murder interrogation. Ex. A (Trial Tr.) at 759:18-21; 760:9-14; 766:7-16; 767:10-13; 718:19-25; 721:1-6; 721:10-21; 725:7-14.

Defendants' explanation for these decisions was that Kuri was being treated as a "witness," not a "suspect." Awkwardly, Defendants forgot that their Answers to the Complaint had admitted that Kuri was in fact arrested on August 5, resulting in a stipulation to that effect that was read to the jury. *Id*. at 1496:10-22.[21]

Meanwhile, when Kuri refused to implicate Gomez, the theory of the case that was presented to the prosecutors in Defendants' resulting police reports (created in October, some two months after the August 5 interrogation) was that Kuri had lied to them during the August 5 session about his alibi. *Id*. at 1076:7-1079:18. Specifically, Defendants' police reports informed

---

[20] Because no contemporaneous police report was created, there is no way to know for sure how long Kuri was held, yet another dubious thing that Defendants insisted was permitted by CPD policies and practices. Ex. A (Trial Tr.) at 729:4-7; 1485:4-21.

[21] In a sense, Kuri was still a "witness" rather than a suspect. Refusing to accept his statements that he had no knowledge of the crime, the Defendants promised him that he could walk away if he cooperated by implicating Gomez as the triggerman. Ex. A (Trial Tr.) at 239:21-240:4. After all, even two weeks after the shooting, the canvas on which Defendants were painting was still conveniently blank. Only one police report had been electronically submitted (on August 4) and that contained no references whatsoever to Kuri or Gomez, despite the eyewitness identifications that allegedly took place on August 2 (and which were not memorialized until the August 14 Supp report). *See* Ex. B (PL Trial Ex. 27); Ex. C (PL Trial Ex. 29).

the State that Kuri had been adamant that he was staying with two people on the night of the murder some three weeks earlier, whereas those people said that Kuri would come and go, but was not there that particular night. *Id.*

In a case lacking any physical evidence, confession, or other proof beyond the eyewitnesses, the purportedly false alibi was the only other factor supposedly confirming guilt. Against that backdrop, Defendants' failure to follow the presumptive protocol of videotaping the murder interrogation deprived Kuri of the ability to prove that the Defendants' October 7 report misled the prosecutors about what he really said about his alibi on August 5. *Id.* at 1078:12-1079:18.[22]

### The Truth About How Kuri Got Implicated

Most important of all, the Defendants withheld the fact that the entire case against Kuri was a lie. Through Folino and McDermott's written police reports, as well as Folino's grand jury testimony and oral interactions with the prosecutors, the Defendants led the criminal justice system to believe that the two eyewitnesses upon whom the entire criminal case was predicated had identified Kuri by name. The reality was the opposite. The Defendants were the ones who fed Kuri's name to the eyewitnesses. If the prosecutors had been aware of the truth, there definitely could have been no prosecution. There was literally no other evidence implicating Kuri.

### 2. The Fact That Kuri Was Acquitted Does Not Defeat The Claim

As Judge St. Eve previously explained in rejecting this same argument at summary judgment, *see Kuri*, 2017 WL 4882338, at *6, Seventh Circuit law makes clear that "the key to a

---

[22] Notably, the GPR notes from the August 5 interrogation contain no reference to the alibi. Ex. D (PL Trial Ex. 48) at 8. These GPR notes also directly refute Defendants' testimony that Kuri was treated as a witness not a suspect. *Id.* ("Denied any / all knowledge of murder / Does not know Gomez- Never seen him / Did not ride bike to scene of murder / Did not observe Gomez w/ or fire a gun / Confronted about witness identification.").

civil *Brady* claim is not a conviction or acquittal but a deprivation of liberty." *Cairel v. Alderden,* 821 F.3d 823, 833 (7th Cir. 2016). Accordingly, under circumstances "where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction." *Id.* A person deprived of liberty but acquitted at trial succeeds on a due process claim by showing "that if all parties had known of some piece of exculpatory evidence, the prosecution would not have moved forward with the charges, the grand jury would not have indicted [the plaintiff], or the trial court would have granted a motion to dismiss the indictment." *Armstrong v. Daily*, 786 F.3d 529, 553 (7th Cir. 2015).

In *Jones v. City of Chicago*, 856 F.2d 985, 988, 995 (7th Cir. 1988), for example, the court affirmed a sizeable jury verdict against police found to have violated a plaintiff's right to due process in a case where the criminal charges were dropped before trial. Permitting due process claims where a deprivation of liberty precedes an acquittal is entirely consistent with the Supreme Court's teaching that the "touchstone of materiality is a 'reasonable probability' of a different result[.]" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). A different result does not necessarily mean a different verdict—it can mean that without the fabrication or suppression the case never would have gone to trial. The question is whether a reasonable decision maker would have ended the prosecution had the evidence come to light sooner. *Armstrong*, 786 F.3d at 553-54 & n.7.[23]

In denying summary judgment, Judge St. Eve previously determined that this case presented a jury question over whether this prosecution would have gone forward had Defendants

---

[23] Defendants' motions devote considerable attention to the concept that exculpatory evidence need only be disclosed in time to make use of it at trial, but this misses the point. Kuri may have learned at his trial that the identifications were tainted, but that was too late to have avoided three years in the County Jail.

not concealed the truth about the Fernandez and Russell's identifications. *Kuri*, 2017 WL 4882338, at *6. As Judge St. Eve correctly summarized:

> Furthermore, the Court can draw a reasonable inference from the evidence in the record, including Defendant Folino's testimony in front of the grand jury, that the prosecutors relied upon the Defendant Officers' version of the facts when deciding to prosecute Kuri for the July 24, 2009 shooting. In sum, Kuri has presented sufficient evidence creating genuine issues of material fact for trial that Defendant Officers concealed evidence that Fernandez and Russell did not identify Kuri without the alleged manipulation and that this concealment prejudiced Kuri because he was detained at the Cook County Jail for approximately three years before his trial.

*Id.* The trial is now concluded, and the jury did in fact draw these inferences in Kuri's favor. This was more than reasonable, and there is no grounds to disturb the jury's determination. *United States v. Lucus*, 165 F.3d 33 (7th Cir. 1998) (holding because weighing the credibility of witnesses and making reasonable inferences are "tasks for the jury," "a court will not disturb the jury's determination of these issues").

