|  |  |  |
|---|---|---|
| ANTHONY KURI<br>(a.k.a Ramsey Qurash), | ) ) ) | |
| Plaintiff, | ) ) | No. 13-cv-01653 |
| v. | ) ) | Judge Edmond E. Chang |
| JOHN FOLINO, *et al.,* | ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Anthony Kuri brought several federal and state law claims against the City of Chicago and its police officers after he was charged with murder, detained for three years in Cook County Jail, and acquitted at trial.[1] Some of the defendants were dismissed during the case's journey to trial, and the claims against the City were bifurcated and stayed. Kuri eventually went to trial on five claims against two Chicago detectives, John Folino and Timothy McDermott (in this Opinion, call them the Defendants). Kuri won all five claims against Folino and succeeded on four claims against McDermott. The jury awarded Kuri $3 million for pain and suffering and $1 million for loss of normal life. The Defendants now bring motions under Rules 50, 59, and 60 of the Federal Rules of Civil Procedure, challenging the jury's verdict on

---

[1]This Court has subject matter jurisdiction over the case under 28 U.S.C. §§ 1331, 1367.

various grounds, while Kuri moves to resume the previously stayed claims against the City. For the reasons discussed below, all four motions are denied.

## I. Background

The events of this case stem from a shooting that took place in the West Side of Chicago on July 23, 2009, the ensuing police investigation, and the state criminal trial of Anthony Kuri on charges related to that shooting.

### A. Kuri's Relationship to the Victims

Kuri was born in Chicago and spent most of his childhood in group homes or with foster parents. Trial Tr. at 223:3-224:23. In the summer of 2009 (when the fateful shooting happened), he was 19 years old. *Id.* at 231:24-25. At certain points growing up, when he would have nowhere else to stay, Kuri would stay with a friend named Zae Russell. *Id.* at 312:17-21. Russell was a member of a gang called the Conservative Vice Lords, which, at the time, was somewhat aligned with another gang, the Latin Kings. *Id.* at 859:6-11. Tony Fernandez—a close friend of Russell's and a member of the Latin Kings—was familiar with Kuri and had seen him hanging out outside of their high school, although Fernandez knew Kuri by his nickname, "Rowdy." R. 315, Fernandez Dep. Tr. at 57:3-58:7; Trial Tr. at 859:3-5.

At some point before 2009, Kuri became a member of a street gang called the Spanish Cobras. Trial Tr. at 229:12-18; Fernandez Dep. Tr. at 58:13-21. In the summer of 2009, Kuri, Russell, and Fernandez all spent time in the East Albany Park area of Chicago, near the intersection of Lawrence and Lawndale. This was known to

be a dividing line between Spanish Cobra territory and Latin Kings territory. Trial Tr. at 859:12-17.

**B. The July 23, 2009 Shooting**

On July 23, 2009, Fernandez and Russell were riding around in Fernandez's minivan with some friends, including Guarav Patel, who was driving the van. Fernandez Dep. Tr. at 63:17-64:7, 65:1-10. At least some of the men in the minivan were members of either the Latin Kings or the Conservative Vice Lords. Trial Tr. at 470:7-12. At some point, the van approached the intersection of Lawrence and Lawndale, where the passengers inside encountered two members of the Spanish Cobras who went by the names "Chino" and "Funk." *Id.* at 470:13-17. Words and gang signs were exchanged between the two groups, but eventually the men in Fernandez's van drove away. *Id.* at 470:13-24; Fernandez Dep. Tr. at 66:23-69:18. Everyone in the van besides Russell, Fernandez, and Patel was then dropped off, and Russell asked Patel to drive to Russell's house on Central Park. Trial Tr. at 471:12-24.

When the van arrived at the house, Russell was sitting in the back row, Fernandez was sitting in the middle row, and Patel was in the driver's seat. Trial Tr. at 471:17-21; Fernandez Dep. Tr. at 85:18-86:11. Fernandez opened the door to let Russell out of the van and Russell began to get out. *Id.* at 91:7-15. But when Russell looked out to his left, he saw two individuals approaching the van, which prompted him to step back inside the van and close the door. *Id.* at 91:16-24. Within seconds, and before Fernandez could get a good look at the two individuals outside, someone began shooting at the van. *Id.* at 93:6-15; 95:17-96:3. Russell immediately ducked

down in the van and was able to evade the gunfire. Trial Tr. at 830:12-18. But Patel was shot in the neck. *Id.* at 830:23-831:2. Fernandez was shot in the leg while trying to attend to Patel and to drive away. Fernandez Dep. Tr. at 93:16-94:7.

Fernandez managed to steer the van away from the shooting towards a group of people around the corner, who called an ambulance upon seeing the van. Fernandez Dep. Tr. at 94:21-95:1. Patel, who had already stopped breathing, was taken away in the first ambulance. *Id.* at 95:2-9, 105:3-7. A second ambulance took Fernandez to Illinois Masonic Hospital, where he was treated for bullet wounds in his leg. *Id.* at 102:21-103:4. According to Fernandez, Russell did not say anything to him about the identity of the perpetrators or who Russell suspected was behind the shooting that night. *Id.* at 108:5-10.

## C. Russell's First Interview

The first CPD officers assigned to the shooting were Detective Frank Szwedo and his partner Detective John Valkner. Trial Tr. at 456:6-24. When they arrived on scene, they found a blue-and-silver Huffy bicycle lying on the sidewalk. R. 331.10, Evidence Inventory at 1. Szwedo and Valkner then tried to interview possible witnesses, including Russell. Russell later testified that the detectives initially placed him in handcuffs, suggested to him that shots were fired from inside the car, and said that they "had to take [him] in for an investigation." Trial Tr. at 831:18-832:6. It is undisputed that the handcuffs were eventually removed, and Szwedo questioned Russell for about ten minutes "[t]o get his account of the incident." *Id.* at 464:5-10,

470:1-2. Szwedo also testified that Russell was cooperative throughout the interaction and answered all of his questions. *Id.* at 464:14-21.

Russell explained to Szwedo that he was driving in a minivan with Fernandez, Patel, and two other members of the Latin Kings he did not know by name when, at the intersection of Lawrence and Lawndale, they had an altercation with two "Cobras" known as Chino and Funk. Trial Tr. at 470:7-17. Russell said that the minivan then drove away, dropped off the two other Latin Kings, and then drove on to Russell's house, where two male "Hispanics" approached the van and yelled "King Killer." *Id.* at 471:12-472:11. Russell described the men as wearing white T-shirts and having short or shaved hairstyles. *Id.* at 472:22-473:9. At trial, Szwedo explained that he was probing Russell during this conversation and giving Russell a chance to explain everything he knew about the incident. *Id.* at 472:15-21. He also testified that Russell's story was consistent with the location of the van and the 911 call. *Id.* at 474:4-8. Finally, Szwedo asked Russell whether he would be able to recognize the shooters if they were presented to him. *Id.* at 475:12-16. Russell responded "maybe." *Id.* At the end of the interaction, Russell gave Szwedo the names of two Spanish Cobras, along with his own address and phone number. *Id.* at 474:20-475:5, 475:21-23. At no point during the interview did Russell mention Kuri's name. *Id.* at 477:3-12; *see also* R. 331.2, 8/4/2009 Supp. Report at 11-12.

### D. The Wachaa Tip

At some point after the shooting, the case was transferred from Szwedo and Valker to the Defendants, CPD Detectives John Folino and Timothy McDermott.

There was no evidence presented at Kuri's civil trial about how or why the case was transferred. Trial Tr. at 537:8-17. Around this time, Folino was contacted by an informant named Abdul Wachaa, who claimed to have information about the July 23 shooting. *Id.* at 549:22-25. Folino did not write a report documenting his first conversation with Wachaa. *Id.* at 550:9-11. Folino testified at Kuri's civil trial that this tip was his very first interaction with Wachaa, *id.* at 539:2-5, but Folino testified at his deposition that he could not remember whether he had worked with Wachaa before the Patel murder, *id.* at 539:13-20. Folino admitted, though, that he used Wachaa as an informant multiple times afterwards and was still using him at the time Folino was deposed in this case. *Id.* at 533:4-24.

Around the same time, on August 3, 2009, Wachaa was arrested for battery and taken to Swedish Covenant Hospital, where he encountered CPD Officer Carmen Lopez. Trial Tr. at 1217:15-1218:2; R. 331.5, Lopez Report. Wachaa told Lopez that he was on the phone with Russell when the shooting took place in front of Russell's house. *Id.* at 1. According to Wachaa, Russell yelled into the phone "Lil David and Rowdy are in front of my house. They killed Indian Dude and they shot T.C… Rowdy was on the bike and Lil David was on the pegs." *Id.* Russell also allegedly told Wachaa that the van was on "Wilson by the alley by the row houses," and then hung up. *Id.* Wachaa explained to Officer Lopez that Rowdy and Lil David were both Spanish Cobras and that he had heard about an altercation between the Cobras and Latin Kings on Lawrence and Lawndale that same evening. *Id.* at 1-2. Lopez determined

that Rowdy was a pseudonym for Kuri and that Lil David was a pseudonym for an individual named David Gomez. *Id*. at 2.