Defendants respond that Plaintiff presented "no evidence" that the case would have died on the vine had the truth come out, R. 324 at 9, but what they really mean is that Plaintiff did not present *direct evidence* in the form of an express admission by a prosecutor. But direct evidence is not the only way to prove a proposition at trial. *Sylvester v. SOS Children's Villages Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (explaining direct and circumstantial evidence have equal probative value). With inferences drawn in Plaintiff's favor, a jury could have reasonably concluded that no prosecutor would have approved, much less pursued, a criminal case had he or she been apprised that Fernandez and Russell did not actually identify Kuri without Defendants' cheating. The eyewitnesses' testimony was the only thing tying Kuri to the crime, and if it became known that these witnesses were actually unable to identify Kuri from personal knowledge, then the only evidence of guilt would have fallen away. It was well-within the realm of reason for a jury to

conclude that no prosecutor would have even considered prosecuting under those circumstances.

Furthermore, there was evidence in the record supporting that conclusion. For example, Ruth Gudino (the ASA who took Russell's videotaped statement) testified that based on her review of the police reports and her conversations with Russell and the police, she was led to believe that Russell's identification of Kuri came from Russell's personal observations, not having been fed Kuri's name by the police. Ex. A (Trial Tr.) at 1274:2-1281:24. The ASA who presented Russell to the grand jury and obtained his photo identification of Kuri (Krista Peterson) testified similarly; she too was at all times under the impression that the police had not fed Kuri's name to the eyewitnesses. *Id*. at 1554:9-16.

At bottom, this was really an all or nothing case, with the jury having to choose between two very different versions of reality. To be sure, if the jury had chosen to credit Defendants' testimony, then they did nothing but elicit legitimate identifications, and therefore violated no one's rights. But if the jury decided to credit Kuri's side of things, which of course it did, then the Defendants framed him and withheld those exculpatory details from the prosecutors. That suffices. *Jones*, 856 F.2d at 994 ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial-none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision[.]"); *Newsome v. McCabe*, 319 F.3d 301, 302-05 (7th Cir. 2003) (holding that "the details about how [the police] induced the witnesses to finger Newsome" was "information vital to probe whether manipulation occurred" and thus supported the jury's *Brady* verdict).

As a final note on the *Brady* point, Defendants' "reasonable diligence" contention is unavailing at this stage. The jury was specifically instructed that it could only find for Plaintiff if the Defendants suppressed exculpatory evidence that "was not otherwise available to plaintiff

through the exercise of reasonable diligence." Ex. A (Trial Tr.) at 1621:21-1622:2. The jury

therefore necessarily rejected this argument, a conclusion that was well-supported by the record.

For instance, as Defendants' own motions point out several times, when Stephen Ramsey (the

investigator hired by Kuri's public defender) diligently interviewed Russell at the Pontiac

Correctional Center, Russell stuck to the false story. R. 308 at 6-7; R. 324 at 10; R. 325 at 10 & 17;

*see also* Ex. A (Trial Tr.) at 1610:17-1611:16 (Ramsey stipulation). Defendants fail to identify

anything more Kuri was supposed to have done to learn the truth.

### C. The Malicious Prosecution Verdict Is Sufficiently Supported by the Record

Focusing on the probable cause element of malicious prosecution, Defendants basically

contend that the jury mis-weighed the evidence. The argument has no merit.

#### 1. Probable Cause Is A Jury Question

In Section 1983 cases, probable cause is a quintessential question of fact for the jury.

*Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993) (determination whether

probable cause existed in a given case "falls within the province of the jury"); *Chelios v. Heavener*,

520 F.3d 678, 686 (7th Cir. 2008) (same). "Accordingly, a conclusion that probable cause existed

as a matter of law is appropriate only when no reasonable jury could find that the officers did not

have probable cause[,]" *Maxwell*, 998 F.2d at 434, and courts cannot decide the probable cause

question "if there is room for a difference of opinion concerning the facts or the reasonable

inferences to be drawn from them." *Id.*

#### 2. If the Jury Rejected Defendants' Version of the Identifications, There Could be No Probable Cause

In this case, in which the jury was asked to choose between two starkly different views of

how the identifications occurred, probable cause was even more dependent than usual on the jury's

role as finder of the facts. That is because there is no dispute that knowingly fabricated evidence and false statements can never support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013); *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (holding that when officer includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Stated another way, police cannot manufacture their own probable cause. *Collier v. Chicago*, 2015 WL 50814408, *4 (N.D. Ill. Aug. 26, 2015).

Defendants insisted to the end that they had probable cause because Kuri's name came from the eyewitnesses, and not the other way around. So committed were they to that position that they admitted on the stand that if they mentioned Kuri to the eyewitnesses prior to the eyewitnesses mentioning Kuri, then any subsquent "identification" of Kuri would not legitimately support probable cause. Ex. A (Trial Tr.) at 1531:16-1532:10. The issue was thus really all or nothing. With the jury having sided with Plaintiff, that is really the end of the matter. *Hammond v. Kunard*, 148 F.3d 692, 697 (7th Cir. 1998) (no police officer who manufactures evidence "could reasonably believe that he was not violating . . . constitutional rights").

### 3. A Rational Jury Could Have Found An Absence of Probable Cause On This Record

Even putting aside the evidence that the identifications were tainted, the other evidence in the trial record supported the jury's conclusion. Based on the totality of the facts known to the officers, a finding that probable cause was lacking was perfectly reasonable.

Most notably, the Defendants released Kuri after interrogating him on August 5. According to McDermott, they did so because they lacked probable cause. Ex. A (Trial Tr.) at

1504:5-20.[24] That was a very significant admission. As of August 5, the Defendants already had Fernandez and Russell saying that they knew Kuri by name, and that Kuri rode the killer toward them on a bicycle. If those identifications were not enough for probable cause on August 5, then they did not somehow transform into probable cause in September when Kuri was arrested. And the Defendants developed zero additional incriminating evidence of any import after August 5. *Id.* at 763:7-12.

Moreover, there was other evidence known to the police cutting against probable cause. *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986) ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest."); *see also Sornberger v. City of Knoxville*, 434 F.3d 1006, 1016 (7th Cir. 2006) ("[R]easonable avenues of investigation must be pursued especially when . . . it is unclear who committed the crime."). For instance, another piece of the probable cause picture that could not be ignored was Defendants' videotaped interaction with Kuri on September 24-26. No matter how many times they asked Kuri between his arrest late on September 24 and his release early on September 26, he never wavered even a little bit from his protestations of innocence. Because of the video, the jury was able to make its own judgment about the weight to accord his steadfast denials of guilt. *Irvin v. Kaczmaryn*, 913 F. Supp. 1190, 1198 (N.D. Ill. 1996) (fact that minor protested his innocence created factual issue for the jury as to whether police officer had probable cause to seize him).