Folino testified at the civil trial that he did not document his first conversation with Wachaa because the same information had already been documented in Lopez's report. Trial Tr. at 550:4-8. Folino admitted that Wachaa's version of the events— that Russell was on the phone with Wachaa while the shooting transpired and managed to relay very detailed information about the incident while ducking from gunfire—seemed implausible. *Id*. at 560:5-10. Folino also testified that Wachaa eventually explained to him that he heard this information "on the street," *id*. at 562:21-563:7, although it is not clear that Wachaa ever retracted his original account (which was that Russell relayed all this on the phone in real-time). In any event, the battery charges against Wachaa were dropped on September 24, 2009. *Id*. at 1369:1-8. The question of who first spoke to Wachaa—Folino or Lopez—is highly contested. *See* R. 335, Pl.'s Resp. Rule 50, 59 Mots. at 6-7; R. 348, Defs.' Reply at 4.

### E. Investigation

### 1. The August 1, 2009 Fernandez Interview

On August 1, 2009, Folino and McDermott visited Fernandez at Illinois Masonic Hospital. R. 331.3, 8/14/2009 Supp. Report at 8. This was the first important step the Defendants took in the case and the first time any CPD detective spoke to Fernandez. Trial Tr. at 595:22-24, 602:16-18, 1408:4-12. Fernandez was still in critical condition at the time, so the detectives did not conduct a "full-blown interview." *Id*. at 1470: 11-16; *see also id*. at 600:9-11. According to Folino's police

report, Fernandez told the detectives that he was willing to cooperate and that he would be able to identify both of the offenders from the shooting. 8/14/2009 Supp. Report at 8.

Folino and McDermott, however, did *not* ask Fernandez for a physical description of the offenders. Trial Tr. at 1036:4-22, 1475:11-14 ("Q: Did you ask him, before you showed him a photograph, to give you a description of any people that he might have seen? A. No."), 1475:20-24 ("Q. Before you showed him the photographs, did you ever say 'Mr. Fernandez, I need you to tell me what you saw. What did they look like?' You never asked him that, did you? A. No."). The detectives instead showed Fernandez two arrays of photos, both dated July 29, 2009. 8/14/2009 Supp. Report at 8; Trial Tr. at 1410:21-23. They created these arrays based on the descriptions of the shooters in the original report written by Detective Szwedo. *Id.* at 1410:4-10. But Fernandez stated that the offenders were not present in either array. 8/14/2009 Supp. Report at 8. He also did not mention the names Rowdy or David Gomez or anything about a bicycle—with or without pegs—during this August 1, 2009 interaction. Trial Tr. at 606:10-20, 610:1-5. It is not even clear if Fernandez affirmatively told Folino and McDermott that he saw the shooter; Folino's report is silent on this question, and Folino could not remember at trial if Fernandez said so, one way or the other. *See* 8/14/2009 Supp. Report at 8; Trial Tr. at 606:21-23.

## 2. Russell's Second Interview

Around the same time, the Defendants went to see Russell to get a more detailed account of the shooting. Trial Tr. at 836:24-837:1. Folino and McDermott

submitted a report on August 14, 2009 documenting this interaction with Russell. R. 331-3, 8/14/2009 Supp. Report. In the report, Folino states that the interview with Russell took place on August 2, 2009, *id*. at 8, one day after he and McDermott met with Fernandez at Illinois Masonic Hospital and one day before Officer Lopez received the tip from Wachaa. Folino later testified at trial that this interview with Russell actually took place on August *1*, 2009, the same day he and McDermott met with Fernandez. Trial Tr. at 612:10-613:7. Folino explained this discrepancy as a "typo" in his report. *Id*. at 625:6-13.

In any event, Folino and McDermott wrote in their report that Russell identified the two offenders as Lil David and Rowdy, and that Russell had "known them for a few years." 8/14/2009 Supp. Report at 8. The report also explained that Russell "did not like the way the police treated him" on the night of the incident and, as a result, "he refused to say anything regarding his observations for that night." *Id*.

### 3. The Photo Arrays

The Defendants' August 14, 2009 report goes on to list three events that took place on August 2, 2009. First, Folino and McDermott worked with two assisting detectives from a tactical team focused on the Lawrence and Lawndale area to identify "Rowdy" as Kuri and "Little David" as Gomez and then pull their photos. 8/14/2009 Supp. Report at 9. The photo arrays that feature Kuri, however, are dated August 1, 2009, not August 2, 2009. Trial Tr. at 623:5-12. At trial, Folino testified that this meant the photographs of Kuri were printed on August 1, 2009. *Id*. at 624:4-10. Folino explained this second discrepancy in his report as another typo. *Id*. at

627:9-19 ("Q. Now the way your report wrote it up, you said on August 2nd, you went to get Rowdy and Gomez's photos, right? A. Based on the report, yes, but it was August 1st. Q. All right. So we have some more typos you're saying, right? A. Well, it was all in chronological order. It looks like it was just a mistake straight down the line. It was just the one date. Q. So three more typos, right? A. Well, it's the same date. It was just a mistake, thinking it was August 2nd, but it was actually August 1st."). Folino admitted he had no notes from his meeting with the tactical team detectives to confirm the date on which they discussed Kuri and printed his photo. *Id.* at 628:16-19.

Next, the report states that Folino and McDermott took the revised photo arrays—which included pictures of Kuri and Gomez—to Fernandez at Illinois Masonic Hospital. 8/14/2009 Supp. Report at 9. The detectives again did *not* ask Fernandez for a physical description of the perpetrators before showing him the photo arrays. Trial Tr. at 1480:7-20. According to the report, Fernandez positively identified Kuri as one of the two offenders from the night of the shooting. 8/14/2009 Supp. Report at 9. Fernandez allegedly told Folino and McDermott that he observed Kuri "riding the Huffy bicycle" when another "male Hispanic that was standing on the pegs of that bicycle, jumped off the bike and while armed with a handgun fired numerous shots at occupants of the van … ." *Id*. The report also states that Fernandez circled Kuri's picture on the photo array. *Id*. Fernandez then told Folino and McDermott that he was not feeling well and was not able to look at the second array, so they left. *Id*. Finally, still on August 2, 2009, Folino and McDermott went back to see Russell and

10

presented him with the revised photo arrays. *Id.* According to the report, Russell positively identified Kuri as Rowdy, the individual "riding the Huffy bicycle with 'Lil David' standing on the rear pegs … ." *Id.* Russell also circled Kuri's picture on the array. *Id.*

The next day, on August 3, 2009, Folino and McDermott went back to Illinois Masonic Hospital to present Fernandez with the second photo array that he had declined to look at the day before. 8/14/2009 Supp. Report at 10. Fernandez identified Gomez, but also requested to view larger photographs of the subjects in the photo array. *Id.* Folino and McDermott presented Fernandez with six individual photographs of the subjects in the original array. *Id.* Fernandez identified Gomez from these six photographs and then circled Gomez's picture. *Id.*

That same day, August 3, 2009, Russell was charged with four counts of misdemeanor battery. Trial Tr. at 1369:11-12. Those charges were dismissed with leave to reinstate on September 24, 2009. *Id.* at 12-14. They were never reinstated. *Id.* at 14-16.

### 4. Kuri's Interrogation and Arrest

On August 5, 2009, CPD officers took Kuri to a police station and questioned him for at least eight hours. Trial Tr. at 357:6-17; 955:23-956:3. Kuri estimated that he was actually in custody for a number of days. *Id.* at 236:5-7. In any event, Folino testified at the civil trial that Kuri was not placed under arrest on August 5 because he was still a witness, rather than a subject. *Id.* at 718:19-25. The interview was not videotaped, Kuri was not given *Miranda* warnings, and Kuri was not given access to

a lawyer. *Id.* at 718:23-25, 721:1-25, 729:4-17. At trial, the Defendants stipulated that they admitted in their Answer to Kuri's Complaint that Kuri was *arrested*, not just questioned, on August 5, 2009. *Id.* at 1496:10-22.

During the interview, Kuri first denied, but then admitted, that he knew David Gomez. Trial Tr. at 357:15-358:17. Kuri also told Folino that, on the night of the murder, he was staying with friends at a house on Tripp Street in Chicago. Trial Tr. at 1011:1-3; 1077:21-1078:1. Folino eventually spoke with someone who lived at that address—Teresa Luis—and wrote in a report that she could not remember if Kuri was at her house on the night of the murder. *Id.* at 1011:11-1012:3, 1016:13-1017:25. Indeed, none of Kuri's alibi witnesses could say definitively that they were with Kuri on the night Patel was killed (which was now around two weeks in the past). *Id.* at 1018:15-18.

Kuri was eventually released following the August 5 interview because there was not enough evidence to charge him. Trial Tr. at 1504:9-20. Folino also testified that he had tried to locate Russell on August 5 so Russell could view Kuri in a lineup, but Folino could not find him. *Id.* at 953:16-954:4. A few days later, Kuri left Chicago for the suburb of Rochelle, Illinois. *Id.* at 378:25-379:24. On September 8, 2009, Folino and another detective went to Rochelle to arrest Kuri. *Id.* at 766:5-14, 1000:3-15, 1514:21-1515:4. Kuri was interrogated until the early morning hours of September 10, R. 331.4, GPRs at 5, and strongly denied any involvement in the murder throughout the interview, Trial Tr. at 239:6-241:4. Kuri demanded a DNA test after the detectives explained that the test would be able to determine whether Kuri had

made contact with the bike found on the scene. *Id.* at 655:2-656:24. He also told Folino to check the recorded footage from the police department cameras located around Lawrence and Lawndale from the night Patel was shot because they would prove he was not there. *Id.* at 241:5-14.