Bolstering the power of Kuri's denials was the fact that they were maintained in the face of powerful attempts to overcome his will. The Defendants isolated him emotionally and deprived

---

[24] Defendants claim they did not seek charges at that time, but if they did and were rejected, there would likely be no way to know. No written arrest report was created surrounding that arrest (which is yet another disputed thing that Defendants testified was permitted by the City's policies and practices).

him of legal counsel, phone calls, sleep and food sufficient for his teenage body.[25] They yelled and swore at him, belittled him, kept his arm at times chained to the wall, told him no one cared about him, lied to him about incriminating witnesses, offered him leniency, and interrogated him off and on throughout the night. They also made it clear that he was never going to be released from the room until he adopted the interrogators version of the truth about events he had no knowledge of—a story which was shamelessly fed to him over and over again in case he did decide to acquiesce.

Through it all, Kuri never gave an inch. His vehement insistence that he was unable to make any deal to save himself because he had no idea what they were even talking about was credible, and was legitimately factored into any probable cause calculus.

Along the same lines, the Defendants explained to Kuri that a DNA test would be able to determine whether he had ever made contact with the offenders' bike. In his not-particularly-sophisticated way, Kuri latched on to that, and demanded such a test, much to Folino's visible frustration. Ex. A (Trial Tr.) at 655:5-7; 656:12-13. The fact that the DNA and fingerprint tests revealed profiles and prints of individuals who were not Kuri undermined probable cause a bit, though the results were admittedly not available until later. What was central to probable cause, however, was Kuri's willingness to volunteer for the test and his unqualified

---

[25] On the latter point, Kuri told them when he was first arrested that he had not eaten and was hungry. Ex. A (Trial Tr.) at 675:21-676:3. They fed him a McDonald's meal arond 4 a.m. on his first full day in custody, but gave him nothing else in response to complaints about hunger except chips and juice until very late the following evening. *Id*. at 677:19-24. This, too, was alleged to have been consistent with the City's policies and practices. *Id*. at 678:24-679:5. As for sleep, Kuri was given no bedding or pillow, and was frequently chained above a narrow bench that was hardly conducive to sleep. *Id*. at 681:25-682:8, 684:22-685, 686:2-7. The interrogators also woke him to interrogate him throughout the night, and he states on the tape that he barely slept. *Id*. at 684:8-15. Again, the Defendants testified all of this was consistent with the City's policies and practices. *Id*. at 678:24-679:23.

certainty that his DNA and prints would not be present.[26]

The same for the POD evidence. When told where the shooting took place, Kuri pointed out that the immediate neighborhood was full of POD cameras, and promised the Defendants that they could check and would not see any evidence of him riding any bike anywhere nearby. Ex. A (Trial Tr.) at 241:5-14. Kuri happened to be right, but the real point remains that his confidence in that regard seriously undermines the Defendants' probable cause hypothesis.

There was also the problem of the missing bike pegs. Wachaa's version, as well as Russell and Fernandez' post-Wachaa revised accounts to the grand jury, all had Kuri pedaling a Huffy-brand bike with Gomez riding behind him while standing on pegs. Ex. A (Trial Tr.) at 870:2-9; 769:9-25; 1057:16-18; 1087:11-24; *see also* Ex. E (PL Trial Ex. 26); Ex. C (PL Trial Ex. 29) at 9. As the Defendants were aware at the time they spoke to Wachaa and interviewed the witnesses, a Huffy brand bike had indeed been recovered at the scene. Ex. J (PL Trial Ex. 47) at 1. It turned out however, that the Huffy bike had no pegs. Ex. A (Trial Tr.) at 772:3-5. The description of the shooting provided by Wachaa, and later adopted by Russell and Fernandez during subsequent conversations with the Defendants, was thus not even possible. *Id.*

Probable cause was further undermined by other holes in Defendants' case. They never presented any persuasive explanation for why Fernandez and Russell withheld the identities of Kuri and Gomez as the murderers if they knew the whole time who committed the crime, and Russell's stated explanation (that he refused to provide any information because the police were mean to him) was verifiably false on both levels. Fernandez, meanwhile, had no explanation at all, at least none Defendants recorded. And the Wachaa tip that brought Kuri into the case in the first

---

[26] By all appearances, this shooting was not the carefully planned work of criminal masterminds. There is no reason to believe the perpetrator even intended to leave the bike at the scene, and it had not been wiped of the DNA or prints recovered on its handlebars, rims, and frame.

place was acknowledged to have been implausible and not credible. *Id.* at 560:5-10.

In response, Defendants' post-trial motions point to other factors that supposedly tipped in favor of probable cause. None are persuasive, much less of a nature that would justify overturning the jury's determination that probable cause on balance was lacking.

First, Defendants reprise their theme that Plaintiff is judicially estopped from denying that Gomez is the shooter. From there, they argue: "Necessarily then, Defendants were justified in their belief that Gomez was the offender. . ." R. 324 at 14. The flaw in their contention that Plaintiff judicially admitted that Gomez was the shooter is addressed *supra* at 16-17, but the real point here is that it would not matter if the Defendants or the eyewitnesses did turn out to be right about Gomez. Probable cause is assessed based on what the officers knew back at the time of their investigation, so subsequent vindication of their suspicions about Gomez is neither here nor there for probable cause purposes. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010) (probable cause standard is an objective one, determined by the facts known to the officer at the relevant time).

Equally misplaced is Defendants' contention that Kuri lied about knowing Gomez. While Kuri did initially hedge when confronted aggressively with the fact that Gomez had murdered someone, he also admitted during the same interrogation that he knew Gomez. Ex. A (Trial Tr.) at 314:11-315:9. Moreover, there was ambiguity; Kuri testified that he knew who Gomez was, but was not friends with him, and therefore did not "know" him. *Id.*

As for Kuri's inability to account precisely for his alibi for the night of July 23, this was not particularly relevant to probable cause because, as he explained repeatedly to his interrogators, he had no permanent address and instead bounced around from place to place. The fact that he could not say with any certainty where he was on a given night weeks earlier thus did not tip the probable cause calulus. For similar reasons, Kuri's "flight" to Rochelle added nothing either. Kuri went to

39

Rochelle for a time because his half-brother lived there and he had nowhere else to stay.

Defendants also point out that they had reason to believe that Spanish Cobras were involved in the shooting, and that Russell agreed to be interviewed on videotape. R. 324 at 14. However, a jury could have reasonably concluded that any bearing these facts had on probable cause was so marginal as to be irrelevant.[27]

At the end of the day, Defendants are fighting a losing battle on this issue. It is not the Court's function to re-weigh and re-balance all of the evidence for/against finding probable cause. The evidence here happens to point overwhelmingly against probable cause, but all that need be said at this stage is that the jury was perfect reasonable in having reached that conclusion.