Kuri was later charged with the murder of Patel and the attempted murder of Fernandez and Russell. He was sent to a maximum-security division of Cook County Jail to await the state trial. Trial Tr. at 267:2-15. Kuri believed he was facing 60 years to life in prison. *Id.* at 310:17-21. He testified at this civil trial that he never considered taking a plea deal because he knew he was innocent. *Id.* at 316:2-10. At the time, Kuri was 19 years old, 5'6", and around 130 pounds. *Id.* at 268:5-10; 293:11-12. Kuri told the jury that jail was a violent place and he had no friends there. *Id.* at 268:12-21. He was attacked and beaten up multiple times, including one time when he was choked by another inmate. *Id.* at 269:2-7; 273:8-274:25. Kuri described an occasion when he was handcuffed and then maced by a correctional officer, *id.* at 280:7-25, and another time when he witnessed another inmate brutally beaten in the shower, *id.* at 279:3-19. Kuri explained that he did not seek protective custody while at Cook County Jail because doing so meant other inmates would believe he was a snitch (that is, someone cooperating with the police), and because the other inmates in protective custody were often sex offenders and potentially even more dangerous than those in the general population. *Id.* at 282:2-21.

Kuri also testified that he had no privacy in jail. Trial Tr. at 283:4-17. He stated that some inmates refused to shower because they were afraid to do so and, as a

result, they developed hygiene problems. *Id.* at 284:17-285:21. He described feeling uncomfortable during group strip searches. *Id.* at 289:1-19. He also compared the food served in the jail to cat food and said the "meat [was] like something you never even saw before." *Id.* at 290:24-291:6. Kuri explained at trial that he was unable to buy other types of food sold at the commissary because he had no access to money while he was detained. *Id.* at 291:13-292:12. Kuri described feeling depressed and lonely in jail and that it would sometimes lead him to cry. *Id.* at 293:24-294:19. He often had to walk around with his feet chained, which made him feel "worse than an animal." *Id.* at 300:5-15. Kuri had only a few visits from family while he was detained and did not receive any letters or phone calls. *Id.* at 297:10-298:12.

After spending about 18 months at Cook County Jail, Kuri attempted suicide. Trial Tr. at 300:17-302:15. He was placed in a maximum-security psychiatric ward for around another year following the attempt. *Id.* at 302:16-303:1. Kuri felt that the inmates in the psychiatric division of the jail were more dangerous than the inmates in other divisions because they were mentally unstable and unpredictable. *Id.* at 303:12-304:12. While housed in the psychiatric division, Kuri started taking several mental-health medications, including Zoloft, Klonopin, and Buspar, which he described as "just putting a Band-Aid over a wound." *Id.* at 304:13-305:16.

### E. The Criminal and Civil Trials

Kuri's criminal bench trial took place in the Circuit Court of Cook County on three separate dates between March and June 2012. Kuri had been in Cook County Jail for about 2½ years when the trial began. As expected, Folino testified at the

criminal trial that Russell provided him with Kuri's and Gomez's names and that both Russell and Fernandez picked Kuri out of a photo array. Trial Tr. at 796:7-9. This testimony was contradicted by both Russell and Fernandez. Russell testified that he did not actually make any identifications during his interviews with Folino and McDermott. Trial Tr. at 840:17-17. Instead, one of the detectives told Russell who to pick: "Well, they said that they knew who it was. And they already said that they had David … they said they just needed me to say that these is them or something, so I guess so." *Id.* at 841:15-19. Russell also testified that Folino and McDermott told him that if he identified Kuri and Gomez, "then they were gonna give Tony Fernandez money for being a victim of a crime." *Id.* at 842:1-4. Fernandez likewise recanted at the criminal trial and testified that he did not see who shot him and thus could not identify either Kuri or Gomez. Fernandez Dep. Tr. at 257:17-24; 261:9-12. He testified that Russell "told me who they were." *Id.* at 270:17-271:2. Finally, there was no physical evidence presented at the trial connecting Kuri to the shooting. Trial Tr. at 316:21-317:15; 571:17-23. Kuri and Gomez were both acquitted by the state court judge.

At the federal civil trial, Kuri testified that he had a difficult time readjusting back into society upon his release. No one from his family was there to greet him or pick him up when he left Cook County Jail and he had no money to support himself. Trial Tr. at 324:2-4; 324:18-24. He initially stayed with Gomez's brother before finding old friends to stay with. *Id.* at 325:9-327:6. He was also taken to the

emergency room numerous times for his anxiety and post-traumatic stress disorder. *Id.* at 327:15-328:17.

Kuri filed this suit against the City of Chicago and nine CPD officers in March 2013. *See* R. 1, Compl. Some of Kuri's claims and some of the defendants were eventually dismissed. S*ee* R. 56, Dismissal Order; R. 187, Pl.'s SJ Resp. at 39. The Court also granted the City's unopposed motion to bifurcate the *Monell* claims, R. 86, 11/24/2014 Minute Entry, so when the trial started in September 2018, the only defendants left were Folino and McDermott. Kuri sought damages on five claims against both Defendants: (1) violation of due process; (2) unlawful detention under the Fourth Amendment; (3) conspiracy; (4) failure to intervene; and (5) malicious prosecution.

Things took another turn at the federal civil trial when Russell again contradicted himself—during the trial itself. At first, Russell testified that the police did not tell him whose photo to pick out, Trial Tr. at 841:3-4, nor did they tell him they were going to provide compensation for Fernandez, *id.* at 842:10-12. Then, just a few minutes later, Russell testified that the police told him that they knew who fired the shots the night Patel was murdered and who he needed to identify. *Id.* at 854:10-15. To make matters worse, Russell testified that he did not see Kuri driving a bike with Gomez on the back the night of the shooting, *id.* at 843:24-844:1, 845:18-19, but that he nonetheless told the detectives that he saw Kuri on the bike that night, *id.* at 862:17-25.

Fernandez was not present to testify at Kuri's civil trial, but a video of his deposition was played for the jury. At several different points during his deposition, Fernandez testified that the detectives told him who to choose from the photo array. For example, Fernandez stated:

> These officers came to me with these guys' pictures. I'm like, who this? Who this? Who this? Well, maybe—maybe they talked to [Russell] first. Whoever they talked to, the detective talked to first, they had some kind of idea what's going on. And then they probably—they just wanted to come to me because I'm the victim and like, Hey, look, just sign your name right here, boom. These are the guys that shot you. We got them, bam.

Fernandez Dep. Tr. at 270:2-13. *See also id.* at 270:19-274:6; 309:14-22; 310:13-312:9; 326:16-327:5 ("A. [W]ell, I just keep telling him I don't know. I kept telling him, I don't know who shot me, who—I don't know if these guys did it or not. I just kept telling him, and he just—he kept pushing me to like, Look these are the guys, from his words… Q. And that's why you signed your name on … those two pictures. A. I'm like, oh, okay yeah… But not because I knew, Oh yeah, it was him, no. It was because they were telling me like it was them."). He also stated that he did not see Kuri riding a bike the night of the shooting, nor did he ever tell the police that he did. *Id.* at 304:6-11, 318:21-319:10.

The jury found in favor of Kuri, and against Folino and McDermott, on the following claims: violation of Kuri's right to due process, Fourth Amendment unlawful detention, conspiracy, and failure to intervene. R. 312, 10/02/2018 Minute Entry. It also found in favor of Kuri and against Folino on the claim of malicious prosecution, although it found in favor of McDermott on that claim. *Id.* The jury awarded Kuri a total of $4,000,000 in compensatory damages, comprised of

$3,000,000 for pain and suffering and $1,000,000 for loss of normal life. *Id.* The jury also awarded $40,000 in punitive damages against Folino and $10,000 in punitive damages against McDermott. *Id.*

Folino and McDermott now bring three post-trial motions challenging this verdict under Federal Rules of Civil Procedure 50(b), 59(a), 60(b). *See* R. 324, Defs.' Rule 50 Mot.; R. 325, Defs.' Rule 59 Mot.; R. 336, Defs.' Rule 60 Mot. Kuri contests these motions and brings his own motion to pursue the bifurcated *Monell* claims against the City. Pl.'s Resp. Rule 50, 59 Mots.; R. 347, Pl.'s Resp. Rule 60 Mot.; R. 342, Pl.'s *Monell* Mot.

## II. Legal Standard

Pursuant to Federal Rule of Civil Procedure 60(b)(2), a party may be entitled to relief from the entry of final judgment if that party presents "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)." Fed. R. Civ. P. 60(b)(2). "Rule 60 relief is limited to extraordinary situations where a judgment is the inadvertent product of special circumstances and not merely the erroneous application of law." *Kennedy v. Schneider Electric*, 893 F.3d 414, 419 (7th Cir. 2018) (cleaned up).[2] When ruling on a Rule 60 motion, courts "must be careful not to undermine too lightly the finality of their judgments." *Id.* There are five prerequisites that the movant must establish before a court will grant a new trial on the basis of newly discovered evidence: (1) the

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

evidence was discovered following trial; (2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would probably produce a new result. *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 732 (7th Cir. 1999).