### 4. The Other Malicious Prosecution Elements

For the most part, Defendants' motions fail to challenge (and therefore forfeit all arguments about) the existence of any malicious prosecution elements other than probable cause. There is a single paragraph at the end of their Rule 59 motion about Folino's malice *vel non,* but this argument goes nowhere.

For starters, it is so conclusory and so devoid of any meaningful analysis that it is effectively forfeited. *Smith v. Northeastern Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (undeveloped arguments are forfeited); *Otto v. Variable Annuity Life Ins. Co.*, 134 F.3d 841, 854 (7th Cir. 1998) (refusing to consider unsupported or cursory arguments). Regardless, even had it ben properly preserved, it is wrong. The evidence and trial testimony discussed at length above is more than sufficient to have enable the jury to find malice on the part of Folino. *See supra* at 2-12.

---

[27] At the risk of nitpicking further, Defendants were actually contradicted on this point. Their counsel kept insisting there was relevance in the fact that Russell affirmatively *requested* to be videotaped, Ex. A (Trial Tr.) at 1289:6-122, but it turned out that he had merely agreed. *Id.* at 1257:2-15.

### D. The Jury's Verdict on Kuri's Derivative Claims Should Not Be Disturbed Either

Because the Defendants have provided no valid reasons to disturb the jury's verdict on any of the due process or malicious prosecution claims, there is likewise no justification to overturn its findings for Kuri on the failure to intervene and conspiracy claims. Defendants' single argument of substance is their half-hearted contention that the evidence cannot support an inference of a conspiratorial agreement between Folino and McDermott. This argument, however, is so under-developed as to be forfeitted under the case law set forth above. *See also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("[S]keletal 'argument,' really nothing more than an assertion, does not preserve a claim").

The reason why the Defendants assert their conspiracy objection only in passing is because the law does not support it. Circumstantial evidence may by itself "provide adequate proof of conspiracy," as the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," but requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981). "The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979).[28]

---

[28] *See also Jones*, 856 F.2d at 992 ("To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them."); *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (a civil conspirator is liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy").

**IV.    The Verdict Against Defendant McDermott Was Not Against the Manifest Weight of the Evidence**

Defendants ask the Court to overturn the verdict against McDermott, asserting that he was purportedly not personally involved in the misconduct that led to Kuri's wrongful imprisonment. Out of the extensive briefing on Defendants' post-trial motions, the argument occupies a single paragraph and is devoid of citations to the record. The reason for this cursory treatment is bcause there is no support.

As set forth in the Statement of Facts, McDermott particiated with Folino at all relevant times, and was present for all of the events at which the misconduct allegedly took place. In fact, Folino expressly gave McDermott credit for solving the case with him. Ex. A (Trial Tr.) at 591:5-10.

On that score, McDermott participated with him in procuring both of the disputed eyewitnesses identifications that formed the basis of the prosecution against Kuri. *Id.* at 592:4-9. Starting with Fernandez, McDermott was present for each of the two Fernandez hospital interviews that culminated in the controversial photo identification. *Id.* at 1408:4-1410:11, 1418:17-1420:13. Like Folino, McDermott took no notes of this critical interview of the victim (despite that this was the first and apparently only police interview) and he failed to record any descriptions by Fernandez of the offender(s) prior to showing photos. *Id.* at 1470:22-1481:1. And he had no good explanation for why any of this was so. *Id.*

McDermott further admitted that he would have shown Fernandez a photo of Kuri on August 1 if he had one. *Id.* at 1468:16-18. The Kuri photo in Defendants' file is in fact dated August 1, but McDermott echoed Folino's dubious "typo" story, namely, that the police report account that Russell disclosed Kuri's name for the first time on August 2 (the day after Kuri's

42

photo was pulled) was actually a typographical error. *Id*. at 1451:3-1453:12. McDermott took that dubious stand even though he admitted to actually having no independent memory of his interactions with Russell. *Id*. at 1449:21-1450:5.

Like Folino, McDermott also spoke to Wachaa multiple times, yet created no notes, reports, or other record of these conversations. *Id*. at 1455:3-1456:3. Also like Folino, McDermott admitted at his deposition that he did not recall either way whether he spoke to Wachaa before speaking to Russell, only to try to disavow that testimony at trial and insist that he was sure he spoke to Russell first. *Id*. at 1458:6-1460:19. McDermott did admit, however, that he used Wachaa help get in touch with Russell, to get Russell to cooperate, and to bring him to the grand jury. *Id*. at 1457:17-23; 1464:19-1465:8; 1509:23-1510:2. Unlike Folino, however, McDermott admitted that Wachaa tried to pretend that he was speaking to Russell on the phone when the shooting happened, something McDermott determined was false. *Id*. at 1462:23-1464:14. McDermott had "no answer" for why he did not "memorialize that in a report somewhere so the State's Attorneys would have have whole picture." *Id*. at 1464:15-18.

McDermott also assisted Folino in the interrogation of Kuri on August 5. *Id*. at 1423:5-1424:25. McDermott admitted that if Kuri was a suspect at the time, he should have been advised of his rights, including the right to a lawyer. *Id*. at 1481:9-1482:14. Even though Fernandez and Russell had supposedly by then already identified Kuri, McDermott affirmatively decided along with Folino not to read Kuri his rights. *Id*. McDermott later had to admit, however, that Kuri had already been arrested that day. *Id*. at 1496:10-1497:18. This was contrary to the descriptions in the Defendants' resulting police report, which obscured the fact that Kuri had been arrested. *Id*. at 1501:11-1502:25.

43

McDermott was part of the decision to interrogate Kuri as a "witness" for a minimum of 8-10 hours even though it took no more than a few minutes for Kuri to tell them that he had no knowledge about anything they were talking about. *Id*. at 1486:8-1487:6. According to McDermott, he made clear to Kuri that he was free to leave at any time but Kuri nevertheless opted to stay in the interrogation room. *Id*. at 1488:23-1489:10. McDermott proceeded to leave "open" the police report from the August 5 interrogation (which therefore remained subject to editing) until it was finally submitted in October, a decision he claimed was consistent with the City's policies and practices. *Id*. at 1485:8-1486:1; 1500:12-1501:6; Ex. K (Def. Tr. Exh. 116). Later, for the September 8-10 interrogation, the jury saw video of McDermott's participation, including questioning consistent with malice on his part. *Id*. at 1515:5-1518:23. McDermott later told the State's Attorneys that Kuri's alibi supposedly did not check out, *id*. at 1511:7-9, which was untrue. *Id*. at 417:6-19.