Under Rule 50(a) of the Federal Rules of Civil Procedure, a district court may enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier–Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id.* And the Court "can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Mejia v. Cook County, Ill.*, 650 F.3d 631, 63 (7th Cir. 2011) (cleaned up). Put another way, "[d]iscrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive" will not render testimony excludable. *Whitehead v. Bond*, 680 F.3d 919, 926 (7th Cir. 2012) (cleaned up).

A court may grant a motion for a new trial under Rule 59(a) if the verdict is against the clear weight of the evidence or if the trial was unfair to the moving party. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). "In passing on a motion for a

new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633 (cleaned up). The district court, however, may not simply substitute its judgment for the jury's. "Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Whitehead*, 680 F.3d at 928. The standard for granting a new trial is, thus, relatively high and a motion requesting as much will only be granted "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* at 927-28.

## III. Analysis

### A. Defendants' Rule 60 Motion

The Court starts with the Defendants' Rule 60 motion, as its outcome impacts the rest of this Opinion. The Defendants argue that new evidence has come to light that undermines the Court's authorization to play Fernandez's video-deposition testimony. By way of background, Kuri sought to present testimony from Fernandez at trial but was unable to serve him with a subpoena. Trial Tr. at 575:19-576:2; R. 294, Mot. to Present Fernandez Testimony. The Court expressed skepticism that Kuri could show Fernandez was unavailable without first serving him with a subpoena. *Id.* at 576:20-23. The Court also pointed out that Kuri should have sought judicial assistance earlier, either via a motion to compel or a motion for assistance from the United States Marshals Service, and the Court noted that it had issued two prior warnings about service of trial subpoenas. *Id.* at 577:13-578:1 (citing to R. 244,

5/23/2018 Minute Entry; R. 263, 8/15/2018 Minute Entry). Kuri's attorney then offered up his investigator to testify about his efforts to find Fernandez and serve him with a subpoena. *Id*. at 578:8-11.

The following day, Kuri's attorney offered the testimony of his investigator, Mort Smith, who testified that he began looking for Fernandez in mid-June 2018 and "continued on periodically throughout the remainder of the summer." Trial Tr. at 974:6-9. Smith explained that he began by searching incarceration records and then moved on to other public databases where he found several possible addresses for Fernandez and his relatives. *Id*. at 974:14-20. Smith went to one of these addresses for the first time in June 2018. *Id*. at 974:21-24. Smith also found three different phone numbers for Fernandez, but all were dead. *Id*. at 975:5-6. Eventually, about two weeks before the trial started on September 24, Smith tracked down Fernandez's girlfriend, who refused to share Fernandez's phone number but offered to convey a message to him. *Id*. at 975:7-17. She also told Smith that Fernandez had been homeless and living in his car. *Id*. at 976:1-4.

In response to all of this, the Court again pointed out that, if only Kuri had come to the Court sooner for help, the Court could have aided him in finding Fernandez. For example: by authorizing a subpoena to a credit reporting agency to find other addresses; ordering Fernandez's girlfriend to provide his telephone number; or sending the Marshals Service to bring him to court. Trial Tr. at 977:22-978:8. Nonetheless, the Court allowed Kuri to play a video recording of Fernandez's deposition because it was important testimony; there is a preference to decide cases

on the merits; and Fernandez was likely dodging service. *Id.* at 978:11-16. The Court explained, however, that the decision "was this close, because I definitely could have helped way back … months ago." *Id.* at 978:16-18.

In their motion, the Defendants explain that, in November 2018, they received investigator Smith's time records from Kuri's attorneys as part of the parties' post-trial briefing. Rule 60 Mot. ¶ 7. According to the defense, the time records did not align with Smith's testimony about his service efforts and seemed to show that he did not begin look for Fernandez until September 2018. *Id.* ¶ 8; R. 339, Time Records at 64. In response, Kuri's attorneys submitted Smith's mileage reimbursement log, which reflected two trips taken in June 2018 to try and locate Fernandez. Pl.'s Resp. Rule 60 Mot. ¶ 4; R. 347.1, Smith Mileage Log. Kuri's attorneys contend that the documents sent to the Defendants did not include entries for these June trips because they had underbilled Smith's time. *Id.* ¶ 3. The Defendants responded that, even if Smith had made some efforts to find Fernandez in June, he had not continued to look for him "periodically throughout the remainder of the summer." R. 351, Defs.' Rule 60 Reply ¶¶ 6, 8, 16. Kuri's attorneys disputed this point, but also argued that Smith had clearly established that he used reasonable diligence to search for Fernandez and that the admission of Fernandez's testimony—even if done so in error—was insufficient to warrant a new trial. R. 358, Rule 60 Sur-Reply at 6-11.

Federal Rule of Civil Procedure 32 governs the use of deposition testimony during trial. Under that provision, "a party may use for any purpose the deposition of a witness, whether or not a party, if the court finds: ... that the party offering the

deposition could not procure the witness's attendance by subpoena...." Fed. R. Civ. P. 32(a)(4)(D). "Implicit in this rule is an obligation to use reasonable diligence to secure the witness's presence, and the district court has broad discretion to determine whether the proponent has satisfied this requirement." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 308 (7th Cir. 2010). A decision to allow deposition testimony, even in error, will not be grounds to undo the verdict "unless the erroneous ruling violated the objecting party's substantial rights." *Maurer v. Speedway, LLC*, 774 F.3d 1132, 1135 (7th Cir. 2014). In other words, a decision is not reversible if the error is harmless in light of the trial record as a whole. *Viramontes v. City of Chicago*, 840 F.3d 423, 430 (7th Cir. 2016).

Based on the record evidence, it is true that Smith did not look for Fernandez "periodically" throughout the summer of 2018, at least in a way that qualifies as reasonable diligence. Smith made some attempts in June and then began again in earnest in September. Kuri's sur-reply argues that Smith should be credited for the work he did between June and September 2018, which included "checking jails and incarceration records and using public records databases to find possible addresses for Mr. Fernandez and names and addresses of friends and relatives of Mr. Fernandez." Rule 60 Sur-Reply at 2. But these preliminary and cursory steps fall short of reasonable diligence on their own. To be sure, those steps would probably be enough in combination with Smith's efforts in *September*, which included multiple prolonged stake-outs, a neighborhood canvass, and confronting Fernandez's girlfriend and her father. *Id.* at 2-3. Indeed, even though Kuri's attorneys did not ask

for judicial help in locating and serving Fernandez, the steps taken by Smith in September would still be enough to show reasonable diligence if taken early on, in a timely manner. These efforts, though, came far too late in the game, especially in light of the Court's multiple warnings about ensuring service of trial subpoenas. Kuri chose to wait until September, when trial would be a scant three weeks away, even though he had three full months to try and locate Fernandez after the trial date was set on May 23. As a result, the September efforts should be zeroed out in this analysis, meaning there is insufficient evidence to find that Kuri used reasonable diligence to serve Fernandez with a trial subpoena.

Nonetheless, the introduction of Fernandez's deposition testimony does not warrant a new trial because it was harmless error—although this is a very close call. There are two reasons to conclude that the error was harmless. First, it is not clear that an earlier search for Fernandez would have made a difference.[3] Although impossible to know for sure, it is reasonable to infer from Smith's intense but unsuccessful attempts to track down Fernandez in September that Fernandez was dodging the subpoena and his girlfriend was complicit in that effort. It is true that

---

[3]In their sur-reply, the Defendants cite *Griman v. Makousky* for the proposition that "whether the plaintiff's last-minute efforts would have secured the witness's appearance had they been undertaken earlier [does] not matter because of the importance of the witnesses' testimony to the plaintiff's case." R. 363, Defs.' Rule 60 Sur-Reply at 3 (citing 76 F.3d 151, 155 (7th Cir. 1996)). This is very hard to square with the opinion, in which the Seventh Circuit quotes the trial court as saying, "I am not persuaded that that sort of diligence that has been shown in the last day [when the plaintiff's counsel was making frantic efforts to locate Hunt] would not have been productive had it been attempted earlier." *Griman*, 76 F.3d at 155. As the Court reads it, the trial court in *Griman* based its decision to exclude deposition testimony, in part, on its belief that earlier efforts to locate the witness *would* have made a difference; the Seventh Circuit appeared to endorse that reasoning. In any event, the plaintiff in *Griman* did not begin looking for the witness until the second day of trial, distinguishing the case from the facts at issue here. *Id.* at 153.

Kuri bears the burden of showing harmless error, but there is no record evidence that pre-September reasonable diligence would have resulted in successful service on Fernandez. The record would look different if the Defendants had offered evidence that, for example, they took a few reasonable steps to look for Fernandez and found him easily. So, this first form of harmless error is satisfied: even if Kuri's team had started to diligently attempt service before September, they probably would not have found Fernandez.