In sum, the jury's determination that McDermott was personally involved in the misconduct that led to Kuri's wrongful imprisonment was perfectly reasonable. As with Folino, McDermott freely acknowledged that probable cause would have been unavailable if Kuri's name originally came from the police rather than the other way around. *Id*. at 1531:9-1532:10. He did not try to defend the fabrication of bogus witness identifications. He simply denied that any such thing ever occurred. This trial thus came down to a jury question about which side's account of how the identifications came to be was more credible. McDermott lost that battle. No post-trial relief from that verdict is warranted.

## V. There Was No Problem With Inconsistent Verdicts

Because the jury found against Folino but not McDermott on Kuri's malicious prosecution claim, and against McDermott on some but not all of the claims against him, Defendants argue that

the resulting verdict is internally inconsistent and on that basis cannot stand. Defendants' argument fails for several independent reasons.

### A. Defendants Failed to Properly Preserve This Argument

Though the Seventh Circuit has not definitively ruled on the question, it has observed in numerous cases that nearly all federal courts dictate that a party's failure to lodge a contemporaneous objection to an inconsistent verdict before the jury is discharged constitutes forfeiture of the argument. *Fox*, 600 F.3d at 844 (citing *Oja v. Howmedica, Inc.*, 111 F.3d 782 (10th Cir. 1997); *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1331 (9th Cir. 1995)); *Kosmynka v. Polaris Indus.*, 462 F.3d 74, 83 (2d Cir. 2006) ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury.") (collecting cases); *Pearson v. Welborn*, 471 F.3d 732, 739 (7th Cir. 2006); *Carter v. Chicago Police Officers*, 165 F.3d 1071, 1079-80 (7th Cir. 1998).

This rule makes sense. Had Defendants raised the purported inconsistency in a timely manner, any genuine inconsistency (which is actually absent here in any event, as discussed below) could have been addressed and potentially resolved while the jury was still empanelled. After failing to raise with the Court any issue about the consistency of the jury's verdict before the jury was discharged, Defendants cannot raise such arguments now. Their motion should be denied on that basis alone.

### B. The Jury's Verdicts Are Not Inconsistent

Inconsistency in verdicts only requires a new trial when no rational jury could have returned the verdicts. *Pearson*, 471 F.3d at 739. The question is whether a verdict in favor of one defendant necessarily makes a verdict against the others impossible. *Thomas v. Cook County*, 604 F.3d 293, 304-05 (7th Cir. 2010) (citing *Los Angeles v. Heller*, 475 U.S. 796, 798-99 (1986)).

"Any plausible explanation for the verdict precludes reversal." *Fox*, 600 F.3d at 844. "If possible, [the] court must reconcile apparently inconsistent verdicts, rather than overturn them." *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005); *see also Freeman v. Chicago Park Dist.*, 189 F.3d 613, 615 (7th Cir.1999) ("[J]ury verdicts must be interpreted so as to avoid inconsistency whenever possible.").

In this case, the verdict in favor of McDermott on the malicious prosecution claim is not necessarily inconsistent with the jury's finding against Folino on the same count. Specifically, in arguing that the jury had no choice on this record but to reach the same finding against both Folino and McDermott, Defendants ignore the first element of malicious prosecution. To be liable for this tort, that particular defendant "must have initiated the criminal proceeding, or his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Logan v. Caterpillar*, 246 F.3d 912, 922 (7th Cir. 2011).

Here, there was definitely a rational basis for a jury to have found that Folino, but not McDermott, was the detective responsible for initiating Kuri's criminal prosecution. Folino's testimony was clear and unambiguous on that point: Folino was the one who decided to call up the State's Attorney to seek murder charges against Kuri. Ex. A (Trial Tr.) at 749:15-21. McDermott testified that the reason he (McDermott) never called the State's Attorney's Office was because there was not enough to charge Kuri. *Id*. at 1504:11-16. Folino also called the State's Attorney on August 5 seeking charges after Kuri's first arrest before McDermott got to work that day. *Id.* at 754:3-755:11; Ex. N (Def. Trial Ex. 69 at Bates 1856). McDermott was therefore not present for that event either. *Id.*

McDermott was also not at work on September 8, the day Kuri was arrested the second time. *Id*. at 1514:21-1515:4. Folino went with a different detective to Rochelle to pick up Kuri, and

46

that is why McDermott only appears on the video at the tail end of the interrogation. *Id*. at 1000:2-15.

Given the foregoing, a jury could have reasonably concluded that the "initiated or continued" element of a malicious prosecution claim was satisfied for Folino but not McDermott. There was there nothing inconsistent about those determinations.

Defendants' other inconsistent verdict argument fails for similar reasons. The fact that McDermott was found liable for fabricating evidence and withholding Brady material is in no way inconsistent with his win on the malicious prosecution claim. To state the obvious, it could both be true that McDermott (a) violated Kuri's right to due process, and did so with malice, but that (b) he nonetheless did not commit the tort of malicious prosecution because there was insufficient evidence he was responsible for initiating or continuing the prosecution. Because these two verdicts can be reconciled in a plausible manner, the argument goes nowhere.

## VI. The Jury's Damage Award Was Sufficiently Supported by the Evidence

Pursuant to well-settled law, as well as the Seventh Amendment to the Constitution, our judicial system presumptively entrusts juries to determine what size compensatory damage award is appropriate to make someone whole. Because the nature of that inquiry is so highly dependent on subjective assessments of the evidence and witness credibility, jury damage awards are disturbed only when necessary to prevent a wholly irrational outcome, one clearly driven by passion or prejudice. No such showing has been made here, and no relief is appropriate.

### A. Legal Standard

When evaluating whether to disturb a jury's determination regarding damages, courts typically consider whether (1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's

fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases. *G.G. v. Grindle*, 665 F.3d 795, 799 (7th Cir. 2011).

In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict. *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). "This perspective is essential, if we are to preserve the jury's role as the trier of fact." *Id.* A monstrously excessive verdict is one that is "a product of passion and prejudice." *Fleming v. Cnty. of Kane*, 898 F.2d 553, 561 (7th Cir.1990).[29]

## B. The Jury's Award Here Was Roughly Comparable to Awards in Similar Cases

The jury awarded Kuri a total of $4 million for roughly three years of wrongful incarceration. This amount is well within the range of normal for such injuries. While Defendants cite cases about scalp injuries and inability to conceive children, the far more relevant comps are other wrongful imprisonment cases.