Second, there is another form of harmlessness: even setting aside Fernandez's deposition testimony, the evidence submitted at trial was powerful enough that there is not a substantial likelihood that the jury's verdict would have been different. *See Viramontes*, 840 F.3d at 430; *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 309 (7th Cir. 2010) (holding that, even if deposition testimony was erroneously allowed, other live-testimony witnesses corroborated the deposition). The Defendants' version of the investigation—that Russell pointed the finger at Kuri (and David Gomez) on August 1, 2009—was substantially discredited by plentiful other evidence, as well as by common sense. To start, Chicago Police detective Frank Szwedo—who had zero motive to testify adversely to fellow detectives Folino and McDermott—testified that Russell did *not* identify anyone when Szwedo interviewed him at the scene right after the shooting. It is true that, sadly, gang-related witnesses sometimes refuse to identify a shooter on the notion that they would rather exact their own revenge. But there was no evidence of that in this case. It was the opposite: Szwedo described Russell as cooperative throughout the interview and conceded that Russell answered

all of Szwedo's questions. Trial Tr. at 464:14-21. At trial, Szwedo explained that he probed Russell during this conversation and gave Russell a chance to explain everything he knew about the shooting. *Id.* at 472:15-21. Indeed, Szwedo recounted (both in his interview report and at trial) Russell's detail-laden description of the lead-up to the shooting and the shooting—including physical identifiers of the assailants. Trial Tr. at 470-77; 472:22-473:9 (men wearing white T-shirts and having short or shaved hairstyles); *see also* 8/4/2009 Supp. Report at 11-12. Yet Russell already knew Kuri; they were friends to the point that Kuri would stay at Russell's house when Kuri had nowhere else to go while growing up. Trial Tr. at 312:17-21 Why Russell would omit the actual identity of the shooter and the bicyclist-accomplice when providing the otherwise fulsome account to Szwedo is a mystery that presents a serious hole in the Defendants' version of the investigation.

The other damaging gap in the defense version of the investigation is the date of Folino's crucial interview of Russell, the one that supposedly yielded the identification of Kuri as a suspect. The written report of interview puts the date at August 2, 2009. 8/14/2009 Supp. Report at 8. But the problem for the defense is that Folino ran Kuri's name through the criminal-history database and pulled Kuri's photograph the day *before*, on August 1. At trial, Folino explained the discrepancy by labelling the August 2 date on the report as a "typo." *Id.* at 625:6-13. But given that Russell inexplicably did not identify Kuri to Detective Szwedo, the jury could readily discredit Folino's "typo" explanation.

What's more, the jury also had ample reason to doubt the defense's version of the investigation in light of another common-sense defying aspect. According to the Defendants, when they interviewed Fernandez on August 1, they purportedly did *not* ask him to provide a physical description of the assailants. Instead, the Defendants showed Fernandez photos of various suspects, allegedly without first asking for a description. Trial Tr. at 1036:4-22, 1475:11-14 ("Q: Did you ask him, before you showed him a photograph, to give you a description of any people that he might have seen? A. No."), 1475:20-24 ("Q. Before you showed him the photographs, did you ever say 'Mr. Fernandez, I need you to tell me what you saw. What did they look like?' You never asked him that, did you? A. No."); 8/14/2009 Supp. Report at 8; Trial Tr. at 1410:18-23. That is simply a bizarre way to interview an eyewitness: show photos of suspects *before* asking for a description? The jury had every reason to discredit that version and conclude that the reality was that the detectives asked Fernandez for a description, and he could *not* provide one. At the very least, Fernandez made no mention of Kuri or David Gomez at the August 1 interview. Trial Tr. at 606:10-20, 610:1-5.

After refuting the Defendants' claims that Russell was the source of the information and that Fernandez identified the perpetrators, Kuri did not need to supply a theory for why the Defendants focused on him, but Kuri actually did provide some evidence on that score. As described above, *see supra* at 5-7, the defense asserted that the tip from Abdul Wachaa came on August 3, via his statement to Officer Lopez. Folino testified at trial that this tip was his very first interaction with Wachaa. Trial

Tr. at 539:2-5. That timing would be important in excluding the possibility that Wachaa—rather than Russell—prompted the Defendants to focus on Kuri and David Gomez. But at Folino's deposition, he made a damning admission: he could not remember whether he had met Wachaa before or after the Patel murder investigation. *Id.* at 539:13-20. At trial, Folino had to contend that the deposition testimony was "inaccurate," *id.* at 539:21-24, and that now (at trial) he did remember that the Patel investigation was the first time the two had met. But the damage was done. It did not help matters that Folino did not write and submit a contemporaneous report—which could have had the benefit of a computer-system date stamp— documenting his first conversation with Wachaa. Trial Tr. at 550:9-11. Folino also acknowledged that he used Wachaa as an informant multiple times afterwards and indeed was still using him at the time Folino was deposed in this case. *Id.* at 533:4-19.

In light of the other evidence in the case, it is not surprising that Kuri's attorney delivered a closing argument and rebuttal that focused on evidence *other* than Fernandez's deposition testimony. All told, Kuri's counsel meaningfully discussed Fernandez's testimony only in sporadic and brief moments during closings.. *See* Trial Tr. at 1640:6-10, 1644:25-1645:4, 1646:16-21, 1649:19-1650:21, 1655:14-19, 1657:8-13, 1659:8-16, 1736:25-1737:2, 1743:8-10. In total, Fernandez's deposition was mentioned by Kuri's counsel in around 71 lines of closing and rebuttal argument, which works out (at 25 lines per page) to fewer than 3 pages out of 67 pages. *See* Trial Tr. at 1635-1686, 1736-1752. The influence of Fernandez's deposition testimony thus

was relatively minor on the verdict. It is important to remember too that the deposition's influence in Kuri's favor was diminished because the video excerpts played at trial included extensive cross-examination of Fernandez by the Defendants' attorney. *Thomas*, 604 F.3d at 309 ("The defendants had the opportunity to cross-examine Matias during his deposition, as well as the other inmates whose testimony corroborated Matias's accounts. Under these circumstances, the minimal prejudice to the defendants does not warrant a new trial."). All of this leads to the conclusion that, even though Kuri failed to use reasonable diligence to locate Fernandez, the introduction of his deposition testimony was harmless error and no new trial is justified.

## B. Rule 50 and Rule 59 Motions

### 1. Due Process Claim

Among the various claims pursued by Kuri, he alleged that the Defendants violated his right to due process of law. To win on this claim, Kuri had to show either that the Defendants failed to disclose exculpatory evidence or that they manufactured evidence that deprived him of his liberty. *Armstrong v. Daily*, 786 F.3d 529, 540 (7th Cir. 2015); *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017). The Defendants argue that the due-process verdict must be tossed out and that the testimony from Russell and Fernandez presented at the civil trial is not credible and should be discounted, if not altogether discarded. *See* Defs.' Rule 50 Mot. at 2-4; Defs.' Rule 59 Mot. at 5-8. According to the Defendants, "Russell and Fernandez attacked their own integrity to such an extent that no reasonable jury could believe any of their testimony to a degree sufficient to establish Plaintiff['s] claims." Defs.' Rule 59 Mot.

at 5. This conflicting testimony, according to the Defendants, warrants either judgment as a matter of law or a new trial.

On Russell, it is true that his testimony was all over the place. At the federal civil trial, he substantially contradicted not only his prior testimony at the criminal trial and grand jury, but also his own testimony given moments earlier. For example, he testified that: (1) he did not see Kuri riding a bicycle the night of the shooting, Trial Tr. at 843:24-844:1, 845:18-19; (2) he told police that he saw Kuri on the bike that night, *id.* at 862:17-25; (3) the police did not tell him whose photo to pick out, *id.* at 841:3-4; and (4) the police told him they knew who the perpetrators were and told him who to pick, *id.* at 854:10-15. The Defendants argue that these inconsistencies lead to the conclusion that Russell was lying. Defs.' Rule 59 Mot. at 7.

But as detailed earlier in the harmlessness analysis of Fernandez's deposition, there was plenty of other evidence—apart from Russell himself—to undermine the defense's version that Russell provided the identification of Kuri to the Defendants. Again, it is crucial that, right after the shooting at the scene of the crime, Russell cooperatively recounted to Detective Szwedo a detailed description of what happened but did not identify Kuri as a perpetrator. This important fact was established by *Szwedo*'s testimony (and his police report) and was not at all dependent on Russell's testimony. Taking this fact into consideration, combined with the August 2 interview-date "typo," it was neither against the manifest weight of the evidence nor legal error for the jury to conclude that Russell was not the source of the identification, and instead had been fed it by the Defendants.

Kuri also presented evidence that Russell was facing separate criminal charges when he gave testimony to the grand jury implicating Kuri in the Patel murder. These charges were dropped shortly after the grand jury indicted Kuri. Trial Tr. at 1369:11-16. While this evidence is not conclusive that there was a *quid pro quo* between Russell and the Defendants, it is another piece of circumstantial evidence that provides a plausible, and unfortunately pernicious, explanation for Russell's eventual identification of Kuri. Given all the supporting evidence, it was fair for the jury to believe Russell when he testified that the Defendants told him who to pick from the photo array and to discredit him when he testified that it did not happen that way. "The jury heard all of the conflicting and inconsistent testimony, bad memories and impeachment and all, and then did precisely what it is called upon to do, which is make a credibility determination that was not manifestly outweighed by other evidence." *Galvan v. Norberg*, 2011 WL 1898237, at *8 (N.D. Ill. May 18, 2011), *aff'd*, 678 F.3d 581 (7th Cir. 2012); *Whitehead*, 680 F.3d at 927 ("When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions.").