In that regard, Plaintiff's counsel's law firm have themselves tried a number of cases where juries awarded more than $1 million per year in compensatory damages. These include: *Johnson v. Guevara*, 2009 WL 1886888 (N.D. Ill. June 22, 2009) ($21 million in compensatory damages for 11 years of wrongful incarceration, almost $2 million/year); *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) (affirming § 1983 jury verdict of $9 million for 4 years' wrongful incarceration, or $2.25 million per year); *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2013) (affirming § 1983 jury verdict of $25 million for 16 years' wrongful incarceration, or $1.5 million per year);

---

[29] Where the jury awarded damages on a state law claim, as it did here for the malicious prosecution claim, "[t]he question whether the ... award was excessive is controlled by Illinois law." *Smart Mktg. Grp. v. Pubs. Int'l Ltd.*, 624 F.3d 824, 832 (7th Cir. 2010). Under Illinois law, the "amount of a verdict is generally at the discretion of the jury," and must be given "great deference." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 612 (7th Cir. 2006). A jury award will be reduced if "it is so large that it shocks the judicial conscience." *Id.*

*Fields v. City of Chicago*, 2015 WL 13578989 (N.D. Ill. Apr. 7, 2015) ($22 million in

compensatory damages for 18 years of wrongful incarceration); *White v. McKinley*, 605 F.3d 525

(10th Cir. 2010) (affirming § 1983 jury verdict of $14 million based on 5.5 years' wrongful

incarceration, or $2.5 million per year); *Ayers v. City of Cleveland*, 2013 WL 1965948 (N.D. Ohio

Mar. 8, 2013) ($13.2 million jury verdict for 11 years' wrongful imprisonment).[30]

The $4 million award for three years in Jail in this case falls comfortably within that range

of damage awards. As the Seventh Circuit explained in a similar case where the plaintiffs spent

201 and 46 days in Jail, respectively: "To be sure, there are cases where people suffered worse

physical injuries and received smaller awards than the appellants here. And there are also cases

---

[30] These awards are consistent with those of other law firms and in other jurisdictions. *Smith v. City of Oakland*, 538 F. Supp. 2d 1217, 1242-43 (N.D. Cal. 2008) (recognizing $1 million per year of incarceration as "a floor for wrongful imprisonment awards, not a ceiling" and collecting cases of approximately $1 million per year of wrongful incarceration) ($5 million award for 4 ½ months' imprisonment based on wrongful parole revocation, remitted to $3 million), *aff'd*, 379 Fed. Appx. 647 (9th Cir. 2010); *Slevin v. Bd. of Comm'rs for Cnty. of Dona Ana*, 934 F. Supp. 2d 1270, 1273–78 (D.N.M. 2012) (holding $15.5 million compensatory damages verdict for 22 months in wrongful solitary confinement—$500,000 per month of confinement plus $1 million per year since release—was not excessive given evidence at trial); *Limone v. United States*, 579 F.3d 79, 103–07 (1st Cir. 2009) (affirming as not excessive a $96 million wrongful conviction verdict split among four plaintiffs—based on $1 million per year baseline); *Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003) (affirming § 1983 jury verdict of $15 million for 15 years' wrongful incarceration); *McGee v. City of Tulsa*, 2006 WL 5722064 (N.D. Okla. Mar. 2016) (Verdict and Settlement Summary) (jury verdict of $14.5 million for 14 years' wrongful imprisonment); *Thompson v. Connick*, 553 F.3d 836, 865–66 (5th Cir. 2009) (affirming district court's denial of a remittitur for $14 million verdict for 18 years of wrongful incarceration), *rev'd on other grounds*, 131 S. Ct. 1350 (2011); *Drumgold v. Callahan*, 806 F. Supp. 2d 405, 426–27 (D. Mass. 2011) (denying remittitur for $14 million jury award for 14 years' wrongful imprisonment), *vacated on other grounds*, 707 F.3d 28 (1st Cir. 2013); *Sarsfield v. City of Marlborough*, 2006 WL 2850359, at *1 (D. Mass. Oct. 4, 2006) (awarding $13 million for 9.5 years of wrongful incarceration); *Newton v. City of New York*, 171 F. Supp. 3d 156, 177 (S.D.N.Y. 2016) ($18.5 million verdict remitted to $12 million for 12 years of wrongful incarceration); *Restivo v. Hessemann*, 846 F.3d 547 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 644 (2018) (affirming jury award of $18 million for 18 years of wrongful incarceration); *Ramirez v. Los Angeles County Sheriff's Office*, 2006 WL 1428310 (C.D. Cal. Feb.16, 2006) ($18 million in compensatory damages for malicious prosecution that resulted in ten months' incarceration).

where plaintiffs received much larger awards for much longer periods of unlawful detention. Nonetheless, we see nothing to undermine this jury's awards of $2.4 million and $1 million—amounts that lie well within the universe of excessive force and malicious prosecution verdicts." *Adams v. City of Chicago*, 798 F.3d 539, 546-47 (7th Cir. 2015). That is enough to survive scrutiny. *Fox,* 600 F.3d at 845–46 ($2.7 million award for loss of consortium did not "shock the judicial conscience" where plaintiff's loved one was in Jail for eight months); *Smith v. City of Oakland*, 538 F.Supp.2d 1217, 1241 (N.D. Cal. 2008) (remitting damage award to $3 million where plaintiff was detained in jail for four and a half months); *Jones,* 856 F.2d 985, 988 (7th Cir.1988) (upholding jury award of $801,000, equivalent to $1.6 million in 2015 dollars, for short stay in Jail of less than a year).

Ignoring the bigger picture, Defendants contend that a particular component of the wrongful imprisonment damages awarded here – loss of normal life – has been overcompensated. The comparator cases do not bear that out. The above-cited Northern District of Illinois damage verdicts were all awarded in the context of the Seventh Circuit's pattern compensatory damage instruction No. 3.10, which specifically includes past and future loss of a normal life as a permissible form of compensatory damages, one for which "no evidence of the dollar value" need be introduced. And the case law bears out the appropriateness of the jury's allocation here.

Specifically, the jury's $4 million damage award allocates $1 million to loss of a normal life, terminology that appears unique to this Circuit (other jurisdictions sometimes refer instead to nonpecuniary damages). The allocation of $1 million, or 25% of the total compensatory award, to loss of normal life is not out of line with comparable cases to an extent which could justify judicial intervention.

For example, in *Collins v. City of Chicago*, No. 2012-L-012389, 2013 WL 5771217( Ill.