With regard to Fernandez's deposition testimony, as discussed in the prior section of this Opinion, the Court must disregard this deposition testimony completely (because Kuri was not reasonably diligent in trying to find Fernandez), but that still leaves the jury verdict intact against a manifest-weight challenge. As detailed above, the defense version that Russell provided the identification of Kuri

was significantly undermined by the absence of an identification when Russell spoke with Szwedo; the August 2 date on the report of Russell's interview with the Defendants, which is after the Defendants printed Kuri's photo; Folino's concession at his deposition that he could not remember whether he had met Wachaa before the Patel investigation; and a lack of a written record of Folino's first conversation with Wachaa. The jury had more than enough evidence to reject the defense's version of the identification.

Nonetheless, the Defendants make two legal arguments for why the verdict on this claim needs to be thrown out. First, the Defendants argue that they cannot be held liable for fabricating evidence because they did not know Russell and Fernandez's identifications were false, that is, they did not know that Kuri was innocent. Defs.' Rule 50 Mot.. at 6. This argument misses the point. Kuri contended that Folino and McDermott concocted a false story that Fernandez and Russell affirmatively identified Kuri based on those witnesses' own personal knowledge, and any information from Wachaa only confirmed what Folino and McDermott already knew. Under Kuri's theory, the story was false because, in reality, Folino and McDermott (1) received Kuri's name from Wachaa, (2) pulled Kuri's photo on August 1, and (3) fed Kuri's name to Russell and Fernandez on August 2.[4] "Falsified evidence will *never* help a jury perform its essential truth-seeking function. That is why convictions premised on deliberately falsified evidence will always violate the

---

[4]This is what distinguishes this case from those relied on by the Defendants. *See* Defs.' Rule 50 Mot. at 5. *Petty v. City of Chicago*, for example, was a "coercion case" where "there [was] not one shred of evidence to suggest that CPD officers fabricated evidence." 754 F. 3d 416, 423 (7th Cir. 2014). That is not so here.

defendant's right to due process." *Avery*, 847 F.3d at 439 (emphasis in original). The jury was free to find that Folino and McDermott fabricated the story of Kuri's identification, and that is the specific falsity that girds the due-process claim.

Second, the Defendants argue that they cannot be held liable for a Due Process claim under *Brady v. Maryland*, because Kuri was able to "make use of the exculpatory evidence at trial." Defs.' Rule 50 Mot.. at 9.[5] This argument was considered and rejected at summary judgment. R. 203, Summary Judgment Op. at 12 ("[U]nder circumstances where an accused is held in pretrial custody before acquittal or dismissal, a failure to disclose exculpatory evidence may cause the type of deprivation of liberty required for a *Brady* claim even if the case ends without a trial or conviction.") (quoting *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016)) (cleaned up). It is no more convincing at this stage. Kuri was denied his right to due process when he was detained for three years in Cook County Jail awaiting trial based on withheld exculpatory evidence.

The Defendants also protest that a finding in favor of Kuri is at odds with *Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017). Defs.' Reply at 23. According to the defense, the previously assigned judge did not address *Gill* in the summary judgment opinion. *Id.* at 23-24. But *Gill* is cited in the opinion, Summary Judgment Op. at 12, meaning that the Court considered it and still denied summary judgment for the Defendants. Even if that were not the case, though, *Gill* is different from the

---

[5]To be clear, Kuri does not need to show both fabrication of evidence and concealment of exculpatory evidence to succeed on his due process claim. The jury was allowed, under the instructions, to find for Kuri if either fact was proven. R. 311.1, Jury Instructions at 20.

facts here. The officers in *Gill* failed to timely turn over incident reports of witness interviews that supported Gill's version of events, putting off disclosure for one year. 850 F.3d at 343. The Seventh Circuit held that, even though the evidence's disclosure was delayed, it was still disclosed early enough for Gill to make use of it at trial. *Id.* Here, if one credits Kuri's version of events, the Defendants never turned over any of the exculpatory evidence at issue. Put another way, Kuri does not argue that exculpatory evidence was disclosed too late; he asserts that the Defendants *never* disclosed evidence showing that they fabricated the key identification of the investigation. Under these circumstances, three years of pretrial detention is a sufficient deprivation of liberty to be actionable under *Brady*, even though Kuri was eventually acquitted.

Finally, the Defendants also make the related but distinct argument that Kuri's *Brady* claim fails because he presented no evidence from which "the jury [could] infer that the prosecutor would have dismissed the case" had they known about the exculpatory evidence. Defs.' Rule 50 Mot. at 9. The Defendants again miss the mark. Kuri was not required to present testimony from "his criminal defense attorney or the trial prosecutor to suggest that that the charges would have been dropped." *Id.* The question of what the specific prosecutor trying the criminal case against Kuri would have done is not controlling. "The appropriate counterfactual to consider is whether a *reasonable* prosecutor under these circumstances would have moved forward with the charges." *Armstrong v. Daily*, 786 F.3d 529, 554, n. 7 (7th Cir. 2015) (emphasis added); *see also Fields v. City of Chicago*, 2017 WL 4553411, at

*3 (N.D. Ill. Oct. 12, 2017) (explaining that to assess the materiality of evidence, the question is measured as to a reasonable prosecutor).[6]

Here, the jury was free to infer that a reasonable prosecutor would have dropped the charges against Kuri if the prosecutor determined that the witness identifications were a result of police fabrication, rather than personal knowledge. The testimony from Russell and Fernandez was really the only evidence linking Kuri to the shooting. *See Smith v. Cain*, 565 U.S. 73, 75 (2012) (finding that withheld witness impeachment evidence was enough to trigger "reasonable probability" of a different result because witness's "testimony was the only evidence linking Smith to the crime"). The verdict on Kuri's due process claim was not against the manifest weight of the evidence, so it will stand.

This goes for both Folino and McDermott. The Defendants argue that there is not enough evidence to show that McDermott was personally involved in the investigation and arrest. Defs.' Rule 59 Mot. at 12. But McDermott was present at most of the key points during the investigation, including both interviews with Russell, Trial Tr. at 1418:2-11, 1419:14-23; both interviews with Fernandez, *id.* at

---

[6]The Defendants also argue that the prosecutor in this case plowed forward with the trial even after Russell and Fernandez recanted their identifications on the stand, and that this proves that turning over additional evidence would not have impacted the outcome of the case. Defs.' Rule 50 Mot. at 10. The Defendants improperly equate Russell and Fernandez's recantations with other evidence of the fabricated investigation, including missing and incorrect police reports, information on the Wachaa tip, and the Defendants' promise to find money for Fernandez in exchange for his identification. None of this was disclosed to the prosecutor or Kuri before or during trial. By withholding this evidence, the Defendants "obstructed the ability of the prosecutors and defense counsel to get at the truth in the criminal trial—which *does* support the jury's verdict." *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) (emphasis in original).

1408:4-1410:11, 1418:17-1419:12; the August 5 and September 8 interrogations of Kuri, *id.* at 1423:5-24, 1515:5-1517:4; and at least some of the conversations with Wachaa, *id.* at 1455:3-1456:3. This is enough participation in the investigation to qualify as personal participation, especially because the jury could reasonably infer that McDermott *had* to be in on the plan in order for it to succeed.

### 2. Fourth Amendment: Unlawful Detention

Next up is Kuri's claim for unlawful detention under the Fourth Amendment. The Fourth Amendment bars unreasonable detention not supported by probable cause. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917 (2017). The Defendants argue that the verdict on this claim cannot stand because they had probable cause to detain Kuri once Russell and Fernandez identified him. Defs.' Rule 50 Mot. at 13 (citing *Matthews of City of East St. Louis*, 675 F.3d 703, 707-08 (7th Cir. 2016)). According to the Defendants, "there was no evidentiary basis for the jury to conclude that Defendants did not justifiably rely on Russell and Fernandez's identifications in pursuing charges against Plaintiff." *Id.* at 14.

Of course officers are *generally* permitted to rely on a witness' account for a probable-cause determination, even if later on it turns out he witness was lying or was wrong. But that general proposition is tempered by an exception: "[A] complaint of … [a] single witness is generally sufficient to establish probable cause, *unless the officer has a reason to question the witness' account*." *Reynolds v. Jamison,* 488 F.3d 756, 765 (7th Cir. 2007) (emphasis added). Here, if the jury accepted Kuri's version of the events, then the fact that the Defendants told Russell and Fernandez whom to identify obviously destroys probable cause. Put another way, if the Defendants

instructed Russell and Fernandez to pick Kuri's picture out of an array, it was *un*reasonable to rely on those "identifications." of Kuri. Fabricated or tainted evidence "cannot support a finding of probable cause." *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013).

The Defendants go on to argue that there was evidence outside of the identifications that established probable cause, including Kuri's inability to produce a reliable alibi, his affiliation with the Spanish Cobras, and his initial lies about knowing Gomez. Rule 50 Mot. at 14. Neither Rule 50 nor Rule 59 requires vacatur of the jury verdict on these facts. It is true that the probable-cause threshold is low: "A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to permit a prudent person to believe that the suspect had committed, is committing, or is about to commit an offense." *Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014). But once the identifications are subtracted out of the probable-cause equation, there is nothing affirmatively connecting Kuri to the crime. All that is left either would apply to potentially thousands of people (the lack of a provable alibi for July 23 and affiliation with the Spanish Cobras) or means very little without additional evidence linking Kuri to the crime (disclaiming knowledge of Gomez).[7]

Lastly, it bears noting that the "probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or reasonable

---

[7]At trial, Kuri explained that, during the August 5 interrogation, he at first falsely disclaimed knowing Gomez because the police were telling him that Gomez implicated Kuri in a murder. Trial Tr. 358:8-11.

inferences to be drawn from them." *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (cleaned up). The jury did so here and found that the Defendants lacked probable cause. Without the identifications of Russell and Fernandez, the verdict was not against the manifest weight of the evidence.