50

Cir. Ct. Sep. 24, 2013) (Verdict and Settlement Summary), John Collins, who was arrested for aggravated battery to a police officer and then wrongly held in jail for more than a year, was awarded $1 million by a jury in Cook County. During his wrongful imprisonment, he missed the birth of his first child. Collins won his malicious prosecution claim and was awarded $100,000 dollars for emotional distress and $900,000 dollars for loss of a normal life. *Id.*

In *Aguirre v. City of Chicago, et al*, No. 2003-L-004065 (Ill. Cir. Ct. Feb. 17, 2006), three men, who spent five years in prison for wrongful murder and kidnapping convictions, sued several Chicago police officers who they allege coerced their confessions. A jury awarded them $6.74 million dollars, including compensation for loss of normal life. Ex. O (*Aguirre v. City of Chicago, et al*, No. 2003-L-004065 (Ill. Cir. Ct. Feb. 17, 2006), Verdict and Settlement Summary).

In *Baba-Ali v. State of New York*, 878 N.Y.S.2d 555 (Ct. Cl. 2009), *aff'd in part, rev'd in part*, 907 N.Y.S.2d 432 (2010), *aff'd as modified*, 19 N.Y.3d 627 (2012), the plaintiff was wrongfully convicted on charges that he sexually abused his daughter. He was imprisoned for over two years in maximum security prisons before his conviction was reversed due to prosecutorial misconduct. The court awarded $1.75 million in non-pecuniary damages (including damages suffered following his release which resulted from his unjust conviction and incarceration), which was subsequently remitted to $1 million. *Id.* at 557.

In *Gristwood v. State of New York*, 2013 WL 1975649  (Ct. Cl. Apr. 4, 2013), *aff'd*, 119 A.D.3d 1414, 990 N.Y.S.2d 386 (2014) plaintiff, who spent nine years in prison for wrongful attempted murder conviction, was awarded $5.49 million in damages, including $1.9 million for continuing pain and suffering and post-incarceration psychological issues. In upholding the award, the Court held: *"*Clearly [Plaintiff], through his loss of liberty for nine years, also lost the fundamental right to enjoy his life, and instead faced nine years of strict confinement in a

51

maximum security prison with a loss of all of his civil rights and liberties." *Id. at \*8; see also Ashe*, *et al. v. State of Connecticut* No. 23728, 2016 WL 2748380 (D.Conn. Jan. 15, 2016) (Verdict and Settlement Summary) (four plaintiffs each awarded $4.2 million for 16-year wrongful incarceration, including $2.4 million for loss of liberty and enjoyment of life); *Egan v. City of Chicago*, 2012 WL 6963983 (N.D. Ill. Oct. 12, 2012) (Verdict and Settlement Summary) (jury awarded plaintiff $100,000 in compensatory damages, including "loss of a normal life" damages for six hours of wrongful detention).

In sum, these comparable verdicts provide strong support for the appropriateness of the jury's award here. Conversely, Defendants have fallen well short of demonstrating that this factor warrants any remittitur.

### C. The Jury's Award Was Neither Monstrously Excessive Nor Lacking Any Rational Connection to the Record Evidence

Loss of normal life is an appropriate component of damages in a wrongful incarceration case. S*ee Hendrickson v. Cooper,* 589 F.3d 887 (7th Cir. 2009) (describing "loss of enjoyment of life" as a proper element of § 1983 damages when the plaintiff continued to suffer effects from the defendant's conduct); *Richman v. Burgeson*, 2008 WL 2567132, at \*4 (N.D. Ill. June 24, 2008) (noting that "the Seventh Circuit allows hedonic damages for § 1983 claims"); *see also Smith v. City of Evanston*, 631 N.E.2d 1269, 1278 (Ill. App. Ct. 1994) (citing Michael Graham, Pattern Jury Instructions: The Prospect of Over or Undercompensation in Damage Awards for Personal Injuries, 28 DePaul L. Rev. 33, 50 (1978)).

Contrary to Defendants' argument, an award for nonpecuniary damages can be supported "solely by a plaintiff's testimony about his or her emotional distress." *Tullis v. Townley Engineering & Manufacturing Co.*, 243 F.3d 1058, 1068 (7th Cir. 2001); *Pickett v. Sheridan*

*Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010) ("Sheridan's position that Pickett could not have established emotional distress without corroborating evidence from a third party finds no support in our precedent."); s*ee also Deloughery v. City of Chicago*, 422 F.3d 611, 620 n. 5 (7th Cir.2005) (no requirement that Plaintiff consult a mental health professional). Here, Kuri provided sufficient testimony of his loss to provide a rational basis for the award. Some of that evidence is summarized in the following section.

### D.  The Record Evidence

Upon being denied bond on the charge of first degree murder, Kuri was sent to maximum security Division 1, the most violent part part of the Jail, full of the most dangerous criminals. Ex. A (Trial Tr.) at 267:12-268:4. At the time, Kuri was still a teenager, only 5'6" and 130 pounds – or 40 pounds less than he weighed as a fully grown man at trial. *Id*. at 268:5-10. He did not know a soul in the Jail, causing much concern on many levels, not the least of which were fear and loneliness. *Id*. at 268:12-21.

Jail was an extremely overcrowded, violent and dangerous place for Kuri. *Id*. at 269:2-273:6. Murders and kidnappers, some with nothing to lose, were armed with knives and other deadly weapons, and Kuri spent years constantly in fear for his life. *Id*. at 275:14-24; 277:1-2. Fights could break out anywhere for any reason, and he was attacked and beaten up repeatedly, about a dozen times. *Id*. at 277:13-23. People perceived as being weak were in greater danger. *Id*. at 278:11-19. This was not a normal life.

Kuri described being choked nearly to death by another prisoner who did not like that he was making noises in his cell. *Id*. at 273:8-275:12. Though he survived when other inmates intervened and saved him, none of the guards cared, and Kuri had to continue to see the man who tried to kill him around the Jail. *Id.* In his cell, Kuri faced danger of being attacked by a cellmate

every time he closed his eyes. Id. at 283:18-25. Protective custody was not a safe option because sex offenders lurked there and preyed upon the weak. *Id.* at 282:2-16. This was not normal either.

On other occasions, Kuri had to witness violence against other people, including, *e.g.,* a group of people stomping on a single person in the shower. *Id.* at 279:3-280:5. There were riots on the tier, and sometimes Kuri got maced, at least once with his hands restrained in cuffs behind his back, burning his eyes. *Id.* at 280:7-281:6.