### 3. Malicious Prosecution

Next, the Defendants challenge the verdict of liability on the malicious prosecution claim. On this claim, the jury found against Folino and in favor of McDermott. The Defendants object to this verdict on two grounds. First, they argue that Kuri failed to show that Folino acted with malice. Defs.' Reply at 31-32. *See also Cairel*, 821 F.3d at 834 ("To establish a claim for malicious prosecution under Illinois law, plaintiffs must establish … malice."). Under Illinois law, "a plaintiff may demonstrate malice by showing that the prosecutor proceeded with the prosecution for the purpose of injuring plaintiff or for some other improper motive." *Aguirre v. City of Chicago*, 887 N.E.2d 656, 663 (Ill. App. Ct. 2008) (citing *Turner v. City of Chicago*, 415 N.E. 2d 481, 487 (Ill. 1980)). An improper motive for a prosecution is any reason other than to bring the party to justice. *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E. 2d 835, 842 (Ill. App. Ct. 2000) (citing *Mack v. First Security Bank*, 511 N.E. 2d 714, 717 (Ill. 1987)).

This first argument requires little discussion. The jury accepted Kuri's version of events and thus believed that Folino fed the identification of Kuri to Russell and Fernandez. The jury was free to infer that Folino acted with an improper motive when he knowingly fabricated evidence and concealed exculpatory evidence, because that misconduct is clearly not designed to bring a truly guilty party to justice. *See, e.g.,*

*Bianchi v. McQueen*, 58 N.E. 3d 680, 699 (Ill. App. Ct. 2016). As such, the jury's verdict against Folino on the malicious prosecution claim will stand.

Second, the Defendants argue that the jury's verdict in favor of McDermott on the malicious prosecution claim is inconsistent with the liability finding against Folino for two reasons: (1) it cannot be squared with the jury's verdict against McDermott on the Fourth Amendment claim; and (2) it is inconsistent with the jury's verdict against Folino for malicious prosecution. Kuri argues that the Defendants failed to preserve these arguments because they did not object to the verdicts before the jury was discharged. Pl.'s Resp. Rule 50, 59 Mots. at 45. The Defendants counter that, although other courts have held that a party must assert an inconsistency objection before the jury is excused, the Seventh Circuit has not yet endorsed this view. Defs.' Reply at 32. After reviewing the case law on this issue, the Court holds that a party indeed does forfeit an inconsistency objection by failing to assert the objection before the jury's discharge.

To start, the Seventh Circuit has decided a related question, albeit not the precise one on hand. Specifically, the Seventh Circuit has addressed the forfeiture issue when a party contends that a general verdict is inconsistent with written interrogatories put to the jury. In that scenario, under Federal Rule of Civil Procedure 49(b), a party must object to inconsistencies between general verdicts and written questions before the jury is excused or else the party forfeits its objection. *See Strauss v. Stratojac Corp.,* 810 F.2d 679, 682-83 (7th Cir. 1987). Here, however, the question

is what to do with when a party contends that two *general* verdicts are inconsistent but failed to pose the objection before the jury was discharged.

Seven other Circuits deem those objections to be forfeited (nine, if counting unpublished decisions). *See, e.g.*, *Zachar v. Lee*, 363 F.3d 70, 75 (1st Cir. 2004); *Anderson Group, LLC v. City of Saratoga Springs*, 805 F.3d 34, 46-49 (2d Cir. 2015); *Frank C. Pollara Group, LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 191 (3d Cir. 2015); *Hutcherson v. Lim*, 584 Fed App'x 151, 152 (4th Cir. 2014) (non-precedential disposition); *Mosley v. Margalis*, 698 Fed. App'x 296, 298 (6th Cir. 2017) (non-precedential disposition); *Chem–Trend, Inc. v. Newport Indus., Inc.*, 279 F.3d 625, 629 (8th Cir. 2002); *Williams v. Gaye*, 895 F.3d 1106, 1130 (9th Cir. 2018); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1545-46 (10th Cir. 1993); *Mason v. Ford Motor Co., Inc.*, 307 F.3d 1271, 1275-76 (11th Cir. 2002).[8] That rule of forfeiture makes sense: generally speaking, advocates must pose objections at a point in trial when the mistake can be avoided or corrected. When a jury verdict is published but the jury has not been dismissed, that is the moment when lawyers can ask for a finding of inconsistency, propose an explanation and instruction to the jury, and allow deliberations to commence again. It is true that the assessment must be made on the spur of the moment—but many trial objections are expected to be posed in exactly that on-the-fly situation. There is also nothing that prevents a lawyer from asking for time, whether in the form of a sidebar or even a recess, in order to consider whether

---

[8]The Court acknowledges that it did not affirmatively ask the parties if they had any objections to the verdict before dismissing the jury. But there is no hint in any of the Circuit decisions that the holding turned on whether the trial court expressly asked the parties for objections before discharging the jury.

the verdict is inconsistent. Also, it is par for the course for lawyers to consider, both before the trial and during the trial, the relationship between the various claims that will be presented to the jury. For example, lawyers must do that to evaluate jury instructions and to craft closing arguments. So, it is not as if the moment of the verdict's publication is the very first moment that lawyers have thought through how the claims relate to one another. And adopting a forfeiture rule is "not a mere technicality," as it ensures "an opportunity for correction of the error while the jury remains empaneled, thereby possibly heading off a second lengthy trial." *Anderson Grp., LLC*, 805 F.3d at 46-47 (cleaned up).

Lastly, a forfeiture rule also prevents parties from acting strategically: here, for example, it is not as if the defense asked for a jury instruction, before deliberations, to the effect that the Defendants or that certain claims should *not* be given separate consideration. Indeed, before the trial, it was the defense that proposed a separate-consideration instruction, and the defense confirmed its agreement with the instruction during the trial. R. 251, Proposed Jury Instructions at 40 (Defendants' Proposed Instruction No. 13); R. 373, Trial Tr. at 1619:20-1620:8 (referring to Jury Instructions at 16). To take advantage of that instruction and then turn around to object after-the-fact should be discouraged. So, the Court concludes that the Defendants forfeited this objection by failing to raise it before the jury's discharge.

Even if the Defendants had not forfeited their verdict-inconsistency objections, the Court would hold that they are not entitled to a new trial. Take first the defense

argument that no reasonable jury could find that Folino was liable for malicious prosecution while McDermott was not. To the contrary, a jury reasonably could distinguish between Folino and McDermott on this claim. Folino played a much larger role than McDermott in causing the prosecution's commencement or continuance. For example, Folino is the one who decided to contact the State's Attorney, in September 2009, to seek charges against Kuri, literally setting the prosecution into motion. Trial Tr. 749:15-21. Folino also contacted the State's Attorney on August 5 (four days after pulling Kuri's photo to show to Fernandez) to explain the state of the investigation. *Id.* at 755:3-757:11. McDermott was not part of those conversations, *id.* at 1440:19-23, 1504:11-20, nor did he accompany Folino when he went to arrest Kuri in September in Rochelle, Trial Tr. at 1437:21-1438:10, 999:18-1000:15. Folino is also the author listed on the supplemental police report that detailed the investigation. 8/14/2009 Supp. Report at 1. What's more, Folino testified at Kuri's criminal trial, Trial Tr. at 796:7-9, whereas there was no evidence presented that McDermott did as well. Lastly, it was Folino who had the handler-informant relationship with Wachaa, and he even admitted that he has used Wachaa as an informant on multiple occasions. *Id.* at 533:4-24**.** These factual differences are enough to justify the different outcomes on the malicious prosecution claim for Folino and McDermott. *Fox*, 600 F.3d at 844 ("Any plausible explanation for the verdict precludes reversal.").

Turning to the Defendants' second inconsistency objection, it was also reasonable for the jury to find that McDermott was liable for unlawful detention but

not for malicious prosecution. To be sure, there is overlap between the two claims. Indeed, on one of the malicious-prosecution elements ("commenced or continued"), the jury was instructed to refer back to the definition given with the unlawful-detention claim. Jury Instructions at 24 ("You should use the same definition of 'commenced or continued' that I have you earlier for the unlawful-detention claim."). But there is a key difference between the two claims: subjective intent. The jury was told that Kuri's malicious prosecution claim was "that Defendants Folino and McDermott maliciously caused him to be prosecuted for murder and attempted murder." *Id.* This differed with their instructions on unlawful detention, which was defined as "causing [Kuri] to be detained without probable cause before his criminal case went to trial." *Id.* at 21. The Fourth Amendment claim did *not* require Kuri to prove that McDermott acted with malice; the test is objective only, with no state-of-mind element. So, the difference in the jury's verdicts can be plausibly explained by Folino's larger role in the prosecution, from which the jury could infer subjective malice, whereas McDermott was not the driving force behind the prosecution itself. Also, Folino's role at Kuri's criminal trial gave the jury more evidence on malice when compared to McDermott. At the federal trial, Folino admitted that he testified at the criminal trial that Russell did not initially identify Kuri the night of the shooting because he became upset and Szwedo was unable to complete the interview. *Id.* at 796:7-797:24. But Szwedo's testimony that Russell actually cooperated on the night of shooting contradicts Folino's explanation. *Id.* at 464:5-21. Based on this evidence, a jury could have reasonably inferred that Folino misled the State's Attorney who brought charges

against Kuri and gave false testimony at the criminal trial. In contrast, there was no evidence presented at the civil trial that McDermott gave any testimony at the criminal trial or contacted the State's Attorney to pursue charges. So, even if the objections were preserved, a new trial would not be warranted.