The cells in which Kuri lived for three years were tiny, built for one man but housing two. *Id*. at 282:23-283:11. There was no normal privacy and nearly perpetual physical discomfort. *Id*. at 283:10-284:8. Cellmates sometimes neglected their hygiene (fearful of showering) which created enormous problems in the Summer, as did the sometimes unbearable heat. *Id*. at 284:17-286:23. Lockdowns sometimes restricted Kuri to his cell all day for a week a longer. *Id*. at 287:14-288:21. Property shakedowns and strip searches were arbitrary, disrespectful, and humiliating. *Id*. at 288:23-289:19. The food was inedible and insufficient, a real problem that was compounded for Kuri because he was totally broke, and thus had no access to commissary alternatives. *Id*. at 290:24-292:12. The latter problem also restricted Kuri's ability to obtain necessities such as underwear, socks, and clothes to deal with the biting cold in the Winter. *Id*. at 292:21-293:6. None of this was a normal life.

Nor was his social environment. Arrested as a teenager and held until he was 22, Kuri was completely deprived of interactions with females his age. *Id*. at 293:8-22. The holidays were extra tough. *Id*. at 293:24-294:5. No one hugged him for those three years in jail. *Id*. at 294:6-8. He sometimes cried. *Id*. at 294:9-19. None of this felt fair to Kuri because he had not done anything to deserve this punishment. *Id*. at 288:12-21.

Some of the guards treated the inmates with enormous disrespect, and Kuri was not always compliant with their rules. *Id*. at 424:23-425:25. All told, he spent a total of 145 days of his incarceration in solitary confinement. *Id*. at 295:18-21; 401:1-13. During that time in "the hole," Kuri was shackled and chained from head to toe anytime he left his cell, leaving him feeling "worse than an animal." *Id*. at 300:11-15 ("Dogs don't even get treated that way"). Being deprived of all human interaction for extended periods was hard on his mind; he would talk to himself and try to sleep most of the time. *Id*. at 309:7-310:1. Not normal.

During all this time, Kuri had to live with the fear that was going to spend the rest of his life in prison for a crime he did not commit. *Id*. at 310:2-311:3. The fear of the loss of any possible happy future was very hard on his mental well-being and interfered with his ability to live a normal life. *Id*.

The only person who visited Kuri during these years was his uncle Omar, early on. *Id*. at 297:1-298:18. After that, he received no visits, phone calls, or letters, despite his desperate attempts to stay in contact with his father, who had only recently (and barely) re-entered his life at the time of his wrongful arrest. *Id*.; *See also id*. at 223:20-224:3, 232:8-10. The same was true for Kuri's brother, who Kuri lived apart from after age 5 when he was sent to live in group homes and then with a foster family. *Id*. at 224:4- 226:10. After Kuri's release from Jail, years went by after his release until the finally reconnected. *Id*. at 227:5-17.

About 18 months into his incarceration, when the DNA results from the bike still had not come back, Kuri started losing hope. *Id*. at 300:17-301:16. A guard told him his choices were to bond out, cop out, or kill himself. *Id*. at 301:20-302:2. Unable to do the first, and unwilling to do the second, he attempted the third, putting a sheet around his neck and tying it to the bars. *Id*. at 302:3-11. He failed, and the Jail sentenced him to 15 days in solitary confinement and sent him to

Division 10, the psychiatric ward, where he stayed for a year. *Id*. at 302:12-303:24; 404:10-405:11. That placement turned out to be even more dangerous for him because it was still maximum security, and the mentally ill inmates tended to present other kinds of risks, including inappropriate sexual behaviors that Kuri was forced to witness. *Id*. at 304:1-12. The Jail also put him on serious pharmaceutical drugs, which Kuri hated because they "tricked" his mind. *Id*. at 304:13-306:4.

When the judge finally declared him not guilty, Kuri walked out of prison with no money, no possessions, no clothes, and no friends. *Id*. at 323:12-326:6. Unlike the typical picture of euphoric reunions with loved ones, Kuri had no one waiting for him on the other side of the Jail's gate, and literally nowhere to go. *Id.* The family of his co-Defendant (who he did not even really know) apparently took pity on him and took him to Walmart for some clothes and let him stay with them for awhile. *Id*. at 325:11-24. Kuri then found people he knew before his wrongful arrest and tried to stay with them for as long as they would tolerate. *Id*. at 326:2-327:6.

Thereafter, Kuri described having a very difficult time getting back on his feet. *Id*. at 327:13-328:21. In his words, "it was real hard, because it was like ten times worse when I got out." *Id*. at 327:15-16. He estimated that he would be picked up by ambulances and taken to emergency rooms at least weekly, about a hundred times. *Id*. at 327:17-328:21. He would summon this help when he felt like was "going to die," and they would give him Xanex for anxiety and PTSD. *Id*.

While he has made progress in the five years since his release, Kuri hardly claimed that his life has returned to the place he was in before all of this happened. To be sure, Kuri was not a particularly eloquent describer of his feelings around all this. When asked to tell the jury how he felt upon being charged with a murder he did not commit, he used words like "real upset" and "sad." *Id*. at 260:10-12. The fact that he could not articulate with greater clarity, however, does not mean the emotions were any less real. *Tullis*, 243 F.3d at 1068 (juries are responsible for

evaluating the credibility of witnesses who testify to emotional impacts, and courts do not second-guess those credibility determinations).

### E. The Defendants Have Not Made The Required Showing that the Jury Acted Irrationally or that the Award Is Mostrously Excessive

At bottom, it was hardly irrational for a jury to have reasonably inferred that effect the foregoing experiences had on Kuri's ability to enjoy a normal life was profound, if not permanent. That was undoubtedly true for the three years he spent in the Jail, it has undoubtedly continued to affect the normalcy of his life to this day, and it undoubtedly will do so into the future. In any event, these are quintessential jury questions, and this jury's determination merits respect. *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022–23 (7th Cir. 2016) ("The jurors here were able to observe Gracia as she testified and they apparently found her testimony to be sincere and sufficient to convince them that she merited the award they gave her. . . It was the jury's job to gauge Gracia's distress and determine an appropriate amount to compensate her. SigmaTron has given us no reason to disturb the jury's determination."). *See also Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) ("It is entirely possible that another jury might have evaluated the Adams brothers' damages more modestly, but that is not the standard.").

## CONCLUSION

For the foregoing reasons, all of Defendants' post-trial arguments, and both of their motions, should be denied.

Respectfully Submitted,

/s/ Jon Loevy
*One of Plaintiff's Attorneys*

Jon Loevy
Julie Goodwin
Danielle Hamilton
Joel Feldman
Loevy & Loevy
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900