### 4. Conspiracy and Failure to Intervene

Next, the Defendants object to the jury's verdicts on the claims of conspiracy and failure to intervene. The Defendants first argue that these claims must fall because there were no underlying constitutional violations. Defs.' Rule 50 Mot. at 15; Defs.' Rule 59 Mot. at 18. As discussed earlier, however, the Court has rejected the challenges to the verdicts on the underlying substantive claims.

The Defendants next contend that Kuri failed to present any evidence of an agreement between Folino and McDermott, so there was no basis for the jury to find them liable for conspiracy. Defs.' Rule 50 Mot. at 15; Defs.' Rule 59 Mot. at 18. Naturally, there was no direct evidence or direct admission of a conspiracy. But equally naturally, "[c]ircumstantial evidence may provide adequate proof of conspiracy." *Hoffman–La Roche, Inc. v. Greenberg,* 447 F.2d 872, 875 (7th Cir. 1971). Kuri presented evidence that Folino and McDermott had an opportunity to form an agreement as partners in the investigation; they interrogated Kuri together; and they interviewed Russell and Fernandez together. In the context of the case presented by Kuri—that the Russell identification was fabricated and Fernandez disclaimed being able to identify the assailants—that is more than enough evidence from which to survive the Defendants' objection on this claim. Folino simply could not have carried on the misconduct without McDermott knowing about it.

The Defendants likewise contest the verdict on Kuri's failure-to-intervene claim, but there was enough evidence for a reasonable jury to find for Kuri and against both Defendants. Again, Folino and McDermott were both present at many of the key points in the investigation. Either one could have stopped the other at any time, including during the interviews with Russell, the interviews with Fernandez, or either interrogation of Kuri. Instead, neither stepped in to get the investigation back on track. The Court will not disturb the verdict on the failure to intervene claim.

### 5. Damages

The last issue raised by the defense is whether to reduce the jury's award of damages for loss of normal life. Defs.' Rule 59 Mot. at 19. The defense asserts that Kuri "presented no evidence of an inability to enjoy the pleasurable aspects of life or any ongoing disability, injury, or pain." *Id.* at 22. Illinois law defines "loss of normal life" as "the temporary or permanent diminished ability to enjoy life… [including] a person's inability to pursue the pleasurable aspects of life." Ill. Pattern Jury Instr.-Civ. 30.04.02 (citing to *Smith v. City of Evanston*, 631 N.E.2d 1269, 1279 (Ill. App. Ct. 1994)). When determining whether or not to remit a damages award, the Court must consider whether "(1) the award is monstrously excessive; (2) there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas; and (3) whether the award is roughly comparable to awards made in similar cases." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015).

Although the Defendants are right that Kuri did not complain of an ongoing disability or injury, he testified in detail about the impact of his lengthy pretrial

detention on his health and the normal aspects of life that he missed out on while detained. For example, Kuri described the complete lack of privacy at Cook County Jail and his inability to buy food or provisions that would have made him more comfortable. Trial Tr. at 283:4-13, 291:1-292:12. He described his depression and eventual suicide attempt. *Id.* at 293:24-294:19, 300:17-302:15. He stated that he felt like he missed every holiday while detained and did not receive a hug the entire time he was in custody. *Id.* at 293:24-294:8. He also testified about the unique difficulty of being detained, including no social interaction with women, from ages 19 to 22. *Id.* at 293:8-22.

Kuri likewise testified about the lasting impact of his arrest and detention on his mental health. He began taking mental-health medication while he was still at Cook County Jail, but he explained that the medications made him feel not like himself and "different." Trial Tr. at 304:13-305:16. Since his release, Kuri has been taken to the emergency room many times for symptoms of anxiety and PTSD. *Id.* at 327:15-328:17. In his own words, his life was "ten times worse" when he was released from jail. *Id.* at 327:15-16. Considering all this evidence, an award of $1 million is not monstrously excessive nor irrational for loss of normal life.

The next step in the analysis is typically to compare the jury's award to those in similar cases. "This, however, is not as important as the review of the evidence in the case at hand; it offers at best a rough approximation of damage awards." *Adams*, 798 F.3d at 545. Here, comparable cases are difficult to come by, as loss of normal life damages are not as commonly awarded as damages for pain and suffering, and, when

they are awarded, are often lumped into one compensatory damages category.[9] With that limitation in mind, when viewing the entire $4 million compensatory damages award, the verdict falls squarely within the bounds of prior verdicts in false imprisonment cases, which have awarded between $1.5 and $2.25 million per year of unlawful detention or incarceration. *See, e.g.*, *Jimenez v. City of Chicago*, 877 F. Supp. 2d 649 (N.D. Ill. 2012), *aff'd* 732 F.3d 710 (7th Cir. 2013); *Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008); *Johnson v. Guevara*, 2009 WL 1886888 (N.D. Ill. June 22, 2009). In light of Kuri's testimony and the three-year pretrial detention, it made sense for the jury to allocate one-fourth of the overall award of $4 million to loss of normal life.

Even if Kuri's award was higher than most, the Court would not automatically be required to remit. "To require that a jury's damages award be no bigger than previous awards in similar cases would make every such award ripe for remittitur. There must be room for a jury's award to exceed the relevant range of cases when the facts warrant." *Adams*, 798 F.3d at 545. The Defendants argue that the facts do not warrant so here because Kuri gave "one-word answers" and did not have anyone else testify on his behalf. Defs.' Reply to Rule 50, 59 Mots. at 35-36. Although Kuri may not have been the most eloquent or loquacious witness, the Court must view the testimony through the lens of Kuri's educational background and overall intelligence. He sufficiently conveyed the suffering and loss he experienced while detained in Cook

---

[9]Although the Defendants presented a few cases where loss of normal life damages were broken out separately, none were brought under § 1983 for constitutional violations, so they are of limited relevance. *See* Defs. Rule 59 Mot. at 21-22.

County Jail for those three years, and he did not need to present expert testimony corroborating his own experience. The jury was free to credit what he testified to and the damages award was reasonable in light of that.

## C. Plaintiff's Motion to Pursue *Monell* Claims

Lastly, Kuri has also filed a motion. He moves to reopen discovery to pursue his *Monell* claims against the City of Chicago. Pl.'s *Monell* Mot. Early on in the litigation, one of the previously assigned judges granted an agreed motion to bifurcate Kuri's claims against the City and stay discovery and trial pending resolution of the claims against the individual defendants. 11/24/2014 Minute Entry. Kuri argues that he should now be allowed to pursue his "independent, non-derivative" claims against the City under *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978). Pl.'s *Monell* Mot. ¶ 2. The City opposes the motion and counters that "there is no remaining case or controversy." R. 354, City Resp. at 1.

The City is correct. Kuri cannot recover anything from the City above what he is able to recover against Folino and McDermott. *Spanish Action Comm. of Chi. v. City of Chi.*, 766 F.2d 315, 321 (7th Cir. 1985) (explaining that a plaintiff's award in § 1983 suit would not increase if additional defendants were added because "compensatory damages can only be collected once"); *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 895-96 (N.D. Ill. 2000). Also, an Illinois statute requires municipalities to indemnify their employees for compensatory damages awarded in tort judgments. *See* 745 ILCS 10/9–102. The Seventh Circuit has held that, under this statute, a plaintiff may seek a judgment against a municipality requiring it to indemnify the officer. *Wilson v. City of Chicago*, 120 F.3d 681, 684–85 (7th Cir. 1997).

So, there is no question that the City will pay the compensatory damages award if it is affirmed.

In other words, Kuri is virtually certain to collect his compensatory damages award of $4 million against Folino and McDermott (and, eventually, the attorneys' fees) pending any appeals. Indeed, the Court has already entered judgment on the compensatory damages award against the City for those claims on which Kuri was successful. R. 313, 10/03/2018 Judgment. Since Kuri is not able to collect anything in addition to that, regardless of any *Monell* claims, and since he has not brought claims against the City for injunctive relief, there is no live case or controversy against the City on which Kuri can move forward. The Court has no subject-matter jurisdiction over Kuri's *Monell* claims. The motion is denied, though it is without prejudice if the City somehow disclaims payment on the compensatory damages award.

## IV. Conclusion

For the reasons discussed, the defense's post-trial motions are denied. Kuri's motion to re-open the *Monell* claim is also denied, and the *Monell* claim is dismissed without prejudice as moot. The status hearing of September 11, 2019 is vacated.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 5, 2019